## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRISK INSURANCE SERVICES LLC,<br>4331 Hillcrest Road<br>Billings, MT 59101-9361,<br><br>                     Plaintiff,<br><br>    v.<br><br>FEDERAL CROP INSURANCE<br>CORPORATION,<br>1400 Independence Avenue SW<br>Washington, DC 20250,<br><br>RISK MANAGEMENT AGENCY, an<br>agency of the United States Department of<br>Agriculture,<br>1400 Independence Avenue SW<br>Washington, DC 20250, and<br><br>PATRICIA SWANSON, in her official<br>capacity as Manager of the Federal Crop<br>Insurance Corporation and as Administrator<br>of Risk Management Agency,<br>1400 Independence Avenue SW<br>Washington, DC 20250,<br>                     Defendants. | Civil Action No.: 1:26-cv-842 |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Brisk Insurance Services LLC brings this action against defendants Federal Crop Insurance Corporation ("FCIC"); Risk Management Agency ("RMA"), an agency of the United States Department of Agriculture; and Patricia Swanson, in her official capacity as Manager of Federal Crop Insurance Corporation and as Administrator of Risk Management Agency.

## <u>NATURE OF THE ACTION</u>

1. Under the Federal Crop Insurance Program ("FCIP"), if a private insurance company enters into a Standard Reinsurance Agreement ("SRA") with FCIC, it becomes an

Approved Insurance Provider ("AIP"). AIPs are authorized to sell crop and livestock insurance policies to agricultural producers. FCIC subsidizes the insurance premiums and regulates and reinsures the policies.

2.      In accordance with the Federal Crop Insurance Act (7 U.S.C. §§ 1501-24) and SRA, FCIC pays AIPs an administrative and operating expense subsidy ("A&O") to deliver the federal crop and livestock insurance policies. From that amount, AIPs pay compensation to insurance agents to sell and service the AIPs' policies. Effective for the 2011 and succeeding SRAs, RMA and AIPs agreed to amend the SRA to impose an annual cap on the amount of compensation an AIP can pay to agents. When questions arose as to what constitutes "compensation" under the new cap, RMA issued its determination through a series of documents called Manager's Bulletins. In Manager's Bulletins MGR-10-011 and MGR-10-011.1, RMA listed items that, in its judgment, do and do not constitute agent compensation. One item that RMA said did *not* constitute agent compensation is policy administration software that AIPs provide to agents because such software is a necessary tool for agents to service the policies.

3.      In 2022, two policy administration software developers, Bozic LLC ("Bozic") and Watts and Associates, Inc. ("Watts"), contemplated forming a business venture, Brisk Insurance Services LLC ("Brisk"), that would develop and license software to AIPs, who in turn would provide that software to certain of the many insurance agencies employed by them, namely, eight Farm Credit associations ("Farm Credit") (but not non-Farm Credit agencies). Before investing in Brisk, Bozic and Watts wanted to confirm that AIPs' service-fee payments to Brisk for its software under this new business model would not constitute agent compensation as defined by RMA because, otherwise, the AIPs would not be interested.

4.      Bozic and Watts proactively contacted RMA and disclosed the details of their proposed business model, including that AIPs would provide Brisk's software only to Farm Credit, and that Farm Credit would advance funds to Brisk, which Brisk would later refund with AIP payments to it. RMA confirmed in multiple letters that the AIP payments to Brisk would not constitute agent compensation, consistent with MGR-10-011 and MGR-10-011.1, and were otherwise compliant with the SRA and RMA's regulations.

5.      In reliance on RMA's confirmation of its prior determination, Brisk, through affiliates, hired over 50 staff members and spent nearly $20 million to develop the software and otherwise build and operate the company. It entered into major contracts with Farm Credit and four AIPs. It undertook a two-year process to obtain SOC 2 certification, an independent cybersecurity and data-handling compliance standard. In February 2025, its software went live.

6.      Brisk's competitors—specifically, AIPs who chose not to partner with Brisk, and non-Farm Credit agents who could not use the new Brisk software—increasingly began to mount political pressure on RMA, looking for any excuse to remove Brisk from the marketplace.

7.      Bowing to this industry pressure, on February 20, 2026, RMA issued a bulletin (MGR-26-002) targeting and effectively destroying Brisk's business. MGR-26-002 reaffirmed the existing "policy administration software" carveout to the agent compensation cap but stated such software *will* constitute agent compensation where (i) an agent funds the software developer; (ii) an agent can control the software developer's work; or (iii) an AIP provides the software to less than 100% of its agents. RMA thus created three new exceptions *just* specific enough to largely preserve the carveout but simultaneously to prevent Brisk from being able to continue its current business model under the carveout. And even worse, the three exceptions are *precisely* the scenarios RMA previously represented to Brisk did *not* involve agent compensation.

3

8.      MGR-26-002 is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law for two main reasons. First, it fails to comply with the change-in-position doctrine because it fails to acknowledge the change from RMA's prior policy, it provides no "good reason" (let alone any reason) for the change, and it completely ignores Brisk's significant reliance interests that RMA induced. Second, MGR-26-002 is irrational and illogical on its face. Because policy administration software is and remains a necessary tool for agents to administer AIPs' policies (hence why it is not considered agent compensation), it makes no sense to "deem" it agent compensation in the three scenarios identified by RMA.

