# Exhibit C



# Agent Compensation - Schemes or Devices

## Background

Section III(a)(4) of the Standard Reinsurance Agreement (SRA) sets forth limitations on compensation that Approved Insurance Providers (AIPs) may pay to persons involved in the direct sale and service of eligible crop insurance contracts. Specifically, section III(a)(4)(B) states that the AIP shall not pay total compensation in excess of 80 percent of the total amount of Administrative and Operating (A&O) expense subsidy by State. However, an AIP may pay compensation up to 100 percent of A&O subsidy in all states if certain conditions set forth in section III(a)(4)(C) are met. The primary condition that must be met under section III(a)(4)(C) is that the AIP must have been paid an underwriting gain for the particular reinsurance year. Section III(a)(4)(E) of the SRA states:

> **If FCIC discovers that the Company, its MGA, or affiliate has paid compensation in excess of the amounts allowed in subparagraphs (B) or (C), the Company will be subject to any sanction described in this Agreement or applicable regulations. Any scheme or device to circumvent the limitations in subparagraphs (B) or (C) will be considered a violation of this Agreement.**

The limitations on agent compensation were first implemented for the 2011 reinsurance year and continue to remain in effect. Since the implementation of these limits, the Risk Management Agency (RMA) has provided additional guidance and clarification on: (1) the types of payments that are or are not considered to be agent compensation; and (2) examples of actual or potential situations the RMA has identified or would consider to be "schemes or devices" to avoid the agent compensation limits. A scheme or device is defined as making a payment or providing a benefit that meets the requirements of agent compensation but not reporting it as such.

On October 29, 2010, RMA issued Manager's Bulletin MGR-10-011.1 (Bulletin) to provide guidance regarding what types of payments are considered agent compensation. On July 22, 2011, RMA issued Information Memorandum IS-11-006 (Memorandum) to provide examples of actual and potential schemes or devices identified by RMA. On August 25, 2011, RMA issued the first series of Frequently Asked Questions (FAQs) for Agent Compensation, Schemes or Devices on RMA's website. The FAQs provide continued guidance and clarification regarding schemes or devices to facilitate the accurate accounting of agent compensation and ensure expenditures are within the limits set forth in the SRA.

In general, any payment to an agent, or any entity owned in whole or part by an agent, that is either an inducement for the agent to move their book of business from one AIP to another or an incentive to dissuade an agent from moving its book of business to another AIP would be agent compensation. Therefore, unless a particular payment is specifically identified by the SRA or guidance to not be agent compensation, the payment should be considered agent compensation. If an AIPs agent compensation expense exceeds 80 percent for a particular State, then any excess payments would likely constitute a scheme or device (with the exception of those payments authorized in section III(a)(4)(C) of the SRA).

Nothing in the SRA, Bulletin, Memorandum, or FAQs, constitutes approval or disapproval by the RMA of any particular payment or benefit, nor prohibits any business practice or transaction by any AIP. AIPs are free to conduct business as they determine in their best interest, provided that it does not otherwise violate any other provision of the SRA.

Throughout these FAQs, the term "agent" will refer to both "agents" and "agencies" as defined in Section I of the SRA.

Just as RMA does not have the authority to approve or disapprove of the formation of a reinsurance entity, RMA does not have the authority to approve or disapprove of the formation of other agent-owned entities. Additionally, RMA does not have the authority to regulate the personal investment activity of an individual. Formation of such entities, as well as the personal investment activity of individuals who participate in the program, is governed by existing applicable State and Federal laws.

# Under what conditions is an acquisition by an AIP considered a scheme or device?

RMA has identified certain scenarios where an acquisition would be considered a scheme or device if payments to the seller are not counted as compensation. The following criteria assume that the seller is an agent, and that the acquiring AIP is making payments to the agent to acquire the entity. If the seller is not an agent, then the limitations set forth by section III(a)(4) of the SRA would not apply.

