**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BRISK INSURANCE SERVICES LLC,

*Plaintiff*,

v.

FEDERAL CROP INSURANCE
CORPORATION, *et al.*,

*Defendants*.

Civil Action No. 26‑842 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

Brisk Insurance Services LLC (Brisk) sells software to private companies that provide crop insurance on behalf of the federal government. In this action, Brisk challenges a February 2026 bulletin issued by the Risk Management Agency that largely prohibits Brisk's business model. Brisk argues that the bulletin is arbitrary and capricious in violation of Section 706 of the Administrative Procedure Act (APA). And Brisk seeks an emergency APA stay, contending that if the bulletin is not stayed before April 1, 2026, Brisk will be forced to close its doors before this action can proceed to a decision on the merits. But Brisk does not back up its claim of irreparable harm. On the record before the Court, Brisk falls well short of demonstrating the irreparable harm necessary to warrant the extraordinary remedy that it seeks. The Court thus denies Brisk's motion and will proceed to expedited merits briefing.

## BACKGROUND

### A.    Statutory Background

Congress "pioneer[ed]" the field of federal crop insurance in response to a major market failure in the field of agriculture. *FCIC v. Merrill*, 332 U.S. 380, 383 n.1 (1947). Crop production is "affected by so many contingencies, such as winds, hail, frost, drought, ravages of insects,

etc.,—contingencies which, while not likely to happen, yet such as may occur,—it would seem that inherently it would be a proper subject for insurance." *In re Hogan*, 78 N.W. 1051, 1052 (N.D. 1899). But for much of our Nation's history, the free market deemed "crop insurance too great a commercial hazard." *Merrill*, 332 U.S. at 383 n.1. "The lack of adequate crop data and a satisfactory actuarial basis upon which to base insurance rates" largely deterred private insurers from engaging in a field with "so many unpredictable risks." *New Heights Farm I, LLC v. Great Am. Ins. Co.*, 119 F.4th 455, 459 (6th Cir. 2024) (cleaned up). And the few private insurers that tried "largely failed" to offer a sufficient spread to account for "the danger of extensive crop failures." President's Comm. on Crop. Ins., *Message from the President of the United States Transmitting the Report and Recommendations of the President's Committee on Crop Insurance*, H.R. Doc. No. 75-150, at 3 (1937) (Crop Ins. Rep.).

With the passage of the Federal Crop Insurance Act of 1938, the federal government embarked on a venture that the private market had dismissed as "impossible of successful accomplishment." *Id.* Congress enacted the statute "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance," 7 U.S.C. § 1502(a), largely in response to the widespread devastation to the agricultural industry during the Dust Bowl of the 1930s, *see Easom v. US Well Servs.*, 37 F.4th 238, 244 (5th Cir. 2022). At that time, New Deal federal relief programs had become the "only source of income" for "many farmers" as catastrophic drought caused "a complete loss" of harvests and "feed supplies were depleted." Crop Ins. Rep. at 1–2. The Federal Crop Insurance Program sought to address the structural market issues causing these "large obligations that the Government ha[d] assumed . . . on account of droughts and other disasters." *Id.* at 3, 12. The 1938 Act established "a pilot

2

program" of crop insurance "for the one crop for which the government had the requisite actuarial data: wheat harvests." *New Heights Farm I*, 119 F.4th at 459.

Between 1938 and the present, Congress expanded the scope of the Federal Crop Insurance Program, seeking to reduce reliance on direct payments and emergency loan programs "to protect agriculture producers from insurable perils." 1 Robert H. Jerry, II, New Appleman on Insurance Law § 56.03 (Library Ed. 2026) (outlining the various legislative enactments since the 1938 Act). Today, the Program insures more than 444 million acres and $150 billion in crop and livestock value, including "over 85% of cropland planted to corn, soybeans, wheat, or cotton." Stephanie Rosch, Cong. Rsch. Serv., R46686, Federal Crop Insurance: A Primer 9 (2021); *see* Stephanie Rosch, Cong. Rsch. Serv., IF12201, Farm Bill Primer: Federal Crop Insurance Program 1 (2022).

