# UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BRISK INSURANCE SERVICES LLC,<br><br>                Plaintiff,<br><br>v.<br><br>FEDERAL CROP INSURANCE<br>CORPORATION et al.,<br><br>                Defendants. | Civil Action No.: 1:26-cv-00842 |

## CERTIFICATION OF ADMINISTRATIVE RECORD

I, Heather Manzano, Associate Administrator for the Risk Management Agency, which is a component of the United States Department of Agriculture ("USDA"), hereby certify that the attached Administrative Record is a true, correct, and complete copy of the non-privileged documents pertaining to USDA's decision making processes with regard to the USDA Risk Management Agency's ("RMA") bulletin MGR-26-002.

HEATHER MANZANO

Digitally signed by
HEATHER MANZANO
Date: 2026.04.08 22:11:18
-04'00'

_____

Heather Manzano
Associate Administrator
Risk Management Agency
United States Department of Agriculture

# EMAIL COMMUNICATIONS

GOV000001

Case 1:26-cv-00842-SLS    Document 24    Filed 04/08/26    Page 16 of 1783

Case 1:26-cv-00842-SLS    Document 24    Filed 04/08/26    Page 51 of 1783

# ANALYSIS DOCUMENTATION

GOV000120

# BACKGROUND DOCUMENTATION

GOV000484

# STANDARD REINSURANCE AGREEMENT

## between the

## FEDERAL CROP INSURANCE CORPORATION

## and the

(Insurance Company Name) (Hereafter "Company")

(City and State)

This Agreement establishes the terms and conditions under which the Federal Crop Insurance Corporation (FCIC), supervised by the Risk Management Agency (RMA) as authorized in section 226A of the Federal Agriculture Improvement and Reform Act of 1996, will provide subsidy and reinsurance on eligible crop insurance contracts sold by the Company. This Agreement is authorized by the Federal Crop Insurance Act (Act) and regulations of FCIC published at 7 C.F.R. chapter IV (regulations).

This is a cooperative financial assistance agreement between FCIC and the Company to deliver eligible crop insurance contracts under the authority of the Act. The Agreement is not considered a contract for the purposes of the Federal Acquisition Regulations. For the purposes of this Agreement, use of the plural form of a word includes the singular and use of the singular form of a word includes the plural unless the context indicates otherwise. The Table of Contents and headings in this Agreement are descriptive only and have no legal effect on FCIC or the Company.

This Agreement becomes effective upon its execution by FCIC and the Company, and the annual approval of the Company's Plan of Operations by FCIC for the applicable reinsurance year. This Agreement is a single year agreement.

GOV000485

# TABLE OF CONTENTS

Pages

SECTION I. DEFINITIONS..................................................................................... 1-9

SECTION II. REINSURANCE

   (a)    General Terms.................................................................... 10-13
   (b)    Reinsurance...................................................................... 13-21

SECTION III. SUBSIDIES, EXPENSES, FEES, AND PAYMENTS

   (a)    Subsidies and Expenses ................................................... 21-27
   (b)    Administrative Fees ............................................................. 28
   (c)    Payments......................................................................... 28-29

SECTION IV. GENERAL PROVISIONS

   (a)    Collection of Information and Data ....................................... 30
   (b)    Reports ............................................................................ 30-34
   (c)    Interest............................................................................ 34-35
   (d)    Escrow Account .................................................................. 35
   (e)    Supplemental Insurance .................................................... 35-36
   (f)    Insurance Operations ....................................................... 36-38
   (g)    Access to Records and Operations......................................... 38
   (h)    Compliance and Corrective Action...................................... 39-42
   (i)    Suspension ......................................................................... 42
   (j)    Termination ........................................................................ 43
   (k)    Disputes and Appeals........................................................... 43
   (l)    Agreement Change Date ....................................................... 44
   (m)   Funding Contingency........................................................... 44
   (n)    Previous Obligations............................................................ 44
   (o)    Preemption of State Law.................................................... 44-45
   (p)    Discrimination..................................................................... 45
   (q)    Set Off............................................................................. 46-47
   (r)    Assignment ........................................................................ 47

GOV000486

## SECTION I. DEFINITIONS

Unless otherwise provided, the definitions of terms herein only apply to the terms and conditions contained in this Agreement and not to FCIC procedures or other documents related to this Agreement.

To the maximum extent practicable, terms that have been defined in the incorporated regulations and the Act will be given the same meaning for the purpose of this Agreement. Since some terms may have more than one definition in the regulations and the Act, the specific regulation or section of the Act to be used will be specified herein.

**"Act"** in lieu of the definition in the incorporated regulations**,** means the Federal Crop Insurance Act (7 U.S.C. §§ 1501-1524).

**"Actuarial data master file"** means the electronic data processing (EDP) compatible information distributed by FCIC that contains premium rates, program dates, and related information concerning the crop insurance program for a crop year.

**"Additional coverage"** has the same meaning as the term "additional coverage" in section 502(b)(1) of the Act (7 U.S.C. § 1502(b)(1)).

**"A&O inflation adjustment factor"** means the subsidy inflation adjustment factor computed annually used to account for an increase in the total administrative and operating expenses paid by FCIC for inflation based on the July to July change in the Consumer Price Index (CPI-U) of the prior Reinsurance Year in accordance with section 508(k)(12) of the Act (7 U.S.C. § 1508(k)(12)).

**"A&O subsidy"** means the subsidy for the administrative and operating expenses paid by FCIC on behalf of the policyholder to the Company for additional coverage level eligible crop insurance contracts in accordance with section 508(k)(4) of the Act (7 U.S.C. § 1508(k)(4)).

**"Administrative fee"** means the processing fee the policyholder must pay under an eligible crop insurance contract.

**"Affiliate"** means any person, including, but not limited to, a managing general agent, agent, service provider, and loss adjuster, that: (1) collects premiums, services the policy, adjusts, or settles claims; (2) collects, processes, manages, and reports electronic data for the purposes of selling, administering, or servicing eligible crop insurance contracts for the Company; or (3) directly or indirectly, through one or more intermediaries, has the authority to control any aspect of the management of the book of business or any other decision made under this Agreement, without the prior and specific approval from the Company. This definition excludes commercial reinsurers and PICs if such reinsurers or PICs do not have the authority to control any aspect of the management of the book of business or any other decision made under this Agreement, without the prior and specific approval from the Company.

GOV000487

**"Agency"** means the person authorized by an AIP, or its designee, to sell and service eligible crop insurance contracts under the Federal crop insurance program.

**"Agent"** means any individual who is: (1) licensed by the State in which eligible crop insurance contracts are sold and serviced for the reinsurance year; and (2) authorized by the Company, or the Company's designee, to sell and service such eligible crop insurance contracts.

**"Agent of record"** means, for the purposes of each eligible crop insurance contract, any agent or subagent who: (1) for a new or revised application, signs the application; and (2) for any crop year, signs the acreage or similar reports, as applicable. Each eligible crop insurance contract has at least one, and may have multiple, agents of record. All agents of record for each eligible crop insurance contract shall be reported by the Company, in accordance with Appendix III.

**"Agreement"** means this Standard Reinsurance Agreement, including Appendices, the Act, and regulations, in effect as of the July 1 start of the reinsurance year, unless otherwise provided for in the Agreement. An Agreement in effect for a reinsurance year constitutes a separate and distinct Agreement from any Agreement that may be in effect for any other reinsurance year, even if the Agreement has been renewed in accordance with section IV(l). Unless specifically provided for in this Agreement, if there is a conflict between a provision of the Act, the regulations, or FCIC procedures with the terms of this Agreement, the order of precedence will be: (1) the provisions of the Act; (2) the regulations; (3) this Agreement; and (4) FCIC procedures, with (1) controlling (2) and (2) controlling (3), etc. The Act and regulations are available on the RMA website ([www.rma.usda.gov](www.rma.usda.gov)).

**"Agricultural commodity"** has the same meaning as the term "agricultural commodity" in section 518 of the Act (7 U.S.C. § 1518), excluding livestock.

**"Annual settlement"** means the settlement of accounts between the Company and FCIC for the reinsurance year, beginning with the October monthly transaction cutoff date following the end of the subsequent reinsurance year and continuing monthly thereafter, as necessary.

**"Approved insurance provider (AIP)"** means a legal entity, including the Company, which has entered into a Standard Reinsurance Agreement with FCIC for the applicable reinsurance year.

**"Average A&O rate"** means the total amount of A&O subsidy paid to all AIPs for the 2008 reinsurance year for all eligible crop insurance contracts divided by total net book premium earned by all AIPs for the 2008 reinsurance year for all eligible crop insurance contracts for which A&O subsidy was paid by FCIC, as of the January 2010 monthly settlement report.

**"Billing date"** means the date specified in the actuarial data master file as the date by which policyholders are billed for premium due on eligible crop insurance contracts.

GOV000488

**"Book of business"** means the aggregation of all eligible crop insurance contracts between the Company and its policyholders that have a sales closing date within the reinsurance year and are eligible to be reinsured under this Agreement.

**"Cancellation date"** has the same meaning as the term "cancellation date" in the applicable eligible crop insurance contract.

**"Catastrophic risk protection (CAT)"** has the same meaning as the term "catastrophic risk protection" in the applicable eligible crop insurance contract.

**"CAT LAE"** means the reimbursement paid by FCIC for eligible crop insurance contracts at the CAT level (as authorized in section 508(b) of the Act) (7 U.S.C. § 1508(b)) in accordance with section 508(b)(11) of the Act (7 U.S.C. § 1508(b)(11)).

**"Cede"** means to pass to another all or part of the net book premium and associated liability for ultimate net losses on eligible crop insurance contracts.

**"Claim"** means a request under an eligible crop insurance contract for an indemnity in an amount certain on a Company form that meets FCIC's standards.

**"Claims supervisor"** means any person having immediate or day-to-day supervisory control, management or oversight authority of the activities of loss adjusters or other persons who determine whether an indemnity will be paid and the amount thereof.

**"Company payment date"** means the last business day of the month.

**"Compensation"** means, for any reinsurance year, commissions, salary, profit sharing, and other forms of payment including, but not limited to, transfer or other types of bonuses, consulting fees, loans, advance payments, deferred payments, cooperative advertising, and any monetary or non-monetary benefits of value, except for those benefits required by law, in accordance with FCIC procedures. Compensation does not include any payments related to a line of insurance not reinsured under this Agreement unless such payment is made to circumvent the provisions of this Agreement.

**"Contract change date"** has the same meaning as the term "contract change date" in the applicable eligible crop insurance contract.

**"Controlled Substance"** has the meaning provided in 7 C.F.R. § 3021.610.

**"Conviction"** has the meaning provided in 7 C.F.R. § 3021.615.

**"Cooperative association"** for the purposes of section 508(b)(5)(B) of the Act (7 U.S.C. § 1508(b)(5)(B)) means a member owned and controlled entity that is recognized by the State in which the entity is doing business as a cooperative related to agriculture.

**"Criminal Drug Statute"** has the meaning provided in 7 C.F.R. § 3021.625.

GOV000489

**"Drug-free Workplace"** has the meaning provided in 7 C.F.R. § 3021.635.

**"Earned premium rate (EPR)"** means the total net book premium earned by all AIPs for the 2008 reinsurance year on all eligible crop insurance contracts for which A&O subsidy was paid by FCIC divided by total liability, as of the January 2010 monthly settlement report.

**"Eligible crop insurance contract"** means an insurance contract with an eligible producer: (1) covering an agricultural commodity authorized to be insured under the Act and approved for sale by FCIC; (2) with terms and conditions in effect as of the applicable contract change date; (3) that is sold and serviced in accordance with the Act, FCIC regulations, FCIC procedures, and this Agreement; and (4) that has a sales closing date within the reinsurance year.

**"Eligible producer"** means a person who has an insurable interest in an agricultural commodity, has not been determined ineligible to participate in the Federal crop insurance program, and possesses a United States issued social security number (SSN) or employer identification number (EIN).

**"Employee"** has the meaning provided in 7 C.F.R. § 3021.640.

**"Experienced agent"** means an agent who has completed at least one full year of sales and service, and is current on certification requirements as may be required by FCIC.

**"Experienced loss adjuster"** means a loss adjuster who has completed at least one full year of loss adjustment and is current on certifications as may be required by FCIC.

**"FCIC payment date"** means the first banking day following the 14th calendar day after FCIC receives the signed, certified monthly or annual settlement report and supporting data from the Company upon which any payment is based.

**"FCIC procedures"** means the applicable handbooks, manuals, bulletins, memoranda or other written directives issued by FCIC related to an eligible crop insurance contract and this Agreement.

**"FSA"** has the same meaning as the term "Farm Service Agency" in section 1 of the Common Crop Insurance Policy Basic Provisions.

**"Immediate family"** means an individual's father, mother, stepfather, stepmother, brother, sister stepbrother, stepsister, son, daughter, stepson, stepdaughter, grandparent, grandson, granddaughter, father-in-law, mother-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, the spouse of the foregoing, and the individual's spouse.

GOV000490

**"Inspection"** means verification:

> As to whether the application, production report, acreage report, notice of claim, or other relevant documents in accordance with FCIC procedures were timely submitted;

(1)     Of the information reported on the documents:

(A)     Referenced in (1) above, and related to the claim, including preliminary and final loss adjustment (Verification of the approved yields will consist of examination of the records supporting the last three years certified for the crop); and

(B)     Related to pre-harvest, growing season, or pre-acceptance examination of the crop;

(2)     That policy documents, including, but not limited to, actuarial documents, have been properly used and applied;

(3)     That the reported practice is being carried out in accordance with good farming practices;

(4)     That the crop has been planted, or replanted as applicable;

(5)     That the policy constitutes an eligible crop insurance contract;

(6)     That the producer qualifies as an eligible producer; and

(7)     That the agent or loss adjuster has complied with FCIC procedures.

**"Insurable interest"** has the same meaning as the term "share" in the applicable eligible crop insurance contract.

**"Loan"** for purposes of the definition of compensation means a lending agreement that transfers money or other items of value from the Company, or its MGA, to a person on the condition that it will be paid back later. Loans are considered compensation unless:

(1)     Such lending agreement was entered into before July 1, 2010; or

(2)     The terms of such lending agreement are commercially reasonable and the Company annually until the loan has been fully repaid, in the Plan of Operations, certifies that the terms of each lending agreement have not been breached and have not and will not be forgiven.

GOV000491

**"Loss adjuster"** means an individual who is licensed by a State, or has passed a proficiency testing program approved by FCIC, as applicable, and who verifies information affecting the coverage and makes factual determinations regarding the existence or amount of loss under an eligible crop insurance contract.

**"Loss ratio"** means the ratio calculated by dividing the ultimate net loss by the net book premium, expressed as a percentage. For example, if $1 ultimate net loss is paid and 50 cents net book premium is received, this would be expressed as a 200 percent loss ratio.

**"Managing General Agent (MGA)"** means an entity that meets the definition of managing general agent under the laws of the State in which such entity is incorporated and in every other state in which it operates, or in the absence of such State law or regulation, meets the definition of a managing general agent or agency in the National Association of Insurance Commissioners Managing General Agents Act, or a successor Act.

**"Material"** means an act or omission that, as determined by FCIC, would: (1) cause FCIC to assume a significant additional risk that it would not otherwise have assumed but for the act or omission; (2) cause the amount paid by or to FCIC to significantly differ from the amount that would otherwise be paid or owed but for the act or omission; (3) likely preclude or make it substantially more difficult to carry out the requirements of the Agreement and FCIC procedures; or (4) create a program vulnerability that could cause a payment to be made that would be significantly different than would otherwise be made if the act or omission had not occurred.

**"Net book premium"** means the premium amount established by FCIC for eligible crop insurance contracts in accordance with section 508(d)(2) of the Act (7 U.S.C. § 1508(d)(2)), less any amount for A&O subsidy.

**"New agent"** means an agent who has not completed one full year of sales and service.

**"New loss adjuster"** means a loss adjuster who has not completed one full year of loss adjustment.

**"Person"** means an individual or legal entity.

**"Personally Identifiable Information"** means any information about an individual maintained by the Company and its affiliates, including but not limited to, education, financial transactions, medical history, and criminal or employment history and information which can be used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, biometric records, etc., including any other personal information which is linked or linkable to an individual.

**"Plan of insurance"** means a broad category of crop insurance contracts such as actual production history (APH), yield protection, revenue protection, etc. that has been designated by FCIC as a separate plan of insurance.

GOV000492

**"Plan of Operations"** means the documents and information the Company shall submit in accordance with section IV(f)(2), Appendix II, and applicable FCIC procedures.

**"Policy Acceptance and Storage System (PASS)"** means any RMA or FCIC approved electronic data processing (EDP) system that receives and accepts or rejects Company-submitted data for eligible crop insurance contracts.

**"Policy Issuing Company (PIC)"** means an insurance company that issues eligible crop insurance contracts reinsured under this Agreement on behalf of the Company and cedes 100 percent of the premiums and associated losses to the Company.

**"Policyholder"** means an eligible producer who has been issued one or more eligible crop insurance contracts.

**"Producer premium"** means that portion of the premium for an eligible crop insurance contract payable by the policyholder.

**"Protected Information"** means any Personally Identifiable Information about a policyholder, or information about the policyholder's farming operation or insurance policy, acquired from the policyholder, USDA, the Comprehensive Information Management System, or the policyholder's previous or current approved insurance provider or agent that is protected from disclosure by the Privacy Act of 1974 (5 U.S.C. § 552a), section 502(c) of the Act (7 U.S.C. § 1502(c)), or any other applicable Federal statute. This definition includes all hard copy or electronic information.

**"Rebate"** means to pay, allow, or give, or offer to pay, allow or give, directly or indirectly, either as an inducement to procure insurance or after insurance has been procured, any benefit (including money, goods or services for which payment is usually made [except any service provided to fulfill an obligation of the Company under this Agreement]), discount, abatement, credit, or reduction of the premium named in the insurance policy and any other valuable consideration or inducement not specified in the policy.

**"Records"** means documentation in any form that relates to an eligible crop insurance contract or this Agreement. Such documentation includes original signed documents, or legible electronic images of the original signed documents, any other documents, or legible electronic images of any other documents, and electronic information either produced by the Company or an affiliate or obtained from outside sources or the policyholder that are utilized by the Company or an affiliate to establish, calculate, verify or determine a policyholder's program eligibility, insurance coverage, APH yields, premium, liability, or indemnity.

 **"Reinsurance year"** means the term of this Agreement beginning July 1 and ending on June 30 of the following year and, for reference purposes, identified by reference to the year containing June.

GOV000493

**"Relative"** means an individual who: (1) is immediate family; (2) resides in the household of; or (3) engages in business with respect to, a farming operation with the person in question, regardless of whether or not the individual is immediate family.

**"Retained"** as applied to ultimate net losses, net book premium, or book of business, means the remaining liability for ultimate net losses and the right to associated net book premiums after all reinsurance ceded to FCIC under this Agreement.

**"Risk subsidy"** means that portion of the premium for an eligible crop insurance contract paid by FCIC on behalf of the policyholder.

**"Sales closing date"** has the same meaning as the term "sales closing date" in the applicable eligible crop insurance contract.

**"Sales supervisor"** means any person having immediate or day-to-day supervisory control, management or oversight authority of the activities of sales agents or sales agency employees on behalf of the Company.

**"Satisfactory performance record"** means a record of performance that demonstrates substantial conformity with applicable requirements, as specified in section II(a)(9).

**"Satisfactory work performance"** means the work of the agent, loss adjuster, or other affiliate that is evaluated annually and found to be in compliance with the requirements of this Agreement.

**"Service provider"** means managing general agents, and any other entity (other than an agent or agency) who issues or services eligible crop insurance contracts; develops, operates or maintains the Information Technology systems or prepares or transmits data; or, who on a regional, State or other area basis, provides loss adjustment services. Regardless of any other factor, a service provider is an affiliate.

**"Signature"** means the affixing of a person's name in a distinctive way as a form of identification or authorization, including in an electronic or digital form as approved by FCIC.

**"State Group 1"** means Illinois, Indiana, Iowa, Minnesota, and Nebraska.

**"State Group 2"** means Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Kansas, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, North Carolina, North Dakota, New Mexico, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Virginia, Washington, and Wisconsin.

**"State Group 3"** means Alaska, Connecticut, Delaware, Hawaii, Maine, Massachusetts, Maryland, Nevada, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Utah, Vermont, West Virginia, and Wyoming.

GOV000494

**"Subagent"** means any individual: (1) licensed by a State in which an eligible crop insurance contract is sold and serviced for the reinsurance year; and (2) who provides on behalf of an Agent any sales or service, or assistance with sales and service, for some or all of the Agent's eligible crop insurance contract(s).

**"Total liability"** means the amount of liability for all eligible crop insurance contracts written by all AIPs for the 2008 reinsurance year for which A&O subsidy was paid by FCIC, as of the January 2010 monthly settlement report.

**"Trade association"** means an entity recognized by the State in which the entity is doing business as a trade association and shall not include an organization that is formed for the purposes of providing insurance.

**"Transaction cutoff date"** for weekly data reporting is 8 p.m. Central time on Friday of each week and for monthly data reporting is 8 p.m. Central time on Friday after the first Sunday of the month.

**"Ultimate net loss"** means the amount paid by the Company under any eligible crop insurance contract reinsured under this Agreement in settlement of any claim and in satisfaction of any judgment, arbitration award, or mediation (including any interest awarded as specified in section XI(e)(1) of Appendix I) rendered on account of a claim under an eligible crop insurance contract, less any recovery or salvage by the Company.

**"Underwriting"** means the determination by the Company that all terms and conditions of eligibility and coverage have been met to qualify the policy as an eligible crop insurance contract.

**"Underwriting Capacity Manager (UCM)"** means an FCIC system that monitors the amount of insurance authorized to be insured or reinsured, and accepts or rejects the application of an eligible producer based on the availability of such amount of insurance, if limits have been placed by Federal legislation or FCIC on the amount of insurance authorized to be insured or reinsured.

**"Underwriting gain"** means the amount by which the Company's share of retained net book premium exceeds its share of retained ultimate net losses.

**"Underwriting loss"** means the amount by which the Company's share of retained ultimate net losses exceeds its share of retained net book premium.

**"Verification"** means the determination of whether information submitted is true and accurate through independent third parties or independent documentation in accordance with FCIC procedures. With respect to certifications, asking the policyholder whether the information is true and accurate does not constitute verification.

**"Written Agreement"** has the same meaning as the term "written agreement" in the applicable eligible crop insurance contract.

GOV000495

## SECTION II. REINSURANCE

(a)    General Terms

(1)    For the Company to receive reinsurance, A&O subsidy, CAT LAE, and risk subsidy under this Agreement, an insurance contract must qualify as an eligible crop insurance contract, except as otherwise specified in this Agreement.

(2)    Notwithstanding paragraph (3), applications for eligible crop insurance contracts that are rejected by the UCM, as applicable, will not be eligible for reinsurance, A&O subsidy, CAT LAE, or risk subsidy.

(3)    Except as specified below, the Company shall offer and market all plans of insurance for all crops in any State where actuarial documents are available in which it writes an eligible crop insurance contract and shall accept and approve applications from all eligible producers. The Company may not cancel an eligible crop insurance contract held by a policyholder so long as the policyholder remains an eligible producer and the Company continues to write eligible crop insurance contracts within the State, except as authorized by FCIC. The Company is not required to offer such plans of insurance as may be approved by FCIC under the authority of section 508(h) of the Act. (7 U.S.C. § 1508(h)). However, if the Company chooses to offer any such plan, it shall offer the plan in all approved states in which it writes an eligible crop insurance contract where such plan is made available and it shall comply with all provisions of this paragraph as to such plan.

(4)    In exchange for premiums ceded by the Company to FCIC under this Agreement, FCIC will provide reinsurance to the Company with respect to such contracts in accordance with the provisions of this Agreement.

(5)    A Company and its affiliates are prohibited from providing a rebate except as authorized in section 508(a)(9)(B) of the Act (7 U.S.C. § 1508(a)(9)(B)).

(6)    A violation of paragraph (5) will result in the denial of reinsurance, A&O subsidy, CAT LAE, and risk subsidy, for all eligible crop insurance contracts for which such violation occurred, and may subject the person who committed or authorized the violation to administrative sanctions, including, but not limited to, disqualification under the Act or applicable regulations.

(7)    Only the amount of net book premium authorized by FCIC in the approved Plan of Operations, including any amendments under Appendix II, shall be reinsured and subsidized under this Agreement.

GOV000496

(8)    The Company shall have the financial and operational resources, organization, experience, internal controls, and technical skills to meet the requirements, including addressing reasonable risks, associated with the Agreement, including 7 C.F.R. part 400, subpart L, as determined by FCIC.

    (A)    The Company shall provide information necessary to evaluate compliance with this paragraph as often as required by FCIC.

    (B)    The Company shall provide written notice to FCIC of any anticipated change in:

        (i)    Its service providers or the services they provide (e.g., software, software agreements, service agreements, etc.); or

        (ii)    Its, or its affiliates', business organization, operations, finances or the sales expectations of the Company, if such change:

            (I)    Is at variance with the Company's Plan of Operations; or

            (II)    Could affect the Company's ability to perform under the Agreement.

    (C)    If any change referenced in subparagraph (B) occurs, whether FCIC learns of the change by notice from the Company or otherwise:

        (i)    FCIC may require the Company to amend its Plan of Operations; or

        (ii)    The Company may submit to FCIC in writing a request to amend the Plan of Operations.

            (I)    The request must be approved by FCIC in writing before the amended Plan of Operations can become a part of this Agreement.

            (II)    The request will be evaluated in accordance with the FCIC procedures applicable to the original Plan of Operations, except that FCIC will also consider whether FCIC's risk is materially increased.

GOV000497

(III)    FCIC will not approve a request to amend the Plan of Operations if such amendment would materially increase the risk of loss to FCIC unless FCIC, at its sole discretion, determines that the amendment arises from an action of FCIC or the U.S. Department of Agriculture that substantially increases the risk of underwriting loss on eligible crop insurance contracts written by the Company.

(IV)    Changes to eligible crop insurance contracts made in accordance with the terms of such contract are not a basis for an amendment to the Plan of Operations.

(D)    If at any time during the reinsurance year FCIC cannot determine that the Company is in compliance with the requirements of this paragraph or FCIC learns that the Company may be in substantial risk for failure to comply with the requirements of this paragraph, the Company shall take corrective actions acceptable to FCIC in accordance with section IV(h)(4), or be subject to the remedies provided for in this Agreement.

(9)    The Company shall demonstrate a satisfactory performance record to obtain an Agreement and continue to hold an Agreement for the reinsurance year. The following will be reviewed to determine whether there is a satisfactory performance record:

(A)    In the most recent five reinsurance years, the Company and service providers shall demonstrate:

(i)    There is substantial conformity with the requirements of this Agreement, the regulations and FCIC procedures, as applicable;

(ii)    Any material deficiency was caused by circumstances beyond the Company's control, and that, as soon as the Company discovered the deficiency, the Company took timely and appropriate corrective action;

(iii)    There was no material misconduct on the part of the Company or its service providers; and

(iv)    To the satisfaction of FCIC, any other mitigating factors that would prove, notwithstanding any identified deficiency, the Company has a satisfactory performance record;

GOV000498

      (B)     Whether the Company can, to the satisfaction of FCIC, demonstrate the ability to comply with the requirements of paragraph (8);

      (C)     Whether the Company can demonstrate the ability to fulfill the requirements under this Agreement under various risk assessment scenarios, including, but not limited to, significant nationwide losses, the loss or failure of a service provider, the threats and risks outlined in section VI of Appendix II, or other risks as identified by FCIC; and

      (D)     Whether FCIC or a State has identified any material deficiencies that may raise questions or concerns regarding the Company's ability to meet the requirements of this Agreement.

(10)    If the Company previously has not been an AIP, the Company and its service providers shall demonstrate to the satisfaction of FCIC that it can achieve and maintain a satisfactory performance record consistent with paragraph (9).

(11)    Failure to meet the conditions stated in paragraphs (8), (9), or (10), may subject the Company to appropriate remedies in this Agreement, including, but not limited to, denial of an Agreement, suspension of the Agreement or a reduction in the net book premium the Company is authorized to write.

(12)    Unless otherwise specifically approved by FCIC in advance in writing, the Company may only delegate its authority or control over the designation of eligible crop insurance contracts to reinsurance funds to its managing general agent and the Company shall include the delegation in its Plan of Operation.

(13)    Failure of the Company to comply with the provisions of this Agreement, including, but not limited to, timely submission of data and reports, does not excuse or delay the Company's requirement to pay any amount due to FCIC by the dates specified herein.

(14)    Neither the Company nor its affiliates shall assess service fees or additional charges on eligible crop insurance contracts reinsured and subsidized under this Agreement except as authorized by the Act or approved by FCIC in writing.

(b)    Reinsurance

GOV000499

(1)    The Company, in accordance with its Plan of Operations, may designate an eligible crop insurance contract to the Assigned Risk Fund by State. Any eligible crop insurance contract not specifically designated by the Company to the Assigned Risk Fund will automatically be assigned to the Commercial Fund by State.

(2)    Unless otherwise specified in Appendix III, if the Company elects to designate eligible crop insurance contracts to the Assigned Risk Fund, it shall do so not later than the transaction cutoff date for the week containing the 30th calendar day after the sales closing date for the eligible crop insurance contract, except:

   (A)    In the case of written agreements requiring annual FCIC approval or for the initial year of an eligible crop insurance contract associated with a written agreement only (excluding written agreements specified in Appendix III), not later than the transaction cutoff date for the week containing the 30th calendar day after FCIC approval;

   (B)    For the initial year of application for any agricultural commodity without a fixed sales closing date, the later of the transaction cutoff date for the week containing the 30th calendar day after the eligible producers signature date on the application, or the transaction cutoff date for the week containing the 30th calendar day prior to the cancellation date; and

   (C)    For the subsequent year of insurance for any agricultural commodity without a fixed sales closing date, the transaction cutoff date for the week containing the 30th calendar day prior to the cancellation date for the previous year.

(3)    Assigned Risk Fund Retention

   (A)    The Company shall retain a 20 percent interest in premium and associated ultimate net losses in the Assigned Risk Fund in each State. The remainder is ceded to FCIC.

   (B)    The associated net book premium of eligible crop insurance contracts assigned to the Assigned Risk Fund shall not exceed 75 percent of the Company's net book premium in each State.

   (C)    Unless otherwise specified in the Agreement, in the event the percentage of net book premium for eligible crop insurance contracts in the Assigned Risk Fund exceeds 75 percent of the aggregate net book premium for any State, the amount of premiums and associated liabilities in the Assigned Risk Fund will

GOV000500

be reduced pro-rata to 75 percent and the excess will be assigned by FCIC to the Commercial Fund for that State.

(4)    Commercial Fund Retention

(A)    The Company shall retain at least a 35 percent interest in premium and associated ultimate net losses in the Commercial Fund in each State. The remainder shall be ceded to FCIC.

(B)    The retention percentage for the Commercial Fund in each State shall be made in 5 percent increments and designated in the Company's Plan of Operations according to Appendix II.

(5)    Underwriting Loss

(A)    Commercial Fund

After the retentions under paragraph (4), the amount of underwriting loss retained by the Company for the Commercial Fund will be calculated within each State as the sum of the following:

(i)     For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 100 percent and is less than or equal to 160 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

(I)     Its retained net book premium;

(II)    The lesser of the Company's actual loss ratio or 160 percent, minus 100 percent; and

(III)   The following percentage for the applicable State Group:

| | |
|---|---|
| State Group 1 | 65.0 percent |
| State Groups 2 and 3 | 42.5 percent |

(ii)    For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 160 percent and is less than or equal to 220 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

(I)     Its retained net book premium;

GOV000501

(II)    The lesser of the Company's actual loss ratio or 220 percent, minus 160 percent; and

(III)    The following percentage for the applicable State Group:

| | |
|---|---|
| State Group 1 | 45.0 percent |
| State Groups 2 and 3 | 20.0 percent |

(iii)    For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 220 percent and is less than or equal to 500 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

(I)    Its retained net book premium;

(II)    The lesser of the Company's actual loss ratio or 500 percent, minus 220 percent; and

(III)    The following percentage for the applicable State Group:

| | |
|---|---|
| State Group 1 | 10.0 percent |
| State Groups 2 and 3 | 5.0 percent |

(iv)    FCIC will assume 100 percent of that portion of the underwriting loss amount for which the Company's loss ratio exceeds 500 percent.

