**Redacted for Public Filing**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BRISK INSURANCE SERVICES LLC,

                    Plaintiff,

    v.

FEDERAL CROP INSURANCE
CORPORATION *et al.*,

                    Defendants.

Civil Action No.: 1:26-cv-00842

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 7(h)(2) of the Local Civil Rules, and the Court's Order dated April 7, 2026 (Dkt. 18), plaintiff Brisk Insurance Services LLC moves for summary judgment in its favor and against Federal Crop Insurance Corporation ("FCIC"); Risk Management Agency ("RMA") and Patricia Swanson, in her official capacity as Manager of FCIC and Administrator of RMA. Manager's Bulletin MGR-26-002 is arbitrary and capricious because it violates the change-in-position doctrine by failing to acknowledge the change in policy and failing to provide a good reason for the change. Brisk asks the Court to vacate MGR-26-002 and remand this matter to the RMA for further proceedings consistent with the Court's Order and Opinion. The motion is supported by the accompanying Memorandum of Law, which is incorporated herein by reference.

**Redacted for Public Filing**

Respectfully submitted,

By:   /s/ Charles A. Zdebski
      Charles A. Zdebski (#451075)
      Chad E. Kurtz (#1016934)
      COZEN O'CONNOR
      2001 M Street NW, Suite 500
      Washington, DC 20036
      Tel: (202) 280-6528
      czdebski@cozen.com
      ckurtz@cozen.com

Dated: April 22, 2026

*Attorneys for Plaintiff,*
*Brisk Insurance Services LLC*

2

**Redacted for Public Filing**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BRISK INSURANCE SERVICES LLC, | |
| Plaintiff, | |
| v. | Civil Action No.: 1:26-cv-00842 |
| FEDERAL CROP INSURANCE CORPORATION *et al.*, | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Charles A. Zdebski (#451075)
Chad E. Kurtz (#1016934)
COZEN O'CONNOR
2001 M Street NW, Suite 500
Washington, DC 20036
Tel: (202) 280-6528
czdebski@cozen.com
ckurtz@cozen.com

*Attorneys for Plaintiff,*
*Brisk Insurance Services LLC*

Dated: April 22, 2026

**Redacted for Public Filing**

**TABLE OF CONTENTS**

**Page**

I.  FACTUAL BACKGROUND ............................................................................... 2

    A.  Contextual background. ....................................................................... 2

    B.  RMA determined that an AIP's provision of insurance policy administration software to an agent does not constitute agent compensation. ......................................................................................... 4

    C.  Brisk develops a single software platform for agents to service multiple AIPs' policies. ...................................................................................... 6

    D.  RMA issues Manager's Bulletin MGR-25-009. .................................... 6

    E.  RMA issues Manager's Bulletin MGR-26-002. .................................... 7

    F.  MGR-26-002 was specifically intended to impact Brisk and has done so. ............ 8

II.  ARGUMENT ................................................................................................. 9

    A.  Legal standard on a summary judgment motion challenging agency action .......... 9

    B.  Brisk has standing to challenge MGR-26-002. ...................................... 9

    C.  MGR-26-002 is arbitrary and capricious under the change-in-position doctrine. ...................................................................................... 12

        1.  MGR-26-002 changed the policy set forth in MGR-10-011.1. ................ 14

        2.  MGR-26-002 did not display awareness of the change in policy. ............ 15

        3.  MGR-26-002 failed to provide any good reason for the new policy. ........ 15

    D.  The Court should vacate MGR-26-002 and remand. ............................ 16

        1.  The Court should follow the default rule and vacate MGR 26-002. ........ 16

        2.  RMA cannot meet its burden in showing that the rarely invoked "remand without vacatur" remedy is warranted here. ............................. 18

            a.  RMA will not be able to cure MGR 26-002 on remand. .............. 20

                1.  The three exceptions in MGR-26-002 do not serve the purpose underlying the cap on agency compensation of preventing AIP insolvency. ............................................... 20

                2.  The three exceptions do not serve the purpose underlying the cap on agency compensation because RMA is improperly trying to regulate, under the guise of the cap on agency compensation, conduct that it lacks authority to regulate. ............................................... 23

             b.  Vacatur would cause virtually no disruptive consequences. ........ 25

III.  CONCLUSION .............................................................................................. 26

i

Redacted for Public Filing

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) .......................................................................................19

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) ................................................................................19, 26

*Am. Bankers Ass'n v. Nat'l Cred. Union Admin.*,
  934 F.3d 649 (D.C. Cir. 2019) .............................................................................16, 19, 20

*Am. Bar Ass'n v. U.S. Dep't of Educ.*,
  370 F.Supp.3d 1 (D.D.C. 2019) ......................................................................................15

*Am. Equity Inv. Life Ins. Co. v. Sec. Exch. Comm'n*,
  613 F.3d 166 (D.C. Cir. 2010) ...................................................................................19, 25

*Am. Great Lakes Ports Ass'n v. Schultz*,
  962 F.3d 510 (D.C. Cir. 2020) .........................................................................17, 18, 19, 26

*Amgen, Inc. v. Smith*,
  357 F.3d 103 (D.C. Cir. 2004) ........................................................................................10

*ANR Pipeline Co. v. Fed. Energy Regul. Comm'n*,
  71 F.3d 897 (D.C. Cir. 1995) ..........................................................................................13

*Bangor Hydro-Electric Co. v. FERC*,
  78 F.3d 659 n.3 (D.C. Cir. 1996) ................................................................................21, 22

*Bennett v. Spear*,
  520 U.S. 154 (1997) .......................................................................................................11

*Block v. Meese*,
  793 F.2d 1303 (D.C. Cir. 1986) ......................................................................................11

*Bridgeport Hosp. v. Becerra*,
  108 F.4th 882 (D.C. Cir. 2024) ..............................................................................16, 19, 25

*Burt Lake Band of Ottawa & Chippewa Indians v. Bernhardt*,
  613 F. Supp. 3d 371 (D.D.C. 2020) .................................................................................20

*Cemex Inc. v. Dep't of Interior*,
  560 F.Supp.3d 268 (D.D.C. 2021) ...................................................................................17

**Redacted for Public Filing**

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979)...........................................................................................................23

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987)...........................................................................................................10

*Clean Wisc. v. Env't Prot. Agency*,
   964 F.3d 1145 (D.C. Cir. 2020)........................................................................................13

*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
   628 F. Supp. 3d 243 (D.D.C. 2022)..................................................................................13

*Ctr. for Biological Diversity v. Ross*,
   480 F.Supp.3d 236 (D.D.C. 2020).....................................................................................19

*Dakota Rural Action v. U.S. Dep't of Agric.*,
   668 F.Supp.3d 1 (D.D.C. 2023).........................................................................................19

*Duke City Lumber Co. v. Butz*,
   382 F. Supp. 362 (D.D.C. 1974).......................................................................................10