9.      Brisk brings this action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, to have MGR-26-002 declared arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law and to set it aside as unlawful agency action.

## **PARTIES**

10.      Brisk is a Delaware limited liability company with its principal place of business located at 4331 Hillcrest Road, Billings, MT 59101.

11.      Defendant FCIC is a government corporation of the United States Department of Agriculture that has overall authority for the FCIP.

12.      Defendant RMA is an agency of the United States Department of Agriculture that manages the FCIP on the FCIC's behalf.

13.      Defendant Patricia Swanson is the Manager of FCIC and Administrator of RMA. She is sued in her official capacity only as the signatory of RMA's Manager's Bulletins.

14.      All defendants are headquartered at 1400 Independence Avenue SW, Washington, DC 20250.

**JURISDICTION AND VENUE**

15.     The Court has subject matter jurisdiction over this action under (i) 7 U.S.C. § 1506(d), because the Court has exclusive original jurisdiction of all suits brought against FCIC (and, by extension, RMA); and (ii) 28 U.S.C. § 1331, because this case arises under the laws of the United States, including but not limited to the Federal Crop Insurance Act, 7 U.S.C. § 1501 *et seq.* and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

16.     Venue is proper in this Court under (i) 7 U.S.C. § 1506(d), which provides that FCIC (and, by extension, RMA) may be sued in this Court; and (ii) 28 U.S.C. § 1391(e)(1), because all the defendants reside, and a substantial part of the events giving rise to this action occurred, in this District.

**FACTUAL BACKGROUND**

A.     **The Federal Crop Insurance Program**

17.     FCIC, through its operating arm, RMA, administers the FCIP, a public-private partnership.

18.     FCIC has the authorities under the Federal Crop Insurance Act, but its authorities are carried out by RMA. For the purposes herein, FCIC and RMA are used interchangeably.

19.     Under the FCIP, AIPs sell crop and livestock insurance to agricultural producers, such as farmers and ranchers.

20.     FCIC subsidizes the insurance premiums and provides reinsurance and A&O subsidies to the AIPs.

21.     An AIP's participation in the FCIP is governed by the SRA that each AIP is required to enter into each reinsurance year.

22.     The AIPs use licensed insurance agents to sell and service policies on AIPs' behalf.

23.     For the agents' services, AIPs pay agent compensation in accordance with the SRA.

24.     Such agent compensation is generally based on a percentage of the premium earned by the crop and livestock insurance policies sold and serviced by the agent.

25.     Under 7 U.S.C. § 1507(c), agents control the policies and may move them to any AIP willing to accept the business, so compensation and service by AIPs is key to agent retention.

**B.      RMA implemented a cap on agent compensation to ensure AIPs remained solvent.**

26.     The premium an AIP may charge a producer for FCIC-reinsured products is established by RMA, meaning AIPs cannot compete with one another on price.

27.     Unable to compete on price, AIPs compete on service, historically paying increasingly exorbitant commissions to agents in an effort to have those agents direct more business to them. AIPs relied on underwriting gains to service its policies and adjust losses.

28.     In 2002, American Growers Insurance Company, one of the then-largest AIPs, became insolvent after paying out excessive agent compensation, and was ordered into liquidation.

29.     Specifically, American Growers paid out more in agent compensation than it received in A&O subsidies, and it was projected to have an underwriting loss, such that it lacked sufficient funds to service its policies and adjust losses.

30.     To ensure that, in underwriting-loss years, AIPs have adequate funds to service policies and adjust losses, RMA and AIPs agreed to amend the SRA effective for the 2011 and succeeding reinsurance years to impose an annual, per-state cap on "[c]ompensation to persons involved in the direct sale and service of any eligible crop insurance contract under [the SRA]," *i.e.*, insurance agents. (SRA, § III(a)(4)).

31.     The cap is as follows: "[I]n any State in which [an AIP] is doing business, the [AIP], its MGA, or any affiliate shall not pay total compensation in excess of 80 percent of the total amount of A&O subsidy and CAT LAE … for such State." (*Id.*, § III(a)(4)(B)).

32.     The SRA defines "compensation" as, "for any reinsurance year, commissions, salary, profit sharing, and other forms of payment including, but not limited to, transfer or other types of bonuses, consulting fees, loans, advance payments, deferred payments, cooperative advertising, and any monetary or non-monetary benefits of value, except for those benefits required by law, in accordance with FCIC procedures." (*Id.*, § I).

33.     The SRA states that, if an AIP pays agent compensation in excess of the cap, "[the AIP] will be subject to any sanction described in [the SRA] or applicable regulations." (*Id.*, § III(a)(4)(E)).

34.     The SRA further states that "[a]ny scheme or device to circumvent the [agent compensation cap] will be considered a violation of this [SRA]." (*Id.*).

**C.     RMA determined that AIPs' provision of insurance policy administration software to agents does not constitute agent compensation.**

35.     RMA may release "bulletins" that, according to its website, "provide program-related information to [AIPs] to administer the terms of the policy to the insured producers, to inform and/or request information from the public."

36.     One such type of bulletin is a "Manager's Bulletin," a "[n]umbered bulletin[] issued by RMA's Administrator's office which may change procedures."