AIP payments to a seller for an acquisition **will be** considered a scheme or device if **any** of the following criteria are met:

1. The acquisition price exceeds the Fair Market Value (FMV) of the assets at the time of purchase and the price exceeding FMV is not reported as agent compensation. This includes both the fixed price if a single payment made at the time of purchase, or the present value of annual installment payments. If the price exceeds the FMV, then the "excess payment" will be deemed agent compensation. For example, if an entity's FMV at the time of purchase is $10 million, but an AIP pays the seller $12 million, the difference of $2 million will be considered agent compensation. A third party independent FMV assessment must be provided to RMA and be based on generally accepted accounting principles for valuing insurance assets.
2. The seller has not been completely divested of the business being sold to the AIP. Divestiture is defined as the condition that the seller must have no subsequent influence, interest, or control over the business sold. The buyer must not be a family member, and the transaction must be a legitimate "arm's length" transaction. There can be no subsequent shared office space, contact or affiliation between the seller and either the business sold or the AIP. Allowing the seller to remain affiliated in any way with the AIP that purchased the book of business provides a mechanism for abuse and will be considered a scheme or device unless counted as compensation.
3. The agency acquisition terms are based on increasing annual installment payments associated with an increase in the total premium volume of the book of business. However, terms that only provide for decreasing annual installment

payments associated with a decrease in the total premium volume of a book of business, thereby reflecting a reduced market value, are not considered a scheme or device.

For non-agency acquisitions, annual installments payments that are not fixed and directly based on the purchase price at the time of the sale, which as stated in criteria number two, must be based on FMV of the assets. If there are subsequent adjustments in any annual installment payment other than what was agreed to at the time of sale, then the seller might have an incentive to channel premium volume through the entity, and RMA would consider these payments to be a scheme or device unless counted as compensation.

4. The acquisition terms include any type of buy-back clause or provision whereby the seller could repurchase the entity at any future date. Further, even if the acquisition terms do not include a buy-back provision, if the seller repurchases the entity, the acquiring AIP's original purchase price will be deemed compensation for those reinsurance years in which payments are made as part of the purchase agreement and may require accounting adjustments in accordance with the SRA for those years. In the case of an agency acquisition, the agent is receiving additional payments or benefits for servicing the same book of business, the purchase price and commissions, salaries, bonuses, etc. There is no way to prove the original sale was legitimate so this is considered a scheme or device unless counted as compensation.

5. An AIP acquires an agency and the seller pays a portion of the purchase price to the agents affiliated with the agency. In such cases the affiliated agents would be receiving additional payments for servicing the same book of business. Such payments would be considered a scheme or device unless counted as compensation.

There are numerous other transactions that could be related to acquisitions. It is impossible to list all of them here, as not every type of transaction that could arise can be envisioned. However, as a general rule, if the seller has the potential to receive additional payments or benefits from the AIP in addition to the acquisition, then RMA will consider all payments or benefits made to the seller to be a scheme or device unless such payments or benefits are counted as compensation.

**If an AIP has an underwriting gain under the SRA, is it permitted to pay a profit share? If so, how much is it permitted to pay? Which reinsurance year should it be applied against as agent compensation?**

Having an underwriting gain under the SRA does not guarantee that an AIP is permitted to pay a profit share under section III(a)(4)(C) of the SRA. Although having an underwriting gain under section II(b)(7) of the SRA is required in order to be able to pay a profit share, the actual amount (in excess of the soft cap) that the AIP is permitted to pay is based on the formula in section III(a)(4)(C)(iii) of the SRA.

Ceding commissions received by an AIP are included in the profit sharing formula under section III(a)(4)(C)(iii) of the SRA. As defined by the Reinsurance Association of America, a Ceding Commission is *an amount deducted from the reinsurance premium to compensate a ceding company for its acquisition and other overhead costs, including premium taxes. It may also include a profit factor.*

The intent of the ceding commission is to cover normal operating expenses and allow for a profit if operational efficiencies are achieved. RMA's expectation is that ceding commissions paid by reinsurers to AIPs are legitimate, normal and customary, and apply industry standards for "arm's length" reinsurance transactions that occur in the private reinsurance market. They should not be used as a means of guaranteeing the maximum profit sharing amount that can be paid to agents.