Prior to 1980, federal crop insurance was provided directly by the Federal Crop Insurance Corporation. *See All. Ins. Co. v. Wilson*, 384 F.3d 547, 549 (8th Cir. 2004); H.R. Rep. No. 96-430, at 12-13 (1979), *reprinted in* 1980 U.S.C.C.A.N. 3068, 3075. But the Federal Crop Insurance Act of 1980 required the Corporation to administer crop insurance through private insurers "to the maximum extent practicable." 7 U.S.C. § 1508(k)(1); *see also* H.R. Rep. 96-1272, at 17 (1980) (Conf. Rep.), *reprinted in* 1980 U.S.C.C.A.N. 3082, 3087. Since 1998, private insurance companies reinsured by the Corporation sell and service all crop insurance policies offered under the Program. *See* Jerry, 1 New Appleman on Insurance Law § 56.04.

Today, "[t]he crop insurance program is, to say the least, complex." *United States ex rel. Kraemer v. United Dairies, L.L.P.*, 82 F.4th 595, 598 (8th Cir. 2023). The Federal Crop Insurance Corporation, "a government corporation within the Department of Agriculture," *id* (characterizing 7 U.S.C. §§ 1502(a), 1503), "provide[s] reinsurance for insurers of [] producers of agricultural commodities grown in the United States," 7 U.S.C. § 1508(a)(1). Accordingly, the Corporation

3

"enlists private crop insurers to sell policies written on terms, including premium rates, approved by" it. *ACE Am. Ins. Co. v. FCIC*, 732 F. App'x 5, 6 (D.C. Cir. 2018) (cleaned up). Meanwhile, the Risk Management Agency (RMA), also in the Department of Agriculture, "supervises and administers the federal crop insurance program" operations. *Id.* (characterizing 7 U.S.C. § 6933). The Court generally refers to the Federal Crop Insurance Corporation and the RMA jointly as the "FCIC." *See id.* (using a similar approach).

Federal crop insurance policies are sold by private insurers approved by the FCIC, known as approved insurance providers (AIPs). *United Dairies*, 82 F.4th at 598; *see* 7 USC § 1502(b)(2). There are currently 12 AIPs approved by the FCIC. *See* 7 C.F.R. § 400.164(e). AIPs then rely on "a network of independent agents [to] sell and service the federal policies." Dennis A. Shields, Cong. Rsch. Serv., R40532, Federal Crop Insurance: Background 23 (2015). "The agents are paid commission on the policies their clients purchase." *United Dairies*, 82 F.4th at 599.

The AIPs "obtain reinsurance from FCIC pursuant to a Standard Reinsurance Agreement (SRA)," a contractual arrangement "negotiated between FCIC and the private crop insurance industry." *ACE Am. Ins.*, 732 F. App'x at 6. This reinsurance arrangement operates as follows:

> [W]hen a farmer incurs a loss to an insured crop, the farmer files a claim with the [AIP]. The [AIP] assesses the amount of the loss, pays the farmer's claim for damage, and then seeks reimbursement from the FCIC. The FCIC reimburses the [AIP] for all or part of the amount paid to the farmer, depending on the particular arrangement set forth in the SRA.

*United States v. Hawley*, 619 F.3d 886, 889 (8th Cir. 2010). "The FCIC also subsidizes a portion of the premiums paid by the insured farmers," *id.,* covering about 62% of total premiums and 100% of catastrophic coverage premiums, Rosch, Farm Bill Primer: Federal Crop Insurance Program, at 1.