(B)    Assigned Risk Fund:

After the retentions under paragraph (3), the amount of the underwriting loss retained by the Company for the Assigned Risk Fund will be calculated within each State as the sum of the following:

(i)    For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 100 percent and is less than or equal to 160 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

(I)    Its retained net book premium;

(II)    The lesser of the Company's actual loss ratio or 160 percent, minus 100 percent; and

GOV000502

   (III) 7.5 percent.

  (ii) For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 160 percent and is less than or equal to 220 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

   (I) Its retained net book premium;

   (II) The lesser of the Company's actual loss ratio or 220 percent, minus 160 percent; and

   (III) 6.0 percent.

  (iii) For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 220 percent and is less than or equal to 500 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

   (I) Its retained net book premium;

   (II) The lesser of the Company's actual loss ratio or 500 percent, minus 220 percent; and

   (III) 3.0 percent.

  (iv) FCIC will assume 100 percent of that portion of the underwriting loss amount for which the Company's loss ratio exceeds 500 percent.

(6) Underwriting Gain

(A) Commercial Fund

After the retentions under paragraph (4), the amount of underwriting gain retained by the Company for the Commercial Fund will be calculated within each State as the sum of the following:

  (i) For that portion of the underwriting gain amount for which the Company's loss ratio is less than or equal to 100 percent but is greater than or equal to 65 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

(I)     Its retained net book premium;

(II)    100 percent minus [the greater of the Company's actual loss ratio or 65 percent]; and

(III)   The following percentage for the applicable State Group:

| | |
|---|---|
| State Group 1 | 75.0 percent |
| State Groups 2 and 3 | 97.5 percent |

(ii)    For that portion of the underwriting gain amount for which the Company's loss ratio is less than 65 percent but is greater than or equal to 50 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

(I)     Its retained net book premium;

(II)    65 percent minus [the greater of the Company's actual loss ratio or 50 percent]; and

(III)   The following percentage for the applicable State Group:

| | |
|---|---|
| State Group 1 | 40.0 percent |
| State Groups 2 and 3 | 40.0 percent |

(iii)   For that portion of the underwriting gain amount for which the Company's loss ratio is less than 50 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

(I)     Its retained net book premium;

(II)    50 percent minus the Company's actual loss ratio; and

(III)   The following percentage for the applicable State Group:

| | |
|---|---|
| State Group 1 | 5.0 percent |
| State Groups 2 and 3 | 5.0 percent |

GOV000504

(B) Assigned Risk Fund

After the retentions under paragraph (3), the amount of underwriting gain retained by the Company for the Assigned Risk Fund will be calculated within each State as the sum of the following:

(i) For that portion of the underwriting gain amount for which the Company's loss ratio is less than or equal to 100 percent but is greater than or equal to 65 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

(I) Its retained net book premium;

(II) 100 percent minus [the greater of the Company's actual loss ratio or 65 percent]; and

(III) 22.5 percent.

(ii) For that portion of the underwriting gain amount for which the Company's loss ratio is less than 65 percent but is greater than or equal to 50 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

(I) Its retained net book premium;

(II) 65 percent minus [the greater of the Company's actual loss ratio or 50 percent]; and

(III) 13.5 percent.

(iii) For that portion of the underwriting gain amount for which the Company's loss ratio is less than 50 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

(I) Its retained net book premium;

(II) 50 percent minus the Company's actual loss ratio; and

(III) 3.0 percent.

(7) The Company's cumulative underwriting gain or loss shall be determined by summing the net underwriting gains or losses for all States for the Commercial and Assigned Risk Funds.

GOV000505

(8)    Net Book Quota Share

    (A)    The Company shall cede to FCIC 6.5 percent of its cumulative underwriting gain or loss calculated in paragraph (7) and the associated premium and losses with such amount.

    (B)    After the cession in subparagraph (A):

        (i)    Any underwriting gain due the Company will be paid by FCIC to the Company at annual settlement.

        (ii)    Any underwriting loss of the Company will be paid to FCIC on each monthly settlement report for which there is an underwriting loss.

(9)    Disbursement of Gains from the Net Book Quota Share

    (A)    If the sum of all AIPs Net Book Quota Share, calculated in accordance with paragraph (8), results in a net underwriting gain to be paid to FCIC for the reinsurance year, a portion of any such net underwriting gain will be disbursed to the Company as a payment equal to the product of the following:

        (i)    The ratio of the Company's total net book premium for additional coverage eligible crop insurance contracts for all funds in State Group 3 relative to total net book premium for additional coverage eligible crop insurance contracts of all AIPs for all funds in State Group 3; and

        (ii)    1.5 percent of the sum of all underwriting gains and losses calculated in accordance with paragraph (7) for all AIPs for the reinsurance year.

    (B)    Any disbursement under this paragraph will be made at annual settlement.

(10)    Contingency Fund

    (A)    The Contingency Fund, which is part of the insurance fund authorized under section 516(c) of the Act (7 U.S.C. § 1516(c)), is used to offset expenses incurred by FCIC to administer a Company's book of business in the event of Company supervision, rehabilitation, insolvency or operational deficiency, or an equivalent event, as determined by FCIC, or the Agreement is terminated for cause.

GOV000506

(B)    Any amounts owed to FCIC by the Company in accordance with sections II(a)(6), II(b)(12), IV(b)(7), IV(h), and IV(j)(4) will be accounted for in the Contingency Fund.

(11)    The Company may reinsure its liability for ultimate net losses remaining after all retentions, designations, and assignments under this Agreement. Insurance companies that qualify as PICs are not precluded from entering into reinsurance arrangements with the Company. The Company shall inform FCIC in writing of all reinsurance arrangements that relate to eligible crop insurance contracts. Reinsurance arrangements, unless otherwise specified by FCIC in writing, must meet the definition of, and the standards applicable to:

(A)    Reinsurance in the National Association of Insurance Commissioners (NAIC) Credit for Reinsurance Model law, or a NAIC model successor law;

(B)    Standards for reinsurance under the NAIC Accounting Practices and Procedures Manual including any revisions or updates; and

(C)    Any other relevant standards developed by the NAIC for credit for reinsurance.

(12)    In addition to other remedies provided in this Agreement, FCIC may, at its sole discretion, offer additional reinsurance beyond what is otherwise provided in this Agreement whenever the Company reports an amount of net book premium greater than the amount FCIC has authorized, in accordance with Appendix II. FCIC may cause the underwriting gain or loss after the cession determined in paragraph (8)(A), payable to or by the Company, to be reduced according to the ratio of the excess net book premium to the total reported net book premium. The excess will then be reinsured under this Agreement. The Company agrees to pay FCIC a reinsurance premium equal to 5 percent of the excess net book premium whenever this provision applies.

## SECTION III. SUBSIDIES, EXPENSES, FEES, AND PAYMENTS

(a)    Subsidies and Expenses

(1)    Risk subsidy shall be determined in accordance with the Act and will be provided on behalf of policyholders to the Company on the monthly settlement report specified in paragraph (2)(B) below.

GOV000507

(2)    A & O Subsidy and CAT LAE

(A)    Notwithstanding the provisions of this section, under no circumstances will A&O subsidy or CAT LAE be paid in excess of the amounts authorized by the Act.

(B)    A&O subsidy and CAT LAE will be paid to the Company after the Company submits, and FCIC accepts, acreage reports, or other similar reports (e.g., preliminary tonnage report for eligible raisin crop insurance contracts, or inventory value reports for nursery and clam crop insurance contracts, annual farm report for eligible AGR crop insurance contracts). The initial payment to the Company of A&O subsidy and CAT LAE will be based on information reported on the September monthly settlement report following the end of the reinsurance year, and will be adjusted monthly thereafter.

(C)    For any eligible crop insurance contract for CAT coverage, A&O subsidy will be 0.0 percent of net book premium; for CAT LAE, 6.0 percent of the net book premium.

(D)    For eligible crop insurance contracts with additional coverage that provide coverage under an area-based, or similar plan of insurance, the A&O subsidy will be:

(i)    For Supplemental Coverage Option and Stacked Income Protection plans of insurance, 12.0 percent of the net book premium. For other such eligible crop insurance contracts, 12.0 percent of the net book premium, except as provided in clause (ii).

(ii)    For area-based or similar plans of insurance that were not widely available as of the 2008 reinsurance year, 20.1 percent of the net book premium for such eligible crop insurance contracts.

(E)    For an agricultural commodity in a county for which FCIC did not establish premium rates in the actuarial data master file for the 2010 reinsurance year and excluding eligible crop insurance contracts subject to subparagraphs (C) and (D):

(i)    For additional coverage eligible crop insurance contracts that provide coverage under a revenue plan of insurance that can increase liability whenever the market price at the time of harvest exceeds the market price at the time of planting, 18.5 percent of the net book premium.

GOV000508

(ii)     For all other eligible crop insurance contracts, 21.9 percent of the net book premium.

(F)     Subject to the limitations provided in subparagraphs (G) and (H) and excluding eligible crop insurance contracts subject to subparagraphs (C), (D), and (E), A&O subsidy will be determined and paid as set forth below.

(i)     For additional coverage eligible crop insurance contracts that provide coverage under a revenue plan of insurance that can increase liability whenever the market price at the time of harvest exceeds the market price at the time of planting, 18.5 percent of the net book premium.

(ii)     For all other eligible crop insurance contracts, 21.9 percent of the net book premium.

(G)     Notwithstanding the provisions contained in subparagraph (F):

(i)     If the sum of the A&O subsidies for all AIPs for all eligible crop insurance contracts subject to subparagraph (F) for the reinsurance year exceeds the product of the following:

(I)     Total liability;

(II)     EPR;

(III)     Average A&O rate;

(IV)     A&O inflation adjustment factor of 1.0793; and

(V)     0.615; then

(ii)     The total A&O subsidy paid to the Company for eligible crop insurance contracts subject to subparagraph (F) will be equal to the product of:

(I)     The total A&O subsidy calculated for the Company according to subparagraph (F); and

(II)     The ratio of clause (i) above divided by the sum of the A&O subsidies for all AIPs for all eligible crop insurance contracts calculated according to subparagraph (F) for the reinsurance year.

GOV000509

(iii)    Any adjustment to the A&O subsidy amount determined in accordance with subparagraph (G) will be made on the monthly settlement report for the applicable reinsurance year and adjustments will end on the first annual settlement report for the reinsurance year.

(H)    Notwithstanding the provisions contained in subparagraph (F):

(i)    If the sum of the A&O subsidies for all AIPs for all eligible crop insurance contracts subject to subparagraph (F) for the reinsurance year is less than the product of the following:

(I)    Total liability;

(II)    EPR;

(III)    Average A&O rate;

(IV)    A&O inflation adjustment factor of 1.0793; and

(V)    0.489; then

(ii)    The total A&O subsidy paid to the Company for eligible crop insurance contracts subject to subparagraph (F) will be equal to the product of:

(I)    The total A&O subsidy calculated for the Company according to subparagraph (F); and

(II)    The ratio of clause (i) above divided by the sum of the A&O subsidies for all AIPs for all eligible crop insurance contracts calculated according to subparagraph (F) for the reinsurance year.

(iii)    Any adjustment to the A&O subsidy amount determined in accordance with subparagraph (H) will be made on the first annual settlement report for the reinsurance year.

(I)    Notwithstanding subparagraphs (E) through (H), FCIC will pay additional A&O subsidy for eligible crop insurance contracts in States in which:

(i)    The loss ratio is greater than 120 percent of the total net book premium written in the State by all AIPs. FCIC will pay an additional A&O subsidy amount equal to 1.15 percent times the netbook premium for eligible crop insurance contracts subject to subparagraphs (E) and (F)

and calculated according to subparagraphs (E) and (F) in accordance with 7 U.S.C. § 1508(k)(4).

(ii) The loss ratio for eligible crop insurance contracts as defined in 7 U.S.C. § 1508(k)(10) is greater than 120 percent of the total net book premium written in the State by all AIPs. FCIC will pay an additional A&O subsidy amount equal to 6.0 percent times the netbook premium for eligible crop insurance contracts subject to subparagraphs (E) and (F) and calculated according to subparagraphs (E) and (F).

(iii) Any adjustment to the loss ratio for a State will be made on the monthly settlement report for the applicable reinsurance year and adjustments will end subject to the limitations for submitting data through automated systems, in accordance with Appendix III.

(J) For Specialty Crops, notwithstanding subparagraphs (D) through (H), the A&O subsidy for crop insurance contracts covering agricultural commodities described in section 101 of the Specialty Crops Competitiveness Act of 2004 (7 U.S.C. 1621 note; Public Law 108–465) shall be equal to or greater than the percentage that is the greater of the following:

(i) 17 percent of the premium used to define loss ratio.

(ii) The percent of the premium used to define loss ratio that is otherwise applicable for the reinsurance year under the terms of this Agreement in effect for the reinsurance year.

(I) In carrying out paragraph (J) FCIC will not reduce A&O subsidy for contracts which are not subject to this paragraph in accordance with U.S.C. § 1508(k)(11).

(K) In addition to other provisions of this Agreement, the amount of A&O subsidy may be adjusted to a level that FCIC determines to be equitable if issuing or servicing eligible crop insurance contracts involves expenses that vary significantly from the basis used to determine the A&O subsidy under this section.

(M) The Company, for itself and any persons whose rights are derivative of the Company (including, but not limited to, assigns, successors, and representatives) hereby covenants and agrees that it will not institute or file any judicial or administrative proceeding, or cause the instituting or filing (directly or indirectly) of any judicial or

GOV000511

administrative proceeding, or assist any third party that has instituted or filed any judicial or administrative proceeding, against FCIC, RMA, the United States Department of Agriculture, or any officer, agent, or director thereof (collectively, "FCIC"), challenging the legality of the terms and conditions of section III(a). Nothing in the forgoing precludes the Company from responding to a court order. This covenant and agreement may be pleaded by FCIC as a bar or release in the event any such judicial or administrative proceeding is instituted or filed. The Company and FCIC, prior to execution of this Agreement, had disputed the provisions of section III(a). That dispute now has been compromised in a manner mutually acceptable to the Company and FCIC, and, in consideration of that compromise, the Company agrees and covenants as set forth above. The Company shall require its agents to acknowledge in writing that the agents agree to and are bound by the same covenant not to sue contained in this paragraph. Such acknowledgement may be contained in an agent or other agreement.

(3)     The SSNs of all agents and loss adjusters, as applicable, who perform any service or related activity under an eligible crop insurance contract, shall be provided to FCIC in accordance with FCIC procedures. If the applicable SSN is not provided for an eligible crop insurance contract, the Company shall not receive any reinsurance for that eligible crop insurance contract until the appropriate SSN is provided.

(4)     Compensation to persons involved in the direct sale and service of any eligible crop insurance contract under this Agreement, in accordance with FCIC procedures, shall only be paid or provided as follows:

(A)     All compensation paid by the Company or its MGA shall be in writing, and provided to FCIC upon request.

(B)     Except as provided in subparagraph (C), in any State in which the Company is doing business, the Company, its MGA, or any affiliate shall not pay total compensation in excess of 80 percent of the total amount of A&O subsidy and CAT LAE calculated in accordance with subsection (a)(2) excluding any amounts paid under subsection (a)(2)(I), for such State.  The calculation of the 80 percent is based on the amount paid by FCIC on the first annual settlement report for the reinsurance year.

(C)     The Company, its MGA, or any affiliates may only provide compensation in excess of that permitted in subparagraph (B) if:

(i)     The Company has been paid an underwriting gain under section II(b)(7) on the first annual settlement report for the reinsurance year;

(ii)     For any State in which the Company is doing business, the total amount of all compensation paid under this subparagraph and subparagraph (B) does not exceed 100 percent of the total amount calculated for A&O subsidy and CAT LAE in accordance with subsection (a)(2), excluding any amounts paid under subsection (a)(2)(I), for such State. The calculation of the 100 percent is based on the amount paid by FCIC on the first annual settlement report for the reinsurance year; and

(iii)    The total amount of compensation paid under this subparagraph to all persons in all States for the reinsurance year does not exceed:

    (I)     The underwriting gain paid to the Company under section II(b)(7) on the first annual settlement report for the reinsurance year; less

    (II)    Any net book quota share ceded to FCIC by the Company under section II(b)(8) on the first annual settlement report for the reinsurance year; plus

    (III)   Any disbursement of gains from the net book quota share received by the Company from FCIC under section II(b)(9) on the first annual settlement report for the reinsurance year; less

    (IV)    Any amounts obligated by the Company under reinsurance arrangements with entities that are not owned, in whole or in part, and controlled by the Company subject to section II(b)(11) for the reinsurance year; plus

    (V)     Any ceding commissions or other amounts received by the Company for reinsurance arrangements subject to section II(b)(11) for the reinsurance year.

(E)     If FCIC discovers that the Company, its MGA, or affiliate has paid compensation in excess of the amounts allowed in subparagraphs (B) or (C), the Company will be subject to any sanction described in this Agreement or applicable regulations. Any scheme or device to circumvent the limitations in subparagraphs (B) or (C) will be considered a violation of this Agreement.

(b)     Administrative Fees

GOV000513

The Company shall remit to FCIC all administrative fees collected in accordance with the applicable eligible crop insurance contract and the following:

(1)    In the event the policyholder is a limited resource farmer as defined in the regulations, the Company shall submit the required information to FCIC and FCIC will waive the applicable fees on the monthly settlement report.

(2)    The Company shall terminate eligible crop insurance contracts if administrative fees are not paid by the date specified in the applicable eligible crop insurance contract for CAT coverage and report such termination to FCIC in accordance with FCIC procedures.

(3)    FCIC will perform debt collection activities for CAT administrative fees that have not been timely paid, provided the Company has followed FCIC procedures.

(c)    Payments

(1)    With respect to payments due FCIC from the Company:

(A)    Except as provided in subparagraph (B), all payments will be netted on the monthly and annual settlement reports with amounts due the Company from FCIC. FCIC will remit amounts due the Company by electronic funds transfer (EFT) on or before the FCIC payment date. Any amounts due FCIC or the Company that are not timely remitted are subject to the interest rate provisions contained in section IV(c), with such interest accruing from the date such payment was due to the date of payment.

(B)    Amounts due FCIC on the September monthly settlement report following the end of the reinsurance year will be netted with amounts due the Company on prior reinsurance year reports. The Company must remit amounts due no later than the Company payment date for the September monthly report. The A&O subsidy and CAT LAE shown on the September monthly settlement report following the end of the reinsurance year, will not be netted with amounts due from the Company, but will be paid no later than the third business day of October. All subsequent monthly or annual settlement reports for the reinsurance year will be paid as specified in subparagraph (A).

(2)    In the event that FCIC erroneously rejects data that was correctly submitted by the Company and a payment would be due to the Company if the data had not been rejected, the Company shall be entitled to interest accrued on this amount for the period of such delay, at the rate provided in section IV(c)(1).

(3)    Any funds paid by the Company to FCIC in the compromise and settlement of any dispute between FCIC and the Company in an amount

GOV000514

less than FCIC claimed was due will be included on the monthly settlement report without regard to the provisions of section II(b).

(4)    Notwithstanding any other provision of this Agreement, if a review or examination reveals that the Company or its affiliates have committed an error or omission or failed to comply with a term of the Act, this Agreement, regulations, or FCIC procedures, FCIC will provide written notice to the Company within 3 years of the end of the insurance period when the error, omission or failure occurred, if the Company owes a debt to FCIC, unless the error, omission or failure was willful or intentional. The failure to provide timely notice required herein shall only relieve the Company from liability for the debt owed and not for other consequences of the error, omission or failure that address other obligations of the Company, including maintaining a satisfactory performance record. Written notice to the Company under this paragraph will:

(A)    Describe the failure regarding compliance with a specified term of the Act, this Agreement, the regulations, or FCIC procedures;

(B)    State that such failure results in an amount being owed to FCIC;

(C)    Include the crop year and eligible crop insurance contract number(s) for which such failure occurred; and

(D)    Provide sufficient detail to put the Company on general notice of the type of error, omission or failure alleged (such as failure to properly calculate the approved yield or failure to conduct a pre-acceptance inspection, etc.).

(5)    The Company shall provide written notice, in a form similar to the notice in paragraph (4), to FCIC of any claim that funds may be owed from FCIC to the Company within 3 years after annual settlement of the reinsurance year in which such funds are claimed to be owed. Failure to provide such notice shall relieve FCIC of the obligation to repay any amount that would be owed to the Company. If an investigation by FCIC determines that funds may be owed by FCIC to the Company, written notice does not need to be provided.

## SECTION IV. GENERAL PROVISIONS

(a)    Collection of Information and Data

(1)    The Company is required to collect and provide to FCIC all SSNs or EINs that are required to be submitted by the policyholder under the eligible crop insurance contract, and the SSNs of all employees, affiliates, and other persons as required by FCIC procedures. SSNs or EINs shall be protected, as prescribed in the Privacy Act of 1974 (5 U.S.C. § 552a), by the Company and all of its affiliates with access to such information.

GOV000515

(2)    In accordance with section 502(c) of the Act (7 U.S.C. § 1502(c)), neither the Company, nor its personnel, or contractors, or affiliates may disclose to the public any information provided by the policyholder unless such disclosure is otherwise required by Federal law.

(3)    All persons who have access to Protected Information or Personally Identifiable Information, including, but not limited to, personnel, contractors, service providers and affiliates of the Company, shall sign a non-disclosure statement, in accordance with reporting and certification requirements contained in section XV of Appendix I.

(4)    The Company and all of its affiliates shall develop, implement, and maintain information controls and systems, including those pertaining to all Protected Information and records, in a manner consistent with the Federal Information Security Management Act (FISMA) (44 U.S.C. § 3541), or any Federal law covering Federal crop insurance information. FISMA is based on an on-going, risk-based process to identify, assess, plan, and strengthen information security. The Company shall make available audit and assessments examining its Information Technology security, both internal and external, to FCIC upon request.

(5)    The Company shall report any loss or unauthorized disclosure of Protected Information or Personally Identifiable Information to FCIC within one hour of discovery of the loss or unauthorized disclosure of such information in accordance with Appendix III, and shall not distinguish between suspected or confirmed losses or disclosures.

(b)    Reports

(1)    The Company is required to collect, maintain and submit to FCIC data that FCIC reasonably determines is necessary to the operation of the Federal crop insurance program. Data the Company is required to submit to FCIC shall be certified as accurate, detailed and submitted to FCIC in accordance with FCIC procedures.

(2)    Unless specifically approved by FCIC in writing, FCIC will reject any eligible crop insurance contract originally submitted by the Company after the February monthly transaction cutoff date following the reinsurance year.

(3)    Producer premiums and administrative fees collected by the Company shall be reported to FCIC in accordance with Appendix III.

(4)    The Company shall provide information to FCIC relating to eligible crop insurance contracts of the Company reinsured under this Agreement as specified herein and in Appendix III.

GOV000516

(5)   In addition to any other reporting requirement, the Company shall report the following information regarding each eligible crop insurance contract and have such information be accepted by FCIC not later than the applicable date specified in paragraph (6):

    (A)   All names, SSNs, and EINs the policyholder is required to report under the eligible crop insurance contract;

    (B)   The agricultural commodity to be insured under the eligible crop insurance contract;

    (C)   The plan of insurance and coverage level, including the price election, elected by the eligible producer; and

    (D)   The actual production history to be used to establish insurable yields under the applicable eligible crop insurance contract, as specified in Appendix III.

(6)   Information specified in paragraph (5) must be accepted by FCIC not later than:

    (A)   For information required by paragraph (5), subparagraphs (A) through (C):

        (i)   In cases of written agreements requiring annual FCIC approval or for the initial year of a written agreement (unless otherwise specified in Appendix III), not later than the transaction cutoff date for the week containing the 30th calendar day after FCIC approval;

        (ii)   For any renewal or multi-year written agreement (unless otherwise specified in Appendix III), the transaction cutoff date for the week containing the 30th calendar day after the sales closing date for the eligible crop insurance contract;

        (iii)   For any agricultural commodity without a fixed sales closing date:

            (I)   For the initial year of application, the later of the transaction cutoff date for the week containing the 30th calendar day after the eligible producers signature date, or the transaction cutoff date for the week containing the 30th calendar day after the cancellation date;

            (II)   For any subsequent year of insurance, the

transaction cutoff date for the week containing the 30th calendar day after the cancellation date; and,

(iv)     For all other eligible crop insurance contracts not covered in subparagraphs (i) through (iii), the transaction cutoff date for the week including the 30th calendar day after the sales closing date for the eligible crop insurance contract.

(B)     For information required by paragraph (5), subparagraph (D), the transaction cutoff date for the week containing the 30th calendar day after the production reporting date for the eligible crop insurance contract, as specified in the actuarial data master file.

(7)     The A&O subsidy applicable to the eligible crop insurance contract determined in accordance with section III(a)(2) will be reduced whenever the information required by paragraph (5) has not been accepted by FCIC or such information is revised after the deadlines set forth in paragraph (6).

(A)     For information required by paragraph (6)(A), the A&O subsidy for the eligible crop insurance contract will be reduced by:

(i)     1 percentage point if the required information is first accepted or revised after the transaction cut-off date for the week containing the 30th calendar day after the sales closing date (or other cancellation, approval, or signature date specified in paragraph (6)), but prior to the transaction cut-off date for the week containing the 60th calendar day;

(ii)     2 percentage points if the required information is first accepted or revised after the transaction cut-off date for the week containing the 60th calendar day after the sales closing date (or other cancellation, approval, or signature date specified in paragraph (6)), but prior to the transaction cut-off date for the week containing the 90th calendar day; or

(iii)     3 percentage points if the required information is first accepted or revised after the transaction cut-off date for the week containing the 90th calendar day after the sales closing date (or other cancellation, approval, or signature date specified in paragraph (6)).

(B)     For information required by paragraph (6)(B), the A&O subsidy for the eligible crop insurance contract will be reduced by:

(i)     1 percentage point if the required information is first

GOV000518

accepted after the transaction cut-off date for the week containing the 30th calendar day after the production reporting date, but prior to the transaction cut-off date for the week containing the 60th calendar day;

(ii)     2 percentage points if the required information is first accepted after the transaction cut-off date for the week containing the 60th calendar day after the production reporting date, but prior to the transaction cut-off date for the week containing the 90th calendar day; or

(iii)    3 percentage points if the required information is first accepted after the transaction cut-off date for the week containing the 90th calendar day after the production reporting date.

(C)     The sanctions under this paragraph may be reduced or waived if the delay is caused in whole or in part by FCIC.

(D)     If the eligible crop insurance contract or FCIC procedures require or allow the policyholder to make an election of, or change to, any information required to be reported under paragraph (5), subparagraphs (A) through (C), after the applicable deadline specified in paragraph (6)(A), the A&O subsidy reduction in paragraph (7)(A) will not apply for that eligible crop insurance contract until the weekly transaction cutoff date containing the 30th calendar date after the date the policyholder is required to make such designation, or a determination by the Company in accordance with FCIC procedures, and the dates in paragraph (7)(A)(i), (ii), and (iii) are adjusted accordingly.

(E)     Nothing in paragraph (7)(B) shall limit the ability of the Company to correct, without application of reductions within (7)(B), any error in the information submitted under paragraph (5)(D) after acceptance of the information by FCIC in accordance with paragraph (6)(B).

(F)     The total of any A&O subsidy reductions in paragraph 7 for an eligible crop insurance contract will not exceed 3 percent.

(8)    The Summary of Coverage and billing statement provided to the policyholder shall, at a minimum, prominently display each of the following:

(A)     The amount of risk subsidy paid by FCIC on behalf of the policyholder;

(B)     The amount of premium and administrative fees due the Company

GOV000519

from the policyholder;

    (C)    The amount of A&O subsidy paid by FCIC to the Company on behalf of the policyholder, as calculated in accordance with sections III(a)(2)(D),(E), and (F) and prior to any adjustments made in accordance with sections III(a)(2)(G), (H), or (I); and

    (D)    For purposes of displaying the A&O subsidy adjustment calculated in accordance with section III(a)(2)(I), a footnote stating: "The reported A&O subsidy amount may increase by up to 7.15 percent of the net book premium, if the loss ratio in the state exceeds 1.20 or may otherwise change if required by the Standard Reinsurance Agreement. However, the amount of premium the policyholder is required to pay will not change.

(c)    Interest

    (1)    Any interest that the Company is required to pay FCIC under the terms of this Agreement will be paid at the simple interest rate of 15 percent per annum.

    (2)    The Company will repay with interest any amount paid to the Company by FCIC that FCIC or the Company subsequently determines was not due.

    (3)    FCIC will repay with interest any amount paid by the Company to FCIC, which FCIC subsequently determines was not due.

    (4)    Interest on amounts determined not to be due will begin to accrue on the 31st day after the date that:

        (A)    In the case of amounts owed to the Company, a written notification stating the amount claimed to be owed is provided to FCIC by the Company, as applicable, and end on the date the amount is paid in full; or

        (B)    In the case of amounts owed to FCIC, the Company receives a final determination from FCIC or other written statement from FCIC that a specific amount is owed, as applicable, and end on the date the overpaid amount is paid in full. Appeal by the Company under this Agreement or 7 C.F.R. § 400.169 does not delay the date by which interest starts to accrue.

(d)    Escrow Account

    (1)    At the Company's request, FCIC will allow the Company to establish an escrow account in the name of FCIC at a bank designated by the Company, and approved by FCIC, to reimburse the Company for payment of indemnities, prevented planting payments or replant payments to

GOV000520

policyholders by the Company. The Company's bank shall pledge collateral as required by 31 C.F.R. § 202 in the amount determined by FCIC.

(2) When an escrow account has been established, the Company may request FCIC to fund the escrow account by submitting indemnity data to FCIC in accordance with Appendix III. A request to fund the escrow account shall be deemed certified by an authorized officer or authorized employee of the Company that the information establishing the claim is correct and accurate. If the Company utilizes the escrow process to pay indemnities, prevented planting, or replant payments, the Company shall issue payment to the producer within 3 business days of submitting the request for escrow funding to FCIC.

(3) Any Company that elects not to utilize escrow funding will be reimbursed for paid losses validated and accepted on the monthly settlement report.

(4) The Company's bank may only draw funds from the escrow account when the instrument or document issued as payment of the indemnity, prevented planting payment or replant payment has cleared the Company's bank account.

(5) If there is a shortfall of funds in the escrow account, it is the Company's responsibility to deposit funds to cover any shortages.

(e) Supplemental Insurance

(1) The Company shall not sell a contract of insurance or similar instrument, which is written in conjunction with an eligible crop insurance contract and not reinsured by FCIC, unless the Company has complied with the requirements of 7 C.F.R. §  400.713.

(2) FCIC will not provide reinsurance for an eligible crop insurance contract if the Company sold a contract of insurance or instrument described in paragraph (1) that FCIC determines to have shifted risk to, or increases the risk of, such eligible crop insurance contract reinsured under this Agreement, or if the Company administers such insurance or instrument in a manner inconsistent with information submitted in accordance with 7 C.F.R. § 400.713.

(3) The Company shall maintain, and make available at the request of FCIC, the underwriting information pertaining to a contract of insurance or instrument described in paragraph (1), including, but not limited to, the policy number and all SSNs and EINs related to the eligible crop insurance contract.

(4) If the terms of a contract of insurance or instrument described in paragraph (1) become inconsistent with the terms of the eligible crop

GOV000521

insurance contract causing payments to be made under the eligible crop insurance contract that would not otherwise be payable, reinsurance will be denied.

(f)    Insurance Operations

    (1)    General

        (A)    The Company shall verify yields and other information used to establish insurance guarantees and indemnity payments in accordance with the regulations and FCIC procedures.

        (B)    The Company shall use contracts, standards, FCIC procedures, methods, and instructions as authorized by FCIC in the sale and service of eligible crop insurance contracts.

        (C)    The Company shall comply with standards and FCIC procedures to create forms used in the sales and service of any eligible crop insurance contract.

    (2)    Plan of Operations

        (A)    The Company's complete Plan of Operations shall be submitted to FCIC by April 1 preceding the reinsurance year, unless otherwise authorized by FCIC. The Plan of Operations shall meet the requirements of this Agreement, including, but not limited to, the format and all requirements specified in Appendix II, to be considered a complete Plan of Operations.

        (B)    The Plan of Operations contains integral terms to this Agreement so no Agreement exists for a reinsurance year until the Plan of Operation has been approved by FCIC. Once approved by FCIC, the Company's Plan of Operations becomes an Appendix to the Agreement.