*Earthworks v. U.S. Dep't of Interior*,
   496 F.Supp.3d 472 (D.D.C. 2020).....................................................................................12

*Ethyl Corp. v. EPA*,
   306 F.3d 1144 (D.C. Cir. 2002).........................................................................................10

*FDA v. Wages & White Lion Inv., LLC*,
   604 U.S. 542 (2025)......................................................................................................12, 13

*Friends of Earth v. Haaland*,
   583 F. Supp. 3d 113 (D.D.C. 2022), *vacated and remanded on other grounds*,
   No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023)..........................................17, 18

*Goldstein v. SEC*,
   451 F.3d 873 (D.C. Cir. 2006)...........................................................................................20

*Heartland Reg'l Med. Ctr. v. Sebelius*,
   566 F.3d 193 (D.C. Cir. 2009)...........................................................................................19

*HMO Louisiana, Inc. v. Dep't of Health & Hum. Servs.*,
   793 F. Supp. 3d 150 (D.D.C. 2025)................................................................................9, 10

*In re Core Commc'ns, Inc.*,
   531 F.3d 849 (D.C. Cir. 2008) (Griffith, J., concurring).................................................17

*Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*,
   887 F. Supp. 2d 259 (D.D.C. 2012).....................................................................................9

*Judulang v. Holder*,
    565 U.S. 42 (2011)................................................................................................20

*Kiakombua v. Wolf*,
    498 F.Supp.3d 1 (D.D.C. 2020)...........................................................................17

*Kingdom v. Trump*,
    No. 25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ...........................20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)..............................................................................................11

*Marin Audobon Soc'y v. Fed. Aviation Admin.*,
    121 F.4th 902 (D.C. Cir. 2024).............................................................................23

*Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*,
    752 F.Supp.3d 13 (D.D.C. 2024)..........................................................................11

*Matson Navigation Co., Inc. v. Dep't of Transp.*,
    770 F.Supp.3d 44 (D.D.C. 2025)..........................................................................13

*Nat. Res. Def. Council v. Env't Prot. Agency*,
    489 F.3d 1250 (D.C. Cir. 2007) (Randolph, J., concurring)..................................17

*Nat'l Ass'n of Broadcasters v. Fed. Commc'ns Comm'n*,
    39 F.4th 817 (D.C. Cir. 2022)...............................................................................23

*Nat'l Ass'n for Advancement of Colored People v. Trump*,
    298 F.Supp.3d 209 (D.D.C. 2018)........................................................................13

*Ovintiv USA, Inc. v. Haaland*,
    665 F.Supp.3d 59 (D.D.C. 2023)..........................................................................13

*Planned Parenthood Fed. of Am., Inc. v. Heckler*,
    712 F.2d 650 (D.C. Cir. 1983)..............................................................................23

*Rempfer v. Sharfstein*,
    583 F.3d 860 (D.C. Cir. 2009)................................................................................9

*Richards v. INS*,
    554 F.2d 1173 (D.C. Cir. 1977)..............................................................................9

*San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Inspection Serv.*,
    257 F.Supp.2d 133 (D.D.C. 2003)........................................................................10

*Shands Jacksonville Med. Ctr. v. Burwell*,
    139 F.Supp.3d 240 (D.D.C. 2015)........................................................................20

Redacted for Public Filing

*Sinclair Wyo. Refining Co. LLC v. EPA*,
    114 F.4th 693 (D.C. Cir. 2024)...................................................................................13, 16

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    282 F.Supp.3d 91 (D.D.C. 2017)...............................................................................19, 25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021)........................................................................................18

*Teva Pharms. USA, Inc. v. U.S. Food & Drug Admin.*,
    514 F.Supp.3d 66 (D.D.C. 2020)......................................................................................12

*The Altman Grp., Inc. v. FCIC et al.*,
    No. 25-2193, Dkt. 22 .........................................................................................................25

*U.S. Sugar Corp. v. Env't Prot. Agency*,
    844 F.3d 268 (D.C. Cir. 2016)..........................................................................................17

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019)........................................................................................19

*Villarreal-Dancy v. U.S. Dep't of Air Force*,
    633 F.Supp.3d 19 (D.D.C. 2022)......................................................................................14

*West Virginia v. Env't Prot. Agency*,
    597 U.S. 697 (2022)..........................................................................................................23

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*,
    485 F.Supp.3d 1 (D.D.C. 2020)........................................................................................12

*Widakuswara v. Lake*,
    779 F. Supp. 3d 10 (D.D.C. 2025).............................................................................13, 15

*Williams v. Walsh*,
    648 F.Supp.3d 70 (D.D.C. 2022)......................................................................................17

**Statutes**

5 U.S.C. § 702.........................................................................................................................10

5 U.S.C. § 706.........................................................................................................................16

7 U.S.C. § 1506.......................................................................................................................23

7 U.S.C. § 1508 ................................................................................................................ *passim*

Agricultural Adjustment Act of 1938 ........................................................................................2

Federal Crop Insurance Act, 7 U.S.C. § 1501 e*t seq.* ........................................................ *passim*

**Redacted for Public Filing**

**Other Authorities**

7 CFR § 457.8(a)...................................................................................................24

Federal Rule of Civil Procedure 56(c) ...............................................................9

**Redacted for Public Filing**

In October 2010, defendant Risk Management Agency ("RMA") issued Manager's Bulletin MGR-10-011.1, which states that, subject to one exception irrelevant here,[1] the provision by an Approved Insurance Provider ("AIP") to an insurance agent of "[c]omputer software, including licensing fees, … for providing eligible crop insurance contract premium quotes to producers or performing the processing tasks identified in paragraph 11" does not constitute agent compensation. (GOV000607). An August 2011 RMA FAQ memorandum, later revised in August 2017, reasoned that such policy administration software is not agent compensation because it is a "tool[]" "necessary for the agent to perform the tasks to service eligible crop insurance contracts." (GOV000612, -621).

This RMA policy remained unaltered for nearly 16 years. Then, in February 2026, RMA issued Manager's Bulletin MGR-26-002, entitled "Agent Compensation - Third Party Software Payments" ("MGR-26-002"), which changed RMA's long-standing "policy administration software is not agent compensation" policy by adding three new exceptions to that policy:

> (1) The service provider is funded in whole or in part by an agency or group of agencies that receives the benefit of the software and services; (2) An agency or group of agencies receiving the benefit of the software and services has authority to control the service provider's work; or (3) The software and support services are provided to a select agency or group of agencies rather than being available to the AIP's entire agency force.

(GOV001770). And yet, in violation of the change-in-position doctrine, RMA made no effort in MGR-26-002 to acknowledge the change, let alone provide a good reason for it, rendering MGR-26-002 arbitrary and capricious. As a result, the Court should vacate MGR-26-002 and remand to RMA for further proceedings consistent with the Court's ruling.