37.     Per the SRA, Manager's Bulletins are binding on AIPs. (SRA, §§ I, III(a)(4)).

38.     On September 13, 2010, RMA issued Manager's Bulletin MGR-10-011, entitled "Guidance Regarding SRA Section III(a)(4)—Agent Compensation" ("MGR-10-011"), to address questions raised regarding what constitutes agent compensation. (Ex. A).

7

39.     In MGR-10-011, RMA identified items it believed to constitute or not constitute agent compensation. (*Id.* at 1-3).

40.     Items constituting agent compensation included but were not limited to commissions, salary, profit sharing, bonuses, and consulting fees. (*Id.*, ¶ 1(a)-(e)).

41.     MGR-10-011 stated that an AIP paying a service provider for policy administration software does *not* constitute compensation because such software is "necessary to operate the [AIP] business": "The following items do not constitute compensation[:] … An AIP's payment to a third party for license fees for software, office equipment (including, but not limited to, computers), and other items necessary to operate the business." (*Id.*, ¶ 2(h)).

42.     MGR-10-011 reiterated that "RMA's purpose in limiting agent compensation" is "in particular, preserving the solvency of AIPs." (*Id.*, ¶ 14).

43.     On October 29, 2010, RMA issued Manager's Bulletin MGR-10-011.1, also entitled "Guidance Regarding SRA Section III(a)(4)—Agent Compensation" ("MGR-10-011.1"). (Ex. B).

44.     MGR-10-011.1 states that it provides "necessary modifications" to MGR-10-011 to address numerous issues raised by AIPs after its release. (*Id.* at 1).

45.     MGR-10-011.1 revised the "software" carveout as follows: "Computer software, including licensing fees, provided by an AIP to an agent, agency, or affiliate for providing eligible crop insurance contract premium quotes to producers or performing the processing tasks identified in paragraph 11, except that payments for such software paid to an agent, agency, or affiliate who sells or services eligible crop insurance contracts written by the AIP will be deemed to be compensation." (*Id.*, ¶ 2(g)).

46.     The referenced "processing tasks identified in paragraph 11" are as follows:

8

(a)    "Processing" includes, but is not limited to, the performance of all of the following tasks:

(i)    Beginning in the 2012 and continuing in subsequent reinsurance years, scanning, faxing, mailing, or otherwise providing original eligible crop insurance contract documents or legible copies of such documents to the AIP;

(ii)    The entry of electronic data at the eligible crop insurance contract level (including data necessary to comply with FCIC procedures); and

(iii)    The transmission of eligible crop insurance contract data to the AIP in a format that is compatible with the AIP's system for transmitting data to RMA.

(*Id.*, ¶ 11(a)(1)-(3)).

47.    In August 2011, RMA reiterated that the policy administration software referenced in ¶ 2(g) of MGR-10-011.1 does not constitute compensation because it is a "necessary" "tool[]" for agents to service AIPs' insurance policies.

48.    Specifically, on August 25, 2011, and as revised on August 7, 2017, RMA issued a memorandum entitled "Agent Compensation – Schemes or Devices," which it posted on the FAQ section of its website ("FAQ Memorandum"). (Ex. C).

49.    In explaining why AIPs providing free map books to agents does not constitute compensation, the FAQ Memorandum used policy administration software as a comparison point:

An AIP wishes to provide its agents free map books with Common Land Units (CLUs) for completing Acreage Reports. This would not be considered compensation because such map books are tools, similar to the software that is not considered compensation under [¶ 2(g)], necessary for the agent to perform the tasks to service eligible crop insurance contracts.

(*Id.*).

9

**D.    Bozic and Watts considered developing a single software platform that could be used for servicing multiple AIPs' policies.**

50.    Each AIP has its own software/portal through which an insurance agent can service the AIP's policies, including but not limited to obtaining insurance quotes, completing policy applications, completing various insurance forms, and reporting planted acreage and harvested crop production.

51.    Each such software/portal is unique and requires specialized training.

52.    There also are third-party service providers that provide similar software to insurance agencies, such as Bozic and Watts.

53.    Bozic develops quoting and analytical software and training materials/instructions for agencies selling federal livestock insurance.

54.    Watts provides similar services for agencies selling federal crop insurance.

55.    Bozic and Watts discovered that their common clients, *i.e.*, agencies selling both livestock insurance and crop insurance, were interested in a single software and training program that would address both livestock insurance and crop insurance.

56.    Specifically, Farm Credit expressed an interest in such a single software and training program.

57.    Farm Credit is a group of major financial institutions across the country providing credit to agricultural producers, all of which institutions are licensed as insurance agencies selling FCIP policies. They are collectively among the largest livestock insurance and crop insurance agencies in the country.

58.    Farm Credit is unique among livestock insurance and crop insurance agents because it is regulated by a separate federal agency, the Farm Credit Administration, under The Farm Credit

10

Act of 1971. This separate regulatory umbrella is designed to safeguard all aspects of these organizations' financial activities.

59.     One such regulation is that Farm Credit, unlike other agents, must make a reasonable and good-faith effort to offer livestock insurance and crop insurance through at least two AIPs, *see* 12 C.F.R. § 618.8040(b)(4)(v), whereas most agents offer such insurance only through a single AIP.

60.     Because of this regulatory requirement, Farm Credit agents have to learn how to navigate and use at least two distinct AIP software programs/portals. Functionally, because of their size and diverse producer needs, Farm Credit agencies deal with many more than two AIPs to best serve their policyholders.