In accordance with MGR-10-011.1, part 7, if the amount of compensation is determined in reference to the premium and or losses of a particular reinsurance year, the compensation shall be included in calculating the limitations for that reinsurance year regardless of whether there is a required minimum premium retention for the following reinsurance year. However, the retention requirement must be limited to solely the following reinsurance year. For example, if the amount of compensation is based upon 2016 premium or 2016 loss ratio (e.g., profit sharing agreements or agreements to retain 2016 eligible crop insurance contracts with a particular AIP into the 2017 reinsurance year), the compensation is deemed 2016 compensation even if it is not paid until the 2017 reinsurance year. However, if the retention requirement for the 2016 profit share was based upon 2018 retention or

total written premium, it would be counted as 2018 base commission. Thus, if an agent earns a profit share accrued for 2016 but transfers business from the AIP for 2017, thereby losing the profit share due to failure to meet a 2017 business retention agreement or condition, the AIP may not pay the profit share in 2018 if the agent returns business to the AIP. Any "new business bonus" or "transfer bonus" paid to generate new or additional policies must be counted as base agent compensation. For example, if a "new business bonus" or "transfer bonus" is offered for 2018 policies, this compensation must be counted as 2018 base commission.

## Can an agent receive proceeds generated by a reinsurance company that reinsures an AIP that the agent writes for?

RMA does not have the authority to approve or disapprove the formation of reinsurance companies. Formations of this type of entity would be governed by applicable State law. However, RMA does have a responsibility to the crop insurance program to ensure that agents are not risking their ability to continue to service their policyholders, that schemes or devices are not created to violate the agent compensation limits, and that the integrity of the crop insurance program is protected.

RMA has determined that if a reinsurance company reinsures an AIP and is used to channel additional funds, directly or indirectly, to an agent writing for the same AIP, that it is a scheme or device to circumvent the agent compensation limits of the SRA. Example: Reinsurance company XYZ offers a reinsurance agreement to an AIP. The AIP accepts the agreement to obtain the underlying book of direct business derived by ceding underwriting gain/loss to reinsurance company XYZ which is then channeled to the agents writing the underlying business.

These types of agreements are deemed a scheme or device to provide additional agent compensation and the proceeds received by an agent, directly or indirectly, from these agreements must be accounted for as agent compensation in the year reinsured.

## If an agent or any entity owned in whole or part by an agent invests in an AIP, its MGA, or affiliate should payments to the

**agent be considered compensation?**

RMA has divided an agent's investment and ownership in an AIP, MGA, or affiliate into two categories: ownership that is publically traded on an exchange; and ownership that is not publically traded on an exchange.

**Publically Traded Ownership Interest:** Some AIPs have parent companies that issue stock which is publicly traded on U.S. or foreign stock exchanges. An agent could acquire an ownership interest in such companies through the public stock exchanges. In such cases, the company would not knowingly be entering into an ownership purchase with the agent; the agent does not conduct business directly with the company; and the AIP or affiliate itself neither knows of the ownership purchase, nor has the ability to influence or control any subsequent dividend payments to the agent by the company. If an AIP or affiliate enables an agent to acquire stock in a public company for less than the market value or provides financial assistance in any form to acquire the stock, the amount of discount or financial assistance will be considered compensation.

**Non-Publically Traded Ownership Interest:** Such investments could be a means of providing additional compensation to agents for the sale and servicing of federally reinsured policies which exceeds the limitations in the SRA, and is not accounted for as agent compensation. RMA attempts to ensure that all AIPs, their MGAs, affiliates, and agents are treated equally and that any relationship that can provide a means to provide additional funds or benefits to an agent for their sales and servicing of federally reinsured business counts as compensation unless otherwise expressly permitted in the SRA or applicable written guidance.

Under a non-publically traded ownership interest scenario, there are various ways in which an agent investor may receive a payment or benefit. This includes a "capital gain" payment (defined as the sales price of the investment less the original purchase price of the investment), a distribution payment in the case of entities formed as Limited Liability Companies or other business formations in which the entity provides a distribution to its investors, or any other payments or benefits derived from the AIPs based on their relationship with the agent.