The FCIC also subsidizes some "of the AIP's operating and administrative expenses." *United Dairies*, 82 F.4th at 598. One such expense is agent compensation, which includes

4

commissions, salary, profit sharing, and other forms of payment to agents and any associations that they work for. SRA, § III(a)(4), Ex. A; *see also id.* at 3.[1] Ultimately, what constitutes agent compensation is determined "in accordance with FCIC procedures," which includes "applicable handbooks, manuals, *bulletins*, memoranda or other written directives issued by FCIC." *Id.* at 3–4 (emphasis added). Since 2011, the SRA caps agent compensation to no more than 80 percent of the total amount of the administrative and operational subsidy from the FCIC. *Id.* § III(a)(4)(B); MGR-10-011.1 Bulletin, Ex.C.

The "FCIC requires the private crop insurers to renew [SRAs] annually." *ACE Am. Ins.*, 732 F. App'x at 6. Thus, the SRA instructs each AIP to submit a "Plan of Operations" to the FCIC by April 1 of each year to renew participation in the program for the following reinsurance year that starts on July 1. SRA § IV(f)(2). The plan of operations must identify every "service provider" that the AIP will use for the upcoming reinsurance year. SRA App'x II, § IV(c). And the FCIC must approve the plan for the AIP to operate under the next reinsurance year's SRA. SRA § IV(f)(2)(C). The annual plans must comply with the FCIC's procedures, which include bulletins issued by the FCIC. *See* SRA at 4, 7.

## B.    Factual Background

"The following facts are alleged in the Complaint or drawn from declarations in the record that are not disputed in relevant part, except where otherwise noted." *Postal Police Officers Ass'n v. USPS*, 502 F. Supp. 3d 411, 415 (D.D.C. 2020). Because Brisk proceeds with a verified complaint, the Court treats the Complaint, ECF No. 1, as a declaration.

On October 29, 2010, the FCIC issued Manager's Bulletin MGR-10-011.1, which provided the relevant agency guidance on defining agent compensation under the SRA. Bulletin MGR-10-

---

[1] All lettered exhibits refer to the exhibits attached to the Motion to Stay. ECF No. 3.

011.1, Ex. D, at 1. In relevant part, that Bulletin stated that "[t]he following item[] do[es] not constitute compensation":

> Computer software, including licensing fees, provided by an AIP to an agent, agency, or affiliate for providing eligible crop insurance contract premium quotes to producers or performing [] processing tasks . . . .

MGR-10-011.1 Bulletin, at 3. The MGR-10-011.1 Bulletin thus contained a software exception to the SRA's definition of agent compensation. In a memorandum issued in August 2011 and revised in August 2017, the FCIC explained its reasoning for the exception:

> An AIP wishes to provide its agents free map books with Common Land Units (CLUs) for completing Acreage Reports. This would not be considered compensation because such map books are *tools, similar to the software that is not considered compensation under item 2(g) of the Bulletin, necessary for the agent to perform the tasks to service eligible crop insurance contracts*.

Ex. E (emphasis added).

In 2022, two software developers, Bozic LLC (Bozic) and Watts and Associates, Inc. (Watts), contemplated forming a unique business venture, Brisk, that would supply specialized software to a single association of agents, Farm Credit, through the various AIPs that utilize Farm Credit. Compl. ¶ 4, ECF No. 1. On August 9, 2022, Bozic and Watts sent an email to the FCIC, along with a memorandum explaining this proposed business venture and two legal opinions, asking the following:

> Based on the information above we would like your legal advisory opinion on the compatibility of the proposed business model with the SRA rules on agent compensation limits. Does anything in the above proposal constitute an indirect form of agent compensation? Is this proposed structure in any way in conflict with the current regulatory guidance?

Ex. F. On September 7, 2022, the FCIC responded: "As of this date, [the FCIC] has not detected any violations of the [SRA] in the structure or operation you are proposing to establish." Ex. G.