        (C)    If the Plan of Operations is not approved by FCIC by the July 1 start of the reinsurance year:

            (i)    FCIC may, at its sole discretion, provide the Company with written notice:

                (I)    Agreeing to reinsure and pay CAT LAE, A&O subsidy and risk subsidy for eligible crop insurance contracts that are renewed or sold by or on behalf of the Company while FCIC continues its evaluation of the Plan of Operations: or

                (II)    Directing the Company and any of its service

providers and agents to cease the renewal or sale of eligible crop insurance contracts until FCIC determines whether to approve or disapprove the Plan of Operations.

(ii)     Any eligible crop insurance contract sold or renewed after FCIC has provided written notice that the Company shall cease the renewal or sale of eligible crop insurance contracts until FCIC determines whether to approve or disapprove the Plan of Operations will not be provided reinsurance, A&O subsidy, CAT LAE, or risk subsidy.

(iii)     If FCIC authorizes the continued renewal or sale of eligible crop insurance contracts by or on behalf of the Company while FCIC completes its evaluation of the Plan of Operations and:

(I)     Approves the Plan of Operations, the renewed and sold eligible crop insurance contracts will be reinsured under the newly approved Plan of Operations; or

(II)     Disapproves the Plan of Operations, the eligible crop insurance contracts renewed or sold during the evaluation period will be transferred to FCIC and will be processed in accordance with section IX of Appendix I.

(D)     The Company shall be in compliance with the Freedom to E-File Act and section 508 of the Rehabilitation Act. The Company shall file its plan for meeting the requirement of these statutory provisions, in accordance with Appendix II.

(g)     Access to Records and Operations

(1)     Upon written request, unless otherwise authorized by the FCIC Manager, the Company shall provide FCIC reasonable access to its offices, personnel, and all records that pertain to the business conducted under, or the requirements contained in, this Agreement, including, but not limited to, access to records on the operation of the Company, at any time during normal business hours.

(2)     The Company shall enter into, and enforce agreements to ensure that its affiliates provide FCIC and the Company with access to its affiliates' offices, personnel, and all records that pertain to the business conducted under, or the requirements contained in, this Agreement, including, but not limited to, access to records on the operation of such affiliate, at any time

during normal business hours.

(3)    The Company shall designate in its Plan of Operations where the records pertaining to the business conducted under this Agreement are located. In the case of electronic records, the location of computers or servers may be deemed the designated location.

(4)    Records described in this subsection shall be retained until 3 years after the last day on which records may be submitted through automated systems in accordance with Appendix III.

(5)    FCIC may require the Company and its affiliates to retain certain specified records for a longer period than required in paragraph (4) if it so notifies the Company in writing at any time before the expiration of the applicable 3-year period. If the applicable 3-year period has expired and the Company or its affiliate still has the records in their possession, FCIC can require that such records be retained for a longer period by providing written notice.

(6)    Notwithstanding paragraph (4), records regarding an unsatisfied debt of a policyholder shall be retained until the debt is satisfied or is discharged through bankruptcy proceedings.

(7)    For the purpose of this subsection the term "FCIC" includes all U.S. Government agencies including, but not limited to, USDA Office of Inspector General, the Government Accountability Office, and the Department of Labor.

(h)    Compliance and Corrective Action

(1)    The Company and its affiliates shall comply with the provisions of this Agreement, as applicable. The Company is solely responsible for the conduct and performance of its personnel and affiliates with respect to the obligations imposed by this Agreement and FCIC procedures. Liability for damages incurred, to the extent it is caused by an error or omission or failure to comply with this Agreement or applicable FCIC procedures, is the sole responsibility of the Company. The assumption of liability under this section is only for the purpose of this Agreement and may not be relied upon by any person or entity not a part to this Agreement for any purpose.

(2)    In addition to paragraph (1), the Company and its affiliates shall comply with FCIC procedures, and the applicable laws of the States in which the Company is conducting business under this Agreement, unless preempted in accordance with section IV(o).

(3)    The Company shall fully cooperate with FCIC in the review or

GOV000524

examination of the Company or its affiliates regarding compliance with the requirements of the Agreement and FCIC procedures. The Company shall include in its agreements with its affiliates provisions that ensure that such affiliates agree to cooperate and assist FCIC in the reviews and examinations conducted in accordance with this Agreement.

(4)     In addition to any other remedies available under this Agreement, if FCIC finds that the Company has not complied with a provision of this Agreement, and the Company has not taken appropriate steps to correct the act of non-compliance, FCIC may, at its sole discretion, require that the Company take corrective action within 45 days of the date of making a written demand. The Company shall provide FCIC with satisfactory documentary evidence of the corrective action taken to address the act of non-compliance.

(5)     If a State makes a determination that the Company or its affiliates are not in compliance with state law and FCIC determines such non-compliance is material to the Company's obligations under this Agreement, and all appeals have been exhausted, FCIC will take remedial actions, which may include suspension or termination of this Agreement in accordance with section IV(i) and (j), denial of reinsurance, A&O subsidy, CAT LAE, and risk subsidy, for all eligible crop insurance contracts for which such non-compliance occurred, in whole or in part, depending on the materiality or severity of the non-compliance.

(6)     In addition to any other remedies in this Agreement, if FCIC determines that the Company or its affiliate willfully violated the Agreement or FCIC procedures, FCIC reserves the right to deny reinsurance, A&O subsidy, CAT LAE, and risk subsidy for any insurance contract that is sold or serviced in violation of the terms of this Agreement or FCIC procedures.

(7)     Whenever a failure to comply with a provision of this Agreement or FCIC procedures by the Company or its service providers, agents, and loss adjusters materially affects the existence or amount of the indemnity, prevented planting payment, replant payment, or premium for an eligible crop insurance contract (including, but not limited to, incorrect APH calculations; improper adjustment of losses; sales agents or sales supervisors involved in the adjustment of losses; failure to verify eligibility for insurance, acreage planted or prevented from being planted, insurable shares, insurable causes of loss, or unit division) and FCIC is:

(A)     Able to determine the correct amount of indemnity, prevented planting payment, replant payment, or premium, FCIC, except as provided in paragraph (8)(A), will deny A&O subsidy, CAT LAE, and risk subsidy or reduce the A&O subsidy or CAT LAE for the eligible crop insurance contract based on the severity of the failure, and require the Company:

39

      (i)     To report to FCIC through PASS the correct amount of indemnity, prevented planting payment, replant payment, and premium;

      (ii)    To pay to the policyholder any amount of underpaid indemnity, prevented planting payment, replant payment, or overpaid premium; and

      (iii)   To pay to FCIC any overpaid indemnity, prevented planting payment, replant payment, or underpaid premium and any subsidy that exceeds the amount the Company or policyholder was entitled to receive.

   (B)    Unable to determine the correct amount of indemnity, prevented planting payment, replant payment, or premium that should have been paid, FCIC shall deny reinsurance, A&O subsidy, CAT LAE and risk subsidy, in whole or in part, based on the severity of the failure, unless the Company can provide documentary evidence satisfactory to FCIC that shows the correct amount of the indemnity, prevented planting payment, replant payment, or premium.

(8)    The Company provides valuable program delivery services for which payment is made in the form of A&O subsidy and CAT LAE. FCIC and the Company agree that FCIC is damaged by a failure of the Company or its service providers, agents, and loss adjusters to provide services or to comply with a provision of this Agreement or FCIC procedures, and that the value of such service or failure to comply is difficult to determine because the damages are uncertain and the amount of service or failure to comply is difficult to quantify. FCIC and the Company agree that in view of the difficulty of determining the value of such service, the amounts stated below are reasonable estimates of the value. In the event there is a pattern or practice of failing to comply with the Agreement or FCIC procedures and FCIC has determined the Company or its service providers, agents, and loss adjusters have failed to provide services or to comply with a provision of this Agreement or FCIC procedures and such failure has occurred:

   (A)    During the sales and service, claims, or operations process, the Company agrees to pay FCIC an amount up to the entire A&O subsidy or CAT LAE, as applicable, on all crop insurance contracts affected by the failure based on the materiality or severity of the failure, as determined by FCIC; and

   (B)    If a pattern or practice under this paragraph also involves overpaid indemnities that may be collected under paragraph (7)(A), any reduction in A&O subsidies and CAT LAE will be imposed under this paragraph, not paragraph (7)(A).

GOV000526

(9)    Failure of the Company or its affiliates to cease or desist any activity or to take a specific action, as required by FCIC in writing, will subject the Company or its affiliates to the sanctions in section 515(h) of the Act (7 U.S.C. § 1515(h)).

(10)    Any payment due from, or paid by, the Company under this subsection shall be in addition, and without prejudice, to any other rights of FCIC, or the United States. FCIC may, at its sole discretion, waive, reduce or delay repayment if such actions are needed for continued delivery of the program.

(11)    Failure of the Company to make payment in accordance with the provisions of this Agreement, or with provisions of any separate written agreement to make such payment between the Company and FCIC, shall subject the Company to the remedies available under this Agreement.

(12)    Nothing in this subsection prevents FCIC from suspending or terminating this Agreement in accordance with section IV(i) and (j).

(13)    Nothing in this Agreement precludes the government from taking any actions authorized by law relating to fraud, waste, or abuse.

(i)    Suspension

In addition to the other remedies available in this Agreement, FCIC may suspend this Agreement for cause due to a material breach or failure to perform or comply with obligations under this Agreement. If this Agreement is suspended for cause:

(1)    Except as provided in paragraph (3), the suspension will remain in effect until FCIC determines that the error or omission has been corrected and that steps have been taken to prevent its occurrence.

(2)    While suspended, the Company shall not, as determined by FCIC:

(A)    Sell, or authorize to be sold, any new crop insurance contracts;

(B)    Renew, or authorize the renewal of, existing eligible crop insurance contracts; or

(C)    Service any eligible crop insurance contracts in effect at the time of the suspension (A&O subsidy and CAT LAE will continue to be paid only for those eligible crop insurance contracts that FCIC requires to be serviced).

(3)    If the eligible crop insurance contracts are not serviced as required by paragraph (2)(C), or errors or omissions are not corrected within the

41

timeframe specified by FCIC, the suspension will remain in effect and this Agreement will automatically terminate at the end of the reinsurance year, or an earlier date if notice of termination is provided by FCIC, and A&O subsidy and CAT LAE will be denied.

(4)     Notwithstanding any other provision of this Agreement, during the period of suspension, the Company may submit a request to FCIC for approval by FCIC to not renew some or all of the existing eligible crop insurance contracts. Each request shall contain supporting documentation stating the basis for the request and the proposed implementation of the request.

(5)     Any eligible crop insurance contract that is sold or renewed if precluded by FCIC, while this Agreement is suspended will not receive reinsurance, A&O subsidy, CAT LAE or risk subsidy for such eligible crop insurance contracts.

(6)     Any eligible crop insurance contract not renewed in accordance with this subsection shall be canceled in accordance with the terms of the eligible crop insurance contract not later than 15 days before the next applicable cancellation date.

(j)     Termination

(1)     Notwithstanding any other provision of this Agreement, FCIC may terminate this Agreement for cause due to a material failure to perform or comply with this Agreement or the FCIC procedures, or for the convenience of the government.

(2)     Termination will be effective on the date specified by FCIC but under no circumstances will it be after the last day of the reinsurance year.

(3)     If this Agreement is terminated, FCIC will not provide reinsurance for eligible crop insurance contracts issued or renewed after the date of the termination. Except as otherwise provided in this Agreement, FCIC will provide reinsurance in accordance with the terms of the Agreement, for eligible crop insurance contracts in effect as of the date of the termination until the next cancellation date for the eligible crop insurance contract.

(4)     In addition to any other reductions provided in the Agreement, if this Agreement is terminated by FCIC for cause, the Company shall pay FCIC an amount not greater than 10 percent of the net book premium for all eligible crop insurance contracts in its book of business based on the materiality or severity of the cause. All amounts collected under this paragraph will be placed in the Contingency Fund.

(5)     After termination of this Agreement, unless otherwise specified in this Agreement, all of the Company's eligible crop insurance contracts in its book of business shall be cancelled in accordance with the terms of such

GOV000528

contract not later than 15 days before the next applicable cancellation date.

(k)    Disputes and Appeals

    (1)    If the Company disputes an action, finding, or decision of FCIC under this Agreement, the Company shall seek a final administrative decision regarding such action, finding, or decision in accordance with the provisions of 7 C.F.R. § 400.169 before seeking judicial review.

    (2)    If the Company seeks a final administrative decision or reconsideration in accordance with 7 C.F.R. § 400.169, FCIC will, in most cases, issue a fully documented decision within 90 days of the receipt of a notice of dispute accompanied by all information necessary to render a decision. If a decision cannot be issued within 90 days, FCIC will notify the Company within the 90-day period of the reasons why such a decision cannot be issued and when it will be issued.

(l)    Agreement Change Date

    (1)    This is a single year Agreement that ends June 30 of the reinsurance year. The Company can enter into a new Agreement under the terms and conditions, except for issuances and revisions pertaining to Appendix III, that exist as of March 15 preceding the reinsurance year by filing a Plan of Operations and obtaining approval from FCIC.

    (2)    If Congress enacts legislation on or before June 30 that will affect the terms of the Agreement for the next reinsurance year, the Company may, within 15 days of the date of enactment:

        (A)    Withdraw its Plan of Operations; or

        (B)    Amend its Plan of Operations, according to FCIC procedures.

(m)    Funding Contingency

If Congress makes any change in law that will affect the amount of funds authorized to be paid under this Agreement, the affected provisions in this Agreement will be automatically revised to reflect such change in funding. Under no circumstance may a payment be made under this Agreement that is in excess of the amount authorized by law at the time such amount may be owed.

(n)    Previous Obligations

Any obligations continuing under any previous Agreement will remain subject to the terms and conditions of such previous Agreement.

(o)    Preemption of State Law

GOV000529

(1)    In accordance with section 506(l) of the Act (7 U.S.C. § 1506(l)), the provisions of this Agreement that are inconsistent with provisions of State or local law will supersede such law to the extent of the inconsistency.

(2)    The provisions of 7 C.F.R. part 400, subpart P pertaining to preemption of State or local laws or regulations are specifically incorporated herein and made a part hereof.

(3)    No assessment for any guarantee funds or similar programs may be computed or levied on the Company by any State for or on account of any premiums payable on eligible crop insurance contracts reinsured under this Agreement.

(4)    No State or local regulatory authority, including without limitation a State's insurance commissioner, department, or comparable public authority, may enforce or seek to enforce any provision of the Act, the regulations, this Agreement, or any FCIC procedures, without the prior written consent of FCIC.

(p)    Discrimination

The Company shall not discriminate against any employee, applicant for employment, insured, applicant for insurance, or potential applicant for insurance because of race, color, national origin, religion, sex, age, disability, marital status, or in retaliation for exercising his or her rights under applicable Federal law. The Company shall be in substantial compliance with all applicable Federal laws prohibiting discrimination.

(q)    Set Off

(1)    Funds due from the Company may be set off under the provisions of this Agreement or under the provisions of 31 U.S.C. chapter 37.

(2)    Any amount due the Company under this Agreement is not subject to any lien, attachment, garnishment, or any other similar process prior to that amount being paid under this Agreement, unless such lien, attachment, or garnishment arises under title 26 of the United States Code.

(3)    Set off as provided in this section will not deprive the Company of any right it might otherwise have to contest the indebtedness involved in the set off action by administrative appeal.

(4)    In the event a Company fails to pay any amount when due under this Agreement, any further payments to the Company from FCIC will be set off against any amounts due FCIC regardless of the reinsurance year until such amounts are paid with appropriate interest.

GOV000530

(5)     Notwithstanding an assignment made in accordance with section IV(r), FCIC may set off:

    (A)     Any amount due FCIC under this Agreement;

    (B)     Any amounts for which the Company is indebted to the United States for taxes for which a notice of lien was filed or a notice of levy was served in accordance with the provisions of the Internal Revenue Code of 1986 (26 U.S.C. § 6323), or any amendments thereto or modifications thereof, before acknowledgment by FCIC of receipt of the notice of assignment; and

    (C)     Any amounts, other than amounts specified in subparagraphs (A) and (B) due to FCIC or any other agency of the United States, if FCIC notified the assignee of such amounts to be set off at or before the time acknowledgment was made of receipt of the notice of assignment.

(r)     Assignment

    (1)     No assignment by the Company shall be made of the Agreement, or the rights thereunder, unless:

        (A)     The Company assigns the proceeds of the Agreement to a bank, trust company, or other financing institution, including, but not limited to, any federal lending agency, or to a person or firm that holds a lien or encumbrance at the time of assignment; and

        (B)     The Company receives the prior approval of FCIC to assign the proceeds of this Agreement to any other person or firm.

    (2)     Any assignment made under paragraph (1):

        (A)     Will be recognized only if and when the assignee thereof files with FCIC a written notice of the assignment together with a signed copy of the instrument of assignment;

        (B)     Shall cover all amounts payable and not already paid under the Agreement;

        (C)     Shall not be made to more than one party; and

        (D)     Shall not be subject to further assignment, except that any such assignment may be made to one party as agency or trustee for two or more parties.

GOV000531

**Certification**

The undersigned acknowledges that the Company and its Board of Directors, if applicable, has authorized the Company to enter into this Agreement for the 2026 reinsurance year. The undersigned certifies that the information provided by the Company related to this Agreement is true and accurate and acknowledges that any misrepresentation in the submission of this Agreement and information provided by the Company related to this Agreement may result in civil, administrative, or criminal liability against the Company.

**APPROVED AND ACCEPTED FOR**

**THE FEDERAL CROP INSURANCE CORPORATION**                      **THE COMPANY**

_____                          _____
Signature                                              Signature

_____                          _____
Name                                                    Name

_____                          _____
Title                                                      Title

_____                          _____
Date                                                     Date

GOV000532

**Plan of Operations Process for Approved Insurance Providers**

## BACKGROUND

The Standard Reinsurance Agreement (SRA), administered by the U.S. Department of Agriculture (USDA) through the Risk Management Agency (RMA), authorizes private insurance companies, Approved Insurance Providers (AIPs), to sell and service Multi-Peril Crop Insurance (MPCI) policies.

Annually (by April 1), companies must submit a Plan of Operations (Plan) to RMA as a condition of eligibility under the program. The Plan serves as the federal government's primary mechanism for evaluating whether AIPs possess adequate financial, managerial, and operational capacity for continued AIP participation. Plans are submitted electronically and include a signed copy of the SRA/LPRA and all required exhibits found in Appendix II of the SRA/LPRA. RMA also provides a guidance document that provides AIPs with information requirements and expectations as it pertains to Plan exhibits.

## STATUATORY AUTHORITY

The following statutory authorities underpin the approval process and related reviews:

- The Federal Crop Insurance Act (7 USC § 1501–1524) authorizes the Federal Crop Insurance Corporation (FCIC) to administer the SRA and enter into reinsurance agreements with private insurers. The Act defines the powers of FCIC's Board of Directors, which approves any new policy, plan of insurance, or major modification under the procedures established by the Board.
- 7 USC § 1508(a) — Authorizes the reinsurance of private insurers under terms set by FCIC.
- 7 USC § 1505 — Establishes the FCIC Board's powers regarding approval of plans and policies.
- 7 USC § 1508(h) — Allows private entities to submit crop insurance products, requiring FCIC review and approval.
- 7 USC § 1502(c) — Establishes strict protections for "Protected Information," relevant to how AIPs must handle data within their operational systems.

## REGULATIONS AND AGREEMENTS

The following regulations and agreements define the agreement between the government and AIPs:

- CFR 400 Subpart L §400.164, defines the eligibility for a reinsurance agreement required of an AIP:
    a. Be licensed or admitted in any state, territory, or possession of the United States.
    b. Be licensed or admitted, or use a policy-issuing company, an insurance company that is licensed or admitted, in each state where the Company will write policies under a Reinsurance Agreement.
    c. Have surplus, as reported in its most recent Annual or Quarterly Statutory Financial Statement, that is at least equal to twice the MPUL amount for the Company's estimated retained premium submitted in its plan of operation.

GOV000533

d. The Company shall have the financial and operational resources, including but not limited to, organization, experience, internal controls, technical skills, positive assessment of the ratio results appearing in Section 400.162 as well as meet methodologies, data submission requirements and assessment contained in Appendix II (Plan of Operations) of the Reinsurance Agreement to meet the requirements, including addressing reasonable risks, associated with a Reinsurance Agreement, as determined by FCIC.

e. The Company shall provide data and demonstrate a satisfactory performance record to obtain a Reinsurance Agreement and continue to hold a Reinsurance Agreement for the Reinsurance Year (RY) as determined by FCIC.

Regarding the ratio results referenced above (Section 400.162), 18 qualification ratios must be evaluated. Ratios outside of allowed tolerances must be explained in the Plan. RMA's Financial Oversight and Debt Management Branch (FODMB) undertakes ratio evaluation.

- The SRA is a contract between FCIC and each AIP and incorporates statutory and regulatory requirements by reference. It explicitly defines a "Plan of Operations" as, *"...the documents and information the Company shall submit in accordance with section IV(f)(2), Appendix II, and applicable FCIC procedures."* The SRA defines the authority, standards, and requirements for the plan:
  - Complete Disclosure of Management, Financial, Operational, and Contractual Information, required under SRA Appendix II.
  - FCIC Authority to Demand Additional Information, supported by 7 USC §1505, 1508 and embedded in SRA Appendix II.
  - Recordkeeping and Quality-Control Requirements derived from the Act and applied through the SRA.
  - Compliance with all federal laws relevant to participation in federally reinsured agricultural programs.
  - Where conflicts arise, the SRA defers first to the Act, then to regulations, and then to the Agreement itself, establishing a clear legal hierarchy.

## SUMMARY

The Plan of Operations approval process is a cornerstone of the FCIC's oversight framework for AIPs participating in the Federal Crop Insurance Program. Grounded in the Federal Crop Insurance Act, federal regulations, and the SRA, the process ensures that AIPs maintain the operational, financial, and managerial integrity required to deliver crop insurance.

2026 SRA—Appendix I                                                                  07-01-25

# APPENDIX I
# REGULATORY DUTIES AND RESPONSIBILITIES

The Company shall comply with the following regulatory duties and responsibilities.

## SECTION I. PROCUREMENT INTEGRITY

(a)    During the term of this Agreement, the Company shall not knowingly:

(1)    Make, directly or indirectly, any offer or promise of future employment or business opportunity to, or engage, directly or indirectly, in any discussion of future employment or business opportunity with any FCIC official;

(2)    Offer, give, or promise to offer or give, directly or indirectly, any money, gratuity, or other thing of value to any FCIC official; or

(3)    Solicit or obtain, directly or indirectly, from any FCIC official, prior to FCIC's acceptance of this Agreement, any proprietary or source selection information regarding the Agreement.

(b)    During the term of this Agreement, no FCIC official shall knowingly:

(1)    Solicit or accept, directly or indirectly, any promise of future employment or business opportunity from, or engage, directly or indirectly, in any discussion of future employment or business opportunity with any officer, employee, representative, agent, consultant, or affiliate of the Company;

(2)    Ask for, demand, exact, solicit, seek, accept, receive, or agree to receive, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from any officer, employee, representative, agent, consultant or affiliate of the Company; or

(3)    Disclose any proprietary or source selection information regarding the Agreement, directly or indirectly, to any person other than a person authorized by FCIC to receive such information.

(c)    During the term of this Agreement, no person who is given authorized or unauthorized access to proprietary information regarding the Agreement shall knowingly disclose such information, directly or indirectly, to any person other than a person authorized by FCIC to receive such information.

(d)    No USDA official or employee who has participated personally and substantially in the deliberation of the Agreement with the Company shall:

---

1

United States General Accounting Office

**GAO**

Report to Congressional Requesters

**June 2004**

# CROP INSURANCE

# USDA Needs to Improve Oversight of Insurance Companies and Develop a Policy to Address Any Future Insolvencies



**G A O**
Accountability ★ Integrity ★ Reliability

GAO-04-517

GOV000536

# GAO
**Accountability·Integrity·Reliability**

# Highlights

Highlights of GAO-04-517, a report to congressional requesters

**June 2004**

# CROP INSURANCE

# USDA Needs to Improve Oversight of Insurance Companies and Develop a Policy to Address Any Future Insolvencies

## Why GAO Did This Study

U.S. Department of Agriculture's (USDA) Risk Management Agency (RMA) administers the federal crop insurance program in partnership with insurance companies who share in the risk of loss or gain. In 2002, American Growers Insurance Company (American Growers), at the time, the largest participant in the program, was placed under regulatory control by the state of Nebraska. To ensure that policyholders were protected and that farmers' claims were paid, RMA agreed to fund the dissolution of American Growers. To date, RMA has spent about $40 million.

GAO was asked to determine (1) what factors led to the failure of American Growers, (2) whether RMA procedures were adequate to monitor companies' financial condition, and (3) how effectively and efficiently RMA handled the dissolution of American Growers.

## What GAO Recommends

GAO recommends that RMA (1) develop written policies to improve reviews of companies' financial condition, (2) develop written agreements with states to improve coordination on the oversight of companies and (3) develop a policy clarifying RMA's authority as it relates to federal and state actions and responsibilities when a state regulator takes control of a company.

In commenting on this report, RMA agreed with our recommendations and has begun implementing them.

www.gao.gov/cgi-bin/getrpt?GAO-04-517.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Lawrence J. Dyckman at (202) 512-3851 or dyckmanl@gao.gov.

## What GAO Found

The failure of American Growers was caused by the cumulative effect of company decisions that reduced the company's surplus, making it vulnerable to collapse when widespread drought in 2002 erased anticipated profits. The company's decisions were part of an overall strategy to increase the scope and size of American Growers' crop insurance business. However, when anticipated profits did not cover the company's high operating expenses and dropped its surplus below statutory minimums, Nebraska's Department of Insurance (NDOI) declared the company to be in a hazardous financial condition prompting the state commissioner to take control of the company.

In 2002, RMA's oversight was inadequate to evaluate the overall financial condition of companies selling federal crop insurance. Although RMA reviewed companies' plans for selling crop insurance and analyzed selected financial data, oversight procedures generally focused on financial data 6 to 18 months old and were insufficient to assess the overall financial health of the company. Additionally, RMA did not routinely share information or otherwise coordinate with state regulators on the financial condition of companies participating in the crop insurance program. For example, NDOI had identified financial and management weaknesses at American Growers. Since American Growers' failure, RMA has acted to strengthen its oversight procedures by requiring additional information on companies' planned financial operations. It is also working to improve its coordination with state insurance regulators. However, as we completed our review, neither of these initiatives had been included in written agency policies.

When American Growers failed, RMA effectively protected the company's policyholders, but lacked a policy to ensure it handled the insolvency efficiently. RMA has spent over $40 million, working with the state of Nebraska, to protect policyholders by ensuring that policies were transferred to other companies and that farmers' claims were paid. NDOI accommodated RMA's interests by allowing RMA to fund the operation of the company long enough to pay farmers' claims. Prior to American Growers' failure, RMA did not have an agreement with the NDOI commissioner defining state and federal financial roles and responsibilities. If the NDOI commissioner had decided to liquidate the company, RMA may have incurred more costs and had less flexibility in protecting policyholders.

GOV000537

**United States General Accounting Office**

# Contents

## Letter                                                                      1

Results in Brief                                                               4
Background                                                                     6
Company Decisions Contributed to American Growers' Failure                     9
RMA Financial Oversight Was Inadequate to Identify American
    Growers' Financial Weaknesses                          11
RMA Effectively Protected American Growers' Policyholders but
    Lacked a Policy to Efficiently Address Insolvencies    19
Conclusions                                                                   24
Recommendations                                                               25
Agency Comments and Our Evaluation                                            26

## Appendixes

Appendix I:      **Scope and Methodology**                                    28
Appendix II:     **Penalties and Financial Losses Associated with Marketing
                 CRC Plus for Rice Reduced American Growers' Surplus**        30
Appendix III:    **Agent Commissions and Other Expenses Created High
                 Operating Costs**                                           32
Appendix IV:     **Purchase of Competitor's Crop Insurance Business Created
                 Additional Expenses**                                       34
Appendix V:      **American Growers' Surplus Was Inadequate to Cover
                 Expenses When Underwriting Gains Did Not Materialize**       35
Appendix VI:     **RMA Paid Policyholders' Claims after American Growers'
                 Failure**                                                   37
Appendix VII:    **Rain and Hail's Proposal to Purchase Selected Assets of
                 American Growers**                                          40
Appendix VIII:   **RMA's Decision to Pay American Growers' Agent
                 Commissions**                                               42
Appendix IX:     **Comments from RMA**                                        44
                 GAO Comments                                                48
Appendix X:      **GAO Contacts and Staff Acknowledgments**                   49
                 GAO Contacts                                                49
                 Acknowledgments                                             49

## Tables

Table 1:  Comparison of Ratio Requirements and American
          Growers' 6 Failed Ratios for December 2000                         14

Contents

Table 2:   Comparison of Ratio Requirements and American
Growers' 5 Failed Ratios for December 2001          15
Table 3:   RMA Costs Incurred in the Dissolution of American
Growers as of March 2004          22
Table 4:   Claims Paid to Policyholders After American Growers'
Failure          37

# Figure

Figure 1:   American Growers' Policyholders Claims Paid vs. RMA
Reimbursements          38

**Abbreviations**

| | |
|---|---|
| CRC Plus | Crop Revenue Coverage Plus |
| FCIC | Federal Crop Insurance Corporation |
| IRIS | Insurance Regulatory Information System |
| NAIC | National Association of Insurance Commissioners |
| NDOI | Nebraska Department of Insurance |
| RMA | Risk Management Agency |
| SRA | Standard Reinsurance Agreement |
| USDA | U.S. Department of Agriculture |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States General Accounting Office**
**Washington, D.C. 20548**

June 1, 2004

The Honorable Bob Goodlatte
Chairman, Committee on Agriculture
House of Representatives

The Honorable Charles W. Stenholm
Ranking Minority Member, Committee on Agriculture
House of Representatives

The Honorable Jerry Moran
Chairman, Subcommittee on General
  Farm Commodities and Risk Management
Committee on Agriculture
House of Representatives

The Honorable Collin C. Peterson
Ranking Minority Member, Subcommittee
  on General Farm Commodities and Risk Management
Committee on Agriculture
House of Representatives

Federal crop insurance is part of an overall safety net of federal programs for American farmers.[1] Federal crop insurance provides protection for participating farmers against the financial losses caused by droughts, floods, or other natural disasters and against the risk of crop price fluctuations. Participation in the program is voluntary; however, participation is encouraged through federal premium subsidies. In 2003, the program provided nearly $40 billion in risk protection for over 200 million acres of farmland at a cost of over $3 billion to the federal government. The U.S. Department of Agriculture's (USDA) Risk Management Agency (RMA) has overall responsibility for the crop insurance program. RMA manages the contracts with the companies that sell and service crop insurance, oversees the development of new insurance products for farmers, and monitors compliance with program provisions by both farmers and insurance companies. RMA also acts as the ultimate guarantor for policy losses, in the event companies are unable to fulfill their obligations under

---

[1]Other safety net programs include price support programs such as counter cyclical payments and marketing assistance loans, and disaster assistance for farmers who experience extreme losses due to a natural disaster.

the federal crop insurance program. RMA administers the program in partnership with private insurance companies that share a percentage of the risk of loss or gain associated with each insurance policy written. In addition, RMA pays companies an expense reimbursement—a percentage of premiums on policies sold—for the administrative costs of selling and servicing federal crop insurance policies. Companies sell crop insurance to farmers through agents, who are paid a commission by the companies on the policies they sell.[2]

American Growers Insurance Company (American Growers) failed in 2002; at that time, it was the largest participant in the federal crop insurance program, accounting for about 20 percent of the premiums written in 2002. American Growers experienced a 50 percent decline in its surplus over a 9-month period, from January through September 2002.[3] This decline in the company's surplus prompted the Nebraska Department of Insurance (NDOI), the regulator for the state in which American Growers was chartered, to take control of the company, due to its hazardous financial condition. On November 22, 2002, NDOI issued a state order of supervision. Under the order of supervision, American Growers could not sell any new insurance policies or conduct other nonroutine business without the approval of the supervisor appointed by NDOI. Rather than immediately liquidating the company, NDOI decided with RMA to place the company in rehabilitation—the process where the regulator, in this case NDOI, takes control of the management of the company—and to operate the company to settle remaining claims and transfer existing policies to other companies. On December 20, 2002, NDOI obtained a court order that placed American Growers into rehabilitation under the auspices of NDOI. Under rehabilitation, NDOI appointed a rehabilitator who took control of American Growers to oversee the orderly termination of the company's business and to allow for an orderly transfer of policies to other companies. To ensure continued service to farmers who purchased crop insurance through American Growers, RMA chose to pay costs associated with managing the company while American Growers finished collecting and processing premiums and settling claims. To date, RMA's funding of

---

[2]While most companies pay their agents a commission to sell and service crop insurance policies, some companies pay agents a salary. American Growers paid its agents a commission.