---

[1] The exception provides that "payments for such software paid to an agent, agency, or affiliate who sells or services eligible crop insurance contracts written by the AIP will be deemed to be compensation." (GOV000606). There is no contention in the administrative record that this exception applies to Brisk.

1

**Redacted for Public Filing**

I.      <u>FACTUAL BACKGROUND</u>

A.      **Contextual background.**

Congress established the federal crop insurance program ("FCIP") in 1938, "after private insurance companies were unable to establish a financially viable crop insurance business." (GOV000545).  The Agricultural Adjustment Act of 1938 (P.L. 75-430) and the Federal Crop Insurance Act of 1980 (P.L. 96-365) were enacted to protect farmers from financial losses caused by events such as droughts, floods, hurricanes, and other natural disasters as well as losses resulting from a drop in crop prices. (GOV000546).  Congress created the Federal Crop Insurance Corporation ("FCIC") within the United States Department of Agriculture ("USDA") to administer the FCIP.  (GOV000545).

FCIC initially offered crop insurance under the FCIP directly to agricultural producers. (*Id*.)  "However, in 1980, Congress enacted legislation that expanded the program and, for the first time, directed that crop insurance—to the maximum extent possible—be offered through private insurance companies, which would sell, service, and share in the risk of federal crop insurance policies." (GOV000546). In 1996, Congress created an independent office, eventually called the Risk Management Agency ("RMA"), to supervise FCIC operations and to administer and oversee the FCIP.  (*Id*.)

"RMA establishes the terms and conditions to be used by private insurance companies selling and servicing crop insurance policies to farmers through a contract made with the companies called the SRA [the Standard Reinsurance Agreement]."  (GOV000546; *see also* 7 U.S.C. § 1508(k)(2) ("The reinsurance shall be provided on such terms and conditions as the Board may determine to be consistent with subsections (b) and (c) and sound reinsurance principles.").  "The SRA is a cooperative financial assistance agreement between RMA, through FCIC, and the

2

private crop insurance companies to deliver federal crop insurance under the authority of the Federal Crop Insurance Act [("FCIA")]." (GOV000546 (footnote omitted)).

Companies retain insurance agents for the sale and service of these crop insurance policies. (*Id.*) "An agent, a person licensed by the state in which the agent does business to sell crop insurance, is employed by or contracts with a company to sell and service eligible crop insurance policies." (*Id.*, *see also* GOV000488 (defining "agent" in the SRA)). "While most companies pay their agents a commission to sell and service crop insurance policies, some companies pay agents a salary." (GOV000546)

"Under the SRA, FCIC reinsures or subsidizes a portion of the losses and pays the insurance companies an administrative fee or expense reimbursement—a preestablished percentage of premiums—to reimburse the companies for the administrative and operating [A&O] expenses of selling and servicing crop insurance policies, including the expenses associated with adjusting claims." (GOV000546 – 547). As a reinsuring agreement, the SRA provides "insurance for insurance companies" (GOV000547), "to limit liability on specific risks, increase the volume of insurance policies that may be written, and help companies stabilize their business in the face of wide market swings in the insurance industry." (GOV000547). The SRA serves as the means by which "RMA shares the risks associated with crop insurance policies with companies that sell federal crop insurance." (*Id.*, *see also* 7 U.S.C. § 1508(k)(1) (requiring that FCIC, "to the maximum extent practicable, provide reinsurance to insurers")).

The premium an approved insurance provider ("AIP") may charge a producer for FCIC-reinsured products is established by RMA, meaning AIPs cannot compete with one another on price. (GOV000546). In 2002, American Growers Insurance Company, one of the then-largest AIPs, became insolvent due to "the cumulative effect of company decisions that reduced the

Redacted for Public Filing

company's surplus, making it vulnerable to collapse when widespread drought in 2002 erased anticipated profits." (GOV000537). One such decision was to pay out excessive agent commissions. (GOV000543, GOV000571 -572). In response to a Report issued by the General Accounting Office in 2004 as to the American Growers insolvency, RMA committed to change the SRA to "formalize a system of enhanced insurance company disclosures and accountabilities consistent with the Agency's current authority and will help RMA to more efficiently and effectively deal with insolvencies and clarify the roles and responsibilities of the companies and RMA in the event of another catastrophic failure." (GOV000583).

Starting with the 2011 reinsurance year, RMA amended the SRA to impose an annual, per-state cap on "[c]ompensation to persons involved in the direct sale and service of any eligible crop insurance contract under [the SRA]," i.e., insurance agents. (GOV000512; *see also* GOV000901 ("Agent compensation limitations were first implemented for the 2011 reinsurance year"). The cap is as follows: "[I]n any State in which [an AIP] is doing business, the [AIP], its MGA, or any affiliate shall not pay total compensation in excess of 80 percent of the total amount of A&O subsidy and CAT LAE … for such State." (*Id.*) The SRA defines "compensation" as, "for any reinsurance year, commissions, salary, profit sharing, and other forms of payment including, but not limited to, transfer or other types of bonuses, consulting fees, loans, advance payments, deferred payments, cooperative advertising, and any monetary or non-monetary benefits of value, except for those benefits required by law, in accordance with FCIC procedures." (GOV000489). If an AIP pays agent compensation in excess of the cap, it can be sanctioned. (GOV000513).

B.    **RMA determined that an AIP's provision of insurance policy administration software to an agent does not constitute agent compensation.** [2]

---

[2] Rather than burdening this brief and the Court by repeating the factual and legal background of the Federal Crop Insurance Act, the roles of the Defendants, the Standard Reinsurance Agreement ("SRA"), the function of agent compensation and the cap on such compensation, Plaintiff hereby

4

**Redacted for Public Filing**

On September 13, 2010, RMA issued Manager's Bulletin MGR-10-011, entitled "Guidance Regarding SRA Section III(a)(4)—Agent Compensation" ("MGR-10-011"), to address questions raised by "[AIPs] and interested other persons, including managing general agents (MGAs)" as to what constitutes agent compensation for purposes of compliance with the cap on such compensation under the SRA. (GOV000591-96). RMA published MGR-10-011 to identify specific items RMA determined either to constitute or not constitute agent compensation. (GOV000591-93). The bulletin states that "[a]n AIP's cost to benefit an agent, agency, or affiliate for … computer software" is agent compensation, "except as provided in paragraph 2." (GOV000592). Paragraph 2(h) created a carveout for a specific type of software, *i.e.*, policy administration software: "The following items do not constitute compensation[:] … An AIP's payment to a third party for license fees for software, … and other items necessary to operate the business." (GOV000593). MGR-10-011 reiterated that "RMA's purpose in limiting agent compensation" is "in particular, preserving the solvency of AIPs." (GOV000596).