61.     Under these circumstances, it is far easier and more cost-efficient for Farm Credit to train its agents on how to use just one software and training program.

62.     With Farm Credit expressing an interest in a single software and training program, Bozic and Watts contemplated forming a new entity to achieve that objective (which later became Brisk).

63.     Specifically, Brisk would contract with AIPs, who would pay Brisk a service fee for development and access to Brisk's software and training programs, and AIPs would provide this software and training programs to their Farm Credit agents.

> **E.     In reliance on ¶ 2(g) and RMA's confirmation that payments made by AIPs to Brisk under Brisk's proposed business model would not constitute agent compensation under ¶ 2(g), Brisk moved forward with its operations.**

64.     Before Bozic and Watts invested substantial funds and time into the Brisk business venture, they wanted to ensure it complied with the SRA and RMA's regulations.

65.     Specifically, they wanted to ensure that the service fees AIPs would pay to Brisk would not constitute agent compensation. Bozic and Watts knew that, if the fees were viewed by AIPs as constituting agent compensation, the AIPs would not be interested in participating because paying the fees could push the AIPs over the agent compensation cap, requiring them to reduce commissions paid to agents, potentially losing their business.

66.     Bozic and Watts began by consulting with their respective legal consultants.

67.     Bozic's consultant, Kimberley Arrigo of Arrigo Risk Consulting PLLC, is a retired attorney who worked at the USDA's Office of General Counsel for several decades and was assigned to RMA.

68.     Watts' consultant, Kenneth D. Ackerman, an attorney at the law firm of Olsson Frank Weeda Terman Matz PC, was an RMA Administrator from 1993 to 2001.

69.     In separate written legal opinions provided to Bozic and Watts in early August 2022, Arrigo and Ackerman both opined that the fees AIPs would pay to Brisk under Brisk's proposed business venture would *not* constitute agent compensation under the SRA because of the "software" exception set forth in ¶ 2(g) of MGR-10-011.1.

70.     On August 9, 2022, Bozic and Watts contacted RMA, sending an email, along with an attached memorandum, advising RMA of the contemplated business venture in which Brisk would contract with AIPs, and seeking formal guidance before proceeding.

71.     Bozic and Watts attached the two legal opinions to the email, advising RMA that Arrigo and Ackerman "have both, independently, reached the same conclusion that AIP payments to [Brisk] to provide training and analytical/integration software do not constitute indirect agent compensation."

12

72.   The email concluded, "Before we proceed, we want to inform you of our intentions and respectfully request formal guidance from your department so we have legal certainty before we invest in the business."

73.   The memorandum laid out a detailed description of the proposed business venture, including that the business would provide software services only to Farm Credit agents.

74.   The "Request" set forth in the memorandum was Brisk explicitly asking RMA if Brisk's proposed business model—AIPs making payments to Brisk for software services to be provided only to Farm Credit agents—would constitute agent compensation:

> Based on the information above we would like your legal advisory opinion on the compatibility of the proposed business model with the SRA rules on agent compensation limits. Does anything in the above proposal constitute an indirect form of agent compensation? Is this proposed structure in any way in conflict with the current regulatory guidance?

75.   RMA responded to Brisk's request in a letter dated September 7, 2022. In this response, RMA made clear that such payments to Brisk would *not* constitute agent compensation: "[RMA] has reviewed the information provided regarding your proposal to establish Brisk … as [a] service provider[] to [Farm Credit]. As of this date, RMA has not detected any violations of the [SRA] in the structure or operation you are proposing to establish." (Ex. D).

76.   Over the next few months, as Brisk worked with Farm Credit to refine the framework of the business model, a few minor non-substantive changes, and one substantive change, to the business model arose.

77.   Because Brisk at all times wanted to be fully transparent with RMA, Brisk disclosed those changes to RMA.

78.     On December 5, 2022, Brisk sent an email to RMA—along with another memorandum and legal opinion from Arrigo—advising that Farm Credit was going to initially fund Brisk so Brisk could start developing its software before receiving AIP service fees.

79.     Brisk asked RMA whether, once Brisk later contracted with the AIPs and the AIPs started paying for the software, Brisk could use those AIP payments to refund Farm Credit the amounts it paid, plus interest at the U.S. Prime Rate, without running afoul of the SRA.

80.     Arrigo's second legal opinion opined that the AIPs, through Brisk, refunding Farm Credit would not constitute agent compensation.

81.     On December 22, 2022, RMA sent a letter to Brisk confirming that Farm Credit funding Brisk, and Brisk later repaying Farm Credit with AIP funds, would not constitute agent compensation or otherwise violate the SRA:

> [RMA] has reviewed the information provided regarding your proposal revision to have [Farm Credit] pre-pay fees for new services that would be created by Brisk, including the universal quoting front-end and the new agent software training platform. Brisk would then consider repaying [Farm Credit] the prepaid fees, possibly with interest once the approved insurance providers (AIPs) establish service contracts and make payments to Brisk. Basically, [Farm Credit] will be financing the Brisk start-up costs with the expectation of repayment.
>
> Brisk understands that paying interest rates that exceed market rates would be a form of indirect rebating and is considering using the U.S. Prime Rate[.] …
>
> Brisk has requested RMA's review of the proposal revision to determine whether the repayment of funds provided by [Farm Credit] is compliant with the Standard Reinsurance Agreement (SRA). As of this date, RMA has not detected any violations of the SRA with regards to [Farm Credit's] financing and Brisk repayment in the proposal revision.