With respect to the types of payments or benefits:

- Any capital gain earned by the agent investor from the sale of any shares or investment in the AIP will be considered agent compensation.
- Tax distributions made for income earned based on 2014 reinsurance year Federal crop insurance program revenue will not be considered agent compensation.
- Tax distributions made for income earned based on 2015 and subsequent reinsurance year's Federal crop insurance program revenue will be considered agent compensation.
- All dividends, and any other payments made or benefits provided to the agent investor will be considered agent compensation.
- Unrealized capital gains will not count as agent compensation. Given the uncertainty of the present value of such gains and whether any such capital gains will be realized, there is no basis to treat unrealized capital gains as compensation.

RMA recognizes that not necessarily all of an entity's revenue would be from the sale and service of Federal crop insurance program products since, for example, the entity could sell private policies, supplementals, over-the-counter risk management products, or other products not regulated by FCIC. Therefore, the amount of agent compensation must be calculated by determining the proportion of revenue earned from Federal crop insurance program products (the sum of Administrative and Operating Expense Subsidy, CAT Loss Adjustment Expense, and Underwriting Gain) divided by total revenue from all products and then multiplying this amount by total payment or benefits received by the agent investor. For example, if the agent receives a capital gain payment of $10,000, and Federal crop insurance program revenue is one-half of total revenue of the entity, then $5,000 of the capital gain must be counted as agent compensation.

AIPs, their MGAs, or affiliates must count all compensation in the reinsurance year in which the payment was received by the agent investor. However, if there is an agreement with the agent investor that contains a guarantee to make payment in a specific amount, for example, to pay $10,000 of capital gains or tax distributions for

each of the next five years, the total amount of the payments count as compensation in the year such agreement was executed.

Even though an agent, or an entity owned in whole or part by an agent, may have obtained ownership with an AIP, their MGA, or affiliate, no agent may review or be involved in the claims process, claim administration, including claims approval or denial, or any function related to insurance except those expressly authorized for an agent. Regardless of their status as an agent investor, agents are still required to comply with all conflict of interest provisions in the SRA.

Any non-publically traded AIP, MGA, or affiliate that has agent investors will be required to report to RMA quarterly the list of those investors, payments made, and interest purchased or sold.

## Does RMA view allocation of payments or benefits as a scheme or device?

RMA has identified the use of "allocation of payments" as a potential scheme or device. A general example is offered in Action item 12(a) of the Bulletin. There have been numerous scenarios regarding the allocation of payments or benefits between different lines of insurance or different States.

1. If an agent writes both Multi-Peril Crop Insurance (MPCI) and other lines of business, the agent payments/benefits can be allocated across lines of business if **all** of the following criteria are met *(MPCI includes all plans of insurance authorized for sale under the SRA and reinsured under the SRA):*
    - The payments or benefits are commensurate with the premium volume sold for each line of business;
    - Contracts are provided for all lines of insurance showing the amounts of payments or benefits; and
    - The AIP provides evidence satisfactory to RMA documenting the premium volume sold for each line of business, and that the payments or benefits do not exceed the amount authorized in the contracts.

If all of these criteria cannot be met, then the payments or benefits will be considered as a scheme or device unless they are counted as compensation.

2. If an agent writes multiple lines of insurance in multiple States, any non-policy compensation must be allocated to the line of insurance and the State based on the agent's premium volume in each state. Failure to properly allocate such non-policy compensation will result in a finding of a scheme or device.
3. An AIP wishes to provide its agents free map books with Common Land Units (CLUs) for completing Acreage Reports. This would not be considered compensation because such map books are tools, similar to the software that is not considered compensation under item 2(g) of the Bulletin, necessary for the agent to perform the tasks to service eligible crop insurance contracts.