On December 5, 2022, Bozic and Watts sent the FCIC a new proposal and legal opinion on an even more unique business model.[2] Compl. ¶¶ 76-79. Specifically, Bozic and Watts asked if it was permissible for Farm Credit (its sole customer) to directly finance its software development, agent software training platform, and start-up costs. *Id.* Brisk claims that it informed the FCIC that it might use its service fees—derived, in part, from AIPs' use of the FCIC's subsidy of operating costs—to repay Farm Credit with interest. *Id.* The FCIC responded: "As of this date, [the FCIC] has not detected any violations of the [SRA] with regards to the [Farm Credit's] financing and Brisk repayment in the proposal revision." Ex. H. On November 28, 2023, following additional discussions between Brisk and the FCIC about Brisk's business plan, the FCIC again confirmed that it had "not detected any violations of the [SRA] with the services Brisk [would] provide under contract with an AIP." Ex. I.

In February 2025, Brisk launched and its software went live. Compl. ¶ 5. And Brisk executed multi-year contracts with four AIPs: (1) American Agricultural Insurance Company; (2) Great American Insurance Company; (3) Rural Community Insurance Company; and (4) QBE Americas, Inc. Compl. ¶ 91. In early May 2025, the FCIC began meeting with these four AIPs about conflict-of-interest concerns arising from the Brisk-Farm-Credit arrangement. Swanson Decl. ¶ 32–33, ECF No. 8-1. Between late May and September 2025, the FCIC also reached out to Brisk about similar concerns. *Id.* ¶¶ 33–38. In meetings with Brisk, the FCIC raised concerns about a processing cap and potential conflicts of interest. Compl. ¶¶ 108–17. And in August 2025, RMA staff had discussions with Brisk about service fees and agent compensation. Swanson Decl. ¶ 35. Neither Party suggests that those discussions centered on the bulletin being challenged.

---

[2] Although Brisk provided the Court with a copy of the FCIC's response to this email, it did not provide the email itself.

In October 2025, the FCIC received a complaint about Brisk's business model. Swanson Decl. ¶ 39. The next month, the FCIC issued a Manager's Bulletin collecting data from all AIPs about software and licensing fees. *Id.* ¶ 40. And in December 2025, the FCIC was made aware that others may try to replicate Brisk's business model. *Id.* ¶ 41. This all culminated in Manager's Bulletin MGR-26-002, entitled "Agent Compensation - Third Party Software Payments," which the FCIC issued on February 20, 2026. *Id.* ¶ 44. It states, in relevant part, that

> an AIP may enter into an agreement with an independent service provider to deliver general policy administration software and support services on behalf of the AIP to all of the AIP's agencies, and payments made by the AIP to the service provider under those circumstances will, as a general matter, not be considered compensation under the SRA. However, payments made by an AIP to a service provider for policy administration software and support services will be deemed a benefit of value and considered compensation under the SRA if any of the following conditions apply: (1) The service provider is funded in whole or in part by an agency or group of agencies that receives the benefit of the software and services; (2) An agency or group of agencies receiving the benefit of the software and services has authority to control the service provider's work; or (3) The software and support services are provided to a select agency or group of agencies rather than being available to the AIP's entire agency force.

MGR-26-002 Bulletin, Ex. K.  After a hearing on Brisk's motion, the Defendants informed the Court that RMA "is evaluating preparing a new manager's bulletin to supplement MGR-26-002." Defs.' Third Status Report, at 2, ECF No. 13. The Defendants further represented that a decision on whether a new bulletin should be released will likely be made by April 8, 2026. Defs.' Fourth Status Report, ECF No. 14.

According to Brisk, MGR-26-002 largely ensures that its software costs will be subject to the 80 percent agent compensation cap, which means that AIPs will no longer be able to contract with Brisk and remain in compliance with the SRA. *See* Compl. ¶ 143–159. One AIP, Great American Insurance Company, has told Brisk that it will not include Brisk in its 2027 plan due on April 1, 2026, because of the bulletin. Compl. ¶ 151. And it has told Brisk that it will terminate its contract with Brisk, though the record does not indicate when that contract termination might

happen. Scharfe Decl. ¶ 4, ECF No. 9-1. Brisk believes that the other three AIPs that it contracts with will also terminate their contracts and exclude Brisk from their 2027 plans. *Id.* ¶ 7.