[3]Surplus is defined as the amount by which an insurance company's assets exceed its liabilities, as reported in its annual statement. Companies can use surplus funds to pay policy losses.

GOV000541

American Growers' operations has cost taxpayers over $40 million to pay agent commissions, staff salaries, and other operating expenses.

You asked us to determine (1) what key factors led to the failure of American Growers, (2) whether RMA procedures were adequate for monitoring crop insurance companies' financial condition, and (3) how effectively and efficiently RMA handled the dissolution of American Growers. In addition, you asked us to determine the factors that led to RMA determinations that affected a proposed sale of American Growers' assets to Rain and Hail LLC (Rain and Hail); and RMA's decision to guarantee that all American Growers' agent commissions be paid. Information related to Rain and Hail's proposal is provided in appendix VII. Information on RMA's decision to pay agent commissions is provided in appendix VIII. To determine the key factors that led to the failure of American Growers, we examined company documents and financial statements, reviewed RMA and NDOI files, conducted interviews with employees and company personnel, and obtained statistical analyses of the crop insurance program from RMA's data mining center.[4] We compared American Growers' financial information with that of other companies in the crop insurance program. We also spoke with crop insurance companies to gain an industry perspective on the failure of American Growers and RMA's actions. To evaluate RMA's procedures for monitoring companies, we reviewed RMA's regulations and methods, interviewed RMA staff, and reviewed documentation to verify that monitoring procedures were followed. To determine the effectiveness of RMA's handling of the dissolution of American Growers, we examined RMA's decision-making process, reviewed financial and other documents, and interviewed RMA and American Growers' staff, National Association of Insurance Commissioners (NAIC)[5] officials, and industry groups. We also contacted state insurance commissioners where crop insurance companies are chartered to discuss oversight issues and coordination with RMA. We performed our work between July 2003 and May 2004, in accordance with

[4]RMA contracts with the Center for Agribusiness Excellence at Tarleton State University to provide data warehousing and data mining services for agricultural data, including analyses of crop insurance sales and claims data.

[5]NAIC is a nonregulatory organization composed of the heads of the insurance departments of the 50 states, the District of Columbia, and the four U.S. territories. The organization encourages uniformity and cooperation among the various states and territories as they individually regulate the insurance industry.

GOV000542

generally accepted government auditing standards. Appendix I contains more detailed information on our scope and methodology.

## Results in Brief

American Growers failed because of the cumulative effect of a number of business decisions by the company. First, in 1999, the company developed and sold a new supplemental insurance product that was not guaranteed by RMA. The new insurance provided supplemental revenue protection for rice, a crop with which American Growers had limited revenue protection experience. Claims and litigation associated with the sale of this new product resulted in significant losses to the company's surplus. Second, the company incurred above average operating expenses in an effort to increase market share. From 2000 to 2002, American Growers paid agent commissions that averaged 12 percent higher than other companies participating in the program. The company also paid expenses not directly related to the sale and service of federally funded crop insurance, such as trips to resort locations. These expenses, among others, created operating costs that were 11 percent greater than the average operating costs of other companies selling crop insurance, and these expenses exceeded the reimbursement RMA provides companies. Third, in 2001, American Growers attempted to increase its market share by purchasing policies and assets from another company, but it failed to achieve the level of efficient operations necessary to make this decision profitable. The cumulative effects of failed growth strategies and high operating costs weakened the financial condition of the company and reduced its surplus, setting the stage for its eventual financial failure. Finally, in 2002, the company projected underwriting gains—the amount by which the company's share of retained premium exceeds its retained losses—in excess of its 10-year average—and was relying on these anticipated profits to cover the company's high operating expenses. When such profits did not materialize, as the result of a widespread drought in 2002, American Growers' surplus dropped significantly, leading NDOI to declare the company to be in a hazardous financial condition, and prompting NDOI to take control of the company.

In 2002, when American Growers was experiencing financial difficulties, RMA's oversight was inadequate to evaluate the overall financial condition of the companies participating in the program. One of RMA's primary responsibilities is to ensure a sound system of federal crop insurance, in part, by monitoring insurance companies' compliance with provisions of the federal crop insurance program. However, we found that although RMA reviewed companies' operation plans and analyzed certain financial data,

GOV000543

oversight procedures were insufficient to assess the overall financial health of a company. RMA oversight procedures focused on historical financial information—from the prior 6 to 18 months—and whether a company had the financial resources to pay claims on policies based on past surplus, not on whether the company would be able to cover its operating expenses in the upcoming year. In the case of American Growers, RMA was unaware that the company was projecting profits on crop insurance policies sold in excess of historic averages to pay for its operating expenses, or that failure to achieve these profits could result in the financial failure of the company. Additionally, RMA did not routinely share information or otherwise coordinate with state regulators on the financial condition of companies participating in the crop insurance program. NDOI had identified financial and management weaknesses at American Growers and had considered planning an on-site examination of the company to determine the extent of those weaknesses; but NDOI was unable to disclose this information because RMA had not signed an agreement that would allow NDOI officials to share such confidential business information with RMA. Since the failure of American Growers, RMA has taken steps to improve its financial oversight of companies participating in the crop insurance program. However, at the time of our review, RMA had not developed written policies to formalize its oversight procedures. Additionally, RMA was working with state regulators to increase RMA-state coordination and was working with NAIC on draft language for confidentiality agreements that would allow state regulatory agencies to share sensitive business information with RMA.

RMA effectively protected farmers insured by American Growers, but it lacked a policy to efficiently address insurance provider insolvencies. Once the company failed, RMA worked with NDOI to protect policyholders by ensuring that policies were transferred to other companies participating in the federal crop insurance program and ensuring that claims were paid. To date, all American Growers' policies have been transferred, and nearly all of the claims have been paid. However, servicing the company's crop insurance policies cost RMA over $40 million for such things as agent commissions, employee severance packages, and staff salaries. RMA would like to recoup some of these costs if American Growers' assets are sold, but whether this will occur is unknown. Finally, while RMA was able to effectively cooperate with NDOI to dissolve American Growers, RMA has no written policy or information sharing agreements to guide its coordination with states for ensuring the most effective and efficient resolution of any future insolvencies in the federal crop insurance program. As the failure of American Growers demonstrates, without written

GOV000544

agreements RMA is vulnerable to state insurance regulators' actions when a company fails.

To address these issues, we are recommending that the Secretary of Agriculture direct RMA to (1) formalize actions under way to improve the financial and operational reviews used to monitor the financial condition of companies, (2) improve coordination with state insurance regulators regarding the financial oversight of companies, and (3) develop a written policy clarifying RMA's and states' authority and responsibility when a state regulator decides to place a company under supervision or to liquidate a company.

We provided USDA with a draft of this report for its review and comment. We received written comments from the Administrator of USDA's Risk Management Agency. RMA agreed with our recommendations and stated that it is (1) formalizing the improvements in oversight that we recommended in the new Standard Reinsurance Agreement (SRA) and (2) developing written agreements with state insurance regulators and the NAIC to improve data sharing and oversight and to clarify RMA's authority, as it relates to federal/state actions when a state takes action against a crop insurance company. Our detailed response to RMA's written comments are presented with RMA's written comments in appendix IX.

## Background

Farming is an inherently risky enterprise. In conducting their operations, farmers are exposed to both production and price risks. Crop insurance is one method farmers have of protecting themselves against these risks. Over the years, the federal government has played an active role in helping to mitigate the effects of these risks on farm income by promoting the use of crop insurance.

Federal crop insurance began on an experimental basis in 1938, after private insurance companies were unable to establish a financially viable crop insurance business. The federal crop insurance program is designed to protect farmers from financial losses caused by events such as droughts, floods, hurricanes, and other natural disasters as well as losses resulting from a drop in crop prices. The Federal Crop Insurance Corporation (FCIC), an agency within USDA, was created to administer the federal crop insurance program. Originally, crop insurance was offered to farmers directly through FCIC. However, in 1980, Congress enacted legislation that expanded the program and, for the first time, directed that crop insurance—to the maximum extent possible—be offered through private

insurance companies, which would sell, service, and share in the risk of federal crop insurance policies. In 1996, Congress created an independent office called RMA to supervise FCIC operations and to administer and oversee the federal crop insurance program.

Federal crop insurance offers farmers various types of insurance coverage to protect against crop loss and revenue loss. Multiperil crop insurance is designed to minimize risk against crop losses due to nature—such as hail, drought, and insects—and to help protect farmers against loss of production below a predetermined yield, which is calculated using the farmer's actual production history. Buy-up insurance, the predominant form of coverage, provides protection at different levels, ranging from 50 to 85 percent of production. Catastrophic insurance provides farmers with protection against extreme crop losses. Revenue insurance, a newer crop insurance product, provides protection against losses in revenue associated with low crop market prices in addition to protecting against crop loss. RMA, through FCIC, pays a portion of farmers' premiums for multiperil and revenue insurance, and it pays the total premium for catastrophic insurance. However, farmers still must pay an administrative fee for catastrophic insurance.[6] RMA determines the amount of premium for each type of insurance policy by crop. RMA, through FCIC, contracts with private insurance companies who then sell these policies to farmers. Companies sell crop insurance to farmers through agents. An agent, a person licensed by the state in which the agent does business to sell crop insurance, is employed by or contracts with a company to sell and service eligible crop insurance policies. While most companies pay their agents a commission to sell and service crop insurance policies, some companies pay agents a salary. American Growers paid its agents a commission.

RMA establishes the terms and conditions to be used by private insurance companies selling and servicing crop insurance policies to farmers through a contract made with the companies called the SRA. The SRA is a cooperative financial assistance agreement between RMA, through FCIC, and the private crop insurance companies to deliver federal crop insurance under the authority of the Federal Crop Insurance Act.[7] Under the SRA, FCIC reinsures or subsidizes a portion of the losses and pays the insurance companies an administrative fee or expense reimbursement—a

---

[6]Farmers with limited resources may have this fee waived.

[7]7 U.S.C. 1501 (et seq.).

GOV000546

preestablished percentage of premiums—to reimburse the companies for the administrative and operating expenses of selling and servicing crop insurance policies, including the expenses associated with adjusting claims.[8] While the reimbursement rate is set at a level to cover the companies' costs of selling and servicing crop insurance policies, the companies have no obligation to spend their payment on expenses related to crop insurance, and they may spend more than they receive from FCIC. The current reimbursement rates, set by statute, are based on recommendations in our 1997 report[9] of the costs associated with selling and servicing crop insurance policies. However, RMA does not have a process for regularly reviewing and updating these rates. RMA is currently conducting a limited review of companies' expenses to validate the costs of selling and servicing federally reinsured crop insurance policies.

RMA, through FCIC, is the reinsurer for a portion of all policies covered by the federal crop insurance program. Reinsurance is sometimes referred to as insurance for insurance companies. It is a method of dividing the risk among several insurance companies through cooperative arrangements that specify ways in which the companies will share risks. Reinsurance serves to limit liability on specific risks, increase the volume of insurance policies that may be written, and help companies stabilize their business in the face of wide market swings in the insurance industry. As the reinsurer, RMA shares the risks associated with crop insurance policies with companies that sell federal crop insurance. However, if a crop insurance company is unable to fulfill its obligations to any federal crop insurance policyholder, RMA, as the ultimate guarantor for losses, assumes all obligations for unpaid losses on these policies. Reinsurance is also available through private reinsurance companies. Crop insurance companies must maintain certain surplus levels to issue crop insurance policies. However, they may increase their capacity to write policies and may further reduce their risk of losses by purchasing reinsurance from private reinsurance companies on the risk not already covered by FCIC.

American Growers was originally established in 1946 as Old Homestead Hail Insurance Company. The company went through several

---

[8]Since 1999, the administrative and operating expenses reimbursement cannot exceed 24.5 percent of the companies' net book premium.

[9]U.S. General Accounting Office, *Crop Insurance: Opportunities Exist to Reduce Government Costs for Private-Sector Delivery,* GAO/RCED-97-70 (Washington, D.C.: Apr. 17, 1997).

GOV000547

reorganizations and name changes between 1946 and 1989. In 1989, the company became American Growers Insurance Company, operating as a subsidiary of the Redland Group, an Iowa-based insurance holding company. Acceptance Insurance Companies Inc.,[10] (Acceptance)—a publicly owned holding company that sold specialty property and casualty insurance—acquired American Growers in 1993.

As a wholly owned subsidiary of Acceptance, American Growers was primarily responsible for selling and servicing federal crop insurance policies and shared the same general management as the parent organization. Another wholly owned subsidiary of Acceptance, American Agrisurance Inc., served as the marketing arm for American Growers.

## Company Decisions Contributed to American Growers' Failure

American Growers' failure was the result of a series of company decisions that reduced the company's surplus, making it vulnerable to collapse when widespread drought erased anticipated profits in 2002. The company's decisions were part of an overall management strategy to increase the scope and size of American Growers' crop insurance business. The company's surplus declined due to losses and other costs from mistakes made when introducing a new crop insurance product, decisions to pay higher than average agent commissions, and the purchase of a competitor's business. Additionally, the company's operating expenses were about 1 1/3 times its reimbursement from RMA. In other words, American Growers was spending $130 for every $100 it was receiving from RMA to pay for selling and servicing crop insurance. American Growers planned to use profits from policy premiums to pay for the expenses not covered by RMA's reimbursement. When these gains did not materialize due to widespread drought, the company's surplus dropped below statutory minimums, prompting NDOI to take control of the company.

First, the company introduced a new crop insurance product, but mistakes associated with the sale of this product resulted in significant losses in the company's surplus. In 1997, the company chose to market a new crop insurance product, Crop Revenue Coverage Plus (CRC Plus), which was a

---

[10]Acceptance was incorporated in Ohio as National Fast Food Corp in 1968, reincorporated in Delaware in 1969 and thereafter operated under the names NFF Corp (1971 to 1973); Orange-co, Inc., (1987-1992); Stoneridge Resources, Inc., (1987 to 1992); and renamed Acceptance in 1992. American Growers and Acceptance were domiciled in Nebraska. However, their principal offices were located in Council Bluffs, Iowa.

supplement to federal crop insurance, but which was not reinsured by RMA. In 1999, American Growers expanded the sale of this product into rice, a crop with which it had little experience. When the company realized it had mis-priced the product for rice and withdrew the product, farmers who had planned on using CRC Plus sued the company. Financial losses, legal settlements, and other costs related to CRC Plus caused significant losses in the company's financial surplus. Appendix II provides further details on the losses associated with CRC Plus.

Second, American Growers chose to spend more than RMA reimbursed it for selling and servicing crop insurance, in part, because the company chose to pay above-average agent commissions in order to attract more agents to sell for the company. As part of its effort to expand operations, the company in 2000 to 2002, paid agent commissions about 12 percent higher, on average, than those offered by other crop insurance companies. In addition to paying agent commission rates above the average of other companies in the industry, American Growers offered agent sales incentives, such as trips to resort locations, and funded other expenses not required to sell and service federal crop insurance. These expenses, among others, created operating costs that were 11 percent greater than the average operating costs of other companies selling crop insurance, and these expenses exceeded the reimbursement RMA provided companies. Appendix III provides additional details of the high operating costs associated with agent commissions and other expenses.

Third, the company purchased the crop business of a competitor, which increased its expenses. In 2001, American Growers attempted to expand its share of the crop insurance market by purchasing assets from another company, including that company's book of crop insurance business. Because American Growers was unable to achieve the operational efficiencies it had anticipated, this acquisition resulted in additional operating costs and expenses that were higher than the reimbursement that RMA provided companies to cover the sale and service of crop insurance. Appendix IV provides additional details on the operating expenses incurred from the purchase of a competitor's crop insurance business.

Finally, the company relied on large underwriting gains to pay for its expenses, rather than RMA's reimbursement. When these gains did not materialize due to widespread drought in 2002, the company's surplus dropped to a level that prompted NDOI to take control of the company. In its 2002 operating budget, American Growers projected profits in excess of its 10-year average and relied on these anticipated profits to cover the

company's operating expenses and to further its growth. The company's profit projections were based, in part, on retaining a higher percentage of the risk for the policies it sold than in past years. By retaining a higher percentage of the risk on the policies, American Growers could increase its profits if claims were low. Conversely, the company increased its exposure to loss if claims were high. However, profits did not materialize as the result of widespread drought, which caused overall federal crop insurance program losses to increase from $3 billion in 2001 to $4 billion in 2002. When American Growers' expenses and losses dropped the company's surplus below statutory minimums, NDOI declared the company to be in a hazardous financial condition and took control of the company—first placing the company under supervision in November 2002 and then in rehabilitation in December 2002. Appendix V provides additional details on the decline in American Growers' surplus.

## RMA Financial Oversight Was Inadequate to Identify American Growers' Financial Weaknesses

At the time of American Growers' failure, RMA's financial oversight processes were inadequate to identify the full extent of financial weaknesses of insurance companies participating in the federal crop insurance program. RMA's actual oversight procedures focused primarily on whether a company had sufficient surplus to pay claims based on its past performance, rather than the overall financial health and outlook of the company. In addition, RMA did not generally share information or coordinate with state regulators on the financial condition of companies participating in the federal crop insurance program. Although RMA reviewed companies' operational plans and selected financial data, such as annual financial statements, in the case of American Growers, RMA was unaware that the company was projecting underwriting gains in excess of historic averages to pay for its operating expenses. The company's failure to achieve these gains resulted in a substantial reduction in its surplus and its subsequent financial failure. In the case of American Growers, RMA and NDOI did not begin cooperating on overseeing the company until it had been placed into supervision in November 2002.

## RMA's Procedures Were Inadequate to Evaluate Companies' Overall Financial Condition

In 2002, when American Growers failed, data provided to RMA by the companies participating in the federal crop insurance program provided an overall picture of company operations and complied with RMA's regulations. However, the information provided was typically 6 to 18 months old; and, according to an RMA official, the agency's oversight focused primarily on whether a company had financial resources to pay

GOV000550

claims on crop insurance policies and not on the overall financial health of the company.[11] RMA's approach to financial oversight stemmed, in part, from the fact that the companies participating in the program are private and are licensed and regulated by state insurance departments. State insurance departments are responsible for monitoring the overall financial condition of companies chartered and licensed to operate in their state. In addition, some of the companies selling crop insurance are affiliated with holding companies or other related companies, which RMA does not review for financial soundness. Since American Growers' failure, RMA has begun requiring federal crop insurance companies to provide additional financial data to help the agency determine if companies are adequately financed to perform their obligations under their SRAs.

One of RMA's primary responsibilities is to ensure the integrity and stability of the crop insurance program, in part, by monitoring insurance companies' compliance with program criteria such as submitting statutory statements required by state regulators and meeting certain financial ratios, as defined in federal regulations. To ensure that the companies participating in the federal crop insurance program sell and service insurance policies in a sound and prudent manner, the Federal Crop Insurance Act[12] requires crop insurance companies to bear a sufficient share of any potential policy loss. Title 7, Code of Federal Regulations, chapter IV, contains the general regulations applicable to administering the federal crop insurance program. The SRA between RMA and participating crop insurance companies establishes the terms and conditions under which RMA will provide subsidy and reinsurance on crop insurance policies sold or reinsured by insurance companies. These terms and conditions state, in part, that companies must provide RMA with accurate and detailed data, including their (1) annual plan of operation, (2) financial statements filed with the applicable state insurance regulator, and (3) any other information determined necessary for RMA to evaluate the financial condition of the company.

---

[11]RMA also reviewed other company information, such as its stock price and private reinsurance agreements.

[12]7 U.S.C. 1501 (et seq).

GOV000551

When approving a company to participate in the crop insurance program, RMA analyzes it according to 16 financial ratios set forth in RMA regulations.[13] Combined, these 16 ratios are intended to provide RMA a reasonable set of parameters for measuring insurance companies' financial health, albeit generally from a historical perspective.[14] The 16 financial ratios include such things as (1) change in net writings, (2) 2-year overall operating ratio,[15] (3) change in surplus, and (4) liabilities to liquid assets. Ten of the 16 ratios specifically refer to changes related to companies' surplus—the uncommitted funds used to cover policy claims. When a company fails more than 4 of the 16 financial ratios, RMA requires the company to submit an explanation for the deviation and its plans to correct the situation.[16] If the explanation appears reasonable, RMA approves the company to sell and service crop insurance for the next crop year.

In August 2001, RMA notified American Growers that the company had 6 ratios, based on its December 2000 financial statement, that fell outside acceptable ranges, including its 2-year overall operating ratio, change in surplus, and 2-year change in surplus. Table 1 shows the 6 ratio requirements and American Growers' ratio for each of the 6 ratios it failed.

---

[13]The 16 ratios include 11 ratios developed by the NAIC, 3 ratios used by A.M. Best Company, and 2 ratios specifically calculated by RMA for the federal crop insurance program. NAIC maintains the Insurance Regulatory Information System (IRIS) to assist state insurance departments in identifying significant changes in the operations of an insurance company, such as changes in its product mix, large reinsurance transactions, or certain changes in operations. Among other things, IRIS is intended to assist state regulators in establishing priorities for scheduling on-site examinations of insurance companies and to clarify the scope and focus of each examination. A.M. Best Company provides ratings used to assess insurance companies' financial strength.

[14]The financial information provided by the company is based on its prior year's activities.

[15]The 2-year operating ratio measures the profitability of a company and is a principal determinant of a company's financial stability and solvency.

[16]According to 7 C.F.R. 400.172, the company may submit a financial management plan acceptable to RMA to eliminate each deficiency indicated by the ratios, or an acceptable explanation as to why a failed ratio does not accurately represent the company's operations, or have a binding agreement with a reinsurance company that qualifies the company to assume financial responsibility in the event the reinsurance company fails to meet its obligations under RMA's reinsured policies.

GOV000552

**Table 1:  Comparison of Ratio Requirements and American Growers' 6 Failed Ratios for December 2000**

| Ratio | Ratio requirement (percent) | American Growers' ratio (percent) |
|---|---|---|
| Two-year overall operating ratio | < 100 | 122 |
| Investment yield | 4.5 to 10 | 13 |
| Change in surplus | -10 to +50 | -22 |
| Combined ratio after policyholders' dividends | < 115 | 145 |
| Two year change in surplus | > -10 | -18 |
| Return on surplus | > -5 | -40 |

Source: GAO analysis of RMA data.

According to an RMA memorandum dated October 2001, American Growers reported that most of its unacceptable ratios were due primarily to underwriting losses related to its multiperil crop insurance that produced unfavorable results due to drought conditions in 2000, particularly in Nebraska and Iowa, and the impact of the federally subsidized reimbursement not covering the company's expenses. Additionally, American Growers cited the cost of the class-action lawsuit relating to its CRC Plus product as a contributing factor. Finally, American Growers explained that the expansion of its crop operations through the purchase of a competitor's crop insurance business was expected to provide efficiencies that would reduce expenses and help improve the company's profitability in the future.

Based on American Growers' explanations, RMA determined that the company's 2002 SRA should be approved. RMA did not believe that the adverse developments that American Growers had experienced were significant enough to move the company close to insolvency. RMA's decision was partially based on anticipated improvements in overall performance resulting from American Growers' acquisition of another company's assets and the potential for achieving greater economies of scale.

Furthermore, while American Growers failed more than 4 of the 16 financial ratios, it was not the only company with such results. Of the 18 companies participating in the federal crop insurance program in 2002, other companies had a higher number of failed ratios than American Growers, though most had fewer. Specifically, of the other 17 companies, 3

GOV000553

companies had 7 or more failed ratios, 1 had 6—the same number as American Growers, and 13 companies had 4 or fewer failed ratios.

In March 2002, American Growers had 5 ratios, based on its December 2001 financial statement, that fell outside acceptable ranges, including change in net writings, 2-year overall operating ratio, and liabilities to liquid assets. Table 2 shows the 5 ratio requirements and American Growers' ratio for each of the 5 ratios it failed.

**Table 2: Comparison of Ratio Requirements and American Growers' 5 Failed Ratios for December 2001**

| Ratio | Ratio requirement (percent) | American Growers' ratio (percent) |
|---|---|---|
| Change in net writings | -33 to +33 | 51 |
| Two-year overall operating ratio | <100 | 105 |
| Investment yield | 4.5 to 10 | 15 |
| Liabilities to liquid assets | <105 | 117 |
| Quick liquidity | >20 | 9 |

Source: GAO analysis of RMA data.

American Growers cited its acquisition of its competitor's crop insurance business, the adverse development of its CRC Plus settlement, and the delay in its reinsurance payments due from RMA as the primary reasons for failing these ratios. Based on the company's explanation of why it had failed the 5 ratios, in June 2002—5 months before American Growers' financial failure—RMA determined that American Growers met the standards for approval to sell and service crop insurance policies for 2003.

In 2002, as in 2001, although American Growers failed to meet more than 4 ratios, as required by the SRA, its performance was not unlike some other companies. Of the 19 companies participating in the crop insurance program in 2003, 2 companies had 8 or more failed ratios, 2 had 5—the same number as American Growers, and 14 companies had 4 or fewer failed ratios.

Although RMA routinely reviewed the financial documents required under the SRA, we found the agency's financial oversight procedures inadequate to fully assess American Growers' financial condition. RMA reviewed the company's surplus and reinsurance arrangements and approved the

company to write policies for the 2003 crop year, based on this analysis. However, RMA was unaware that American Growers was projecting profits in excess of historic averages to pay for its operating expenses and that its failure to achieve these profits would mean that the company's surplus would be inadequate to absorb resulting operating losses and could result in the financial failure of the company.

One reason RMA was unable to identify deficiencies in American Growers' finances was because, following the agency's emphasis on companies' compliance with program criteria, RMA only reviewed a company's historical financial information and its ability to pay claims on the basis of the company's past surplus and its private reinsurance agreements. For example, RMA's decision to approve companies to participate in the federal crop insurance program for 2002 (July 2001 – June 2002) was based on the company's financial information as of December 31, 2000. Further, while RMA required companies to submit an operation plan showing projected policy sales, RMA did not require a company to provide operating budget projections for the upcoming year. As a result, RMA's approval decisions were generally based on a company's past financial performance rather than a forward-looking perspective of a company's financial health.[17]

Without knowing the details of a company's projected operating budget including its acquisition plans and the financial conditions of affiliated, parent, or subsidiary companies, RMA did not have a complete picture of the company's financial condition. Thus, RMA was unable to adequately identify or take action to lessen any risks that may have been developing in companies with deteriorating profits, as was the case in American Growers. We believe that this lack of information impaired RMA's decision-making process; therefore, the agency was forced to make decisions based on incomplete, narrowly focused, and dated information.

Subsequent to the financial failure of American Growers, RMA took several steps to improve its oversight and analysis of the financial condition of companies currently participating in the federal crop insurance program. For example, in 2003, RMA started requesting more comprehensive budget and cash flow information from participating companies, which provides

---

[17]Forward-looking information generally reflects a company's current best estimate regarding its future operations. RMA requested forward-looking financial data in 2003, to use in deciding whether to grant approval to participating companies to sell and service crop insurance policies in the 2004 crop year.

**GAO-04-517 Crop Insurance**
GOV000555

the agency a more forward-looking perspective of the companies' financial health. Specifically, RMA will require insurance companies to provide their estimated underwriting gains or losses for the coming year; copies of all risk-based capital reports;[18] and a signed statement identifying any potential threats to the company's ability to meet its obligations for current and future reinsurance years, along with the possible financial ramification of such obligations. In addition, RMA is revising the SRA in its efforts to address some of the shortcomings of the current SRA. Although RMA officials said the agency plans to continue requesting more comprehensive information from crop insurance companies and had developed a financial analysis plan, as we concluded our review, the agency did not have formal written policies and procedures in place incorporating these changes.

In a November 2003 memorandum to RMA's administrator, USDA's Office of Inspector General provided general comments and suggestions for RMA's consideration in its renegotiation of the current SRA. Some of the suggestions to improve the SRA included requiring companies to provide (1) "revenue and expense forecast budget data for the forthcoming year as a part of the plan of operations approval process, including agents' commission rates and salary and other compensation for top company officials," (2) "information relating to any planned acquisition of other crop insurance companies," and (3) "the financial roles that will be played by parent/subsidiary companies in the crop insurance operations."

## RMA Did Not Coordinate Oversight with State Insurance Regulators

RMA did not routinely coordinate with state regulators regarding the financial condition of companies participating in the federal crop insurance program. RMA's contact with state regulators was ad hoc and primarily limited to episodes during the introduction of new crop products or company acquisitions. RMA did not discuss the financial status of companies with regulators, but it would have been prevented from doing so

---

[18]In 1993, NAIC instituted formal regulatory risk-based capital requirements. NAIC's risk-based capital system uses a formula that establishes the minimum amount of capital and surplus necessary for an insurance company to support its overall business operations. That amount is compared to the company's actual statutory capital to determine whether a company is technically solvent. The NAIC's risk-based capital system limits the amount of risk a company can take on by requiring higher amounts of capital for bearing higher amounts of risk. Failure to maintain minimum capital and surplus adequate to support the company's particular risks, including the risks associated with its underwriting and investment activities, may subject it to regulatory action by its state insurance commissioner.

GOV000556

because it lacked an agreement with state insurance regulators regarding the sharing of confidential financial and examination records.

Companies selling and servicing crop insurance under the federal crop insurance program are subject to the regulations of the state where the company is chartered as well as federal regulations. According to NAIC, a state regulators' primary responsibilities are to protect the public interest; promote competitive markets; facilitate the fair and equitable treatment of insurance consumers; promote the reliability, solvency, and financial solidity of insurance institutions; and enforce state regulation of insurance. State regulators, among other things, require companies to file periodic information regarding their financial condition, including the adequacy of their surplus to cover claim losses, and the solvency of the company.

Prior to the failure of American Growers, RMA did not routinely coordinate with state regulators regarding companies' financial condition. Also, RMA did not have a written policy or information-sharing agreements that would allow state insurance regulators to share sensitive financial information about crop insurance companies with the agency. According to several state regulators, RMA did not routinely share information or otherwise coordinate with state regulators to determine the financial health of a company. According to another state regulator, RMA and the state have talked when a company was introducing a new crop insurance product; however, the regulator could not remember sharing information with RMA about the financial operations of companies participating in the federal crop insurance program. Furthermore, the state regulators with whom we spoke said that any policy promoting coordination would be of limited value unless the states and RMA established a written agreement allowing the state regulators to share confidential business information with RMA.

RMA's lack of an agreement for sharing information with NDOI prevented the state from disclosing sensitive business information on American Growers. NDOI officials identified financial and management weaknesses directly or indirectly affecting American Growers during its periodic reviews as early as 2000. Beginning in 2001, and continuing through August 2002, NDOI was internally discussing the possibility of conducting a targeted examination of Acceptance, including its subsidiary—American Growers. However, in September 2002, due to other priorities and resource constraints, NDOI decided to postpone an on-site examination of the company until 2003. RMA called the state insurance regulator in May 2002, and again in September 2002, asking whether there were any special inquiries or actions pending by the state regarding American Growers and

GOV000557

whether American Growers was listed on the state's list of companies at risk. NDOI acknowledged to RMA that it had asked American Growers to provide additional information regarding its first quarterly submission for 2002; however, NDOI explained that this was not unusual because a number of other companies also had outstanding inquiries. NDOI explained that most of its information is considered public and could be furnished to RMA if requested. However, NDOI's work products, including its list of companies most at risk, company examination reports, and associated work papers were considered confidential. As a result, NDOI required that a confidentiality agreement be signed before they could share the information. On September 20, 2002, NDOI began drafting a confidentiality agreement so it could share information about American Growers with RMA. However, this agreement was not completed before American Growers' failure.

Since the failure of American Growers, RMA has begun working with NAIC on draft language for confidentiality agreements that would allow state regulatory agencies to share confidential business information with RMA. However, at the conclusion of our review, no written confidentiality agreements had been formalized.