On October 29, 2010, RMA issued Manager's Bulletin MGR-10-011.1 ("MGR-10-011.1") to provide "necessary modifications" to MGR-10-011 to address numerous issues raised by AIPs after RMA published MGR-10-011. (GOV000604). MGR-10-011.1 revised the "software" carveout for policy administration software—changed from Paragraph 2(h) to Paragraph 2(g)—to read as follows, and to include one exception:

> Computer software, including licensing fees, provided by an AIP to an agent, agency, or affiliate for providing eligible crop insurance contract premium quotes to producers or performing the processing tasks identified in paragraph 11, except that payments for such software paid to an agent, agency, or affiliate who sells or services eligible crop insurance contracts written by the AIP will be deemed to be compensation.

---

adopts and incorporates by reference the Court's thorough discussion of these matters in its Memorandum Opinion dated March 31, 2026. *See* [15] Memorandum Opinion of Judge Sparkle L. Sooknanan (March 31, 2026) ("*Memorandum Opinion*") at 1-5.

Redacted for Public Filing

(GOV000606). In a FAQ memorandum issued in August 2011 and revised in August 2017, RMA reiterated that the software referenced in Paragraph 2(g) was not agent compensation because it is a "tool[]" "necessary for the agent to perform the tasks to service eligible crop insurance contracts." (GOV000612; GOV000621).

### C.   Brisk develops a single software platform for agents to service multiple AIPs' policies.

### D.   RMA issues Manager's Bulletin MGR-25-009.

On November 20, 2025, RMA issued Manager's Bulletin MGR-25-009, entitled "Agent Compensation - Third Party Software Payments" ("MGR-25-009"), which requested that AIPs provide RMA, within 10 business days, certain specified "documentation for third party computer

6

software and licensing fees paid for and provided by an AIP to an agent … for the 2026 reinsurance year [i.e., July 1, 2025 to June 30, 2026]." (GOV000901-02). Notably, MGR-25-009 reiterated that the purpose of the cap on agent compensation was to ensure AIP solvency: "Agent compensation limitations were first implemented for the 2011 reinsurance year. These limitations were added as a result of an [AIP] which failed after paying out more agent compensation than it received in [Administrative and Overhead ("A&O")] during a high loss year. To ensure AIPs have enough funds to service policies and adjust losses, the SRA includes a cap on agent compensation[.]" (GOV000901-02).

E.      **RMA issues Manager's Bulletin MGR-26-002.**

On February 20, 2026, RMA issued Manager's Bulletin MGR-26-002, also entitled "Agent Compensation - Third Party Software Payments" ("MGR-26-002"). (GOV001769-71). The new bulletin states that RMA "determined that additional guidance is warranted with respect to arrangements between [AIPs] and service providers that provide policy administration software and support services primarily for the benefit of certain agents and agencies." (GOV001769). It further states that "[t]he purpose" of MGR-26-002 is to "remind" FCIP participants of the SRA's definition of "compensation." (*Id.*).

Although MGR-26-002 pertains to "policy administration software," it does not mention Paragraph 2(g) of MGR-10-011.1, which states that, subject to one exception, such software is *not* agent compensation. (GOV001769-70). Despite not referencing Paragraph 2(g), MGR-26-002 effectively amends it by adding three new exceptions/instances in which the provision of policy administration software is deemed agent compensation:

> [A]n AIP may enter into an agreement with an independent service provider to deliver general policy administration software and support services on behalf of the AIP to all of the AIP's agencies, and payments made by the AIP to the service provider under those circumstances will, as a general matter, not be considered compensation under the SRA. However, payments made by an AIP to a service

7

**Redacted for Public Filing**

provider for policy administration software and support services will be deemed a benefit of value and considered compensation under the SRA if any of the following conditions apply: (1) The service provider is funded in whole or in part by an agency or group of agencies that receives the benefit of the software and services; (2) An agency or group of agencies receiving the benefit of the software and services has authority to control the service provider's work; or (3) The software and support services are provided to a select agency or group of agencies rather than being available to the AIP's entire agency force.

(GOV001770).

F.    **MGR-26-002 was specifically intended to impact Brisk and has done so.**



8

Redacted for Public Filing

## II.    ARGUMENT

### A.    Legal standard on a summary judgment motion challenging agency action

"When ruling on a summary judgment motion in a case involving final review of an agency action under the APA, the standards of Federal Rule of Civil Procedure 56(c) do not apply because of the limited role of the court in reviewing the administrative record." *Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*, 887 F. Supp. 2d 259, 265–66 (D.D.C. 2012). Rather, summary judgment in the context of an APA challenge "serves as a mechanism for deciding, as a matter of law, whether the administrative record supports the agency action and whether the agency action is consistent with the APA standard of review." *Id.* at 266 (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)); *HMO Louisiana, Inc. v. Dep't of Health & Hum. Servs.*, 793 F. Supp. 3d 150, 154 (D.D.C. 2025) ("At summary judgment, the Court must determine whether the challenged agency action complies with the APA and is supported by the administrative record."); *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (emphasizing that, on summary judgment motions for APA claims, "the district judge sits as an appellate tribunal" because "[t]he entire case on review is a question of law" and only presents "arguments about the legal conclusions to be drawn about the agency action"). Review is limited to the administrative record and the party challenging an agency's action bears the burden of proof. *See HMO Louisiana, Inc.*, 793 F. Supp. 3d 150, 154 (D.D.C. 2025) (citations omitted).

### B.    Brisk has standing to challenge MGR-26-002.

**Redacted for Public Filing**

Under the APA, a plaintiff may seek judicial review of agency action where it is "adversely affected or aggrieved by agency action[.]" 5 U.S.C. § 702. Courts apply a "liberal approach regarding a party's standing to challenge administrative action." *Duke City Lumber Co. v. Butz*, 382 F. Supp. 362, 368–69 (D.D.C. 1974). To establish standing, a plaintiff must show (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged agency action; and (3) that the injury is likely to be redressed by a favorable judicial decision. *See San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Inspection Serv.*, 257 F.Supp.2d 133, 137 (D.D.C. 2003). The APA also requires that a plaintiff's interests fall within the "zone of interests" arguably protected by the statute under which the agency acted. *Id.* at 138. The zone-of-interests standard is "not meant to be especially demanding," and only excludes "parties whose interests are not consistent with the purposes of the statute in question[.]" *Amgen, Inc. v. Smith*, 357 F.3d 103, 108–09 (D.C. Cir. 2004) (first quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396–97 (1987)); and then quoting *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002)). Brisk has standing because RMA specifically designed and intended MGR-26-002 to impact Brisk. MGR-26-002 has accomplished its purpose, and vacating the bulletin will redress the harm to Brisk.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ RMA clearly intended and believed its actions would have a concrete, actual, and causal effect on Brisk. And indeed, and as RMA can confirm

based on the plans in operations in its possession, three of the four AIPs with whom Brisk contracts omitted Brisk from their respective plans in operations submitted on April 1, 2026.