(Ex. E).

82.     With now both the September 7, 2022 and December 22, 2022 letters from RMA approving Brisk's business model as compliant with the SRA, including by confirming that AIP payments to Brisk would not constitute agent compensation consistent with RMA's prior

determination in MGR-10-011 and MGR-10-011.1, Bozic and Watts proceeded with the Brisk venture.

83.     After months of extensive negotiations, on September 15, 2023, Brisk executed a Master Software Development and Related Services Agreement ("MSA") with Farm Credit.

84.     Under the MSA, and as Brisk had disclosed to RMA, Farm Credit would prepay service fees to Brisk, which, if certain circumstances were met, Brisk would repay to Farm Credit with funds provided by AIPs to Brisk pursuant to Brisk's anticipated future contracts with the AIPs.

**E.       After obtaining further RMA approval, Brisk signed contracts with four AIPs.**

85.     Having negotiated and executed the MSA with Farm Credit, Brisk then turned to the negotiations with AIPs.

86.     As Brisk considered the structure of the service fees AIPs would pay to it, Brisk again approached RMA to ensure the proposed structure would be SRA-compliant.

87.     On October 4, 2023, RMA and Brisk had a meeting to discuss the fee structure.

88.     The next day, Brisk sent a letter to RMA identifying the proposed fee structure and asking RMA to confirm that the fee structure was SRA-compliant.

89.     On November 7, 2023, Brisk had a meeting with RMA leadership and one AIP (American Agricultural Insurance Company).

90.     On November 28, 2023, RMA sent a letter to Brisk that responded to Brisk's October 4, 2023 letter, in which RMA confirmed that it had "not detected any violations of the [SRA] with the services Brisk will provide under contract with an AIP," including as to the proposed fee structure. (Ex. F).

91.     With that additional RMA approval, over the next year-plus from January 2024 through January 2025, Brisk executed a multi-year Services Agreement with each of four AIPs

15

("AIP Agreements"): (i) American Agricultural Insurance Company ("AmericanAg"); (ii) Great American Insurance Company ("Great American"); (iii) Rural Community Insurance Company ("RCIC"); and (iv) QBE Americas, Inc. ("NAU") (together, the "Four AIPs").

92.    Under the AIP Agreements, each AIP agreed to pay Brisk service fees to license Brisk's software and for related services, which the AIPs would provide to their respective Farm Credit agents.

93.    The Four AIPs each independently sought, and obtained, RMA confirmation that their proposed business arrangement with Brisk did not run afoul of the SRA, including that the payments to Brisk did not constitute agent compensation.

94.    For example, on February 13, 2025, RMA sent a letter response to NAU stating that, with respect to the proposed agreement between Brisk and NAU, "[a]s of this date, RMA has not detected any violations of the [SRA] in the structure or operation proposed."

95.    On information and belief, the Four AIPs each also independently conducted their own internal compliance and due diligence checks with their own and outside counsel.

**F.    Brisk expended substantial funds and time in developing its software and otherwise building and operating the company.**

96.    Meanwhile, after RMA provided its third and final approval letter to Brisk in November 2023, and in reliance on those three approval letters, the "software" carveout in ¶ 2(g) of MGR-10-011.1, the FAQ Memorandum, and Brisk's consultants' legal opinions, Brisk started expending substantial funds and, through Bozic and Watts, started hiring numerous staff members to develop the software program and otherwise serve Brisk.

97.    Since January 2024, Brisk has spent about $19.7 million developing the software and otherwise building and operating the company.

98.    Also starting in January 2024, Brisk, through service contracts with affiliated companies, hired over 50 staff members to serve Brisk.

99.    Specifically, Brisk signed service contracts with Bozic and Watts, and Bozic in turn signed a service contract with Bozic Europe d.o.o., for Watts, Bozic, and Bozic Europe to hire employees to work on the Brisk venture.

100.    Watts, Bozic, and Bozic Europe have together hired over 50 full-time employees to work on the Brisk venture.

101.    Since January 2024, those 50+ employees have spent over 150,000 hours working on the Brisk venture, including but not limited to software development, agent training, and management.

102.    Brisk also undertook a two-year process to obtain SOC 2 certification—an independent cybersecurity and data-handling compliance standard—so Brisk could (i) securely handle the Personally Identifiable Information of agricultural producers as contemplated by RMA's own guidance to Brisk, and (ii) establish enterprise-grade IT infrastructure including two real-time redundant data centers in geographically separate locations to ensure continuous availability of the platform to AIPs and their agents.

103.    After over a year of development, in early February 2025, Brisk finalized and released the first version (1.0) of its proprietary software, Brisk WorkSpace ("BWS").

104.    BWS is a web-based software tool compatible with certain AIP systems that enables insurance agents to quote premiums for and service livestock insurance and crop insurance policies issued by those AIPs.

105.    BWS improves upon existing AIP systems by (i) offering advanced analytics that help agents have informed discussions with producers regarding the optimal insurance

coverage choices; and (ii) allowing agents to be more efficient, by using the same system for servicing policies placed with multiple AIPs.

106. Brisk planned to release the next set of BWS modules in Spring or Summer of 2026, and has invested heavily in the development and creation of these modules. The successor modules are currently in the development pipeline.