## What are some scenarios under which recognition-entertainment expenses are considered a scheme or device?

Here are three such scenarios:

1. An AIP wants to allocate payments and benefits for agent recognition-entertainment expenses between MPCI[1] and non-MPCI policies written by the agent. Action item 1(m) of the Bulletin states that up to $200 of payments or benefits can be provided for agent recognition-entertainment costs and that any amount in excess of that will be considered as compensation. Non-policy payments and benefits can be allocated between lines of insurance and States because such payments are fixed in the agent's contract and are easily calculated based on the agent's premium volume in a State. However, agent recognition-entertainment is not a contractual obligation and there is no way to establish the basis for which such payment is made because it is generally used as an inducement or reward. Therefore, it provides a mechanism for abuse, and any payment or benefit for agent recognition-entertainment in excess of $200 is considered compensation and failure to report such payments and benefits in excess of $200 as compensation will be considered a scheme or device.
2. An AIP wants to apply the $600 agency recognition-entertainment payment or benefit limit to the subagents of the contracted agency. Action item 1(m) of the Bulletin makes it clear that the $200 limitation applies to **individual** agents

and the $600 limitation applies to **all agents and other employees of an agency.** Subagents of an agency are considered agents or employees of an agency and, therefore, are subject to the $600 limitation. This exception to the compensation rules is not intended to provide additional benefits to agents, such as trips, golf clubs or other such benefits. It is simply to allow AIPs a means to provide nominal recognition for agents. Failure to report amounts paid in excess of the $600 limitation will be considered a scheme or device unless such amounts are reported as compensation.

3. An AIP had an incentive program based on crop insurance sales (MPCI, Crop Hail, Named Peril, etc.) established prior to the 2011 reinsurance year, and they continue the program for the 2011 and subsequent reinsurance years with the exclusion of the MPCI business. Similar to agent recognition and entertainment, incentive programs are not contractually obligated and there is no way to establish the incentive is not for MPCI even if it is not included in the calculation of the amount. Therefore, it provides a mechanism for abuse, and the incentive program payment or benefit would be subject to the $200 and $600 limitation contained in Action item 1(m) of the Bulletin and failure to properly report such payments and benefits in excess of the $200 and $600 limitation will be considered a scheme or device unless such amounts are counted as compensation.

## Are processing fees considered a scheme or device?

Following are the conditions under which processing fees may or not be considered a scheme or device:

1. An AIP wants to make advance processing fee payments to an agency. Processing fees are payments for services rendered. Therefore, the payment must be made at the time or after receipt of service. Advance payments for future processing will be considered a scheme or device unless counted as compensation.

2. An AIP pays a processing fee to a processing center. Action item 11 of the Bulletin provides that payments to agents agencies, and affiliates for costs of processing, up to and including 5 percent of the A&O subsidy and CAT LAE, will not be deemed by RMA to be compensation for the sale and service of eligible

crop insurance contracts, provided that certain criteria in section III(a)(4) of the SRA are met. Processing centers are considered affiliates and, therefore, are subject to the 5 percent limitation. Failure to report payments to a processing center for processing in excess of the 5-percent limitation is considered a scheme or device unless such amount is reported as compensation.

3. An AIP pays a 5-percent processing fee to an agent whose business is subsequently processed by a separate processing center. AIPs can either choose to pay a processing fee allowance (up to the 5 percent) to agents or to utilize a processing center, which might be more cost effective. If an AIP utilizes a processing center to process an agent's book of business, then any processing fee payment to agents who sell and service the eligible crop insurance contracts will be considered a scheme or device. In addition, for AIP payments to processing centers not to be deemed as agent compensation, the processing center must be a distinct, unique entity not affiliated with any particular agent or agency. Otherwise, the potential for abuse exists and RMA will consider any payments to such entities affiliated with the agents to be a scheme or device.

## What about cooperative advertising?

Cooperative advertising expenses for insurance products totally unrelated to MPCI products are not considered agent compensation, provided the AIP can provide evidence satisfactory to RMA that the payments made correspond to advertisements placed for the non-MPCI products. If an AIP wants to pay cooperative advertising expenses for non-MPCI products, any payments in excess of such amounts will be considered a scheme or device unless counted as compensation.

## Are other benefits considered a scheme or device?

An AIP pays a portion of an agent's health insurance, pension plans, or other such benefits. These payments are considered to be agent compensation. In accordance with item 10 of the Bulletin, any benefit plan, or a portion paid thereto, not required by Federal, State or local law, will be considered agent compensation. Failure to properly report such payments will be considered a scheme or device.

**Footnote**

1. For the purposes of these FAQs, MPCI includes all plans of insurance authorized for sale under the Federal Crop Insurance Act and reinsured under the SRA.