### C.        Procedural Background

Brisk filed this action on March 10, 2026, against the FCIC (alongside the RMA Administrator/FCIC Manager) and moved under Section 705 of the APA for an emergency stay of the MGR-26-002 Bulletin by April 1, 2026. Compl.; Mot., ECF No. 3. The Court held a hearing on the motion on March 26, 2026. Minute Entry (March 26, 2026). The motion is fully briefed and ripe for review. Opp'n, ECF No. 8; Reply, ECF No. 9.

### LEGAL STANDARD

Section 705 of the APA authorizes "the reviewing court" to stay "the effective date of an agency action" pending judicial review "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. To warrant a stay, "[a] movant must show (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable [injury] without a stay, (3) that the balance of equities tips in his favor, and (4) that a stay is in the public interest." *League of Women Voters v. DHS*, No. 25-cv-3501, 2025 WL 3198970, at *5 (D.D.C. Nov. 17, 2025) (citing *Ohio v. EPA*, 603 U.S. 279, 291 (2024)). The factors governing a stay are the same as those governing a preliminary injunction, *id.*, but this does not mean that the "two are one and the same." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Rather, "similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Id.* A Court may not grant a stay if not "necessary to prevent irreparable injury." 5 U.S.C. § 705. "[I]f a party fails to make a sufficient showing of irreparable injury, the court may deny the motion . . . without considering the other factors." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15–16, 15 n.4 (D.D.C. 2010) (citing *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

**DISCUSSION**

Brisk argues that the MGR-26-002 Bulletin violates the APA because it "failed to comply with the change-in-position doctrine," Mot. 19–22, and because, "on its surface, [it] is arbitrary and capricious," Mot. 22–25. The change-in-position doctrine recognizes that "it is elementary that an agency must conform to its prior decisions or explain the reason for its departure from such precedent." *NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017) (cleaned up). Agencies are "free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (cleaned up). At first glance, MGR-26-002 seems to run headfirst into this doctrine. The bulletin does not appear to display an awareness of a change in position or offer reasons for the new policy. But the Court need not decide whether Brisk is substantially likely to succeed on the merits of its APA claim because it fails to make showing of irreparable injury.[3]

"The moving party bears the burden of demonstrating irreparable injury." *Mylan Lab'ys, Inc. v. Leavitt*, 484 F. Supp. 2d 109, 123 (D.D.C. 2007). And the standard for irreparable injury is

---

[3] In any event, the Court may not currently assess Brisk's likelihood of succeeding on the merits of its arbitrary and capricious claim because the Defendants are unable to provide the administrative record until April 8, 2026. *See* Defs.' Status Report, ECF No. 10; *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001). Even though Brisk filed suit on March 10, 2026, and moved for an emergency APA stay on the same date, it never requested the administrative record from the Defendants. At the motion hearing, Brisk took the position—without identifying any legal support—that a FOIA request from Brisk's counsel for documents that may comprise the administrative record constitutes a request for the administrative record in this case. Mot. Hr'g Tr. (Bench Draft) at 88:15–18; Defs.' Second Status Report, ECF No. 11. Brisk went further in urging the Court to evaluate its arbitrary and capricious claim without the administrative record or by considering only the portions of the administrative record cited in the Defendants' brief—in disregard of D.C. Circuit precedent. Mot. Hr'g Tr. (Bench Draft) at 88–90; *Thompson*, 243 F.3d at 582. And Brisk went further still in ultimately asking the Court to temporarily stay the bulletin for a week without any showing of likelihood of success on the merits. Mot. Hr'g Tr. (Bench Draft) at 91:4–9. Suffice it to say that the Court declines all three of these unsupported invitations.