## RMA Effectively Protected American Growers' Policyholders but Lacked a Policy to Efficiently Address Insolvencies

RMA worked with NDOI to effectively manage the failure of American Growers by ensuring that policyholder claims were paid and crop insurance coverage was not disrupted. However, servicing the company's crop insurance policies cost RMA more than $40 million for such things as paying agent commissions and staff salaries. Further, RMA lacked a written policy that clearly defined its relationship to state actions in handling company insolvencies. While NDOI accommodated RMA's interests by not immediately liquidating American Growers' assets so that policyholders could be served, without a written agreement in place, other actions such as liquidation could have limited RMA's flexibility to protect policyholders and maintain stability in the federal crop insurance program.

### RMA Effectively Protected American Growers' Policyholders

RMA effectively protected American Growers' policyholders after the company's failure by ensuring that farmers' claims were paid and that their crop insurance coverage was not disrupted. After NDOI obtained an order of supervision, NDOI and RMA signed a memorandum of understanding that specified that American Growers, under NDOI appointed management, would pay claims and service policies with American Growers' funds. RMA

GOV000558

signed an amendment to American Growers' 1998 SRA and agreed to reimburse the company for continued expenses associated with paying or servicing crop insurance claims when American Growers' available cash accounts—about $35 million—dropped to $10 million or below. RMA began day-to-day oversight of American Growers in conjunction with NDOI at the company's Council Bluffs, Iowa, offices on January 6, 2003. The purpose of the oversight was, among other things, to ensure the timely payment of claims, the timely collection of premiums, the efficient transfer of 2003 business to other insurance companies, and the review and approval of the company's employee retention plan and payments to creditors.

RMA worked with NDOI to keep American Growers in rehabilitation rather than liquidate the company because RMA was concerned that if NDOI chose to liquidate the company RMA may not have a mechanism to expeditiously pay claims and transfer American Growers' policies to other insurance providers. Continuity of coverage is critical to policyholders because they must provide proof of insurance coverage in order to secure loans and obtain credit to plant the next year's crops. Policyholders may become ineligible for crop insurance for 1 year if their coverage is terminated. RMA was concerned that if American Growers was liquidated, policyholders would not be paid for their losses and their coverage would lapse, making them ineligible for continued crop insurance coverage. While the SRA provides that RMA could take control of American Growers' crop insurance policies, it did not have an effective way to service these policies.

On December 18, 2002, RMA issued procedures for transferring existing policies written under American Growers to other insurance providers approved under the federal crop insurance program. Under these procedures, American Growers was to notify its agents that all of its policies must be placed with another insurance provider. The agents had the primary responsibility to transfer the policies. By April 2003, RMA transferred or assigned a total of 349,185 policies—all which were eligible—to other companies in the federal crop insurance program reflecting about $576.4 million in premiums.[19] Any American Growers' policy that was not transferred voluntarily to a new insurance provider was assigned by RMA on a random basis to a provider that was currently writing insurance in the applicable state. Less than 8 percent of the policies had to be assigned to other insurance providers because the policy or agent

---

[19]An additional 30,231 American Growers' policies were not transferred because the policyholder had not been planting, the farmer was deceased, or other reasons.

GOV000559

had not acted on them, or because paperwork errors interfered with their transfer. For the fall and spring crop seasons combined, agents or policyholders transferred about 323,000 policies, and RMA assigned about 26,500 policies.

RMA worked in conjunction with NDOI and remaining American Growers' staff to ensure that 52,681 claims totaling about $410 million were paid.[20] About $400 million of these claims were paid by March 2003. The claims that were filed resulted from policyholder losses from the 1999 through 2003 crop seasons—primarily the 2002 crop season. A month-by-month presentation of this information is presented in appendix VI.

## Servicing American Growers' Policies Cost RMA More Than $40 Million

The cost of servicing American Growers' crop insurance policies, which included the administrative and operating costs of paying claims and transferring policies, totaled about $40.5 million as of March 2004 (see table 3). These costs included agent commissions, office space leases and rental equipment, payroll for remaining American Growers' staff, severance pay, and other expenses.[21] Six former American Growers' employees remained on-site to respond to information requests associated with paid claims and transferred policies, to process remaining claims, and to produce end-of-year financial statements.

---

[20]As of February 2004, 19 claims remained unsettled due to litigation, problem claims, and other reasons.

[21]RMA will incur additional costs for staff that are employed until all claims are paid.

GOV000560

**Table 3: RMA Costs Incurred in the Dissolution of American Growers as of March 2004**

| Type of costs | Amount |
|---|---|
| Payroll, payroll taxes, benefits | $8.4 |
| Agent commissions | 7.6 |
| Space leases including costs to break leases, rental, equipment maintenance, and other | 6.8 |
| Severance | 6.4 |
| Premiums to reinsurers | 4.3 |
| Claims overpayments[a] | 3.6 |
| Health insurance | 2.1 |
| Other[b] | 1.3 |
| **Total** | **$40.5** |

Source: GAO analysis of RMA data.

[a]Payments to farmers that, after adjustment, were determined to be overpayments. RMA is in the process of trying to collect these claims.

[b]Other costs include 401k benefit costs, and profit-share bonuses, among others costs.

RMA would like to recoup some of these costs by (1) obtaining revenues that could be derived from the liquidation of American Growers' assets by NDOI, if that should occur, and (2) requesting that NDOI provide RMA with any portion of the company's cash reserves—totaling about $7 million as of February 2004—that may remain before the company is liquidated. However, according to NDOI, RMA's standing as a creditor in the case of liquidation is unclear, and RMA does not know to what extent, if any, it can recoup its costs from these financial sources.

## RMA Lacked a Written Policy to Efficiently Address Insurance Provider Insolvencies

At the time of American Growers' failure, RMA did not have a written policy defining its financial roles and responsibilities in relationship to state actions in the event of an insurance provider insolvency. While the SRA provides that RMA may take control of the policies of an insolvent insurance company to maintain service to policyholders and ensure the integrity of the federal crop insurance program, state regulators' decisions may constrain RMA's ability to efficiently protect policyholders. In the case of American Growers, an RMA official reported that NDOI made it clear that it had no choice, given the weakened financial condition of the company, but to liquidate American Growers unless RMA funded the

GOV000561

company until all the policies had been serviced. If the state had liquidated the company, it would have sold all the company's property and assets, creditors may have initiated legal actions over the existing assets (including premiums owed by policyholders), and there was the possibility of a freeze on the payment of any claims. Furthermore, liquidation would have left RMA with a number of crop policies to service, with no way of servicing them.

RMA decided that the best course of action was to reach an agreement with NDOI to stave off liquidation by reimbursing NDOI for all costs associated with the servicing of policies until all 2002 policies had been serviced and until all producers had found new insurance providers for the 2003 crop year. Fortunately, NDOI accommodated RMA's interests by allowing RMA to fund the operation of the company long enough to pay farmers' claims and transfer policies. However, other actions available to the state could have increased RMA's costs or limited RMA's flexibility in protecting policyholders.

When an insurance provider becomes insolvent, the SRA provides that RMA will gain control of its federally funded crop insurance policies and any premiums associated with those policies. However, as the case of American Growers demonstrates, RMA is not prepared to assume such responsibility. RMA was concerned, among other things, that it lacked sufficient staff and other capabilities, such as data management systems, to effectively service policyholders. RMA could have employed a contractor to service policyholders, but doing so could have been costly and may not have resulted in the timely payment of claims. Furthermore, according to RMA, they were unable to identify a company to contract with to service the policies and related claims. Thus, according to RMA, while RMA has the authority in the event of insolvency to service policyholders by taking control of companies' policies, it is unprepared to act on this authority. RMA is further dependent on state regulators to make decisions that will allow the agency to act in the most efficient manner to protect policyholders and maintain stability in the federal crop insurance program.

Prior to American Growers' insolvency, RMA had not reached an agreement with NDOI that addressed RMA's interests in the case of insolvency including the state's financial responsibilities. RMA argues that while it does not have a written policy to address insolvencies, it does have flexibility to assess the situation when it occurs and use the most efficient way to ensure that policyholders do not face a service disruption. While the lack of a written policy and agreements may allow greater flexibility, the

GOV000562

absence of specific framework may also result in state regulator decisions detrimental to RMA and the federal crop insurance program. A policy describing state and RMA authorities and responsibilities when a state decides to act against an insolvent company would provide RMA some assurance that the federal government's interests are protected.

## Conclusions

The failure of American Growers, at the time, the largest participant in the federal crop insurance program was caused by the cumulative effect of company decisions over several years, and triggered by a drought that forced the company to severely deplete its surplus to cover operating expenses. Reviewing the causes underlying American Growers' failure and RMA's actions provides a valuable opportunity to identify shortcomings in the financial oversight of companies participating in the federal crop insurance program and reforms necessary to strengthen RMA's oversight and RMA's ability to respond to an insurance provider insolvency.

The failure of American Growers demonstrates that companies relying on anticipated underwriting gains to cover operational expenses may face financial difficulties similar to American Growers. More specifically, it suggests that companies must find ways to achieve operating efficiencies so that their expenses do not exceed the administrative and operational expense reimbursement provided by RMA to cover expenses for the sale and service of federal crop insurance policies. Further, the failure of American Growers highlights the need to improve RMA's financial oversight of companies participating in the federal crop insurance program. Clearly, RMA's oversight procedures at the time of the failure were inadequate to ensure that companies met applicable financial requirements for participation in the program. Specifically, the failure of American Growers highlights the need for improved financial and operational reviews, and improved coordination with state insurance regulators. If adequate financial oversight procedures had been in place prior to the failure of American Growers, the company's weakened financial condition may have been detected in time to allow for corrective actions and thereby reduced costs to taxpayers. While RMA has conducted additional oversight of companies and has initiated greater contact with state regulators after the failure of American Growers, RMA has not formalized these procedures.

RMA responded to the failure of American Growers in an effective manner that ensured continued coverage for farmers and stability in the crop insurance program. Further, RMA demonstrated that the federal crop

GOV000563

insurance program functioned as intended by ensuring that policyholders were protected. However, the failure of American Growers highlights the need for RMA to consider developing written policies to ensure that it takes the most effective and efficient actions in the event of future insolvencies in the federal crop insurance program. As demonstrated by the failure of American Growers, RMA is vulnerable to state insurance regulators' actions when a company fails. State regulators are vested with the authority to determine what supervisory action to take in response to the financial failure of an insurance company. While NDOI accommodated RMA's interests by allowing RMA to fund the operation of the company long enough to pay farmers' claims, other actions available to the state, including liquidation, could have increased RMA's costs or limited RMA's flexibility in protecting policyholders. Better coordination with state regulators, regarding respective authorities and responsibilities in the event of future insurance provider insolvencies, is necessary to ensure that RMA's interests are protected.

## Recommendations

To improve RMA's financial oversight of companies participating in the federal crop insurance program and its ability to effectively address future insolvencies, we recommend that the Secretary of Agriculture direct RMA to take the following three actions:

(1) Develop written policies to improve financial and operational reviews used to monitor the financial condition of companies to include analyses of projected expenses, projected underwriting gains, relevant financial operations of holding companies, and financial data on planned acquisitions.

(2) Develop written agreements with state insurance regulators to improve coordination and cooperation in overseeing the financial condition of companies selling crop insurance, including the sharing of examination results and supporting work papers.

(3) Develop a written policy clarifying RMA's authority as it relates to federal/state actions and responsibilities when a state regulator decides to place a company under supervision or rehabilitation, or to liquidate the company.

GOV000564

## Agency Comments and Our Evaluation

We provided USDA with a draft of this report for its review and comment. We received written comments from the Administrator of USDA's RMA. RMA agreed with our recommendations and stated that it is (1) formalizing the improvements in oversight that we recommended in the new SRA, (2) developing written agreements with state insurance regulators and the National Association of Insurance Commissioners (NAIC) to improve data sharing and oversight, and (3) clarifying RMA's authority as it relates to federal/state actions when a state takes action against a crop insurance company in its draft SRA and in discussions with state regulators and the NAIC.

When completed, RMA's initiatives to implement the recommendations in this report will improve its ability to evaluate companies overall financial health and to earlier detect weaknesses in companies' financial condition. However, to the extent that RMA cannot obtain enhanced disclosure and accountability through proposed changes to the SRA, it should implement our recommendation by modifying its regulations or other written policies. Finally, RMA's increased cooperation and coordination with state insurance regulators will likely strengthen oversight by both federal and state regulators and facilitate problem resolution should a company fail in the future.

RMA also provided technical corrections, which we have incorporated into the report as appropriate.  RMA's written comments are presented in appendix IX.

As arranged with your office, unless you publicly announce its contents earlier, we plan no further distribution of the report until 30 days from its issue date. At that time we will send copies of this report to appropriate

GAO-04-517 Crop Insurance
GOV000565

congressional committees; the Secretary of Agriculture; the Director, Office of Management and Budget; and other interested parties. In addition, this report will be available at no charge on GAO's Web site at http://www.gao.gov.

Lawrence J. Dyckman
Director, Natural Resources
  and Environment

Appendix I

# Scope and Methodology

At the request of the Chairman and Ranking Minority Member of the House Committee on Agriculture and the Chairman and Ranking Minority member of the House Subcommittee on General Farm Commodities and Risk Management, we reviewed USDA's actions regarding American Growers Insurance Company (American Growers) and their impact on the federal crop insurance program. Specifically, we agreed to-determine (1) what key factors led to the failure of American Growers, (2) whether Risk Management Agency (RMA) procedures were adequate for monitoring crop insurance companies' financial condition, and (3) how effectively and efficientlyRMA handled the dissolution of American Growers. In addition, we were asked to determine what factors led to RMA determinations affecting a proposed sale of American Growers' assets to Rain and Hail LLC (Rain and Hail) and RMA's decision to guarantee that all American Growers' agent commissions be paid. Information related to the Rain and Hail proposal is provided in appendix VII. Information on USDA's decisions to guarantee agent commissions is provided in appendix VIII.

To determine the key factors leading to the failure of American Growers, we analyzed company documents and financial statements, including annual and quarterly statements for 1999 through 2002. We compared American Growers' expense data with expense data for other companies participating in the program. For this analysis, we computed the average expense ratios of companies participating in the crop insurance program, excluding the expense data from American Growers. Due to the timing of American Growers' failure, it did not submit an expense report to RMA for 2002. To capture the extent of the financial problems that American Growers experienced in 2002 in comparison with other companies, we worked closely with staff who remained at American Growers while it was in rehabilitation to create an expense report for 2002.  We also interviewed American Growers' management; the Nebraska Department of Insurance (NDOI) appointed rehabilitator for American Growers and other key staff; industry groups, such as the National Association of Insurance Commissioners (NAIC); and representatives from other crop insurance companies, including key Rain and Hail personnel, to gain an industry perspective on the failure of American Growers' and RMA's actions. We also contacted the National Association of Crop Insurance Agents; however, they did not grant our requests for an interview. To adjust for the general effects of inflation over time, we used the chain-weighted gross domestic product price index to express dollar amounts in inflation-adjusted 2003 dollars.

GOV000567

To evaluate RMA's oversight procedures we interviewed RMA staff in Washington, D.C. and Kansas City, Missouri, offices. We reviewed the guidance that RMA uses to monitor companies' compliance with the federal crop insurance program, including relevant laws; the Code of Federal Regulations, title 7, part 400; and agency guidance, including RMA's Crop Insurance Handbook for 2002 and the current Standard Reinsurance Agreement (SRA), to verify that monitoring procedures were met. We also reviewed RMA's files relating to the oversight of American Growers and approval of its SRA.

To determine the effectiveness of RMA's dissolution of American Growers, we examined RMA's decision-making process and the costs associated with running American Growers' operations after its failure to ensure that federal crop insurance policies were serviced. We reviewed American Growers' financial statements and other documents. We used semistructured interviews to obtain the views of the Nebraska state commissioner; American Growers' management; representatives from other crop insurance companies, including key Rain and Hail personnel; RMA staff; NAIC officials; and, industry groups on the failure of American Growers and on issues related to RMA's handling of the dissolution. Specifically, we obtained our information from the officials by asking 10 structured questions in a uniform order within an interview that included additional unstructured, probing follow-up questions that were interjected at the discretion of the interviewer. We also used structured interviews to obtain the views of insurance commissioners on the failure of American Growers and on issues related to sharing confidential business information with RMA. In this case, we asked an additional three structured questions and followed up with additional unstructured questions as needed. We selected insurance commissioners in 10 states where there was at least one 2004 SRA holder, according to RMA data. These states were Connecticut, Indiana, Illinois, Iowa, Kansas, Minnesota, New York, Ohio, Pennsylvania, and Texas. We met with RMA officials in February 2004 to discuss our findings and tentative recommendations.

We conducted our review from July 2003 through May 2004 in accordance with generally accepted government auditing standards.

GOV000568

Appendix II

# Penalties and Financial Losses Associated with Marketing CRC Plus for Rice Reduced American Growers' Surplus

As part of an overall strategy to increase the company's market share of the crop insurance industry, in 1997, American Growers developed and marketed a crop insurance product—Crop Revenue Coverage Plus (CRC Plus)—that was a supplement to federally reinsured crop insurance, but it was not subsidized or reinsured by the federal government. The product was a supplement to Crop Revenue Coverage (CRC), an insurance product that protected farmers against crop loss and low crop prices in the event of a low price, a low yield, or any combination of the two. CRC Plus allowed farmers to obtain supplemental coverage for their crops, in essence providing a higher level of coverage in the event of losses. American Growers initially marketed CRC Plus in only two states and covered grain, corn, sorghum, and soybean crops. In 1999, when the company extended CRC Plus to rice, a crop with which American Growers had limited actuarial experience, the company mistakenly priced the product too low. It then promoted the product heavily and did not adequately anticipate the demand for the product.

When it priced CRC Plus for rice, American Growers made a mathematical error—caused by the misplacement of a decimal point—that resulted in the insurance being sold for a lower price than it should have been. The low price for the policy, coupled with uncertainty in the market price of rice that year, resulted in a greater demand for the product than the company had anticipated. When American Growers realized that the demand for the product and associated losses would be greater than the company's surplus could handle, especially considering its low price, American Growers announced it would no longer accept applications at the price originally listed, effectively withdrawing the product from the market. However, farmers had already made decisions about what crop insurance they would purchase, based upon their belief that they could obtain the new product offered by American Growers. The withdrawal of the product was untimely and made it difficult for some farmers to find adequate insurance. As a result, Congress acted to extend the filing deadline for other types of federally reinsured crop insurance so that farmers adversely affected by American Growers' actions could obtain adequate insurance for their crops.

Finally, some farmers sued American Growers, while RMA and six states examined American Growers' actions. The litigation by farmers and regulatory actions resulted in more than $13 million in fines and settlements levied against American Growers in addition to losses of $6 million. The fines, costs from litigation, and increased service costs resulting from the new insurance product reduced American Growers'

GAO-04-517 Crop Insurance

GOV000569

**Appendix II
Penalties and Financial Losses Associated
with Marketing CRC Plus for Rice Reduced
American Growers' Surplus**

surplus. As a result, American Growers' surplus dropped from $76 million in 1998, to $60 million in 2000, a 21 percent decline over 2 years. This decline in American Growers' surplus occurred at the same time the company increased the amount of insurance premium it wrote, from $271 million in 1998 to $307 million in 2000, an increase of 13 percent. To lessen the impact of losses associated with the CRC Plus policies, American Growers accepted a $20 million loan in the form of a surplus note[1] from an affiliate company to strengthen its surplus. American Growers also acquired commercial reinsurance coverage to pay for losses related to CRC Plus. This reinsurance coverage committed the company to future payments of more than $60 million through 2006.

---

[1]Surplus notes are a form of debt that insurers can issue. Because the loan was provided as a surplus note, it was recorded as surplus instead of as a liability; and, as such, NDOI would have had to approve any repayment of this surplus note.

GOV000570

Appendix III

# Agent Commissions and Other Expenses Created High Operating Costs

American Growers' reported that operating expenses were higher than the average reported expenses of other companies participating in the federal crop insurance program, primarily due to American Growers' efforts to attract agents by paying them higher than average commissions and other actions designed to expand its business. From 2000 to 2002, average commissions for American Growers' agents were 12 percent higher than commissions for agents working for other companies. American Growers paid commissions that averaged about $17 for each $100 premium it sold while other companies' agent commissions averaged $15 for each $100 of premium.[1]

Agents are companies' principal representatives to farmers. Farmers purchase crop insurance through agents who can write premium for any company selling crop insurance. Farmers generally develop relationships with specific agents and rely on agents for advice and service. Successful agents write more policies and may write policies with lower loss ratios. Agents typically receive as a commission a percentage of every dollar of premium in crop insurance sold to farmers. Some agents choose to write policies for certain companies based on commissions paid them by the company and on how well the company services the agents' clients. Higher commission rates are not the only factor attracting an agent to a company, but rates do play an important role. In an effort to increase its market share by recruiting more agents to sell crop insurance, American Growers paid higher agent commissions than other companies participating in the program.

American Growers also funded some expenses not directly related to the sale and service of federally funded crop insurance, such as trips to resort locations. These expenses, among others, created operating costs that were greater than the average operating expenses of other companies in the industry. Overall, American Growers' expenses, as a percentage of premium sold, were about 11 percent higher than the average expenses of the other companies. In other words, American Growers had expenses of about $30 for every $100 of premium it sold while other companies had expenses of about $27 for every $100 of premium sold. Salaries at American Growers averaged 15 percent higher than at other companies. In addition, American Growers spent twice the rate as other companies on advertising; and American Growers' expenses for equipment, including computer equipment, was twice that of other companies. In addition to the fact that

---

[1]Not all agents receive the same commission rate.

GOV000571

**Appendix III
Agent Commissions and Other Expenses
Created High Operating Costs**

American Growers' expenses, as a percent of premium sold, were higher than those of other companies, American Growers' expenses were also higher than the amount of RMA's reimbursement to the company.

RMA provides companies a reimbursement to cover their expenses related to the sale and service of crop insurance. This reimbursement is a preestablished percentage of premiums to reimburse companies for the expenses associated with selling and servicing federal crop insurance. The reimbursement rate is set at a level to cover the companies' costs to sell and service crop insurance policies. These costs include agent commissions, staff and office expenses required to process policies and claims, and loss adjusting expenses. In 1998, Congress reduced the amount of reimbursement from a cap of 27 cents per dollar of premium a company sells to 24.5 cents per dollar of premium. This reduction occurred after our 1997 report[2] revealed that companies were basing their request for higher reimbursement rates on numerous expenses that were not directly related to the sale and service of crop insurance, such as trips to resorts, noncompete clauses associated with company mergers, and company profit-sharing arrangements. Under the current reimbursement arrangement, companies have no obligation to spend their payment on expenses related to crop insurance; they may spend the payment in any way they choose. We found that American Growers spent more than its reimbursement by paying above average-rates for agent commissions, marketing efforts, and other items not directly related to the sale and service of federal crop policies, such as tickets to sporting events and trips to resorts for agents.[3]

---

[2]U.S. General Accounting Office *Crop Insurance: Opportunities Exist to Reduce Government Costs for Private-Sector Delivery,* GAO/RCED-97-70 (Washington, D.C.: Apr. 17, 1997).

[3]In 2003, seven companies reported expenses in excess of RMA's reimbursement for selling and servicing federal crop insurance. RMA is currently reviewing company expenditures to determine if expenses reported are accurate.

GOV000572

Appendix IV

# Purchase of Competitor's Crop Insurance Business Created Additional Expenses

On June 6, 2001, Acceptance Insurance Companies Inc., (Acceptance) and its subsidiaries, including American Growers, acquired the crop insurance business of IGF Insurance Company (IGF) from Symons International Group, Inc. Acceptance and its subsidiaries raised funds for this purchase by selling most of its noncrop insurance subsidiaries between September 1999 and July 2001, as part of a larger business strategy to focus on and expand American Growers' crop insurance business.

American Growers, through its parent corporation Acceptance, acquired most of IGF's book of crop insurance policies, in addition to obtaining leased office space, company cars, and related staff to service these policies. A senior manager at American Growers said that the company's strategy was to achieve operational efficiencies by combining the operations of the two companies. However, he said that this goal was not achieved as quickly as the company had planned. For example, American Growers had planned on combining the companies' two computer systems; but it was unable to successfully do so, requiring it to keep two staffs of information technology specialists.

After the acquisition, American Growers grew from the company with the third largest volume of premium sold to being the largest. However, this growth also came with higher costs. American Growers' expenses increased 63 percent, from 2000 to 2001, the years before and after the purchase of IGF. In 2000, American Growers had about $117 million in expenses, but its expenses increased to $191 million in 2001. While the amount of premium American Growers wrote increased, from about $291 million in 2000 to $450 million in 2001, a 54 percent increase, the amount of surplus the company kept only increased from $57 million in 2000 to $75 million in 2001, a 31 percent increase. In 2002, American Growers wrote nearly $632 million in premiums, but without adding to the $75 million reserve.

GOV000573

Appendix V

# American Growers' Surplus Was Inadequate to Cover Expenses When Underwriting Gains Did Not Materialize

American Growers' high expenses led them to spend more than RMA was reimbursing it for the sale and service of crop insurance. In 2001, for every $100 RMA provided American Growers to sell and service crop insurance, the company was spending $130. To pay for its expenses in excess of RMA's reimbursement, American Growers planned on making underwriting profits from the sale of crop insurance. When setting its budget for 2002, American Growers predicted it would receive an 18 percent underwriting gain from policies it serviced under the federally reinsured crop program. However, American Growers' 10-year history of underwriting gains in the program was only 16 percent.[1]

American Growers based its 2002 budget on achieving over $86 million in underwriting gains that year. The company's profit projections were based, in part, on retaining a higher percentage of the risk for the policies it sold than in past years. By retaining a higher percentage of the risk on policies, American Growers could increase its profits if claims were low. Conversely, the company increased its exposure to loss if claims were high.

However, widespread drought impacted the company's ability to achieve these gains. In June 2002, more than one-third of the contiguous U.S. was in severe to extreme drought. Total losses for the crop insurance program increased 33 percent from 2001. In 2001, total losses to the program were over $3 billion. In 2002, total losses increased to over $4 billion. For the category of policies for which American Growers retained a higher level of risk, the loss ratio in 2002 was about 40 percent higher than in 2001, resulting in the payment of $114 in claims for every $100 it received in premiums for those policies.

When the underwriting gains American Growers had predicted did not materialize, losses and expenses depleted the company's surplus. As a result, NDOI, which regulates insurance companies domiciled in that state, declared that the company was operating in a hazardous financial condition and placed the company in supervision, and later rehabilitation. On November 22, 2002,[2] NDOI took steps to protect American Growers'

---

[1]As an example of the effect of a higher projected return, on a retained premium base of $480 million, 18 percent is $86 million and 16 percent is $76 million, a difference of $10 million.

[2]On this same date, RMA notified American Growers that its SRA was suspended and the company was to cease and desist from selling any new insurance policies.

GOV000574

**Appendix V
American Growers' Surplus Was Inadequate
to Cover Expenses When Underwriting Gains
Did Not Materialize**

policyholders by issuing a state order of supervision.[3] NDOI ordered the supervision because the company's surplus declined from about $75 million for the year ending December 31, 2001, to about $11 million as of September 2002. According to the order, the decline in American Growers' surplus—in excess of 50 percent within a 9-month period—rendered the company financially hazardous to the public and its policyholders. Under the order of supervision, American Growers could not sell any new insurance policies or conduct business beyond those that are routine in the day-to-day operations of its business, without the approval of the supervisor appointed by NDOI.

On December 20, 2002, NDOI obtained a court order that placed American Growers into rehabilitation under the auspices of NDOI.[4] Under rehabilitation, NDOI appointed a rehabilitator who took control of American Growers to oversee the orderly termination of the company's business and to allow for an orderly transfer of policies to other companies. The NDOI-appointed rehabilitator assumed the responsibilities of the board of directors and officers and took control of the day-to-day management of the company.

---

[3]The Insurers Supervision, Rehabilitation, Liquidation Act, *Neb. Rev. Stat.* 44-4809(2)(a)(i).

[4]NDOI did not invoke its option to liquidate the company, which entails closing the company, selling off all of its assets, and distributing proceeds to creditors in order of legal precedence.

**GAO-04-517 Crop Insurance**
GOV000575

# RMA Paid Policyholders' Claims after American Growers' Failure

RMA worked in conjunction with NDOI and remaining American Growers' staff to ensure that claims were paid (see table 4).[1] The claims that were filed resulted from policyholder losses from the 1999 through 2003 crop seasons—primarily the 2002 crop season.

**Table 4: Claims Paid to Policyholders After American Growers' Failure**

Dollars in millions

| | Claims | | Cumulative Claims | |
|---|---|---|---|---|
| Year | Number of claims | Amount | Number of claims | Amount |
| **2002** | | | | |
| November | 10,383 | $ 65.3 | 10,383 | $65.3 |
| December | 16,531 | 140.9 | 26,914 | 206.2 |
| **2003** | | | | |
| January | 11,815 | 110.5 | 38,729 | 316.7 |
| February | 6,515 | 67.0 | 45,244 | 383.7 |
| March | 2,032 | 20.2 | 47,276 | 403.9 |
| April | 4,286 | 4.9 | 51,562 | 408.8 |
| May | 468 | 4.2 | 52,030 | 413.0 |
| June | 176 | 2.0 | 52,206 | 415.0 |
| July[a] | 172 | (4.4) | 52,378 | 410.6 |
| August | 124 | .2 | 52,502 | 410.8 |
| September[a] | 44 | (2.4) | 52,546 | 408.4 |
| October | 74 | .2 | 52,620 | 408.6 |
| November | 49 | .8 | 52,669 | 409.4 |
| December | 12 | .5 | 52,681 | 409.9 |
| **Total** | **52,681** | **$409.9** | **52,681** | **$409.9** |

Source: GAO analysis of RMA data.

Notes: This table reflects both claims and adjustments to claims that reduced the amount of claims—the amount of claims are net claims.

Dollar totals do not add up due to rounding.

[a]The amount of claims shown for July 2003 and September 2003 are negative claims due to adjustments.

[1]As of February 2004, 19 claims remain unsettled due to litigation, problem claims, and other reasons.

GOV000576

**Appendix VI**
**RMA Paid Policyholders' Claims after**
**American Growers' Failure**

After NDOI took control of American Growers, the company had about $35 million in cash. These funds were used, in part, to pay American Growers' staff and support staff operating under the auspices of NDOI to pay policyholder claims. When American Growers' cash reserves were reduced to $10 million, RMA reimbursed NDOI for additional costs of $40.5 million to operate the company. When RMA began reimbursing NDOI in February 2003, the vast majority of policyholder claims had been paid (see Fig. 1). About $317 million, or 77 percent, of the approximately $410 million in claims were paid by the end of January 2003.

**Figure 1: American Growers' Policyholders Claims Paid vs. RMA Reimbursements**



Source: GAO analysis of RMA data.

GOV000577

**Appendix VI
RMA Paid Policyholders' Claims after
American Growers' Failure**

According to an RMA official, while the costs of reimbursing American Growers' operations may appear excessive, relative to the amount of claims paid, the claims that had been paid before February 2003, were those that could be expeditiously handled. The claims that remained to be paid—beginning in February 2003—were those that required follow-up to determine the accuracy of reported information, were difficult to process due to missing information, or had other problems. Additionally, although claims had been paid and policies transferred, staff were still needed to process the transfer of policy-related paperwork to other companies and resolve lingering issues, such as claims with missing information.

GOV000578

Appendix VII

# Rain and Hail's Proposal to Purchase Selected Assets of American Growers

Prior to NDOI's declaration of its hazardous financial condition, American Growers was working to strengthen its financial condition by selling its insurance business to another insurance provider. In September 2002, as losses associated with that year's extensive drought began to materialize, American Growers realized that the company's operating expenses and crop losses were outpacing its income and surplus and advised NDOI and RMA accordingly. To improve its financial condition, American Growers attempted to sell its crop insurance business to another insurance company. On November 18, 2002, American Growers' parent company, Acceptance, signed a nonbinding letter of intent setting forth preliminary terms for the company to sell portions of its crop insurance business to Rain and Hail LLC (Rain and Hail) for over $20 million pending regulatory approval.