That harm is fairly traceable to MGR-26-002 and RMA's actions. Indeed, RMA's conduct—as reflected by the record—is essentially an admission that they believe there is a causal link between MGR-26-002 and the impact on Brisk's business. That was their goal and they cannot now plausibly argue that they believe there was no connection between the issuance of MGR-26-002 and three AIPs dropping Brisk from their plans of operations. When a third party's actions are part of a causal chain, all a plaintiff need show is that the agency action had a "determinative . . . effect" on that third party. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Because Article III "requires no more than *de facto* causality," *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986), and because "[p]roximate causation is not a requirement" for standing, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014), agency action need not be the only step— or even "the very last step"—in the causal chain, *Bennett*, 520 U.S. at 169. "[W]hen plaintiffs meet 'their burden of showing that third parties will likely react in predictable ways' to the defendant's conduct, . . . courts will countenance 'a domino-effect theory of causation[.]" *Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 752 F.Supp.3d 13, 29 (D.D.C. 2024) (citation omitted) ("Thirty years of D.C. Circuit caselaw illustrate how standing may rest 'on the predictable effect of Government action on the decisions of third parties.'").

Because the concrete and actual harm caused Brisk is fairly traceable to MGR-26-002, it is redressable by the relief sought here. Vacating the bulletin will remove the AIPs, their plans of operations and Brisk from MGR-26-002's regime, thereby allowing the AIPs to put Brisk back in their plans. "'Causation and redressability typically 'overlap as two sides of a causation coin.' For 'if a government action causes an injury, enjoining the action usually will redress that injury.'"

11

**Redacted for Public Filing**

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F.Supp.3d 1, 25 (D.D.C. 2020) (internal citation omitted).

Finally, Brisk falls within the zone of interests because it is a "service provider" as referenced in MGR-26-002. (And, of course, the reason for MGR-26-002's existence). "In the APA context, 'the zone-of-interests test is not 'especially demanding''" because "it exists against a backdrop of 'Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.''" *Teva Pharms. USA, Inc. v. U.S. Food & Drug Admin.*, 514 F.Supp.3d 66, 92 (D.D.C. 2020) (citations omitted); *Earthworks v. U.S. Dep't of Interior*, 496 F.Supp.3d 472, 488 (D.D.C. 2020). "A suit will thus fail the zone-of-interests test 'only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.''" *Earthworks*, 496 F.Supp.3d at 488. Brisk satisfies this very lenient test because, *inter alia*, FCIC endeavors to regulate Brisk under the SRA. Brisk is a "service provider," and thus, in turn, an AIP "affiliate," under the SRA. (GOV000487, -494 (defining "service provider" as "any … entity … who develops, operates or maintains the [IT] systems or prepares or transmits data," and defining AIP "affiliate" to include, among others, a "service provider")). The SRA addresses what an affiliate may and may not do and, thus, regulates it. (GOV000496, -499, -512-14, 516).

**C.     MGR-26-002 is arbitrary and capricious under the change-in-position doctrine.**

Under the change-in-position doctrine, "'[a]gencies are free to change their existing policies so long as they provide a reasoned explanation for the change,' ''display awareness that [they are] changing position,'' and consider ''serious reliance interests.''" *FDA v. Wages & White Lion Inv., LLC*, 604 U.S. 542, 568 (2025) (citations omitted). The doctrine applies not just to formal policy but also "prior practice and precedent, even if there had been no previous formal

**Redacted for Public Filing**

policy." *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp. 3d 243, 259 (D.D.C. 2022); *ANR Pipeline Co. v. Fed. Energy Regul. Comm'n*, 71 F.3d 897, 901 (D.C. Cir. 1995) (referring to "established precedent").

"The change-in-position doctrine asks two questions." *Wages*, 604 U.S. at 569. "The first is whether an agency changed existing policy," such as by "act[ing] 'inconsistent[ly]' with an 'earlier position.'" *Id.* at 569–70 (citations omitted). "Once a change in agency position is identified, the doctrine poses a second question: Did the agency 'display awareness that it *is* changing position' and offer 'good reasons for the new policy?'" *Id.* at 570 (citation omitted) (emphasis in original); *Sinclair Wyo. Refining Co. LLC v. EPA*, 114 F.4th 693, 711 (D.C. Cir. 2024) (an agency "may not . . . depart from a prior policy *sub silentio*" (citations omitted)); *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 33 (D.D.C. 2025) (an agency must "'supply a reasoned analysis' for a change in policy").

To determine whether RMA changed policy, displayed awareness of the change and provided good reasons for the change, the Court need only look at the face of MGR-26-002. It is "a foundational principle of administrative law" that "judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Ovintiv USA, Inc. v. Haaland*, 665 F.Supp.3d 59, 72 (D.D.C. 2023); *Matson Navigation Co., Inc. v. Dep't of Transp.*, 770 F.Supp.3d 44, 73 (D.D.C. 2025) (an "agency's articulation of its rationale [must occur] at the time it takes action so that a court is able to review that rationale"); *Clean Wisc. v. Env't Prot. Agency*, 964 F.3d 1145, 1167 (D.C. Cir. 2020) ("[T]he soundness of an agency's decision must rest on the reasoning contained therein."). After-the-fact justifications made for the first time in litigation are of no moment. *See, e.g., Nat'l Ass'n for Advancement of Colored People v. Trump*, 298 F.Supp.3d 209, 237 (D.D.C. 2018) ("[P]ost hoc explanations that the agency did not articulate when it acted are

13

**Redacted for Public Filing**

insufficient."); *Villarreal-Dancy v. U.S. Dep't of Air Force*, 633 F.Supp.3d 19 (D.D.C. 2022) (stating the court "may not consider [an agency's] arguments pressed for the first time in litigation").

### 1.     MGR-26-002 changed the policy set forth in MGR-10-011.1.

Pursuant to Paragraph (2)(g) of MGR-10-011.1, and subject only to one exception set forth therein, payment by an AIP to a third party for policy administration software provided to an agent "do[es] not constitute compensation." Through MGR-26-002, RMA has expanded from one to four instances in which the provision of policy administration software are deemed agent compensation. That cannot plausibly be described as anything other than a change.

14

███████████████████████████████████████████████████████████

████████████████████████████

At the hearing on Brisk's emergency motion for stay, the Court questioned RMA's counsel, "How is there possibly [not] a change in position?," and then later said, "[I]t's clearly a change." (Dkt. 17, Tr. 3.26.26, 76:20-79:18). In light of the Court's comments, and in an effort to narrow the issues in dispute, Brisk's counsel asked RMA's counsel if RMA would consent to, *inter alia*, there existing a change in policy. RMA declined. Because RMA continues to argue there was no change in policy, if the Court rules in fact there was, RMA necessarily violated the change-in-position doctrine as it has showed no awareness of a change. *See Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F.Supp.3d 1, 32 (D.D.C. 2019) ("But its refusal to concede that it changed its practices when it adopted the standards effectively precluded it from satisfying the APA's basic procedural requirements when it did so."). Even acknowledging a change at this point cannot remedy the fact that MGR-26-002 provides no good reason for the change it effects.