**G.  Reacting to industry concerns, RMA started looking for ways that Brisk's business model might not be SRA-compliant.**

107. Since Brisk implemented its business model, AIPs who chose not to partner with Brisk, and livestock insurance and crop insurance agents other than Farm Credit, have put immense pressure on RMA to find a way to remove Brisk from the marketplace—not because Brisk is harmful to producers (they benefit from the software) but because Brisk, through its innovative software, makes those other AIPs and agents less competitive.

108. On May 29, 2025, RMA sent an email to Brisk stating, "[USDA] Administrator Swanson would like to set up a time to meet with [Brisk] to discuss some concerns that have been raised by the industry regarding [Brisk]."

109. On June 4, 2025, RMA and Brisk held a meeting to discuss those industry concerns, namely a flurry of social media posts regarding a relationship between Farm Credit agencies and only a subset of AIPs, but also complaints directly from AIPs and agents.

110. At no point during (or after) that meeting did RMA inform Brisk that it was in violation of the SRA.

111. On July 28, 2025, RMA and Brisk had another meeting, at which RMA advised that it was still reviewing the issue.

112. On August 26, 2025, RMA told Brisk it was reviewing whether AIP payments to Brisk were subject to a certain 5% cap.

113.   For context, per MGR-10-011.1, AIP payments to agents for the "cost of processing" are not deemed compensation up to and including 5% of the A&O subsidy and "CAT LAE." (Ex. B, ¶ 11).

114.   RMA was considering whether that 5% cap applicable to AIP payments to agents also was applicable to AIP payments to service providers, such as Brisk.

115.   Brisk responded that the 5% cap applies only to AIP payments to agents, and provided another memorandum from Arrigo reaching that same conclusion.

116.   RMA never responded to Brisk, never said that Brisk's interpretation of the 5% cap was incorrect, and never again raised the issue of the 5% cap allegedly applying to Brisk.

117.   RMA also raised the issue of whether Brisk's business model raised a certain conflict of interest under § 508(h) of the Federal Crop Insurance Act. But after Brisk provided RMA with certain information responsive to the question, RMA ultimately let that potential issue go, too.

118.   On November 20, 2025, RMA issued Manager's Bulletin MGR-25-009, entitled "Agent Compensation - Third Party Software Payments" ("MGR-25-009"). (Ex. G).

119.   MGR-25-009 requested that AIPs provide RMA, within 10 business days, with certain specified "documentation for third party computer software and licensing fees paid for and provided by an AIP to an agent … for the 2026 reinsurance year [i.e., July 1, 2025 to June 30, 2026]." (*Id.*).

120.   The requested documents in no way implicated the aforementioned 5% cap or § 508(h) issues, such that RMA apparently no longer had any alleged concerns about those issues.

121.   Notably, Brisk had already long ago proactively provided to RMA all the documents requested by MGR-25-009.

122. MGR-25-009 reiterated that the purpose of the cap on agent compensation was to ensure AIP solvency: "Agent compensation limitations were first implemented for the 2011 reinsurance year. These limitations were added as a result of an [AIP] which failed after paying out more agent compensation than it received in [A&O] during a high loss year. To ensure AIPs have enough funds to service policies and adjust losses, the SRA includes a cap on agent compensation[.]" (*Id.*).

123. AIPs, including the Four AIPs, provided RMA with the documents requested by MGR-25-009.

124. At a December 16, 2025 meeting between RMA and Brisk, RMA made no indication that it believed Brisk to not be SRA-compliant.

**H.    RMA issued MGR-26-002, which arbitrarily and capriciously deems all AIP payments to Brisk to constitute agent compensation, a complete reversal of prior RMA policy and RMA's multiple assurances to Brisk and the Four AIPs.**

125. Following its purported review of the documents provided in response to MGR-25-009, without any notice to Brisk, and without any documented record as the basis for its decision, on February 20, 2026, RMA issued Manager's Bulletin MGR-26-002, entitled "Agent Compensation - Third Party Software Payments" ("MGR-26-002"), essentially a death sentence for Brisk that deems all payments made by AIPs to it to be agent compensation. (Ex. H).

126. MGR-26-002 initially states that RMA "determined that additional guidance is warranted with respect to arrangements between [AIPs] and service providers that provide policy administration software and support services primarily for the benefit of certain agents and agencies." (*Id.*).

127. It further states that "[t]he purpose" of MGR-26-002 is to "remind" FCIP participants of the SRA's definition of "compensation." (*Id.*).

128.    Although the subject matter of MGR-26-002 is "policy administration software" and its title refers to "[s]oftware [p]ayments," MGR-26-002 astonishingly never mentions ¶ 2(g) of MGR-10-011.1, which states that policy administration software does *not* constitute agent compensation. (*Id.*).

129.    Notably, ¶ 2(g) states that policy administration software provided to "an" agent of an AIP—not "all" agents of an AIP—is not compensation. (Ex. B, ¶ 2(g)).

130.    Yet, MGR-26-002, without even referencing ¶ 2(g), purports to revise it by stating that, from this point forward, the providing of policy administration software will be exempt from the agent compensation cap *only if* an AIP provides it to *all* of its agents: "[A]n AIP may enter into an agreement with an independent service provider to deliver general policy administration software and support services on behalf of the AIP to all of the AIP's agencies, and payments made by the AIP to the service provider under those circumstances will, as a general matter, not be considered compensation under the SRA." (Ex. H).