"high"—it "must be both certain and great" and "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up). A mere "possibility" of irreparable injury does not suffice. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The moving party fails to meet its burden if there is even a "possibility that adequate . . . corrective relief will be available at a later date, in the ordinary course of litigation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)). Brisk raises two theories of irreparable injury: (1) the lack of inclusion in four AIPs' 2027 plans of operations due on April 1, 2026, and (2) the potential termination of its multi-year contracts with those AIPs. Mot. Hr'g Tr. (Bench Draft) at 23:14–17. Based on the record before the Court, Brisk fails to carry its burden under either theory.[4]

### A.    Annual Plans of Operation

Brisk's first theory of irreparable harm centers on its inclusion in the 2027 annual plans of operations for the four AIPs with which it contracts. AIPs are required to submit their plan of operations, which lists their service providers for the 2027 reinsurance year, by April 1, 2026. SRA §§ IV(f)(2)(A), App'x II, § IV(c). And the FCIC must approve or provisionally approve those plans for the AIPs to operate in the 2027 reinsurance year. SRA § IV(f)(2)(C). Those plans must comply with the FCIC's procedures, which include bulletins issued by the FCIC. *See* SRA at 4, 7. Brisk claims that it will suffer irreparable harm because, "absent a stay, [it] will not appear in any of the Four AIPs' Plans of Operation" for the 2027 reinsurance year due on April 1, 2026, Mot. 27, and thus "lose a substantial portion of its revenue and/or be forced to terminate a large portion of

---

[4] Although the Defendants raise a mountain of threshold arguments—including standing and sovereign immunity, among others—they agree that the Court may leave those questions for another day. Mot. Hr'g Tr. (Bench Draft) at 60:19–61:17; *see League of Women Voters v. DHS*, No. 25-cv-3501, 2025 WL 3198970, at *5 n.6 (D.D.C. Nov. 17, 2025) (citing *Univ. of California Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 n.3 (D.D.C. 2025)).

its workforce," Mot. 26. More specifically, Brisk contends that if it is not in the approved plans of operations by the beginning of the 2027 reinsurance year, July 1, 2026, it "will receive no AIP payments for [the 2027 reinsurance year]—and thus be deprived of about 99% of its revenue over that time period" and "will need to start laying off employees as early [as] July 2026." Mot. 27.[5] Brisk's argument comes up short.

As a preliminary matter, it is not clear that the four AIPs will in fact exclude Brisk from their plans of operations currently due on April 1, 2026. Brisk's Complaint states that "Great American explicitly told Brisk it would not include Brisk in its Plan of Operations for reinsurance year 2027." Compl. ¶ 151. But as to the other three AIPs, Brisk admits that they "have not yet provided Brisk with a definitive answer." Compl. ¶ 152. And although Brisk's declaration from Connor Scharfe, Brisk's President and CEO, references "multiple conversations" with the AIPs, Scharfe Decl. ¶ 7, it says nothing definitive about their intentions regarding the annual plans. The Court understands that Brisk fears that all four AIPs might exclude Brisk because of the bulletin. But it is Brisk's burden to demonstrate irreparable harm and "mere speculation" does not suffice. *See Heart 6 Ranch, LLC v. Bernhardt*, 365 F. Supp. 3d 105, 117 (D.D.C. 2019). It is possible that the AIPs might move expenses around to keep contracting for Brisk's software while staying within the 80 percent cap. But Brisk's shortcoming on this point is not ultimately dispositive.

Even assuming that the AIPs will exclude Brisk from the annual plan submissions on April 1, 2026, Brisk has not demonstrated that it will not be in the *approved* plans by July 1, 2026. And

---

[5] Brisk argues that these injuries would be irreparable because they would cause "extreme hardship" to its business and "irretrievable monetary loss." Mot. 26–27 (cleaned up). Courts in this District have not uniformly concluded that such monetary injuries constitute irreparable injury in suits against the government. *Compare Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008), *with ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014). The Court need not weigh in on this question because Brisk's claims of irreparable injury are unsupported by the current record.