Rain and Hail asked RMA for authority to transfer American Growers' policies without having to cancel each policy and rewrite them under its own name—a concession that would have facilitated the bulk transfer of the policies. In the past, RMA had allowed this type of transfer only if the acquiring company agreed to (1) accept all the policies previously underwritten by the company being purchased and (2) assume all past liability for those policies. According to RMA, Rain and Hail did not want to assume any past liabilities for the policies and wanted to retain the right to select agents and policyholders with whom it wished to contract. According to RMA, Rain and Hail's intention was to not accept past liabilities regarding disputed claims, compliance issues, litigation or regulatory issues associated with American Growers' policies and ultimately to acquire only about one-third of American Growers' business.

In a letter dated November 25, 2002, RMA rejected Rain and Hail's request for exemptions from RMA rules regarding the bulk transfer of policies. The agency was concerned that waiving the existing rules regarding potential liabilities and future policy placement would not protect the interests of policyholders and taxpayers or the integrity of the federal crop insurance program. RMA was concerned that if it approved the sale of American Growers' policies to Rain and Hail, it could have left a significant number of policyholders without insurance. It also may have left a disproportionate number of poor performing policies for other insurance providers to assume. Since reinsured companies are required to accept all policyholders that apply for insurance regardless of their loss history, RMA was concerned that its decision would be unfair to other insurance providers and that any future denial of similar exemptions to other companies would

GOV000579

be challenged as arbitrary and capricious. As a result, RMA informed Rain and Hail that it could not grant the exemptions it requested.[1]

Accordingly, Rain and Hail announced that it was withdrawing its offer to purchase American Growers' business. When we discussed this issue with Rain and Hail, it concurred that its company was unwilling to accept the past liabilities associated with American Growers' policies, but denied it was not willing to accept all of American Growers' policyholders. Senior managers at Rain and Hail said their company was unwilling to accept the past liabilities associated with American Growers' policies because they did not have adequate time to assess the extent of any such liabilities and the financial implications for Rain and Hail. However, these managers said that Rain and Hail was willing to accept any farmer who wanted a policy from the company, but they stated that the company wanted to retain the right to select which agents it would use to sell and service crop insurance policies.

Whether the sale of American Growers' policies to Rain and Hail could have saved taxpayers all or some of the costs of the dissolution if the proposed sale had been completed is unclear. A Rain and Hail representative stated that the sale would have provided a cash infusion that could have prevented the failure of American Growers. An Acceptance representative stated that the sale might have allowed American Growers to pay remaining claims without having to come under control of NDOI. However, depending on the details, even with the cash infusion from the sale of assets to Rain and Hail, the company may still have been found to be in a financially hazardous condition.

---

[1]According to RMA, nothing in its refusal to approve Rain and Hail's requested exemption constituted a disapproval of the sale. RMA has stated that it did not have the authority to approve or disapprove the sale provided that all SRA requirements were met.

# RMA's Decision to Pay American Growers' Agent Commissions

After consultation with NDOI, RMA agreed to pay American Growers' agent commissions in full, despite the fact that they were paid higher than industry averages.[1] RMA believed several factors, any one of which could have resulted in the disruption of policyholders' coverage, warranted paying agent commissions in full. First, RMA agreed to pay agent commissions in full, in part, because NDOI's position was that as long as American Growers was under the rehabilitation order instead of in liquidation, the company's contracts were valid, enforceable legal obligations that had to be paid. Second, RMA was concerned that some agents may have refused to continue to service policyholders if they knew they would not get paid for their work, and RMA needed agents' cooperation in ensuring the timely collection of premiums and transfer of policies to other crop insurance companies. Third, RMA was concerned that some agents, particularly small agents, could go out of business if not paid their commissions and would therefore be unable to service claims or transfer policies. Finally, RMA was concerned that some agents may have deducted their commissions from policyholder premiums, which could have made it more difficult for RMA to determine which policyholders had paid the premiums on their policies.

While RMA could have potentially achieved cost savings of about $800,000 by not paying some of American Growers' agents' commissions—the portion of their $7.6 million in commissions that exceeded industry averages—agents' response to such a decision could have also disrupted service to policyholders and caused RMA to incur additional costs.

Industry opinion varied on whether RMA should have paid agent commissions in full. According to the former chief executive officer of American Growers, high commissions paid to agents contributed to American Growers' and other companies' financial troubles. One company executive expressed concerns that RMA's actions might make it more difficult for companies that are holding the line on agent commissions to continue to hold commissions at a reasonable level. Another representative was concerned that agents were going to work for the company that paid the highest commissions, regardless of the company's financial health,

---

[1]After consultation with NDOI, RMA agreed to pay agent commissions in full, both parties agreed that they were not obligated to pay about $6 million in bonuses, based on agent performance, that agents believed they were due under existing contracts with American Growers. RMA did, however, pay about $429,000 in bonuses to agents with an affiliated company because a review of the contract showed that American Growers had a binding obligation with the company to make these payments.

GOV000581

**Appendix VIII
RMA's Decision to Pay American Growers'
Agent Commissions**

because RMA had shown that agents would receive their commission regardless of the company's status. However, one crop insurance company representative was concerned about the consequences of not paying agent commissions, particularly since the agents were not directly responsible for the company's failure. Representatives also stated that RMA was correct in paying agent commissions to ensure agent cooperation, to not drive smaller agents into bankruptcy, and to maintain the integrity of the federal crop insurance program.

Finally, RMA's actions in paying full agent commissions could have implications for the future of the federal crop insurance program, but it is unclear how future company and agent practices may be affected by RMA's decisions. RMA's actions could suggest that it might provide similar financial support in the event of future insolvencies, regardless of company and agent practices. For example, RMA's actions could have set a precedent for high agent commissions, a key factor in the failure of American Growers, which could, in turn, be a factor in other insolvencies. However, RMA has stated that it plans to consider each new situation on a case-by-case basis and that agents and companies should not expect the same treatment as in the case of American Growers. RMA said that a managing general agent had recently gone out of business and that RMA had not stepped in to provide relief to agents.[2]

---

[2]A managing general agent is a company that acts on behalf of the insurance company in selling and servicing policies.

GOV000582

Appendix IX

# Comments from RMA

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



**United States Department of Agriculture**

**Risk Management Agency**

1400 Independence Avenue, SW Stop 0801 Washington, DC 20250-0801

APR 2 8 2004

TO:        Lawrence J. Dyckman
           Director, Natural Resources and Environment
           General Accounting Office

FROM:      Ross J. Davidson, Jr.
           Administrator

SUBJECT:   Risk Management Agency: USDA Needs to Improve Oversight of Insurance
           Companies and Develop a Policy to Address any Future Insolvencies, Audit
           Number GAO-04-517

Thank you for providing the United States Department of Agriculture (USDA) and the Risk Management Agency (RMA) with your draft report, "USDA Needs to Improve Oversight of Insurance Companies and Develop a Policy to Address any Future Insolvencies." I would like to offer the following comments for your consideration, and ask that a copy of this response be included in your final report.

**General Comments**

The Risk Management Agency (RMA) would like to recognize the GAO for the professional manner in which this audit was conducted. RMA was actively involved in the run-off of American Growers policies at the time of the audit, and the GAO auditors were cognizant of the workload and flexible in their requests for audit assistance from the RMA staff who were assigned to the American Growers activity.

While RMA understands that GAO does not recognize actions until they are concluded, many of the problems encountered with American Growers have been recognized and are being addressed through the current Standard Reinsurance Agreement (SRA) negotiations. The proposed changes to the SRA will formalize a system of enhanced insurance company disclosures and accountabilities consistent with the Agency's current authority and will help RMA to more efficiently and effectively deal with insolvencies and clarify the roles and responsibilities of the companies and RMA in the event of another catastrophic failure. The proposed SRA also contains provisions that will provide RMA with information that should help to highlight future problems and provide RMA additional time to preempt situations similar to the American Growers failure. RMA will report the changes made to the SRA once the negotiations have been completed.

**General (Technical) Comments**

In reading the draft, we noted a few general items in addition to the responses to the specific recommendations that could be clarified to assist both the casual reader of this report as well as anyone familiar with insurance industry practices and the Federal crop insurance program specifically.

 The Risk Management Agency Administers And Oversees All Programs Authorized Under The Federal Crop Insurance Corporation

An Equal Opportunity Employer

**GAO-04-517 Crop Insurance**

GOV000583

Appendix IX
Comments from RMA

2

See comment 1.

RMA would suggest that where the report discusses the State of Nebraska's takeover of the company the draft be modified to reflect that the State's first action was to place the company under supervision for some time before they moved into rehabilitation. This is an important point, because the State has different authorities depending on whether a company is under supervision, rehabilitation or liquidation. For example, while a company is under supervision, the State has less authority to abrogate existing contracts. This impacted RMA's flexibility in working with the State and the company in the weeks and months following the first action of the State.

See comment 2.

The report may also give the reader the impression that all agents who sell crop insurance receive commissions. While this was true in the case of American Growers, some companies employ captive agents who receive salaries rather than commissions and some use a combination of salaried and contracted agents. For clarity, the statements referring to the industry as a whole should either be modified or changed to reference American Growers only. The same is also true relative to loss adjusters in that companies may employ or contract their loss adjusters or use a combination of both salaried or contracted adjusters in order to ensure service to their policyholders.

**GAO Recommendation 1**

Develop written policies to improve financial and operational reviews used to monitor the financial condition of companies to include analyses of projected expenses, projected underwriting gains, relevant financial operation of holding companies, and financial data on planned acquisitions.

**USDA Response**

See comment 3.

As stated above, much of the improvement in monitoring the companies is intended to be achieved through the enhanced disclosures and accountabilities incorporated in the draft SRA. However, in the interim, for the 2004 reinsurance year, RMA requested additional financial documentation from the companies to be included with their Plan of Operations to help ensure the program integrity and stability of the crop insurance program. At that time, a financial analysis template (FAT) was developed to convert financial data into meaningful ratios, charts, graphs, and reports that more accurately depict the existing and future financial strength of the company. This was used for the 2004 SRA approval process and will again be used for the 2005 SRA approval process when companies will again be required to provide additional financial documentation with their Plan of Operations. RMA is using a modification of the FAT to assist in a quarterly financial analysis of each SRA holder and managing general agent (MGA) to determine both of their financial strengths. In addition, written procedures are in place for the yearly approval of SRA holders and applicants and their MGAs to ensure they all have the financial and operational ability to fulfill their obligations under the SRA.

See comment 4.

On-site financial and operational reviews are conducted on each company at least once in a three-year period. A review plan that contains tasks, objectives, and items to be reviewed is in place. To improve our monitoring of the companies, the plan is reviewed periodically and modified as RMA's needs change or issues are identified.

GAO-04-517 Crop Insurance

GOV000584

Appendix IX
Comments from RMA

3

The additional financial information received for the 2004 and 2005 Plans of Operations review and approval, including projected expenses, underwriting gains, etc., needs to be provided as a matter of course in the annual Plan of Operation review and approval process. This additional information disclosure requirement has been added to Appendix III of the draft 2005 SRA to formalize the process.

**GAO Recommendation 2**

Develop written agreements with state insurance regulators to improve coordination and cooperation in overseeing the financial condition of companies selling crop insurance, including the sharing of examination results and supporting work papers.

**USDA Response**

RMA is currently developing two agreements. One standard agreement will be executed with each individual state to obtain and share information on a confidential basis regarding a crop insurance company's financial and market conduct performance. This would include any state examination information and documentation obtained by the state as well as RMA sharing its financial analysis information and documentation with the state. This agreement will form the foundation of a "collaborative effort" between RMA and state insurance regulators in the review, examination and regulation of crop insurance companies.

The second agreement will be executed with the National Association of Insurance Commissioners (NAIC) for the purposes of accessing regulatory data reported to the NAIC by each individual state. The NAIC databases contain insurance company financial information and analysis results as well as regulatory data regarding crop insurance agents, loss adjusters, etc.

**GAO Recommendation 3**

Develop a written policy clarifying RMA's authority as it relates to federal/state actions and responsibilities when a state regulator decides to place a company under supervision or rehabilitation, or to liquidate the company.

**USDA Response**

RMA has utilized the existing agreement with the State of Nebraska in the supervision of American Growers Insurance Company and "lessons learned" documented during this process to draft changes to the SRA. One change specifies that RMA must be promptly notified by the company of any regulatory action to be taken against a crop insurance company if such action would affect the company's ability to perform its obligations under the SRA and the state must obtain RMA's approval before such action may be taken. The draft SRA also sets forth RMA's requirements and processes to ensure that the interests of Federal crop insurance policyholders and taxpayers are protected in the event the company is unable to fulfill its obligations under the SRA by requiring RMA approval of actions taken a company or service provider, the orderly transfer of policies to other companies to

Appendix IX
Comments from RMA

4

ensure uninterrupted service; preserving the ability to use the company's systems, records and equipment to run out the business; ensuring receipt of all funds in the possession of the company or owed to the company related to the Federal crop insurance policies; and preserving the highest priority in liquidation.  In addition, RMA will work with the states and the NAIC to outline the respective roles, duties and responsibilities in this collaborative relationship between the states and RMA in the supervision, rehabilitation or liquidation process.  RMA may employ the SRA, Federal regulation, memoranda of understanding or other appropriate means as needed to ensure maximum effectiveness of these changes.

Thank you for the opportunity to comment on this report.  If you have any questions, please contact Michael Hand, Deputy Administrator for Compliance, at (202) 720-0642.

**Appendix IX**
**Comments from RMA**

The following are GAO's comments on the Risk Management Agency's letter dated April 28, 2004.

## GAO Comments

1. Per RMA's suggestion, we have provided additional details in this report noting that NDOI placed American Growers under supervision on November 22, 2002, and later placed the company under rehabilitation on December 20, 2002. RMA suggests that the state's initial action impacted its flexibility in working with the state and the company. As we note in our conclusions, better coordination with state regulators regarding respective authorities and responsibilities in the event of future insurance provider insolvencies is necessary to ensure that RMA's interests are protected.

2. We revised the report to note that some agents are paid a salary rather than receiving commissions on the premiums from policies sold. American Growers' agents received commissions, as do most agents who sell and service crop insurance.

3. At the time of our review, we noted written procedures based on regulations for the yearly review and approval of SRA holders and applicants. However, as noted in this report, these procedures were insufficient to assess the overall financial health of a company. To the extent that the final SRA does not fully address oversight weaknesses identified in our report, RMA should take action to modify its regulations or other written policies.

4. RMA on-site financial and operational reviews do not appear to focus on the overall financial health of a company, but rather on internal controls. However, as a minimum, RMA should coordinate these reviews with state regulators who periodically review company operations.

Appendix X

# GAO Contacts and Staff Acknowledgments

## GAO Contacts

Lawrence J. Dyckman (202) 512-9692
Ronald E. Maxon, Jr. (214) 777-5659

## Acknowledgments

In addition to the individuals named above, David W. Bennett, John W. Delicath, Tyra DiPalma-Vigil, Jean McSween, and Bruce Skud made key contributions to this report.

| | |
|---|---|
| **GAO's Mission** | The General Accounting Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through the Internet. GAO's Web site (www.gao.gov) contains abstracts and full-text files of current reports and testimony and an expanding archive of older products. The Web site features a search engine to help you locate documents using key words and phrases. You can print these documents in their entirety, including charts and other graphics.<br><br>Each day, GAO issues a list of newly released reports, testimony, and correspondence. GAO posts this list, known as "Today's Reports," on its Web site daily. The list contains links to the full-text document files. To have GAO e-mail this list to you every afternoon, go to www.gao.gov and select "Subscribe to e-mail alerts" under the "Order GAO Products" heading. |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. General Accounting Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:   Voice: (202) 512-6000<br>                         TDD: (202) 512-2537<br>                         Fax: (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Public Affairs** | Jeff Nelligan, Managing Director, NelliganJ@gao.gov (202) 512-4800<br>U.S. General Accounting Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |



PRINTED ON **RECYCLED PAPER**

GOV000589

**United States**
**General Accounting Office**
**Washington, D.C. 20548-0001**

**Official Business**
**Penalty for Private Use $300**

**Address Service Requested**

<table>
<tr><td>**Presorted Standard**<br>**Postage & Fees Paid**<br>**GAO**<br>**Permit No. GI00**</td></tr>
</table>



GOV000590



**BULLETIN NO.: MGR-10-011**

**United States Department of Agriculture**

Farm and Foreign Agricultural Services

Risk Management Agency

1400 Independence Avenue, SW Stop 0801 Washington, DC 20250-0801

**TO:**     All Approved Insurance Providers
           All Risk Management Field Offices
           All Other Interested Parties

**FROM:**   William J. Murphy   */s/ Barbara M. Leach, for*      *9/13/2010*
           Administrator

**SUBJECT:**   Guidance Regarding SRA Section III(a)(4)—Agent Compensation

**BACKGROUND**:

In negotiating the 2011 Standard Reinsurance Agreement (SRA), approved insurance providers (AIPs) and interested other persons, including managing general agents (MGAs), raised questions regarding compensation provided to agents under section III(a)(4) of the SRA. Additional questions are expected as AIPs begin implementing the provisions of section III(a)(4). This bulletin provides guidance for the 2011 and subsequent reinsurance years involving those provisions. Any reference to an AIP includes an MGA, if applicable, and any reference to an agent includes an agency. Also, this bulletin addresses other issues pertaining to compensation under section III(a)(4) of the SRA.

**ACTION**:

RMA has categorized items that do or do not constitute compensation as provided below:

1.      The following items (looking at the characteristics, not the name) constitute compensation for the direct sale and service of eligible crop insurance contracts:

   a.  Commissions.

   b.  Salary.

   c.  Profit Sharing.

   d.  Bonuses.

   e.  Consulting Fees.

 The Risk Management Agency Administers
And Oversees All Programs Authorized Under
The Federal Crop Insurance Corporation

USDA is an Equal Opportunity Provider and Employer.

GOV000591

**BULLETIN NO.: MGR-10-011**                                    **Page 2**

    f.   Loans (unless meeting the criteria in paragraph 2).

    g.   Advance Payments.

    h.   Deferred Payments.

    i.   All amounts paid to agents for advertising and promotion of the agent.

    j.   Amounts paid for processing costs that do not meet the criteria established in paragraph 11.

    k.   Insurance coverage provided by AIPs to agents, including errors and omission, accident, and life insurance.

    l.   An AIP's payment to an agent for the license fees for software, office equipment (including, but not limited to, computers), subscriptions, and meeting registration fees.

    m.  Unless the total cumulative costs are less than $600 for the reinsurance year, an AIP's cost benefitting any individual agent for:

        i.   Sponsoring agent appreciation, recognition, reward, or similar trips;

        ii.  Golf, hunting, fishing, or other outings held in conjunction with training events;

        iii. Trips or entertainment provided or in any way offered to individuals, including the unreimbursed portions thereof if an AIP or affiliate charges less than the full cost of the trips or entertainment (whether or not such costs would be considered ordinary or necessary for income tax purposes); or

        iv. Any other entertainment, promotional gifts, or benefits.

    n.   Any other payments made by the AIP to the agent or any business owned in whole or in part by the agent, except as specified in paragraph 2 or paragraph 11.

2.     The following items do not constitute compensation for the direct sale and service of eligible crop insurance contracts:

    a.   Loans made on or before June 30, 2010.

    b.   Loans made on commercially reasonable terms as determined by FCIC (e.g., at a rate of interest, of a duration, and with repayment terms typical of commercial loans) and being repaid in accordance with such terms.

GOV000592

**BULLETIN NO.: MGR-10-011**                                        **Page 3**

    c.  Payments related to any line of insurance not reinsured by FCIC under the SRA (unless such payments are higher than industry standards for such lines of insurance).

    d.  Training, including continuing education expenses and incidental expenses directly associated with such training (e.g., meals, refreshments, and receptions), provided that the costs incurred are reasonable.

    e.  Promotional items of nominal value (e.g., pens, pencils, calendars, caps, and golf balls).

    f.  An AIP's actual costs (e.g., room rental and refreshments) paid to a third party (not an agent or relative of an agent) for educational producer meetings on the value of crop insurance as a risk management tool.

    g.  An AIPs payment to a third party for advertising or promotion of the agent.

    h.  An AIP's payment to a third party for license fees for software, office equipment (including, but not limited to, computers), and other items necessary to operate the business.

    i.  Benefits that are required by law as specified in paragraph 10.

    j.  Amounts up to 4 percent of the A&O subsidy and CAT LAE paid for processing costs for a State for the reinsurance year that meet the criteria established in paragraph 11.

3.     The phrase "direct sale and service of any eligible crop insurance contract" does not include loss adjustment costs.

4.     If an AIP employee is an agent and the activity as an agent represents a minority of the employee's responsibilities and time, only the portion of the employee's compensation related to performing agent functions will be considered to be for the direct sale and service of eligible crop insurance contracts.  If the AIP cannot show the apportionment of the compensation between the duties of the employee, the employee's total compensation will be considered to be for the direct sale and service of eligible crop insurance contracts.

5.     Compensation subject to the limitation of section III(a)(4)(B) of the SRA (i.e., 80 percent of A&O and CAT LAE by State) may be paid anytime during or after the reinsurance year.  If the amount of A&O later is reduced under section III(a)(2) of the SRA and the reduction results in an AIP's existing payments exceeding the limitation contained in section III(a)(4)(B) of the SRA, the AIP will be granted 90 days in which to recover payments in the amount necessary to be in compliance with the limitations under SRA.

GOV000593

**BULLETIN NO.: MGR-10-011**                                              **Page 4**

6.      Compensation subject to the limitation of section III(a)(4)(C) of the SRA (i.e., 100 percent of A&O and CAT LAE by State) may only be paid after the first annual settlement between FCIC and the AIP for the reinsurance year.

7.      Except as provided in paragraph 8, if the amount of compensation is determined in reference to the premium and or losses of a particular reinsurance year, the compensation shall be included in calculating the limitations for that reinsurance year under sections III(a)(4)(B) and (C) of the SRA, regardless of the date on which the agreement was made or the compensation paid.  For example, if the amount of compensation is based upon 2010 premium or 2010 loss ratio (e.g., profit sharing agreements or agreements to retain 2010 eligible crop insurance contracts with a particular AIP into the next reinsurance year), the compensation is deemed 2010 compensation even if it is not paid until the 2011 reinsurance year.  Conversely, if the amount of compensation is based upon 2011 premium or 2011 loss ratio, the compensation is deemed 2011 compensation even if the agreement under which the compensation is paid was made before July 1, 2010.

8.      For any arrangement between an AIP and an agent entered into or amended after July 1, 2010, that provides compensation referencing 2010 or any previous reinsurance year, such compensation is deemed to be for the 2011 reinsurance year.

9.      In accordance with section III(a)(4)(C)(ii) of the SRA, for purposes of determining compensation limitations, any "snap back" payments are excluded, and thus are not utilized to calculate the 80 percent and 100 percent limitations.

10.     The definition of "compensation" in the SRA uses two specific terms about which clarification has been sought: "non-monetary benefits" and "except for those benefits required by law."  As delineated above, there are direct or indirect payments in the form of cash paid to the agent.  Those are monetary benefits.  There are other benefits, such as trips, computers, advertising, etc., that are non-cash items that provides a benefit to the agent.  The treatment of non-monetary benefits has been included in paragraph 2.  Related to this issue are the "benefits required by law."  For purposes of meeting SRA requirements, benefits required by law are the **employer's** share of: Social Security, Medicare, unemployment insurance payments, and health insurance, if mandated in Federal, State, or local law.  In reporting compensation:

   a. For AIP employees, the AIP may exclude its share of the payment of the benefits required by law when reporting compensation in the Plan of Operations, according to item IV(f) of SRA Appendix II.

   b. With respect to independent agents, the employer, whether a self-employed agent or an affiliate that contracts with the agent, may, at the end of each reinsurance year, report to the AIP the **employer's** (not to include the employee's) share of the amount of benefits required by law paid for each agent relating to eligible crop insurance contracts reinsured under the SRA for that AIP.  If the employer writes multiple lines of insurance other than that reinsured under the SRA, writes for

**BULLETIN NO.: MGR-10-011**                                                **Page 5**

multiple AIPs, or has sources of revenue other than insurance, the report must show in detail the method for allocating total costs required by law across AIPs, lines of insurance, and other sources of revenue.  The report must be certified as accurate by the employer.  AIPs may report these amounts in their Plan of Operations, according to item IV(f) of SRA Appendix II.  Documented amounts paid by agents and affiliates for benefits required by law incurred for the sale and service of eligible crop insurance contracts under the SRA will not be subject to the limitations of section III(a)(4) of the SRA.

11.    Processing costs are amounts incurred internally or paid to agents or affiliates for processing any part of the AIP's book of business (e.g., applications, production reports, and acreage reports).  AIPs may report processing costs paid to agents and affiliates in their Plan of Operations, according to item IV(f) of SRA Appendix II.  Such payments reported by an AIP up to 4 percent of the A&O subsidy and CAT LAE for a State for the reinsurance year will be excluded from the limitations on compensation in section III(a)(4) of the SRA, provided the AIP can provide to RMA, upon request, detailed documentation supporting such payments.  In agreements with agents and affiliates, that portion of any payment by the AIP to the agent or affiliate for processing must be clearly specified.

12.    In accordance with section III(a)(4)(E) of the SRA, if RMA determines that an AIP or its MGA has employed a scheme or device to avoid the limitations imposed by section III(a)(4) of the SRA, all payments by the AIP relating to the scheme or device will be deemed by RMA to be compensation subject to the limitations of section III(a)(4), any eligible crop insurance contracts relating to the scheme or device will be subject to the denial of reinsurance, and the AIP will be subject to other sanctions set forth in section IV(h) and 7 C.F.R. part 400, subpart R.  It is impossible to list all potential schemes and devices.  Nevertheless, RMA has been made aware of several hypothetical situations that would constitute a scheme or device under section III(a)(4)(E).  RMA offers these examples for general information; the list is not intended to be comprehensive:

a.  Offering commission rates to an agent for private crop-hail business that exceed usual and customary rates contingent on an AIP receiving that agent's book of eligible crop insurance contracts reinsured under the SRA.

b.  The purchase by an AIP of an insurance agency under terms and conditions that would, in effect, manipulate and inflate the compensation the agency owner or the agency's agents receive beyond that which it would receive under the SRA had the agency not changed ownership.  Terms of such a scheme might include, for instance, an AIP purchasing an agency for an amount in excess of market value and later allowing the seller of the agency to reacquire the business for a relatively low value, thereby circumventing the limitation on agent compensation.

c.  The purchase of an agent's book of business with terms that allows annual payments to be based on the premium volume or the performance of the book of business for which the payment is being made.

GOV000595

**BULLETIN NO.: MGR-10-011**                                   **Page  6**

d.  The purchase of a book of business owned by a person other than an agent, who in turn, provides all or part of the funds received to the agents employed or contracted by the person.

e.  To acquire an agent's book of business, an AIP hires, at an inflated wage, the agent or relative of the agent for a position that does not involve the direct sale or service of eligible crop insurance contracts.

f.  Establishing or using a third party (such as a commodity group, a marketing specialist, or data processing entity) to channel payments to agents or agencies to supplement compensation that is subject to the SRA limitations.

g.  Establishing or using a third party (such as a commodity group, a marketing specialist, or data processing entity) to provide services to producers that are normally performed by an agent or agency.

h.  Back-dating or forward-dating documents related to agent or third-party compensation arrangements to shift compensation from one reinsurance year to another.

13.    Because section III(a)(4) is new and raises many complex issues, RMA will be mindful of the materiality and related factors in 7 C.F.R. § 400.454(c)(2) as it and AIPs become familiar with RMA's positions.  Nevertheless, use of an intentional scheme or device to avoid compliance will be deemed a serious violation of the SRA.

14.    RMA recognizes that the foregoing does not exhaust the subject of determining what is or is not compensation.  By reference to the guidance provided above, and in working with financial and tax accountants and advisors, AIPs should be able to develop internal operating principles for reasonably administering the SRA limitations on agent compensation.  RMA reminds AIPs that they must keep in mind both the specific text of section III(a)(4) of the SRA, the guidance provided in this bulletin, and RMA's purpose in limiting agent compensation (in particular, preserving the solvency of AIPs).

15.  In view of questions that may remain after this bulletin is issued, RMA will schedule periodic meetings to review and evaluate the administration and enforcement of agent compensation provisions of the SRA.

GOV000596



**United States Department of Agriculture**

Farm and Foreign Agricultural Services

Risk Management Agency

1400 Independence Avenue, SW Stop 0801 Washington, DC 20250-0801

**INFORMATION MEMORANDUM NO.:  IS-11-006**

| | |
|---|---|
| **TO:** | All Approved Insurance Providers<br>All RMA Field Offices<br>All other Interested Parties |
| **FROM:** | Michael A. Alston   */s/ David L. Miller, for*    *7/22/2011*<br>Deputy Administrator for Insurance Services |
| **SUBJECT:** | Agent Compensation – Schemes or Devices |

## BACKGROUND:

Section III(a)(4)(E) of the Standard Reinsurance Agreement (SRA) states:

> If FCIC discovers that the Company, its MGA, or affiliate has paid compensation in excess of the amounts allowed in subparagraphs (B) or (C), the Company will be subject to any sanction described in this Agreement or applicable regulations. Any scheme or device to circumvent the limitations in subparagraphs (B) or (C) will be considered a violation of this Agreement.

Approved insurance providers (AIPs) have asked the Risk Management Agency (RMA) to provide guidance regarding what scheme or devices have been identified by RMA to circumvent the limitations in section III(a)(4)(E) of the SRA.   A scheme or device is the making of a payment or benefit that meets the requirements for compensation paid to persons involved in the direct sale and service of eligible crop insurance contracts when such benefit or payment should be counted as compensation.

RMA has compiled a list of identified and potential schemes or devices included herein that will be posted on RMA's website, www.rma.usda.gov under "*Frequently Asked Questions.*"  Most of these scenarios were identified from questions posed by the AIPs and other interested persons and not necessarily actions discovered by RMA.  These scenarios will be updated as RMA receives additional questions from AIPs or others in the industry.

**Nothing in the SRA, Manager's Bulletin MGR-10-011.1 (Bulletin), or this memorandum constitutes approval or disapproval by RMA of any particular payment or benefit, and nothing in this memorandum constitutes a prohibition of any business practice or transaction by any AIP.  The AIPs are free to conduct business as they determine in their best interest, provided that it does not otherwise**



The Risk Management Agency Administers
And Oversees All Programs Authorized Under
The Federal Crop Insurance Corporation

USDA is an Equal Opportunity Provider and Employer

GOV000597

**INFORMATION MEMORANDUM NO.:  IS-11-006**                        2

**violate any other provision of the SRA.  The only purpose of this document is to specify those situations where RMA has determined a payment or benefit to be considered as compensation, and a business practice to be a potential scheme or device under the terms of the SRA or Bulletin.**

Section III(a)(4) of the SRA sets forth requirements and limitations on compensation paid by AIPs to persons involved in the direct sale and service of eligible crop insurance contracts.  On October 29, 2010, RMA issued the Bulletin to provide guidance regarding section III(a)(4) of the SRA and agent compensation.  The AIPs have asked that RMA provide a list of those situations where it has, or has not, found that a particular payment or benefit constitutes compensation for the purposes of section III(a)(4) of the SRA, or whether a business practice constitutes a scheme or device in accordance with section III(a)(4)(E) of the SRA and item 12 of the Bulletin.

For the purposes of this memorandum, the term "payment or benefit" includes anything of value provided to the agent such as money, trips, dinners, insurance, or any other thing of value or benefit not otherwise excluded from compensation in the Bulletin.   RMA considers "policy compensation" to be commissions, salary, bonuses, and profit sharing, which are Action items 1(a), (b), (c), and (d) respectively, of the Bulletin.  Furthermore, RMA considers "non-policy compensation" to be any additional payments or benefits that constitute compensation under the SRA or Bulletin such as health benefits, etc.

In determining whether a particular action is a scheme or device, RMA has taken into consideration whether the action would provide the means for the AIP to provide a payment or benefit in addition to the commission, salary, bonuses, and other payments or benefits customarily included in the agent contracts, and not otherwise excluded from compensation in the Bulletin.  Failure to treat such payments as compensation would create unfairness in the marketplace.  To ensure an even playing field for all AIPs, RMA is providing these guidelines.