2.    **MGR-26-002 did not display awareness of the change in policy.**

Although MGR-26-002 effectively serves to create three new exceptions to the "software" carveout set forth in Paragraph 2(g) of MGR-10-011.1, it does not even mention Paragraph 2(g) or otherwise acknowledge the change in policy. It thus fails to acknowledge that there are now three scenarios giving rise to agency compensation that, for the prior 15 plus years, did not give rise to agency compensation.

3.    **MGR-26-002 failed to provide any good reason for the new policy.**

Because RMA did not acknowledge the change, it necessarily did not offer a reason—let alone the requisite "good reason"—for the change. These circumstances alone establish MGR-26-002 as arbitrary and capricious. *See, e.g., Lake*, 779 F. Supp. 3d at 33–34 (holding that, under the change-in-position doctrine, where there was "an absence of any analysis whatsoever," agency

15

action was arbitrary and capricious); *Sinclair*, 114 F.4th at 712 (holding that an agency action was arbitrary and capricious where agency "offer[ed] no explanation for its change in view"). MGR-26-002 provides no reasoning for the three new exceptions, *i.e.*, why policy administration software should now be deemed agent compensation in these three specific new scenarios.[4]

### D.     The Court should vacate MGR-26-002 and remand.

If the Court agrees that MGR-26-002 is arbitrary and capricious because it fails to comply with the change-in-position doctrine, the next step is to determine the appropriate remedy. Brisk contends that the Court should award the default remedy and vacate MGR-26-002, particularly because RMA plans to soon issue a new bulletin to supplement or replace MGR-26-002.

RMA may, however, argue this is a "rare case" warranting the "exceptional remedy" of remand without vacatur. The Court should decline to depart from the default remedy because (i) there is no "serious possibility" that RMA can cure the deficiencies with MGR-26-002 on remand; and (ii) vacating MGR-26-002 will cause virtually no disruption.

### 1.     The Court should follow the default rule and vacate MGR 26-002.

"When a rule is contrary to law, the 'ordinary practice is to vacate' it." *Am. Bankers Ass'n v. Nat'l Cred. Union Admin.*, 934 F.3d 649, 673-74 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2) (stating the "reviewing court shall … set aside" unlawful agency action)); *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (citations omitted) ("When an agency's action is unlawful, 'vacatur is the normal remedy.' That's because Congress directed us to 'hold unlawful

---

[4] Again, when an agency changes position, it must consider any serious reliance interests. Although Brisk relied on Paragraph 2(g) and letters from RMA, because, in Brisk's view, RMA's failure to acknowledge a policy change or identify a good reason for the policy change so plainly violate the change-in-position doctrine, Brisk opts to not burden the Court with the more intricate, fact-intensive "reliance" inquiry at this time. Brisk, though, reserves the right to assert reliance interests in connection with any subsequent challenge by Brisk to RMA's forthcoming new bulletin intended to replace or supplement MGR-26-002.

and set aside agency action' that is 'not in accordance with law[.]' '[T]o 'set aside' a rule is to vacate it.'"); *Williams v. Walsh*, 648 F.Supp.3d 70, 97 (D.D.C. 2022) ("[V]acatur is the default remedy."). "[A] vacatur order takes the unlawful agency action 'off the books[,]' which is an entirely appropriate response when a plaintiff successfully establishes that the agency's conduct violates the law." *Kiakombua v. Wolf*, 498 F.Supp.3d 1, 50 (D.D.C. 2020) (citations omitted).

"[A]gencies often delay or decline to take action" if a court orders remand without vacatur. *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (citing *In re Core Commc'ns, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) ("[E]xperience suggests that [remand without vacatur] sometimes invites agency indifference."); *U.S. Sugar Corp. v. Env't Prot. Agency*, 844 F.3d 268, 270 (D.C. Cir. 2016) ("[R]emand without vacatur may in some circumstances invite prejudicial agency delay."); *Nat. Res. Def. Council v. Env't Prot. Agency*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."); *Cemex Inc. v. Dep't of Interior*, 560 F.Supp.3d 268, 282 n.8 (D.D.C. 2021) ("The remand-without-vacatur remedy has received criticism from some corners."). The default rule of vacatur also "serves to avoid creating perverse incentives for the agency to press forward with a faulty decision and fill in its analysis later." *Friends of Earth v. Haaland*, 583 F. Supp. 3d 113, 156 (D.D.C. 2022), *vacated and remanded on other grounds*, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023).

Because RMA violated the change-in-position doctrine and MGR-26-002 is thus arbitrary and capricious, the Court should follow the "ordinary practice" and "normal remedy" and vacate the bulletin. Absent a vacatur here, RMA (and other agencies) could be incentivized to rush to adopt policy changes with no effort to satisfy the change-in-position doctrine on the belief that, if

the policy change is later challenged, they can belatedly comply with the doctrine on remand while the policy change—held arbitrary and capricious—remains in effect. *See id.*; *see also* (Dkt. 17, Tr. 3.26.26, 79:2-24 (the Court stating RMA "just didn't do the work to explain the change," having made "absolutely no attempt to explain why it is making the change")).

Vacating MGR-26-002 would also discourage the prospect of any potential "agency indifference" by RMA in how expeditiously it issues any new bulletin. In a joint status report filed on April 6, 2026, RMA stated that it "expects to publish a new manager's bulletin within 50 days," or by May 26, 2026. (Dkt. 20, at 4). If the Court finds MGR-26-002 arbitrary and capricious but remands without vacatur, RMA will have less incentive to promptly issue any new bulletin, and especially before the critical July 1, 2026 date when the new reinsurance year starts.

To address this concern, and to avoid the need for unnecessary summary judgment motion practice (where, in Brisk's view, the parties' efforts should instead be focused on meeting to discuss the potential new bulletin), Brisk asked RMA to agree that, if RMA did not issue any new bulletin by June 1, 2026, RMA would withdraw MGR-26-002, which would negate the need for Brisk to seek summary judgment. RMA declined. With RMA unable to commit to issuing a new bulletin by June 1, 2026 (or any date), Brisk believes it especially important for MGR-26-002 to be vacated while RMA works on the new bulletin to avoid a scenario in which the unlawful MGR-26-002 remains "on the books" come July 1, 2026.