131.    In addition to that new "non-exclusivity" carveout to ¶ 2(g), MGR-26-002 creates two other new carveouts—a "funding" carveout and "control" carveout—under which policy administration software will now be "deemed"—notably, not "is"—agent compensation:

> [P]ayments made by an AIP to a service provider for policy administration software and support services will be deemed a benefit of value and considered compensation under the SRA if any of the following conditions apply: (1) The service provider is funded in whole or in part by an agency or group of agencies that receives the benefit of the software and services; (2) An agency or group of agencies receiving the benefit of the software and services has authority to control the service provider's work; or (3) The software and support services are provided to a select agency or group of agencies rather than being available to the AIP's entire agency force.

(*Id.*).

132.    MGR-26-002 concludes that, "[e]ffective for the 2027 and succeeding reinsurance years"—*i.e.*, starting on July 1, 2026—"third party-software and support relationships meeting the criteria above will be considered agent compensation." (*Id.*).

133.    MGR-26-002 does not acknowledge that it constitutes a change to RMA's prior determination as set forth in, among other places, ¶ 2(g) of MGR-10-011.1, the FAQ Memorandum, and the multiple RMA approval letters sent to Brisk and certain AIPs that contracted with Brisk.

134.    MGR-26-002 identifies no reasoning, rationale, justification, or other basis for any of those three carveouts to ¶ 2(g), *i.e.*, for why policy administration software—otherwise always deemed non-compensation under ¶ 2(g)—should now arbitrarily be "deemed" compensation in those three specified scenarios, nor does it provide a rationale for why this reversal in position is necessary to ensure AIP solvency given that the use of such software is still necessary to service the crop and livestock insurance policies. MGR-26-002 also does not identify any documents, comments, or record as the basis for reversing its prior determination.

135.    That is, although policy administration software does not constitute agent compensation because it is a "tool[] … necessary for the agent to perform the tasks to service eligible crop insurance contracts" and thus "necessary to operate the [AIP] business," RMA does not explain why policy administration software, as such a "necessary" "tool," should *ever* be considered compensation, whether in the three specified scenarios or otherwise.

136.    As for the "funding" carveout, there is no logical reason why an agent *co-paying* for a necessary, administrative tool would somehow transform the tool from not being agent compensation into being agent compensation. If anything, it is just the opposite; an agent co-paying for something makes it *not* compensation because the agent gives up something in return

for it. It thus defies logic that an agent being provided software at no cost is not compensation but the agent co-paying for the software *is* compensation.

137.    As for the "control" carveout, that an agent using software has a say in how the software is configured—to, *inter alia*, suit the agent's needs and/or streamline the policy administration process—has no logical connection to whether the software constitutes compensation to the agent.

138.    As for the "non-exclusivity" carveout, it makes no sense that whether policy administration software constitutes agent compensation depends on whether an AIP provides it to 100% of its agent workforce.

139.    Using a fictitious example to illustrate that point, under MGR-26-002, if an AIP provides software to 99 of its 100 agents, the $1 million it pays to the service provider is deemed agent compensation. But if the AIP suddenly makes the software available to the 100th agent, then the $1 million is instantly reduced to $0 in agent compensation.

140.    The arbitrary nature of the "non-exclusivity" carveout is further evidenced by two inconsistencies in its interpretation. First, of all the various types of non-compensation specified under ¶ 2 of MGR-10-011.1, policy administration software is now the *only* item that, if provided by an AIP to less than 100% of its agents, is deemed compensation. Thus, if an AIP provides, for example, continuing education training, certain entertainment, or promotional items of nominal value, to less than 100% of its agents, those items still remain as non-compensation. There is no rational basis for distinguishing between policy administration software and all other items of non-compensation on this basis.

141.    Second, under MGR-26-002, if an AIP offers its own proprietary software—as opposed to software licensed from a service provider—to less than 100% of its agents, that AIP-

owned software does not count as compensation. AIPs routinely differentiate among their own agents in the provision of software access: some agents are granted direct-entry privileges to key policy information into the AIPs' own systems, while other agents must submit paper or electronic policy forms to the AIPs, which then keys the information internally. These two groups of agents receive materially different levels of software access and functionality from the same AIP, yet RMA has never suggested that providing direct-entry access to some agents but not others constitutes agent compensation. There is no rational basis for distinguishing between software developed in-house at AIPs and software provided by a third-party service provider when deciding whether to count the software as agent compensation because, in both instances, AIPs are expending funds on software development.

142. The lack of any rational connection between the three carveouts and the cap on agent compensation underscores what is really going on here: MGR-26-002 is not about the agent compensation cap or the cap's purpose of ensuring AIPs have adequate funds to service policies and adjust losses. It is about RMA—reacting to industry pressure—misusing the cap as a means to achieve objectives wholly unrelated to the cap, affecting the competitive balance within the AIP industry.

143. Although MGR-26-002 is targeted at Brisk, the bulletin astoundingly makes no mention of Brisk or how—as RMA is well aware—Brisk relied on ¶ 2(g) of MGR-10-011.1 and RMA's multiple assurances to Brisk that its proposed business model did not involve any agent compensation and was otherwise SRA-compliant.