on Brisk's own account, Brisk's "depriv[ation] of about 99% of its revenue" and "need to start laying off employees" only kicks in if Brisk is not in an approved plan of operations by the beginning of the 2027 reinsurance year on July 1, 2026. Mot. 27. Although Brisk initially suggested that exclusion from the annual plans due on April 1, 2026, meant that it would not be in the approved plans for the 2027 reinsurance year, *see* Mot. 27, that has proven to be incorrect. As the FCIC pointed out in opposing Brisk's motion, "[t]he SRA allows amendment. AIPs are permitted to change [their] service providers even after submitting 2027 Plan[s] of Operations." Opp'n 19; *see* SRA § II(a)(8)(B)–(D). Indeed, one AIP previously added Brisk to its 2026 plan of operations through an amended submission on April 15, 2025. Defs.' Third Status Report at 2, ECF No. 10; Mot. Hr'g Tr. (Bench Draft) at 56:7–9. And the FCIC has represented that if an AIP submits an amended plan adding Brisk as a service provider before June 24, 2026, it will make a determination on that amendment before July 1, 2026. *See* Defs.' Fourth Status Report, ECF No. 14. That representation is dispositive in light of Brisk's concession that it will suffer no irreparable injury if the FCIC approves an amended plan of operations before the 2027 reinsurance year that simply "add[s] Brisk as a line item," Mot. Hr'g Tr. (Bench Draft) at 82:8–12, 30:11–20.

Indeed, the FCIC's representation appears to place Brisk in an even more favorable position. The SRA does not require the FCIC to render a decision on a plan of operations submitted on April 1, 2026, by the beginning of the 2027 reinsurance year. SRA § IV(f)(2)(C). Rather, if a decision is not rendered by July 1, 2026, the FCIC retains the authority to either provisionally continue or discontinue that AIP's participation in the Federal Crop Insurance Program until it makes a final determination on the plan. *Id.* So if Brisk is correct that any of the four AIPs intend to exclude Brisk from their annual plans, the FCIC's assurance means that Brisk is arguably better-

13

off. It now has a guarantee that a determination will be rendered before July 1, 2026, on any amended plan that includes Brisk, which it would not have for any plan submitted on April 1.

Despite this guarantee, Brisk argues that it would take even more to remedy its irreparable harm. At the motion hearing, Brisk took the position that the FCIC would need to stipulate to *approving* any amended plan for the 2027 reinsurance year that adds Brisk as a service provider should this Court ultimately rule in its favor. *See* Mot. Hr'g Tr. (Bench Draft) at 82:5–12, 85:7–12, 86:2–15. But this is entirely unwarranted. On the current record, there is no question that Brisk's alleged irreparable injuries—that it would lose nearly 99 percent of its revenue for the 2027 reinsurance year and "need to start laying off employees as early [as] July 2026"—would be remedied if it is included in any plan of operations by July 1, 2026. *See* Mot. 27, 14. The current record also leaves no doubt that there is ample time to ensure that Brisk is included in an approved plan by that date given the FCIC's representation that it will make a determination on any amended plan of operations involving Brisk that is submitted by June 24, 2026. And Brisk does not articulate why, assuming it prevails, it is disadvantaged by inclusion in an amended plan rather than an initial plan. For example, Brisk has not alleged that AIPs need to clear a higher bar to obtain approval of an amended plan.[6] Thus, the earlier April 1, 2026, deadline does not justify entering emergency relief. Brisk has not identified irreparable injury that is "beyond remediation" at "a later date, in the ordinary course of litigation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (citation omitted).

---

[6] The Court does not know the answer to this question because of Brisk's failure to adequately describe the contours of the Federal Crop Insurance Program. *See, e.g.*, Mot. Hr'g Tr. (Bench Draft) at 19:7–22:9.