<u>SCHEMES AND DEVICES:</u>

<u>Agency Acquisitions</u>

Agency acquisitions by AIPs are not per se a scheme or device.  However, RMA has identified certain scenarios where the acquisition of an agency would be considered a scheme or device if the payments are not counted as compensation.  Action item number 12 of the Bulletin offers several examples of how an "agency acquisition" could be employed as a scheme or device to avoid the limits on agent compensation.

GOV000598

**INFORMATION MEMORANDUM NO.:  IS-11-006**                              3

In addition to the scenarios listed in item 12 of the Bulletin, AIP payments to acquire an agency's book of business will be considered a scheme or device if <u>any</u> of the following criteria are met:

1.  The acquisition price exceeds the Fair Market Value (FMV) of the assets at the time of purchase.  This includes both the fixed price if a single payment is made at the time of purchase, or the present value of annual installment payments.  If the price exceeds the FMV, then the "excess payment" will be deemed agent compensation.  For example, if an agency's FMV at the time of purchase is $10 million, but an AIP pays the seller $12 million, the difference of $2 million will be considered agent compensation.  A third party independent FMV assessment must be provided to RMA and be based on generally accepted accounting principles for valuing insurance assets.

2.  The sellers of the agency have not completely divested themselves of any interest in the book of business and all affiliation with the acquiring AIP.  If an agent continues to work for the AIP, and in many cases, still services the book of business, the agent is still doing the same work as before and receiving payment as a contractor or employee.  This means the agent would be receiving additional payments and benefits for servicing the same book of business.  At best, such payments or benefits would be no different than the transfer or retention bonuses paid to agents that are considered compensation.  Allowing the seller to remain associated with the book of business purchased, and receive a purchase payment along with any additional compensation payments, provides a mechanism for abuse, so the purchase price must be considered as compensation.   Further, even if there are claims that the agent would work in another capacity with the AIP, there is no way to verify that the agent has no involvement with the book of business they sold. Therefore, allowing the seller to remain affiliated in any way with the AIP that purchased the book of business provides a mechanism for abuse and will be considered a scheme or device unless counted as compensation.

3.  Acquisition terms based on annual installment payments provide for an increase in an annual installment payment based on an increase in the total premium volume of the book of business.  However, terms that only provide for downward adjustments to annual installment payments where such adjustments are based on a decrease in the total premium volume of a book of business, thereby reflecting a reduced market value, are not considered a scheme or device unless counted as compensation.

4.  The acquisition terms include any type of buy-back clause or provision whereby the seller could repurchase the book of business or agency at any future date.  Further, even if the acquisition terms do not include a buy-back provision, if the seller repurchases the book, the acquiring AIP's original purchase price will be deemed compensation for those reinsurance years in which payments are made as part of the purchase agreement and may require accounting adjustments in accordance with the

GOV000599

**INFORMATION MEMORANDUM NO.:  IS-11-006**                                4

SRA for those years.  Again, in many of these cases, the agent is receiving additional payments or benefits for servicing the same book of business, the purchase price and commissions, salaries, bonuses, etc.  There is no way to prove the original sale was legitimate so this is considered a scheme or device unless counted as compensation.

5.  If an AIP acquires an agency, or other similar entity, and the seller pays a portion of the purchase price to the agents affiliated with the agency.  In such cases the affiliated agents would be receiving additional payments for servicing the same book of business.  Such payments would be considered a scheme or device unless counted as compensation.

There are numerous other transactions that could be related to acquisitions of books of business.  It is impossible to list all of them here, as not every type of transaction that could arise can be envisioned.  However, as a general rule, if the seller has the potential to receive additional payments or benefits from the AIP in addition to the acquisition, then RMA will consider all payments or benefits made to the seller to be a scheme or device unless such payments or benefits are counted as compensation.

**Allocation of Payments or Benefits**

RMA has identified the use of "allocation of payments" as a potential scheme or device.  A general example is offered in Action item 12(a) of the Bulletin.  There have been numerous scenarios regarding the allocation of payments or benefits between different lines of insurance or different States.

1.  If an agent writes both Multi-Peril Crop Insurance (MPCI)[1] and other lines of business, the agent payments/benefits can be allocated across lines of business if <u>all</u> of the following criteria are met:

   - The payments or benefits are commensurate with the premium volume sold for each line of business;

   - Contracts are provided for all lines of insurance showing the amounts of payments or benefits; and

   - The AIP provides evidence satisfactory to RMA documenting the premium volume sold for each line of business, and that the payments or benefits do not exceed the amount authorized in the contracts.

---

1 For the purposes of this Memorandum, MPCI includes all plans of insurances authorized for sale under the SRA and reinsured under the SRA.

GOV000600

**INFORMATION MEMORANDUM NO.:  IS-11-006**                    5

If all of these criteria cannot be met, then the payments or benefits will be considered as a scheme or device unless they are counted as compensation.

2.  If an agent writes multiple lines of insurance in multiple States, any non-policy compensation must be allocated to the line of insurance and the State based on the agent's premium volume in each state.  Failure to properly allocate such non-policy compensation will result in a finding of a scheme or device.

3.  An AIP wishes to provide its agents free map books with Common Land Units (CLUs) for completing Acreage Reports.  This would not be considered compensation because such map books are tools, similar to the software that is not considered compensation under item 2(g) of the Bulletin, necessary for the agent to perform the tasks to service eligible crop insurance contracts.

**Recognition-Entertainment Expense**

1.  An AIP wants to allocate payments and benefits for agent recognition-entertainment expenses between MPCI and non-MPCI policies written by the agent.  Action item 1(m) of the Bulletin states that up to $200 of payments or benefits can be provided for agent recognition-entertainment costs and that any amount in excess of that will be considered as compensation.  Non-policy payments and benefits can be allocated between lines of insurance and States because such payments are fixed in the agent's contract and are easily calculated based on the agent's premium volume in a State. However, agent recognition-entertainment is not a contractual obligation and there is no way to establish the basis for which such payment is made because it is generally used as an inducement or reward.  Therefore, it provides a mechanism for abuse, and any payment or benefit for agent recognition-entertainment in excess of $200 is considered compensation and failure to report such payments and benefits in excess of $200 as compensation will be considered a scheme or device.

2.  An AIP wants to apply the $600 agency recognition-entertainment payment or benefit limit to the subagents of the contracted agency.  Action item 1(m) of the Bulletin makes it clear that the $200 limitation applies to **individual** agents and the $600 limitation applies to **all agents and other employees of an agency**.  Subagents of an agency are considered agents or employees of an agency and, therefore, are subject to the $600 limitation.  This exception to the compensation rules is not intended to provide additional benefits to agents, such as trips, golf clubs or other such benefits.  It is simply to allow AIPs a means to provide nominal recognition for agents.  Failure to report amounts paid in excess of the $600 limitation will be considered a scheme or device unless such amounts are reported as compensation.

3.  An AIP had an incentive program based on crop insurance sales (MPCI, Crop Hail, Named Peril, etc.) established prior to the 2011 reinsurance year, and they continue

the program for the 2011 and subsequent reinsurance years with the exclusion of the

**INFORMATION MEMORANDUM NO.:  IS-11-006**                     6

MPCI business.  Similar to agent recognition and entertainment, incentive programs are not contractually obligated and there is no way to establish the incentive is not for MPCI even if it is not included in the calculation of the amount.  Therefore, it provides a mechanism for abuse, and the incentive program payment or benefit would be subject to the $200 and $600 limitation contained in Action item 1(m) of the Bulletin and failure to properly report such payments and benefits in excess of the $200 and $600 limitation will be considered a scheme or device unless such amounts are counted as compensation.

### Processing Fees

1. An AIP wants to make advance processing fee payments to an agency.  Processing fees are payments for services rendered.  Therefore, the payment must be made at the time or after receipt of service.  Advance payments for future processing will be considered a scheme or device unless counted as compensation.

2. An AIP pays a processing fee to a processing center.  Action item 11 of the Bulletin provides that payments to agents agencies, and affiliates for costs of processing, up to and including 5 percent of the A&O subsidy and CAT LAE, will not be deemed by RMA to be compensation for the sale and service of eligible crop insurance contracts, provided that certain criteria in section III(a)(4) of the SRA are met.  Processing centers are considered affiliates and, therefore, are subject to the 5 percent limitation.  Failure to report payments to a processing center for processing in excess of the 5 percent limitation is considered a scheme or device unless such amount is reported as compensation.

3. An AIP pays a 5 percent processing fee to an agent whose business is subsequently processed by a separate processing center.  AIPs can either choose to pay a processing fee allowance (up to the 5 percent) to agents or to utilize a processing center, which might be more cost effective.  If an AIP utilizes a processing center to process an agent's book of business, then any processing fee payment to agents who sell and service the eligible crop insurance contracts will be considered a scheme or device.  In addition, for AIP payments to processing centers not to be deemed as agent compensation, the processing center must be a distinct, unique entity not affiliated with any particular agent or agency.  Otherwise, the potential for abuse exists and RMA will consider any payments to such entities affiliated with the agents to be a scheme or device.

### Cooperative Advertising

An AIP wants to pay cooperative advertising expenses for non-MPCI products.  Cooperative advertising expenses for insurance products totally unrelated to MPCI products are not considered agent compensation provided the AIP can provide evidence satisfactory to RMA that the payments made correspond to advertisements placed for the

**INFORMATION MEMORANDUM NO.:  IS-11-006**                                      7

non-MPCI products.   Any payments in excess of such amounts will be considered a scheme or device unless counted as compensation.

**Benefits**

An AIP pays a portion of an agent's health insurance, pension plans, or other such benefits.  These payments are considered to be agent compensation.  In accordance with item 10 of the Bulletin, any benefit plan, or a portion paid thereto, not required by Federal, State or local law, will be considered agent compensation.  Failure to properly report such payments will be considered a scheme or device.

**DISPOSAL DATE:**

This memorandum will remain in effect until rescinded or until incorporated into procedures.

GOV000603



**United States Department of Agriculture**

Farm and Foreign Agricultural Services

Risk Management Agency

1400 Independence Avenue, SW Stop 0801 Washington, DC 20250-0801

**BULLETIN NO: MGR-10-011.1**

**TO:**    All Approved Insurance Providers
All Risk Management Field Offices
All Other Interested Parties

**FROM:**    William J. Murphy    */s/ William J. Murphy*    *10/29/2010*
Administrator

**SUBJECT:**    Guidance Regarding SRA Section III(a)(4)—Agent Compensation

**BACKGROUND**:

On September 13, 2010, the Risk Management Agency (RMA) issued Managers Bulletin MGR-10-011, "Guidance Regarding SRA section III(a)(4)—Agent Compensation." Since the release of MGR-10-011, a number of issues have been raised by approved insurance providers (AIPs). After evaluating these issues, RMA has determined that modifications in MGR-10-011 are needed. The following bulletin incorporates necessary modifications, with a revised "Action" section for MGR-10-011 provided in its entirety. Any reference to an AIP includes a Managing General Agent (MGA), if applicable. Any reference to an agent includes current and prospective agents. For purposes of this bulletin, "agency" means an entity that either currently has or prospectively could have a contract with an AIP as an affiliate for the sales and service of eligible crop insurance contracts.

**ACTION**:

RMA has categorized items that do or do not constitute compensation as provided below:

1.    The following items (looking at the characteristics, not the name) constitute compensation for the direct sale and service of eligible crop insurance contracts:

   (a)    Commissions.

   (b)    Salary.

   (c)    Profit Sharing.

   (d)    Bonuses.



The Risk Management Agency Administers
And Oversees All Programs Authorized Under
The Federal Crop Insurance Corportion

USDA is an Equal Opportunity Provider and Employer

GOV000604

**BULLETIN NO.: MGR-10-011.1**                                    **Page 2**

(e)   Consulting Fees.

(f)   Loans (unless meeting the criteria in paragraph 2).

(g)   Advance Payments.

(h)   Deferred Payments.

(i)   Cooperative advertising, to include any amount paid by an AIP to an agent, agency, affiliate, or third party for advertising or promotion of an agent or agency.

(j)   Amounts paid to agents, agencies, or affiliates for processing of eligible crop insurance contracts that either:

   (i)    Do not meet the definition of processing contained in paragraph 11; or

   (ii)   Meet the definition of processing, but exceed the limit established in paragraph 11.

(k)   Insurance coverage provided by AIPs to agents, agencies, or affiliates, including but not limited to errors and omission, accident, and life insurance.

(l)   An AIP's cost to benefit an agent, agency, or affiliate for office furnishings or equipment (excluding computer hardware), computer software (except as provided in paragraph 2), subscriptions, and meeting registration fees.

(m)   Unless the total cumulative cost benefitting an individual agent for a reinsurance year is less than $200, and the total for all agents and other employees of an agency is less than $600, an AIP's cost for:

   (i)    Sponsoring agent appreciation, recognition, reward, or similar trips;

   (ii)   Golf, hunting, fishing, or other outings held in conjunction with training events;

   (iii)  Trips or entertainment provided or in any way offered to individuals, including the unreimbursed portions thereof if an AIP or affiliate charges less than the full cost of the trips or

GOV000605

entertainment (whether or not such costs would be considered ordinary or necessary for income tax purposes); or

    (iv)    Any other entertainment, promotional gifts, or benefits, except as specified in paragraph 2.

(n)    Any other payments made by the AIP to an agent, agency, or any business owned in whole or in part by an agent, except as specified in paragraph 2.

2.    The following items do not constitute compensation for the direct sale and service of eligible crop insurance contracts:

(a)    Loans made on or before June 30, 2010.

(b)    Loans made on commercially reasonable terms as determined by FCIC (e.g., at a rate of interest, of a duration, and with repayment terms typical of commercial loans) and being repaid in accordance with such terms.

(c)    Payments related to any line of insurance not reinsured by FCIC under the Standard Reinsurance Agreement (SRA) (unless such payments are higher than industry standards for such lines of insurance).

(d)    Training, including continuing education expenses and incidental expenses directly associated with such training (e.g., meals, refreshments, and receptions), provided that the costs incurred are reasonable.

(e)    Promotional items of nominal value (e.g., pens, pencils, calendars, caps, and golf balls).

(f)    An AIP's actual costs (e.g., room rental and refreshments) paid to a third party (not an agent, relative of an agent, or agency) for educational producer meetings on the value of crop insurance as a risk management tool.

(g)    Computer software, including licensing fees, provided by an AIP to an agent, agency, or affiliate for providing eligible crop insurance contract premium quotes to producers or performing the processing tasks identified in paragraph 11, except that payments for such software paid to an agent, agency, or affiliate who sells or services eligible crop insurance contracts written by the AIP will be deemed to be compensation.

GOV000606

(h)    Computer hardware including pre-loaded software provided by an AIP to an agent, agency, or affiliate, subject to the limitations on processing costs contained in paragraph 11.

(i)    Benefits that are required by law, as specified in paragraph 10.

(j)    Amounts paid to agents, agencies, or affiliates for the cost of processing that conform to the definition of processing and the limitations established in paragraph 11.

(k)    Reasonable, actual meal costs incurred by the AIP while meeting with agents and affiliates for purposes of agent recruiting, retention, and marketing.

3.    The phrase "direct sale and service of any eligible crop insurance contract" does not include loss adjustment costs.

4.    If an AIP employee is an agent and the activity as an agent represents a minority of the employee's responsibilities and time, only the portion of the employee's compensation related to performing agent functions will be considered to be for the direct sale and service of eligible crop insurance contracts.  If the AIP cannot support the apportionment of the compensation between the duties of the employee with documentation provided upon request to RMA, the employee's total compensation will be considered to be for the direct sale and service of eligible crop insurance contracts.

5.    Compensation subject to the limitation of section III(a)(4)(B) of the SRA (i.e., 80 percent of A&O and CAT LAE by State) may be paid anytime during or after the reinsurance year.  If the amount of A&O later is reduced under section III(a)(2) of the SRA and the reduction results in an AIP's existing payments exceeding the limitation contained in section III(a)(4)(B) of the SRA, the AIP will be granted 90 days in which to recover payments in the amount necessary to be in compliance with the limitations under SRA.

6.    Compensation subject to the limitation of section III(a)(4)(C) of the SRA (i.e., 100 percent of A&O and CAT LAE by State) may only be paid after the first annual settlement between the Federal Crop Insurance Corporation (FCIC) and the AIP for the reinsurance year.

7.    Except as provided in paragraph 8, if the amount of compensation is determined in reference to the premium and or losses of a particular reinsurance year, the compensation shall be included in calculating the limitations for that reinsurance year under sections III(a)(4)(B) and (C) of the SRA, regardless of the date on which  the agreement was made or the compensation paid.  For example, if the

GOV000607

**BULLETIN NO.: MGR-10-011.1**                                    **Page 5**

amount of compensation is based upon 2010 premium or 2010 loss ratio (e.g., profit sharing agreements or agreements to retain 2010 eligible crop insurance contracts with a particular AIP into the next reinsurance year), the compensation is deemed 2010 compensation even if it is not paid until the 2011 reinsurance year. Conversely, if the amount of compensation is based upon 2011 premium or 2011 loss ratio, the compensation is deemed 2011 compensation even if the agreement under which the compensation is paid was made before July 1, 2010.

8.    For any arrangement between an AIP and an agent or agency entered into or amended after July 1, 2010, that provides compensation referencing 2010 or any previous reinsurance year, such compensation is deemed to be for the 2011 reinsurance year.

9.    In accordance with sections III(a)(4)(B) and (C)(ii) of the SRA, for purposes of determining compensation limitations, any "snap back" payments are excluded, and thus are not utilized to calculate the 80 percent and 100 percent limitations.

10.   The definition of "compensation" in the SRA uses the term "except for those benefits required by law," about which clarification has been sought. For purposes of meeting SRA requirements, benefits required by law are the amounts paid by AIP's for the employer's share of Social Security; Medicare; unemployment insurance payments; and health insurance, if mandated in Federal, State, or local law, on behalf of any AIP employee who sells and services eligible crop insurance contracts. An AIP may exclude its share of the payment of the benefits required by law when reporting compensation in the Plan of Operations, according to section III(f) of Appendix II of the SRA.

11.   Payments to agents, agencies, and affiliates for the cost of processing, including payments for computer hardware, up to and including 5 percent of the A&O subsidy and CAT LAE for a State for the reinsurance year will not be deemed by RMA to be compensation for the sale and service of eligible crop insurance contracts and will, therefore, be excluded from the limitations on compensation in section III(a)(4) of the SRA, provided the AIP can provide to RMA, upon request, detailed documentation supporting all such payments made to processing agents, agencies, and affiliates.

      (a)   "Processing" includes, but is not limited to, the performance of all of the following tasks:

            (i)   Beginning in the 2012 and continuing in subsequent reinsurance years, scanning, faxing, mailing, or otherwise providing original

GOV000608

eligible crop insurance contract documents or legible copies of such documents to the AIP;

    (ii)    The entry of electronic data at the eligible crop insurance contract level (including data necessary to comply with FCIC procedures); and

    (iii)    The transmission of eligible crop insurance contract data to the AIP in a format that is compatible with the AIP's system for transmitting data to RMA.

(b)    For payments to an agent, agency, or affiliate to qualify as processing costs:

    (i)    The agent, agency, or affiliate must perform the tasks described in paragraph 11(a) in a timely manner for substantially all eligible crop insurance contracts sold or serviced by the agent, agency, or affiliate;

    (ii)    The terms and conditions of payments by the AIP to the agent, agency, or affiliate for processing must be clearly specified in writing; and

    (iii)    In AIP documentation, payments to an agent, agency, or affiliate for processing must be shown separately from any amounts for the sales and service of eligible crop insurance contracts or other payments.

(c)    Computer hardware purchased by the AIP for an agent, agency, or affiliate is presumed to be used for processing and is subject to the limitations on processing costs established in this paragraph.

(d)    AIPs may report total processing costs paid in their Plan of Operations, according to SRA Appendix II, item III(f).

(e)    Payments to agents, agencies, and affiliates for processing in excess of 5 percent of the A&O subsidy and CAT LAE for a State for the reinsurance year will be deemed by RMA to be compensation and will be subject to the limitations in section III(a)(4) of the SRA.

GOV000609

**BULLETIN NO.: MGR-10-011.1**                                                    **Page 7**

12.    In accordance with section III(a)(4)(E) of the SRA, if RMA determines that an AIP or its MGA has employed a scheme or device to avoid the limitations imposed by section III(a)(4) of the SRA, all payments by the AIP relating to the scheme or device will be deemed by RMA to be compensation subject to the limitations of section III(a)(4); any eligible crop insurance contracts relating to the scheme or device will be subject to the denial of reinsurance; and the AIP will be subject to other sanctions set forth in section IV(h) and 7 C.F.R. part 400, subpart R.  It is impossible to list all potential schemes and devices.  In view of questions that may remain after this bulletin is issued, RMA will schedule periodic meetings to discuss and evaluate activities that might be subject to section III(a)(4)(E).  Nevertheless, RMA has been made aware of several hypothetical situations that would constitute a scheme or device under section III(a)(4)(E).  RMA offers these examples for general information; the list is not intended to be comprehensive:

   (a)    Offering commission rates to an agent for private crop-hail business that exceed usual and customary rates contingent on an AIP receiving that agent's book of eligible crop insurance contracts reinsured under the SRA.

   (b)    The purchase by an AIP of an insurance agency under terms and conditions that would, in effect, manipulate and inflate the compensation the agency owner or the agency's agents receive beyond that which it would receive under the SRA had the agency not changed ownership. Terms of such a scheme might include, for instance, an AIP purchasing an agency for an amount in excess of market value and later allowing the seller of the agency to reacquire the business for a relatively low value, thereby circumventing the limitation on agent compensation.

   (c)    The purchase of an agent's book of business with terms that allows annual payments to be based on the premium volume or the performance of the book of business for which the payment is being made.

   (d)    The purchase of a book of business owned by a person other than an agent, who in turn, provides all or part of the funds received to the agents employed or contracted by the person.

   (e)    To acquire an agent's book of business, an AIP hires, at an inflated wage, the agent or relative of the agent for a position that does not involve the direct sale or service of eligible crop insurance contracts.

   (f)    Establishing or using a third party (such as a commodity group, a marketing specialist, or data processing entity) to channel payments to agents or agencies to supplement compensation that is subject to the SRA limitations.

GOV000610

**BULLETIN NO.: MGR-10-011.1**                                          **Page 8**

      (g)     Establishing or using a third party (such as a commodity group, a marketing specialist, or data processing entity) to provide services to producers that are normally performed by an agent or agency.

      (h)     Back-dating or forward-dating documents related to agent or third-party compensation arrangements to shift compensation from one reinsurance year to another.

13.     Because section III(a)(4) is new and raises many complex issues, RMA will be mindful of the materiality and related factors in 7 C.F.R. § 400.454(c)(2) as it and AIPs become familiar with RMA's position.  Nevertheless, use of an intentional scheme or device to avoid compliance will be deemed a serious violation of the SRA.

14.     RMA recognizes that the foregoing does not exhaust the subject of determining what is or is not compensation.  By reference to the guidance provided above, and in working with financial and tax accountants and advisors, AIPs should be able to develop internal operating principles for reasonably administering the SRA limitations on agent compensation.  RMA reminds AIPs that they must keep in mind both the specific text of section III(a)(4) of the SRA, the guidance provided in this bulletin, and RMA's purpose in limiting agent compensation (in particular, preserving the solvency of AIPs).

15.     Nothing contained in this bulletin shall preclude an AIP from seeking guidance from RMA as to whether or not contractual relationships with agents prior to July 1, 2010 do or do not constitute compensation within the meaning of the SRA for 2011 and subsequent reinsurance years.

**DISPOSAL DATE:**

Until rescinded by RMA.

 Risk Management Agency
U.S. DEPARTMENT OF AGRICULTURE

# Agent Compensation - Schemes or Devices

## Background

Section III(a)(4) of the Standard Reinsurance Agreement (SRA) sets forth limitations on compensation that Approved Insurance Providers (AIPs) may pay to persons involved in the direct sale and service of eligible crop insurance contracts. Specifically, section III(a)(4)(B) states that the AIP shall not pay total compensation in excess of 80 percent of the total amount of Administrative and Operating (A&O) expense subsidy by State. However, an AIP may pay compensation up to 100 percent of A&O subsidy in all states if certain conditions set forth in section III(a)(4)(C) are met. The primary condition that must be met under section III(a)(4)(C) is that the AIP must have been paid an underwriting gain for the particular reinsurance year. Section III(a)(4)(E) of the SRA states:

> **If FCIC discovers that the Company, its MGA, or affiliate has paid compensation in excess of the amounts allowed in subparagraphs (B) or (C), the Company will be subject to any sanction described in this Agreement or applicable regulations. Any scheme or device to circumvent the limitations in subparagraphs (B) or (C) will be considered a violation of this Agreement.**

The limitations on agent compensation were first implemented for the 2011 reinsurance year and continue to remain in effect. Since the implementation of these limits, the Risk Management Agency (RMA) has provided additional guidance and clarification on: (1) the types of payments that are or are not considered to be agent compensation; and (2) examples of actual or potential situations the RMA has identified or would consider to be "schemes or devices" to avoid the agent compensation limits. A scheme or device is defined as making a payment or providing a benefit that meets the requirements of agent compensation but not reporting it as such.

GOV000612

On October 29, 2010, RMA issued Manager's Bulletin MGR-10-011.1 (Bulletin) to provide guidance regarding what types of payments are considered agent compensation. On July 22, 2011, RMA issued Information Memorandum IS-11-006 (Memorandum) to provide examples of actual and potential schemes or devices identified by RMA. On August 25, 2011, RMA issued the first series of Frequently Asked Questions (FAQs) for Agent Compensation, Schemes or Devices on RMA's website. The FAQs provide continued guidance and clarification regarding schemes or devices to facilitate the accurate accounting of agent compensation and ensure expenditures are within the limits set forth in the SRA.

In general, any payment to an agent, or any entity owned in whole or part by an agent, that is either an inducement for the agent to move their book of business from one AIP to another or an incentive to dissuade an agent from moving its book of business to another AIP would be agent compensation. Therefore, unless a particular payment is specifically identified by the SRA or guidance to not be agent compensation, the payment should be considered agent compensation. If an AIPs agent compensation expense exceeds 80 percent for a particular State, then any excess payments would likely constitute a scheme or device (with the exception of those payments authorized in section III(a)(4)(C) of the SRA).

Nothing in the SRA, Bulletin, Memorandum, or FAQs, constitutes approval or disapproval by the RMA of any particular payment or benefit, nor prohibits any business practice or transaction by any AIP. AIPs are free to conduct business as they determine in their best interest, provided that it does not otherwise violate any other provision of the SRA.

Throughout these FAQs, the term "agent" will refer to both "agents" and "agencies" as defined in Section I of the SRA.

Just as RMA does not have the authority to approve or disapprove of the formation of a reinsurance entity, RMA does not have the authority to approve or disapprove of the formation of other agent-owned entities. Additionally, RMA does not have the authority to regulate the personal investment activity of an individual. Formation of such entities, as well as the personal investment activity of individuals who participate in the program, is governed by existing applicable State and Federal laws.

GOV000613

# Under what conditions is an acquisition by an AIP considered a scheme or device?

RMA has identified certain scenarios where an acquisition would be considered a scheme or device if payments to the seller are not counted as compensation. The following criteria assume that the seller is an agent, and that the acquiring AIP is making payments to the agent to acquire the entity. If the seller is not an agent, then the limitations set forth by section III(a)(4) of the SRA would not apply.

AIP payments to a seller for an acquisition **will be** considered a scheme or device if **any** of the following criteria are met:

1. The acquisition price exceeds the Fair Market Value (FMV) of the assets at the time of purchase and the price exceeding FMV is not reported as agent compensation. This includes both the fixed price if a single payment made at the time of purchase, or the present value of annual installment payments. If the price exceeds the FMV, then the "excess payment" will be deemed agent compensation. For example, if an entity's FMV at the time of purchase is $10 million, but an AIP pays the seller $12 million, the difference of $2 million will be considered agent compensation. A third party independent FMV assessment must be provided to RMA and be based on generally accepted accounting principles for valuing insurance assets.
2. The seller has not been completely divested of the business being sold to the AIP. Divestiture is defined as the condition that the seller must have no subsequent influence, interest, or control over the business sold. The buyer must not be a family member, and the transaction must be a legitimate "arm's length" transaction. There can be no subsequent shared office space, contact or affiliation between the seller and either the business sold or the AIP. Allowing the seller to remain affiliated in any way with the AIP that purchased the book of business provides a mechanism for abuse and will be considered a scheme or device unless counted as compensation.
3. The agency acquisition terms are based on increasing annual installment payments associated with an increase in the total premium volume of the book of business. However, terms that only provide for decreasing annual installment

payments associated with a decrease in the total premium volume of a book of business, thereby reflecting a reduced market value, are not considered a scheme or device.

For non-agency acquisitions, annual installments payments that are not fixed and directly based on the purchase price at the time of the sale, which as stated in criteria number two, must be based on FMV of the assets. If there are subsequent adjustments in any annual installment payment other than what was agreed to at the time of sale, then the seller might have an incentive to channel premium volume through the entity, and RMA would consider these payments to be a scheme or device unless counted as compensation.

4. The acquisition terms include any type of buy-back clause or provision whereby the seller could repurchase the entity at any future date. Further, even if the acquisition terms do not include a buy-back provision, if the seller repurchases the entity, the acquiring AIP's original purchase price will be deemed compensation for those reinsurance years in which payments are made as part of the purchase agreement and may require accounting adjustments in accordance with the SRA for those years. In the case of an agency acquisition, the agent is receiving additional payments or benefits for servicing the same book of business, the purchase price and commissions, salaries, bonuses, etc. There is no way to prove the original sale was legitimate so this is considered a scheme or device unless counted as compensation.

5. An AIP acquires an agency and the seller pays a portion of the purchase price to the agents affiliated with the agency. In such cases the affiliated agents would be receiving additional payments for servicing the same book of business. Such payments would be considered a scheme or device unless counted as compensation.

There are numerous other transactions that could be related to acquisitions. It is impossible to list all of them here, as not every type of transaction that could arise can be envisioned. However, as a general rule, if the seller has the potential to receive additional payments or benefits from the AIP in addition to the acquisition, then RMA will consider all payments or benefits made to the seller to be a scheme or device unless such payments or benefits are counted as compensation.

GOV000615

**If an AIP has an underwriting gain under the SRA, is it permitted to pay a profit share? If so, how much is it permitted to pay? Which reinsurance year should it be applied against as agent compensation?**

Having an underwriting gain under the SRA does not guarantee that an AIP is permitted to pay a profit share under section III(a)(4)(C) of the SRA. Although having an underwriting gain under section II(b)(7) of the SRA is required in order to be able to pay a profit share, the actual amount (in excess of the soft cap) that the AIP is permitted to pay is based on the formula in section III(a)(4)(C)(iii) of the SRA.

Ceding commissions received by an AIP are included in the profit sharing formula under section III(a)(4)(C)(iii) of the SRA. As defined by the Reinsurance Association of America, a Ceding Commission is *an amount deducted from the reinsurance premium to compensate a ceding company for its acquisition and other overhead costs, including premium taxes. It may also include a profit factor.*

The intent of the ceding commission is to cover normal operating expenses and allow for a profit if operational efficiencies are achieved. RMA's expectation is that ceding commissions paid by reinsurers to AIPs are legitimate, normal and customary, and apply industry standards for "arm's length" reinsurance transactions that occur in the private reinsurance market. They should not be used as a means of guaranteeing the maximum profit sharing amount that can be paid to agents.

In accordance with MGR-10-011.1, part 7, if the amount of compensation is determined in reference to the premium and or losses of a particular reinsurance year, the compensation shall be included in calculating the limitations for that reinsurance year regardless of whether there is a required minimum premium retention for the following reinsurance year. However, the retention requirement must be limited to solely the following reinsurance year. For example, if the amount of compensation is based upon 2016 premium or 2016 loss ratio (e.g., profit sharing agreements or agreements to retain 2016 eligible crop insurance contracts with a particular AIP into the 2017 reinsurance year), the compensation is deemed 2016 compensation even if it is not paid until the 2017 reinsurance year. However, if the retention requirement for the 2016 profit share was based upon 2018 retention or

GOV000616

total written premium, it would be counted as 2018 base commission. Thus, if an agent earns a profit share accrued for 2016 but transfers business from the AIP for 2017, thereby losing the profit share due to failure to meet a 2017 business retention agreement or condition, the AIP may not pay the profit share in 2018 if the agent returns business to the AIP. Any "new business bonus" or "transfer bonus" paid to generate new or additional policies must be counted as base agent compensation. For example, if a "new business bonus" or "transfer bonus" is offered for 2018 policies, this compensation must be counted as 2018 base commission.