### 2.  RMA cannot meet its burden in showing that the rarely invoked "remand without vacatur" remedy is warranted here.

"'While unsupported agency action normally warrants vacatur, [a] court is not without discretion' to leave agency action in place while the decision is remanded for further explanation." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). A remand without vacatur, however, is an "exceptional remedy" used in "rare cases." *Schultz*, 962

F.3d at 519; *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *Dakota Rural Action v. U.S. Dep't of Agric.*, 668 F.Supp.3d 1, 9 (D.D.C. 2023) ("This exception to the general rule is an exception for good reason."); *see Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F.Supp.3d 91, 97 (D.D.C. 2017) ("The question for the Court today is thus whether this is the 'type of case that merits departure from the presumptive remedy of vacatur.'"). "Because vacatur is the default remedy, ... defendants bear the burden to prove that vacatur is unnecessary." *Ctr. for Biological Diversity v. Ross*, 480 F.Supp.3d 236, 245 (D.D.C. 2020).

In deciding whether to remand without vacatur, courts "balance "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Am. Bankers*, 934 F.3d at 674. For the first factor, courts determine whether there is "at least a serious possibility that [an agency] will be able to substantiate its decision on remand." *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993); *see also Bridgeport*, 108 F.4th at 890 ("[O]ur precedents allow [remand without vacatur] only if an agency's error is 'curable.'"); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("When an agency may be able readily to cure a defect in its explanation of a decision, the first factor … counsels remand without vacatur."). For the second factor, courts consider "whether vacatur will lead to impermissibly disruptive consequences in the interim." *Standing Rock*, 282 F.Supp.3d at 97. They assess whether it is a case "in which the 'egg has been scrambled,' and it is too late to reverse course." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110-11 (D.C. Cir. 2014); *Schultz*, 962 F.3d at 519 (counseling against vacatur if it "would disrupt settled transactions"); *Am. Equity Inv. Life Ins. Co. v. Sec. Exch. Comm'n*, 613 F.3d 166, 179 (D.C. Cir. 2010) (finding that vacating a rule would not be disruptive because the rule "has not yet gone into effect").

19

"A strong showing of one factor may obviate the need to find a similar showing of the other." *Am. Bankers*, 934 F.3d at 674. "There is no rule requiring either the proponent or opponent of vacatur to prevail on both factors." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F.Supp.3d 240, 270 (D.D.C. 2015). "Rather, resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives." *Id.*

### a.    RMA will not be able to cure MGR 26-002 on remand.

RMA is unable to fix the deficiencies with MGR-26-002 on remand because (i) the three exceptions in MGR-26-002 are inherently arbitrary and capricious because they do not serve the purpose of preventing AIP insolvency through the cap on agency compensation; and (ii) the three exceptions necessarily do not serve that purpose because RMA is improperly using the cap on agency compensation as a means to regulate conduct that it lacks statutory authority to regulate.

### 1.    The three exceptions in MGR-26-002 do not serve the purpose underlying the cap on agency compensation of preventing AIP insolvency.

An agency's decision is arbitrary and capricious when it is "unmoored from the purposes and concerns" of the underlying statutory scheme. *Judulang v. Holder*, 565 U.S. 42, 64 (2011). The decision thus should be connected to the goals and objectives of the relevant laws. *See id.* at 58 (criticizing the agency's rule because it had "no connection to the goals" or "rational operation" of the relevant laws); *see also Burt Lake Band of Ottawa & Chippewa Indians v. Bernhardt*, 613 F. Supp. 3d 371, 384-85 (D.D.C. 2020) (vacating agency decision that "will frustrate, and not advance, the stated goal" and thus was "not rationally connected to the reasons proffered by the agency"); *Kingdom v. Trump*, No. 25-cv-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025) (stating "the APA does require an agency to take actions that are rationally and demonstrably related to its stated goals" and granting preliminary injunctive relief where the "rationale at face value, it has little, if anything, to do with the agency's decision"); *Goldstein v. SEC*, 451 F.3d 873,

883-84 (D.C. Cir. 2006) (vacating a rule as "arbitrary" where the "rule bears no rational relationship to achieving [the relevant law's] goal"); *Bangor Hydro-Electric Co. v. FERC*, 78 F.3d 659, 663-64 & 663 n.3 (D.C. Cir. 1996) (applying arbitrary-and-capricious standard and vacating the agency's decision because it was not "reasonably related to its goal").

The RMA's stated purpose for the cap on agency compensation is preventing AIP insolvency. (GOV000596, MGR-10-011 ("RMA's purpose in limiting agent compensation" is "in particular, preserving the solvency of AIPs[.]"); GOV000611, MGR-10-011.1 (same)). ███████

███████████████████████████████

███████████████████████████████

███████████████████████ (GOV000901; *id.* (RMA stating it "added [the cap] as a result of an [AIP] which failed after paying out more agent compensation than it received in [A&O expenses] during a high loss year"); ████████

███████████████████████████████

███████████████████████████████

████████; GOV001769). Therefore, an RMA policy that deems a direct or indirect benefit to an agent to be agent compensation—and thus counts towards the cap on agent compensation—is arbitrary and capricious unless the policy serves the goal of preventing AIP insolvency.

The three circumstances in which MGR-26-002 deems policy administration software to be agent compensation—when an agent funds a service provider, when an agent has control over a service provider's work, and where an AIP provides the software to less than all its agency force—do not serve the cap's objective of preventing AIP insolvency, and, in some instances, they even undermine that objective.

**Redacted for Public Filing**

The first exception is: "The service provider is funded in whole or in part by an agency or group of agencies that receives the benefit of the software and services." (GOV001770). Under Paragraph 2(g) of MGR-10-011.1, an AIP paying a service provider to provide policy administration software to an agent is not agent compensation. (GOV000606). Given that rule, it does not serve to prevent AIP insolvency by RMA deeming the software in that circumstance to be agent compensation simply because the agent makes a payment to the service provider. Needless to say, an agent paying a service provider does not deplete AIP resources and poses no risk to AIP solvency. Further, conceptually, it makes little sense that the act of an agent receiving software at no cost is not agent compensation, but then the act of an agent paying for the software turns it into compensation. Paying for something makes it *not* compensation.

The second exception is: "An agency or group of agencies receiving the benefit of the software and services has authority to control the service provider's work." (GOV001770). An agent merely *having* authority, let alone exercising that authority, to prescribe how policy administration software is configured—to, *inter alia*, suit the agent's needs and/or streamline the policy administration process—in no way implicates an AIP's solvency. Indeed, regardless of whether an agent has and/or exercises that control, an AIP pays not a dollar more to a service provider. Therefore, where an AIP's provision of policy administration software to an agent is not deemed agent compensation under Paragraph 2(g) and the RMA thus has no concern about AIP insolvency, an agent's ability to control the software does not somehow pose a risk to AIP solvency.