144. Indeed, RMA previously told Brisk that it "has not detected any violations of the SRA" with respect to "[Farm Credit's] financing [of Brisk]," the business structure of Brisk "as [a] service provider[] to [exclusively] [Farm Credit]," or Brisk contracting with Farm Credit

(through which Farm Credit might have contractual control over some aspects of the software). (Exs. D, E).

145. With the three exceptions set forth in MGR-26-002, RMA has now deemed to involve agent compensation the *precise* scenarios it previously told Brisk did *not* involve agent compensation.

146. And yet, MGR-26-002 is completely silent on Brisk's reliance interests, any reason for RMA's about-face, and any documentation to support RMA's decision.

**I.        If MGR-26-002 remains in place, Brisk will cease to exist.**

147. The SRA requires each AIP to submit a "Plan of Operations" to RMA by April 1 of each year for the reinsurance year that starts on the following July 1. (SRA, § IV(f)(2)).

148. The Plan of Operations must identify every "service provider" the AIP will use for the upcoming reinsurance year. (Appendix II to SRA, § IV(c)).

149. AIPs must also provide information related to agent compensation with the Plan of Operations.

150. In light of MGR-26-002 that now deems AIP payments to Brisk to be agent compensation, Brisk believes it likely that none of the Four AIPs will include Brisk in their respective Plans of Operations that they will submit to RMA on or before April 1, 2026 for reinsurance year 2027 because of the issue of agent compensation.

151. Great American explicitly told Brisk it would not include Brisk in its Plan of Operations for reinsurance year 2027.

152. Although the other three AIPs (AmericanAg, RCIC, and NAU) have not yet provided Brisk with a definitive answer, they each separately told Brisk it is *not* their respective

intentions to include Brisk in their respective Plans of Operations for reinsurance year 2027 because of the issue of agent compensation.

153. If the Four AIPs exclude Brisk from their respective Plans of Operations and thus do not use Brisk's services for reinsurance year 2027, Brisk's revenue stream will come to almost a complete stop because virtually all its revenue comes from the Four AIPs.

154. Indeed, Brisk had projected that, starting with calendar year 2026, the AIP payments to Brisk would account for about **98.6%** of its revenue.

155. When the Four AIPs stop using Brisk, as early as July 2026, Brisk, through Watts, Bozic, and Bozic Europe, will have to start laying off the 50+ employees that serve Brisk.

156. Brisk would also need to start winding down its operations.

157. Brisk's entire business model is dependent on selling its software and services to AIPs. If AIPs cannot or will not use Brisk in light of MGR-26-002 because paying Brisk would cause them to exceed the cap on agent compensation, Brisk is—without hyperbole—finished.

### COUNT I – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 701 *et seq.*)

158. Brisk incorporates by reference all preceding paragraphs.

159. The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, entitles any person "adversely affected or aggrieved by agency action" to judicial review.

160. MGR-26-002 constitutes final agency action because it marks the consummation of RMA's decision-making process and determines legal rights.

161. Brisk is aggrieved by MGR-26-002 because, *inter alia*, MGR-26-002 has caused or will cause the Four AIPs to stop doing business with Brisk.

162. RMA violated the APA because MGR-26-002 is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" ("arbitrary and capricious").

163.    MGR-26-002 is arbitrary and capricious because, *inter alia*, (i) it fails to comply with the change-in-position doctrine; and (ii) it is irrational and illogical.

164.    Under the change-in-position doctrine, if an agency changes a prior policy, it must display awareness of the change, provide a good reason for the change, and take serious reliance interests into account.

165.    RMA failed to acknowledge the change from its prior policy (of policy administration software not constituting agent compensation); it provided no reason, let alone the requisite "good" reason, for the change; and it completely ignored Brisk's serious reliance interests, including but not limited to Brisk's reliance on ¶ 2(g) of MGR-10-011.1 and RMA's multiple letters confirming that AIP payments to Brisk would *not* constitute agent compensation.

166.    MGR-26-002 is irrational and illogical because, *inter alia*, as set forth above, there is no valid reason for deeming AIP payments to service providers for policy administration software—which otherwise are not agent compensation under ¶ 2(g) of MGR-10-011.1—to be agent compensation in the three scenarios identified in MGR-26-002.

167.    As a direct result of MGR-26-002, Brisk has been and will further be damaged because the Four AIPs will no longer do business with Brisk, causing Brisk to lose nearly 99% of its revenue and be put out of business.

WHEREFORE, Brisk respectfully requests that the Court (i) declare that MGR-26-002 is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (ii) set aside MGR-26-002 as unlawful agency action; and (iii) award Brisk its legal fees, expenses, and costs, and such other and further relief as the Court deems just and proper.

27

Respectfully submitted,

/s/ Charles A. Zdebski

Charles A. Zdebski (#451075)
Chad E. Kurtz (#1016934)
COZEN O'CONNOR
2001 M Street NW, Suite 500
Washington, DC 20036
Tel.: (202) 280-6528
czdebski@cozen.com
ckurtz@cozen.com
*Attorneys for Plaintiff,*

Dated: March 10, 2026                    *Brisk Insurance Services LLC*

28

## **VERIFICATION**

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 10, 2026.

Brisk Insurance Services LLC

By: _Connor Scharfe_
4724D87E18EB4AE...
Name: Connor Scharfe
Title: President and CEO