### B.    Termination of Contracts

Next, Brisk relies on the potential termination of contracts to meet its burden of demonstrating irreparable harm. This argument appears for the first time in Brisk's reply, where Brisk notes (1) that one AIP, Great American, has informed Brisk that it will terminate its contract with Brisk because of the bulletin, and (2) that it "strongly believes" that the others will do the same. Reply 12. But Brisk falls well short of showing that this harm is "imminen[t]." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (citation omitted). As Brisk was forced to concede at the motion hearing, Great American "did not provide a specific date" for when it intends to terminate its contract and Brisk is "not sure if they know a specific date at this point." Mot. Hr'g Tr. (Bench Draft) at 24:2–6. It should be obvious that the Court cannot grant preliminary relief based on Brisk's "mere speculation of irreparable harm." *Heart 6 Ranch*, 365 F. Supp. 3d at 117.

Brisk's failure to make a record on irreparable harm does not stop there. At the motion hearing, the Court posed numerous questions about the mechanics of the administrative and operating subsidies in order to understand why the 80 percent cap on agent compensation might lead to AIPs terminating their contracts with Brisk. *See* Mot. Hr'g Tr. (Bench Draft) at 12:21–23:9. Surprisingly, Brisk's counsel could not answer these basic questions and required time to confer with his client before providing the Court with his best understanding of the subsidies, though without any citation to SRA provisions or other authorities. *Id.* at 18:2–22:8. Counsel dismissed these questions as irrelevant. *Id.* at 20:23–21:4; 21:22–25. But as counsel should have recognized, the Court cannot assess irreparable injuries arising from a change to a government program without understanding the basic contours of that program. And as the party seeking the extraordinary remedy of an APA stay, it is Brisk's burden to put those facts in the record.

15

Indeed, as the Court noted previously, Brisk generally asserts that the four AIPs will terminate their contracts with Brisk because they cannot sustain those contracts from the portion of the subsidy that may be used for agent compensation. *See id.* at 23:1–8. But Brisk points to nothing whatsoever to support that assertion. It does not show, for example, that the AIPs have no room in their 80 percent cap to continue payments to Brisk. *See* Mot.; Reply. Nor does Brisk explain the details of it "multi-year" contracts with the AIPs and whether they would permit termination during the pendency of this litigation. *See* Compl. ¶ 91. Brisk's silence on this point is notable. In opposing Brisk's requested relief, the FCIC argued that Brisk had failed to demonstrate a likelihood that the AIPs would "break [their] contract[s]" instead of "modifying their budgets to continue working with Brisk while adhering to the SRA's agency compensation caps." Opp'n 19. Brisk said nothing in response, either in its reply or at the motion hearing. And, again, it is Brisk's burden to identify irreparable harm. *See Mylan Lab'ys*, 484 F. Supp. 2d at 123.

In any event, even assuming that the four AIPs will terminate their contracts with Brisk at some point in the future because of the bulletin, Brisk conceded at the motion hearing that it cannot show that any such termination would occur in the immediate future, instead relying largely on speculation. *See* Mot. Hr'g Tr. (Bench Draft) at 24:2–6; Reply 12–13. Because Brisk's alleged terminations are not "certain" to occur prior to the entry of a final judgment in this case, Brisk has not met its burden of demonstrating irreparable injury on this basis as well. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted).

*    *    *

In this Circuit, courts must deny preliminary relief where a movant fails to show any irreparable injury "even if the other three factors entering the calculus merit such relief." *Id.* To grant a stay under the APA, preventing "irreparable injury" is a statutory requirement. 5 U.S.C.

16

§ 705. Since Brisk fails to make a showing of irreparable harm before a final decision, the Court denies its request for a stay without addressing the other factors. *See Affinity Healthcare Servs.*, 720 F. Supp. 2d at 15–16, 15 n.4. Given the rapid ongoing developments, the Court intends to move expeditiously to resolve the merits of this dispute. The Court thus orders the Parties to propose next steps in a joint notice by April 6, 2026, including an expedited summary judgment briefing schedule if necessary.

**CONCLUSION**

For these reasons, the Court denies Brisk's Motion for a Stay under Section 705 of the APA, ECF No. 3.

A separate order will issue.

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date:   March 31, 2026