## Can an agent receive proceeds generated by a reinsurance company that reinsures an AIP that the agent writes for?

RMA does not have the authority to approve or disapprove the formation of reinsurance companies. Formations of this type of entity would be governed by applicable State law. However, RMA does have a responsibility to the crop insurance program to ensure that agents are not risking their ability to continue to service their policyholders, that schemes or devices are not created to violate the agent compensation limits, and that the integrity of the crop insurance program is protected.

RMA has determined that if a reinsurance company reinsures an AIP and is used to channel additional funds, directly or indirectly, to an agent writing for the same AIP, that it is a scheme or device to circumvent the agent compensation limits of the SRA. Example: Reinsurance company XYZ offers a reinsurance agreement to an AIP. The AIP accepts the agreement to obtain the underlying book of direct business derived by ceding underwriting gain/loss to reinsurance company XYZ which is then channeled to the agents writing the underlying business.

These types of agreements are deemed a scheme or device to provide additional agent compensation and the proceeds received by an agent, directly or indirectly, from these agreements must be accounted for as agent compensation in the year reinsured.

## If an agent or any entity owned in whole or part by an agent invests in an AIP, its MGA, or affiliate should payments to the

GOV000617

**agent be considered compensation?**

RMA has divided an agent's investment and ownership in an AIP, MGA, or affiliate into two categories: ownership that is publically traded on an exchange; and ownership that is not publically traded on an exchange.

**Publically Traded Ownership Interest:** Some AIPs have parent companies that issue stock which is publicly traded on U.S. or foreign stock exchanges. An agent could acquire an ownership interest in such companies through the public stock exchanges. In such cases, the company would not knowingly be entering into an ownership purchase with the agent; the agent does not conduct business directly with the company; and the AIP or affiliate itself neither knows of the ownership purchase, nor has the ability to influence or control any subsequent dividend payments to the agent by the company. If an AIP or affiliate enables an agent to acquire stock in a public company for less than the market value or provides financial assistance in any form to acquire the stock, the amount of discount or financial assistance will be considered compensation.

**Non-Publically Traded Ownership Interest:** Such investments could be a means of providing additional compensation to agents for the sale and servicing of federally reinsured policies which exceeds the limitations in the SRA, and is not accounted for as agent compensation. RMA attempts to ensure that all AIPs, their MGAs, affiliates, and agents are treated equally and that any relationship that can provide a means to provide additional funds or benefits to an agent for their sales and servicing of federally reinsured business counts as compensation unless otherwise expressly permitted in the SRA or applicable written guidance.

Under a non-publically traded ownership interest scenario, there are various ways in which an agent investor may receive a payment or benefit. This includes a "capital gain" payment (defined as the sales price of the investment less the original purchase price of the investment), a distribution payment in the case of entities formed as Limited Liability Companies or other business formations in which the entity provides a distribution to its investors, or any other payments or benefits derived from the AIPs based on their relationship with the agent.

GOV000618

With respect to the types of payments or benefits:

- Any capital gain earned by the agent investor from the sale of any shares or investment in the AIP will be considered agent compensation.
- Tax distributions made for income earned based on 2014 reinsurance year Federal crop insurance program revenue will not be considered agent compensation.
- Tax distributions made for income earned based on 2015 and subsequent reinsurance year's Federal crop insurance program revenue will be considered agent compensation.
- All dividends, and any other payments made or benefits provided to the agent investor will be considered agent compensation.
- Unrealized capital gains will not count as agent compensation. Given the uncertainty of the present value of such gains and whether any such capital gains will be realized, there is no basis to treat unrealized capital gains as compensation.

RMA recognizes that not necessarily all of an entity's revenue would be from the sale and service of Federal crop insurance program products since, for example, the entity could sell private policies, supplementals, over-the-counter risk management products, or other products not regulated by FCIC. Therefore, the amount of agent compensation must be calculated by determining the proportion of revenue earned from Federal crop insurance program products (the sum of Administrative and Operating Expense Subsidy, CAT Loss Adjustment Expense, and Underwriting Gain) divided by total revenue from all products and then multiplying this amount by total payment or benefits received by the agent investor. For example, if the agent receives a capital gain payment of $10,000, and Federal crop insurance program revenue is one-half of total revenue of the entity, then $5,000 of the capital gain must be counted as agent compensation.

AIPs, their MGAs, or affiliates must count all compensation in the reinsurance year in which the payment was received by the agent investor. However, if there is an agreement with the agent investor that contains a guarantee to make payment in a specific amount, for example, to pay $10,000 of capital gains or tax distributions for

each of the next five years, the total amount of the payments count as compensation in the year such agreement was executed.

Even though an agent, or an entity owned in whole or part by an agent, may have obtained ownership with an AIP, their MGA, or affiliate, no agent may review or be involved in the claims process, claim administration, including claims approval or denial, or any function related to insurance except those expressly authorized for an agent. Regardless of their status as an agent investor, agents are still required to comply with all conflict of interest provisions in the SRA.

Any non-publically traded AIP, MGA, or affiliate that has agent investors will be required to report to RMA quarterly the list of those investors, payments made, and interest purchased or sold.

## Does RMA view allocation of payments or benefits as a scheme or device?

RMA has identified the use of "allocation of payments" as a potential scheme or device. A general example is offered in Action item 12(a) of the Bulletin. There have been numerous scenarios regarding the allocation of payments or benefits between different lines of insurance or different States.

1. If an agent writes both Multi-Peril Crop Insurance (MPCI) and other lines of business, the agent payments/benefits can be allocated across lines of business if **all** of the following criteria are met *(MPCI includes all plans of insurance authorized for sale under the SRA and reinsured under the SRA):*
   - The payments or benefits are commensurate with the premium volume sold for each line of business;
   - Contracts are provided for all lines of insurance showing the amounts of payments or benefits; and
   - The AIP provides evidence satisfactory to RMA documenting the premium volume sold for each line of business, and that the payments or benefits do not exceed the amount authorized in the contracts.

GOV000620

If all of these criteria cannot be met, then the payments or benefits will be considered as a scheme or device unless they are counted as compensation.

2. If an agent writes multiple lines of insurance in multiple States, any non-policy compensation must be allocated to the line of insurance and the State based on the agent's premium volume in each state. Failure to properly allocate such non-policy compensation will result in a finding of a scheme or device.
3. An AIP wishes to provide its agents free map books with Common Land Units (CLUs) for completing Acreage Reports. This would not be considered compensation because such map books are tools, similar to the software that is not considered compensation under item 2(g) of the Bulletin, necessary for the agent to perform the tasks to service eligible crop insurance contracts.

## What are some scenarios under which recognition-entertainment expenses are considered a scheme or device?

Here are three such scenarios:

1. An AIP wants to allocate payments and benefits for agent recognition-entertainment expenses between MPCI[1] and non-MPCI policies written by the agent. Action item 1(m) of the Bulletin states that up to $200 of payments or benefits can be provided for agent recognition-entertainment costs and that any amount in excess of that will be considered as compensation. Non-policy payments and benefits can be allocated between lines of insurance and States because such payments are fixed in the agent's contract and are easily calculated based on the agent's premium volume in a State. However, agent recognition-entertainment is not a contractual obligation and there is no way to establish the basis for which such payment is made because it is generally used as an inducement or reward. Therefore, it provides a mechanism for abuse, and any payment or benefit for agent recognition-entertainment in excess of $200 is considered compensation and failure to report such payments and benefits in excess of $200 as compensation will be considered a scheme or device.
2. An AIP wants to apply the $600 agency recognition-entertainment payment or benefit limit to the subagents of the contracted agency. Action item 1(m) of the Bulletin makes it clear that the $200 limitation applies to **individual** agents

GOV000621

and the $600 limitation applies to **all agents and other employees of an agency.** Subagents of an agency are considered agents or employees of an agency and, therefore, are subject to the $600 limitation. This exception to the compensation rules is not intended to provide additional benefits to agents, such as trips, golf clubs or other such benefits. It is simply to allow AIPs a means to provide nominal recognition for agents. Failure to report amounts paid in excess of the $600 limitation will be considered a scheme or device unless such amounts are reported as compensation.

3. An AIP had an incentive program based on crop insurance sales (MPCI, Crop Hail, Named Peril, etc.) established prior to the 2011 reinsurance year, and they continue the program for the 2011 and subsequent reinsurance years with the exclusion of the MPCI business. Similar to agent recognition and entertainment, incentive programs are not contractually obligated and there is no way to establish the incentive is not for MPCI even if it is not included in the calculation of the amount. Therefore, it provides a mechanism for abuse, and the incentive program payment or benefit would be subject to the $200 and $600 limitation contained in Action item 1(m) of the Bulletin and failure to properly report such payments and benefits in excess of the $200 and $600 limitation will be considered a scheme or device unless such amounts are counted as compensation.

## Are processing fees considered a scheme or device?

Following are the conditions under which processing fees may or not be considered a scheme or device:

1. An AIP wants to make advance processing fee payments to an agency. Processing fees are payments for services rendered. Therefore, the payment must be made at the time or after receipt of service. Advance payments for future processing will be considered a scheme or device unless counted as compensation.

2. An AIP pays a processing fee to a processing center. Action item 11 of the Bulletin provides that payments to agents agencies, and affiliates for costs of processing, up to and including 5 percent of the A&O subsidy and CAT LAE, will not be deemed by RMA to be compensation for the sale and service of eligible

GOV000622

crop insurance contracts, provided that certain criteria in section III(a)(4) of the SRA are met. Processing centers are considered affiliates and, therefore, are subject to the 5 percent limitation. Failure to report payments to a processing center for processing in excess of the 5-percent limitation is considered a scheme or device unless such amount is reported as compensation.

3. An AIP pays a 5-percent processing fee to an agent whose business is subsequently processed by a separate processing center. AIPs can either choose to pay a processing fee allowance (up to the 5 percent) to agents or to utilize a processing center, which might be more cost effective. If an AIP utilizes a processing center to process an agent's book of business, then any processing fee payment to agents who sell and service the eligible crop insurance contracts will be considered a scheme or device. In addition, for AIP payments to processing centers not to be deemed as agent compensation, the processing center must be a distinct, unique entity not affiliated with any particular agent or agency. Otherwise, the potential for abuse exists and RMA will consider any payments to such entities affiliated with the agents to be a scheme or device.

## What about cooperative advertising?

Cooperative advertising expenses for insurance products totally unrelated to MPCI products are not considered agent compensation, provided the AIP can provide evidence satisfactory to RMA that the payments made correspond to advertisements placed for the non-MPCI products. If an AIP wants to pay cooperative advertising expenses for non-MPCI products, any payments in excess of such amounts will be considered a scheme or device unless counted as compensation.

## Are other benefits considered a scheme or device?

An AIP pays a portion of an agent's health insurance, pension plans, or other such benefits. These payments are considered to be agent compensation. In accordance with item 10 of the Bulletin, any benefit plan, or a portion paid thereto, not required by Federal, State or local law, will be considered agent compensation. Failure to properly report such payments will be considered a scheme or device.

**Footnote**

GOV000623

1. For the purposes of these FAQs, MPCI includes all plans of insurance authorized for sale under the Federal Crop Insurance Act and reinsured under the SRA.

GOV000624

 Risk Management Agency
U.S. DEPARTMENT OF AGRICULTURE

# Published Rebating Violations and Sanctions

## Background

Rebating is strictly prohibited by the Federal Crop Insurance Act (Act) and the Standard Reinsurance Agreement (SRA), with limited exceptions authorized by the Act. The Risk Management Agency (RMA) takes the rebating prohibition seriously and enforces it stringently. RMA has released numerous guidance documents regarding rebating which are listed below under "References". This FAQ summarizes the rebating prohibition guidance and provides examples so that approved insurance providers (AIPs), agents, and insureds understand how broad the prohibition extends.

Section 508(a)(9) of the Act states:

(9) PREMIUM ADJUSTMENTS.—

(A) PROHIBITION.—Except as provided in subparagraph (B), no person shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, either as an inducement to procure insurance or after insurance has been procured, any rebate, discount, abatement, credit, or reduction of the premium named in an insurance policy or any other valuable consideration or inducement not specified in the policy.

(B) EXCEPTIONS.—Subparagraph (A) does not apply with respect to—

(i) a payment authorized under subsection (b)(5)(B);
(ii) a performance-based discount authorized under subsection (d)(3); or
(iii) a patronage dividend, or similar payment, that is paid—

(I) by an entity that was approved by the Corporation to make such payments for the 2005, 2006, or 2007 reinsurance year, in accordance with subsection (b)(5)(B) as in effect on the day before the date of enactment of this paragraph; and
(II) in a manner consistent with the payment plan approved in accordance with that subsection for the entity by the Corporation for the applicable reinsurance year.

GOV000625

(C) PUBLICATION OF VIOLATIONS. –

(i) PUBLICATION REQUIRED. – Subject to clause(ii), the Corporation shall publish in a timely manner on the website of the Risk Management Agency information regarding each violation of this paragraph, including any sanctions imposed in response to the violation, in sufficient detail so that the information may serve as effective guidance to the approved insurance providers, agents, and producers.
(ii) PROTECTION OF PRIVACY. – In providing information under clause (i) regarding violations of this paragraph, the Corporation shall redact the identity of the persons and entities committing the violations in order to protect the privacy of those persons and entities.

**References**

Additional information on RMA's rebating enforcement efforts:

1. Violations and Sanctions web page
2. Rebating Prohibition
3. Private Product Sales
4. Enforcement Initiative, Federal letter, State letter
5. "Anti-Rebating Certification Statement" in the Document and Supplemental Standards Handbook

It is not possible or practical to attempt to list every possible rebating scenario, but as a general rule, if you are offering an insured or prospective insured something that you are not offering to everybody else, including all existing insureds as well as prospective insureds, regardless of whether they have or are seeking Federal crop insurance, it is likely a rebate.

# Under "EXCEPTIONS" in section 508(a)(9) of the Act it references subsections (b)(5)(B) and (d)(3). What do they allow?

A: Subsection (b)(5)(B) states:
(B) PAYMENT OF CATASTROPHIC RISK PROTECTION FEE ON BEHALF OF PRODUCERS.—

GOV000626

(i) PAYMENT AUTHORIZED.—If State law permits a licensing fee to be paid by an insurance provider to a cooperative association or trade association and rebated to a producer through the payment of catastrophic risk protection administrative fees, a cooperative association or trade association located in that State may pay, on behalf of a member of the association in that State or a contiguous State who consents to be insured under such an arrangement, all or a portion of the administrative fee required by this paragraph for catastrophic risk protection.

(ii) SELECTION OF PROVIDER.—Nothing in this sub- paragraph limits the option of a producer to select the licensed insurance agent or other approved insurance provider from whom the producer will purchase a policy or plan of insurance or to refuse coverage for which a payment is offered to be made under clause (i).

(iii) DELIVERY OF INSURANCE.—Catastrophic risk protection coverage for which a payment is made under clause (i) shall be delivered by a licensed insurance agent or other approved insurance provider.

(iv) ADDITIONAL COVERAGE ENCOURAGED.—A cooperative association or trade association, and any approved insurance provider with whom a licensing fee is made, shall encourage producer members to purchase appropriate levels of coverage in order to meet the risk management needs of the member producers.

Subsection (d)(3) states:

(3) PERFORMANCE-BASED DISCOUNT.—The Corporation may provide a performance based premium discount for a producer of an agricultural commodity who has good insurance or production experience relative to other producers of that agricultural commodity in the same area, as determined by the Corporation.

NOTE: Regarding subsection (d)(3), there are currently no "Performance-Based Discounts" authorized.

## Who is authorized to provide a patronage dividend referenced in section 508(a)(9)(B)(iii) of the Act?

While rebating was not addressed by statute prior to the 2008 Farm Bill, section 508(b)(5)(B) of the Act authorized an approved insurance provider (AIP) to make a licensing fee or other payment to a "cooperative association" or "trade association," which could, in turn, be rebated to a producer with CAT coverage or buy-up

GOV000627

coverage. The following cooperatives are "grandfathered" by this section of the Act and approved in only the listed states.

| Cooperative | Approved States |
| --- | --- |
| California Grape and Tree Fruit League | California |
| Nisei Farmers League | California |
| Allied Grape Growers | California |
| Paramount Citrus Exchange of CA | California |
| Livingston Farmers Association | California |
| Minturn Huller Cooperative, Inc. | California |
| Cortez Growers Association | California |
| Northern Merced Hulling Association | California |
| Westside Hulling Association | California |
| Salida Hulling Association, Inc. | California |
| North State Hulling Cooperative, Inc. | California |
| ArborOne, ACA (formerly Pee Dee Farm Credit) | South Carolina |
| Farm Credit of Florida, ACA | Florida |
| Farm Credit of Central Florida, ACA | Florida |
| AgSouth Farm Credit, ACA | Georgia, South Carolina |
| Sunrise Cooperative | Ohio, Michigan |

The above listed cooperatives may pay patronage dividends to all members who reside in the approved state, even when membership has grown through acquisitions and mergers. However, the above listed cooperatives may not pay a patronage dividend to any member who resides outside of the approved states. No other cooperative association or trade association is authorized to pay a patronage dividend based upon insurance policy sales except those listed above.

## Do state rebating laws apply to an agent/agency (agent) who sell federal crop insurance?

While section 506(1) of the Act preempts State law that is in conflict with the Act, it does not prohibit the States from enforcing their rebating statutes on agents who

GOV000628

sell insurance if such laws are not in conflict. RMA and the States work together and share information regarding rebating violations. Given the broad scope of section 508(a)(9) of the Act, it is unlikely that there would be a violation of State rebating laws that would not be a violation of section 508(a)(9). RMA and the States are both enforcing rebating prohibitions.

## What are some examples of rebating?

Scenario A

An agent is affiliated with another business, and they provide other goods or services at a lower cost or more favorable contract terms to producers that purchase their insurance policy from them. The same lower cost or contract term is not provided to producers who do not purchase their insurance policy from them.

Examples of these other goods, services, or contracts include, but are not limited to: other insurance; loan rates; commodity bushel price; accounting, financial, grain marketing, or farm management services; land appraisal or loan origination services; seed and inputs sales; and equipment sales and maintenance.

Scenario B

An agent also sells other insurance policies, but you have to purchase your insurance policy from them in order to buy the other policies.

Example: Another agent offers a crop hail policy that costs less than the coverage offered by your insurance agent. In order to purchase the less expensive crop hail policy from the other agent you have to purchase your insurance from them. Reference 3) "Private Product Sales" above is the RMA Managers Bulletin that addresses this prohibition.

Scenario C

Providing gifts to a current or potential insurance customer or their family.

Examples: trips (to anywhere); fishing, hunting, or sporting event outings; equipment or tools; vehicles; club memberships; contributions toward a customer's debt; customer appreciation dinners; basically, anything exceeding a minimal value. An example of what would not be considered a gift would be promotional and marketing items or activities of minimal value that are provided to all persons in the

GOV000629

normal course of business, including calendars, pens, and meals, are not regarded as a valuable consideration or inducement to procure or retain insurance.

Scenario D
Purchasing items/services from an insurance customer at a price above market value.

Examples: Paying $5000 for a car with a blue book value of $4000 or paying more than the current selling price for any goods or services.

Scenario E
Structuring a business entity for the purpose of transferring insurance sales revenue back to the insurance customer.

Example: Establishing a Limited Liability Corporation (LLC) or other entity comprised of producer owners, having an owner or another individual become the insurance agent for the LLC members, and the agent write policies for the owners of the LLC. The commissions earned on the policies are then paid to the LLC, and the agent is compensated from part of the commissions. The LLC then dividends the remaining commission income back to the customer members in cash; or buys seed, fertilizer, equipment, etc. for the customer members; or distributes the commission income benefit back to the customer members through some other means.

Scenario F
Providing an insurance customer an investment, ownership, or similar opportunity with the agent/agency.

Example: Selling shares in an agency to insurance customers as an incentive to purchase insurance from the agency. As with Example E, this provides a benefit back to the customer directly related to their purchasing their insurance from the specific agent/agency.

Scenario G
An agent pays all or part of a producer's premium.

Example: An agent agrees to pay a producer's premium in exchange for a future indemnity and/or other repayment. A producer has an agreement with their agent to share an indemnity payment received by the producer and the agent agrees to pay the producer's premium when an indemnity is not received.

GOV000630

Scenario H

A landlord requires a lessee to purchase insurance from a specific agent or agency and the lessee receives a direct or indirect benefit.

Example: A landlord requires the lessee to purchase their insurance from an agent: the agent also sells seed, gives the landlord a discount which is passed down to the lessee; the landlord is given farm management software from the agent which they then provide to the lessee; the agent pays the landlord, and the landlord provides a reduced lease rate to the lessee.

Scenario I

Offering or providing access to financial institutions as an inducement to obtain or retain a policyholder's business.

Example: An agent, agency, AIP, or person associated with an agent, agency, or AIP, offers exclusive financial services or options providing exclusive terms or a method to pay or be credited, either directly or indirectly for the insurance premium in part or full.

Scenario J

Offering or providing discounted brokerage commissions.

Example: A commodity broker associated with an agent, agency, or AIP, offers discounted brokerage fees not offered to all other potential insurance customers.

## What if a lending institution or cooperative has a patronage program or provides their members a dividend. Is this a rebate?

Lending institutions may offer a patronage dividend program calculated based upon loan interest paid or other product purchases. Cooperatives may provide their members a dividend calculated based upon the business they conducted with the cooperative. If crop or livestock premium is not part of the calculation to determine the dividend a producer receives, it is not a rebate. If crop or livestock premium is included in the calculation, it is a rebate. A producer participating in a dividend program should be eligible and receive the same amount regardless of whether they purchased their crop or livestock insurance from the entity providing the dividend. The only exceptions are the "grandfathered" cooperatives listed above.

GOV000631

# What is the "Anti-Rebating Certification Statement"?

Reference 5) above contains guidance on the Anti-Rebating Certification Statement. The following certification statements are included on a form executed by the insured and their crop insurance agent.

Applicant/Insured Statement
--I certify, for the crop year indicated, that I have not directly or indirectly received, accepted, or been paid, offered, promised, or given any benefit, including money, goods, or services for which payment is usually made, rebate, discount, abatement, credit, or reduction of premium, or any other valuable consideration, as an inducement to procure insurance or in exchange for purchasing this insurance policy after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any information on this form may subject me, and any person with a substantial beneficial interest in me, to sanctions, including but not limited to, criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 U.S.C. §1515(h)) and all other applicable federal statutes.

Agent Statement
--I certify, for the crop year indicated, that I have neither offered nor promised, directly or indirectly, any benefit, including money, goods, or services for which payment is usually made, rebate, discount, credit, reduction of premium, or any other valuable consideration to this person either as an inducement to procure insurance or in exchange for obtaining insurance after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any violation may subject me, and all agencies/companies I represent, to sanctions, including but not limited, to criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 USC §1515(h)) and all other applicable federal statutes.

GOV000632

Every insurance customer and agent is certifying that they have not received or given a rebate. If you are unsure whether the rebating prohibition applies to your situation, contact your AIP.

## What are the potential sanctions against agents and producers involved in rebating?

As stated in the Anti-Rebating Certification Statement executed by the producer and agent, both are subject to sanctions including criminal and civil penalties and administrative sanctions in accordance with Section 515(h) of the Federal Crop Insurance Act (FCIA) Laws and Regulations and all other applicable federal statutes. Sanctions include civil fines and disqualification for up to 5 years.

GOV000633

# CONTRACTS

GOV000675

# MEETINGS / NOTES

GOV000878

# MGR-25-009 – ISSUANCE AND RESPONSE

GOV000900



**United States Department of Agriculture**

Farm Production and Conservation

Risk Management Agency

1400 Independence Avenue, SW Washington, D.C. 20250

**DATE:** November 20, 2025

**BULLETIN NO.: MGR-25-009**

**TO:**    All Approved Insurance Providers
All Risk Management Agency Field Offices
All Other Interested Parties

**FROM:**    Patricia Swanson
Administrator

PATRICIA SWANSON    Digitally signed by PATRICIA SWANSON
Date: 2025.11.20 14:43:08 -05'00'

**SUBJECT:**    Agent Compensation – Third Party Software Payments

### BACKGROUND:

Agent compensation limitations were first implemented for the 2011 reinsurance year. These limitations were added as a result of an Approved Insurance Provider (AIP) which failed after paying out more agent compensation than it received in Administrative and Operating Expense (A&O) during a high loss year. To ensure AIPs have enough funds to service policies and adjust losses, the SRA includes a cap on agent compensation, which is described in Section III(a)(4).

RMA subsequently released MGR-10-011.1, IS-11-006, and FAQs due to questions raised by AIPs asking RMA to provide guidance regarding what scheme or devices have been identified by RMA to circumvent the limitations in section III(a)(4)(E) of the SRA.

"*A scheme or device is the making of a payment or benefit that meets the requirements for compensation paid to persons involved in the direct sale and service of eligible crop insurance contracts when such benefit or payment should be counted as compensation.*"

Further, in determining whether a particular action is a scheme or device, RMA has taken into consideration whether the action would provide the means for the AIP to provide a payment or benefit in addition to the commission, salary, bonuses, and other payments or benefits customarily included in the agent contracts and not otherwise excluded from compensation.

### ACTION:

In accordance with the 2026 SRA part IV(g) RMA is requesting documentation for third party computer software and licensing fees paid for and provided by an AIP to an agent, agency or affiliate for providing eligible crop insurance contracts (ECIC) for the 2026 reinsurance year. As part of this request, please submit the following information to RMA at SM.FPAC.RMA.ReinsuranceServices@usda.gov within the next 10 business days:

- Provide a brief description of the software or programing purchased from a third

GOV000901

party and provided to agents and agencies and how it aids in sales and service of ECIC.

- Provide a description of the 2026 reinsurance year expenses paid or estimated to be paid by the AIP to a third party to obtain the software or license.
- Provide whether the software or licensing fee counts as agent compensation? Yes or No. If your answer is No, please provide an explanation why this is not considered agent compensation.
- Provide whether the AIP makes the software or license available to all agent/agencies who write with the AIP or is it only provided to a select group? If provided only to a select group describe why this group needs this software and is there a reason other agents/agencies do not need it.
- Provide your third-party contracts and any applicable marketing materials provided to the AIP for software and programming purchases which aid in the sales and service of ECIC by agents and agencies.

Attachment

BULLETIN NO.: MGR-25-009                                                                                                                Page 3

| Agent Compensation – Third Party Software Payments Template | | | | |
|---|---|---|---|---|
| **Software Name** | **Description** | **Expenses paid or estimated to be paid** | **Counted as agent compensation? Yes/No** | **If not counted as agent compensation, why?** |
| *Provide name of software/license* | *Provide description and how it aids in sales of service.* | *Provide total cost of software/license.* | *Yes/No* | *Please explain.* |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

GOV000903

BULLETIN NO.: MGR-25-009                                                                                                                    Page 4

| Agent Compensation – Third Party Software Payments Template Continued | | |
|---|---|---|
| **Available to all your agents/agencies? Yes/No** | **If not available to all your agents/agencies, why?** | **Contract/Marketing Materials Attached? Yes** |
| *Yes/No* | *Please explain why only a specific group/agent/agency needs this software and reason other groups/agents/agencies do not need it.* | *Yes* |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

GOV000904

Case 1:26-cv-00842-SLS    Document 24    Filed 04/08/26    Page 1637 of 1783

Case 1:26-cv-00842-SLS    Document 24    Filed 04/08/26    Page 1694 of 1783

Case 1:26-cv-00842-SLS    Document 24    Filed 04/08/26    Page 1742 of 1783

# MGR-26-002 ISSUANCE AND RESPONSE

GOV001768



**United States Department of Agriculture**

Farm Production and Conservation

Risk Management Agency

1400 Independence Avenue, SW Washington, D.C. 20250

**DATE:** February 20, 2026

**BULLETIN NO.: MGR-26-002**

**TO:**  All Approved Insurance Providers
All Risk Management Agency Field Offices
All Other Interested Parties

**FROM:**  Patricia Swanson
Administrator

PATRICIA SWANSON    Digitally signed by PATRICIA SWANSON
Date: 2026.02.20 12:41:01 -05'00'

**SUBJECT:**  Agent Compensation – Third Party Software Payments

### BACKGROUND:

The Department of Agriculture (USDA), Risk Management Agency (RMA) has completed its review of the documentation requested in MGR-25-009 and has determined that additional guidance is warranted with respect to arrangements between Approved Insurance Providers (AIPs) and service providers that provide policy administration software and support services primarily for the benefit of certain agents and agencies.  The purpose of this bulletin is to remind participants in the Federal Crop Insurance Program that, except for benefits required by law, any monetary or non-monetary benefits of value provided, directly or indirectly, to an agency by either an AIP or an affiliate of an AIP are considered compensation under the Standard Reinsurance Agreement (SRA).

Section III(a)(4)(B) of the SRA provides:

> *"Except as provided in subparagraph (C), in any State in which the Company is doing business, the Company, its MGA, or any affiliate shall not pay total compensation in excess of 80 percent of the total amount of A&O subsidy and CAT LAE calculated in accordance with subsection (a)(2) excluding any amounts paid under subsection (a)(2)(I), for such State…"*

The SRA defines the term "compensation," as:

> *"Compensation" means, for any reinsurance year, commissions, salary, profit sharing, and other forms of payment including, but not limited to, transfer or other types of bonuses, consulting fees, loans, advance payments, deferred payments, cooperative advertising, and any monetary or non-monetary benefits of value, except for those benefits required by law, in accordance with FCIC procedures. Compensation does not include any payments related to a line of insurance not reinsured under this Agreement unless such payment is made to circumvent the provisions of this Agreement.*

BULLETIN NO.: MGR-26-002                                                      Page 2

The SRA defines the term "affiliate" as:

> *"Affiliate" means any person, including, but not limited to, a managing general agent, agent, service provider, and loss adjuster, that: (1) collects premiums, services the policy, adjusts, or settles claims; (2) collects, processes, manages, and reports electronic data for the purposes of selling, administering, or servicing eligible crop insurance contracts for the Company; or (3) directly or indirectly, through one or more intermediaries, has the authority to control any aspect of the management of the book of business or any other decision made under this Agreement, without the prior and specific approval from the Company…*

RMA prohibits relationships that can provide additional funds or benefits to an agent for their sales and servicing of federally reinsured business above what is permitted.

In general, any payment to an agent, or any entity owned in whole or part by an agent, that is either an inducement for the agent to move their book of business from one AIP to another or an incentive to dissuade an agent from moving its book of business to another AIP would be agent compensation. Therefore, unless a particular payment is specifically identified by the SRA or guidance to not be agent compensation, the payment should be considered agent compensation.

Under the standards set forth above, an AIP may enter into an agreement with an independent service provider to deliver general policy administration software and support services on behalf of the AIP to all of the AIP's agencies, and payments made by the AIP to the service provider under those circumstances will, as a general matter, not be considered compensation under the SRA. However, payments made by an AIP to a service provider for policy administration software and support services will be deemed a benefit of value and considered compensation under the SRA if any of the following conditions apply:  (1) The service provider is funded in whole or in part by an agency or group of agencies that receives the benefit of the software and services; (2) An agency or group of agencies receiving the benefit of the software and services has authority to control the service provider's work; or (3) The software and support services are provided to a select agency or group of agencies rather than being available to the AIP's entire agency force.

## ACTION:

AIPs are directed to review all arrangements with their service providers to ensure they are paying and reporting agent compensation in accordance with the SRA, the FAQs for Agent Compensation, Schemes or Devices on RMA's website, and this bulletin in advance of the start of the 2027 RY. Effective for the 2027 and succeeding reinsurance years, third party-software and support relationships meeting the criteria above will be considered agent compensation.   Further, AIPs are reminded that Section III(a)(4)(E) of the SRA provides:

If FCIC discovers that the Company, its MGA, or affiliate has paid compensation in excess of the amounts allowed in subparagraphs (B) or (C), the Company will be subject to any sanction described in this Agreement or applicable regulations. Any scheme or device to circumvent the limitations in subparagraphs (B) or (C) will be considered a violation of this Agreement.

GOV001770

BULLETIN NO.: MGR-26-002                                                      Page 3

**Disposal Date:**
Effective until superseded or rescinded.

GOV001771

# OTHER

GOV001773