The third exception is: "The software and support services are provided to a select agency or group of agencies rather than being available to the AIP's entire agency force." (*Id.*). This exception not only fails to advance but actually undermines the purpose of the cap on agent

22

compensation. Under this exception, if an AIP provides policy administration software to anywhere from 1% to 99% of its agency force, the software is deemed agent compensation that counts towards the cap. But, if the AIP provides the software to 100% of its agency force, the software that is otherwise agent compensation is now *not* deemed agent compensation and thus does not apply to the cap, thus wrongfully cutting into the very AIP funds the cap intends to safeguard. Also, because RMA has designated policy administration software as *not* compensation because it is a necessary, administrative tool (GOV000593, -621), it is illogical for that designation to arbitrarily fluctuate based simply on the number of agents provided the tool.

> **2.      The three exceptions do not serve the purpose underlying the cap on agency compensation because RMA is improperly trying to regulate, under the guise of the cap on agency compensation, conduct that it lacks authority to regulate.**

"Federal agencies … are creatures of statute and as such 'literally ha[ve] no power to act' except to the extent Congress authorized them." *Marin Audobon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 911-12 (D.C. Cir. 2024); *see also Nat'l Ass'n of Broadcasters v. Fed. Commc'ns Comm'n*, 39 F.4th 817, 819 (D.C. Cir. 2022) ("An agency must identify statutory authority for any action it takes."). "[R]egulations can be sustained only if this 'reviewing court [is] reasonably able to conclude that the grant of authority contemplates the regulations issued.'" *Planned Parenthood Fed. of Am., Inc. v. Heckler*, 712 F.2d 650, 655 (D.C. Cir. 1983) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 308 (1979)). "Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'" *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022).

The enabling legislation granting powers to FCIC is the Federal Crop Insurance Act ("FCIA"), 7 U.S.C. § 1501 e*t seq.* Under the FCIA, for instance, FCIC may "issue such regulations as are necessary to carry out this subchapter." 7 U.S.C. § 1506(o). Pertinent to this action, §

**Redacted for Public Filing**

1508(k) of the FCIA addresses the manner in which FCIC must, "to the maximum extent practicable," provide reinsurance to AIPs. *Id.*, § 1508(k)(1). For implementing this mandate, "[t]he reinsurance shall be provided on such terms and conditions as the Board may determine to be consistent with subsections (b) and (c) and sound reinsurance principles." *Id.*, § 1508(k)(2). Neither § 1508(k) nor any other part of § 1508 or the FCIA authorizes FCIC to regulate a relationship between an agent and a third-party software provider, including the amount an agent may pay to, or the amount of control an agent may exercise over, a software provider to develop software that facilitates the agent's sale or service of eligible crop insurance contracts ("ECICs"). Further, the agent's role relates only to ECICs issued by the AIPs the agent is authorized to represent, not the reinsurance contract which an AIP may enter into with FCIC. (*See* GOV000488 (defining "agent"); 7 CFR § 457.8(a) (The application for an ECIC by any person who wishes to participate in the program "must be submitted to FCIC or the reinsured company through the crop insurance agent"). As to RMA's non-exclusivity provision, the FCIA simply does not authorize RMA to dictate to which agents AIPs must provide services.

It is telling that RMA did not issue a bulletin stating, for example, that an AIP must make its software available to its full agency force—full stop. RMA knows it lacks the authority to make such a decree. Unable to regulate such conduct, RMA seeks to improperly, indirectly do so by stating that, if an AIP does not make its software available to its full agency force, RMA will deem the AIP's payment for that software—otherwise exempt from compensation under Paragraph 2(g)—to be compensation. RMA tries to shoehorn into the "agent compensation" context—an area RMA contends it has authority to regulate[5]—a bulletin that, as explained above, does not serve the

---

[5] Although it need not be addressed at this time, the FCIA does not authorize FCIC to impose a cap on agent compensation, as FCIC effectively conceded in a recent filing in another case pending before the Court: "The FCIA sets out a structure for FCIC's program administration, but it does

**Redacted for Public Filing**

purpose underlying the cap on agent compensation. The Court should not permit RMA to use the threat of arbitrarily labeling a benefit or indirect benefit as "agent compensation" as a means of compelling conduct that it lacks authority under the FCIA to regulate.

Because MGR-26-002, under the guise of the cap on agent compensation, seeks to regulate conduct it lacks statutory authorization to regulate, it cannot be cured, which counsels in favor of vacatur. *See Bridgeport*, 108 F.4th at 890 ("Because an agency can't 'cure' the fact that it lacks authority to take a certain action, remand-without-vacatur is unavailable here.").

### b. Vacatur would cause virtually no disruptive consequences.

Vacating MGR-26-002 would not "lead to impermissibly disruptive consequences" because there has been very minimal reliance on it, which reliance can easily be undone. *See Standing Rock*, 282 F.Supp.3d at 97. The exceptions in MGR-26-002 do not go into effect until July 1, 2026, the start of the 2027 reinsurance year: "Effective for the 2027 and succeeding reinsurance years, third party-software [sic] and support relationships meeting the criteria above will be considered agent compensation." (GOV001770); *see Am. Equity Inv. Life Ins. Co. v. Sec. Exch. Comm'n*, 613 F.3d 166, 179 (D.C. Cir. 2010) (finding that vacating a rule would not be disruptive because the rule "has not yet gone into effect"). Although three of the four AIPs with whom Brisk contracts omitted Brisk from their respective plans of operations submitted to FCIC on April 1, 2026, under the SRA, an AIP may ask FCIC for permission to amend a plan of operations. (GOV000497). Indeed, RMA has already informed the Court that, if an AIP submits a request for amendment by June 24, 2026, it will address the request before July 1, 2026. (Dkt. 14). If RMA grants all such requests—which is entirely within its control—there will be no disruption resulting from vacatur. This case is thus hardly one "in which the 'egg has been scrambled,' and

---

not give FCIC or RMA rulemaking or enforcement authority as to agent compensation." *The Altman Grp., Inc. v. FCIC et al.*, No. 25-2193, Dkt. 22, at 2.

**Redacted for Public Filing**

it is too late to reverse course," or where "settled transactions" would be disrupted. *See Allina*, 746 F.3d at 1110-11; *Schultz*, 962 F.3d at 519.

## III.    CONCLUSION

For the above reasons, the Court should grant Brisk's motion, vacate MGR-26-002, and remand to RMA for further proceedings consistent with the Court's ruling.

Respectfully submitted,

By:    /s/ Charles A. Zdebski
Charles A. Zdebski (#451075)
Chad E. Kurtz (#1016934)
COZEN O'CONNOR
2001 M Street NW, Suite 500
Washington, DC 20036
Tel: (202) 280-6528
czdebski@cozen.com
ckurtz@cozen.com

*Attorneys for Plaintiff,*
*Brisk Insurance Services LLC*

Dated: April 22, 2026

26

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of April 2026, I caused Plaintiff's Motion for Summary Judgment, along with the accompanying Memorandum of Law and proposed Order, to be served via ECF on all counsel of record.

/s/ Charles A. Zdebski
Charles A. Zdebski