**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BRISK INSURANCE SERVICES LLC,<br><br>      Plaintiff,<br><br> v.<br><br>FEDERAL CROP INSURANCE<br>CORPORATION et al.,<br><br>      Defendants. | Civil Action No.: 1:26-cv-00842-SLS |

## AMENDED VERIFIED COMPLAINT

Plaintiff Brisk Insurance Services LLC files this amended complaint against defendants Federal Crop Insurance Corporation ("FCIC"); Risk Management Agency ("RMA"), an agency of the United States Department of Agriculture; and Patricia Swanson, in her official capacity as Manager of Federal Crop Insurance Corporation and as Administrator of Risk Management Agency.

## NATURE OF THE ACTION

1. Under the Federal Crop Insurance Program ("FCIP"), if a private insurance company enters into a Standard Reinsurance Agreement ("SRA") with FCIC, it becomes an Approved Insurance Provider ("AIP"). AIPs are authorized to sell crop and livestock insurance policies to agricultural producers. FCIC subsidizes the insurance premiums and regulates and reinsures the policies.

2. In accordance with the Federal Crop Insurance Act (7 U.S.C. §§ 1501-24) and SRA, FCIC pays AIPs an administrative and operating expense subsidy ("A&O") to deliver the federal crop and livestock insurance policies. From that amount, AIPs pay compensation to insurance agents to sell and service the AIPs' policies. Effective for the 2011 and succeeding SRAs, RMA

1

and AIPs renegotiated the SRA to, among other things, impose an annual cap on the amount of compensation an AIP can pay to agents. When questions arose as to what constitutes "compensation" under the new cap, RMA issued its determination through a series of documents called Manager's Bulletins. In Manager's Bulletins MGR-10-011 and MGR-10-011.1, RMA listed items that, in its judgment, do and do not constitute agent compensation. One item that RMA said did *not* constitute agent compensation is policy administration software that AIPs provide to agents because such software is a necessary tool for agents to service the policies.

3.  In 2022, two policy administration software developers, Bozic LLC ("Bozic") and Watts and Associates, Inc. ("Watts"), contemplated forming a business venture, Brisk Insurance Services LLC ("Brisk"), that would develop and license software to AIPs, who in turn would provide that software to certain of the many insurance agencies employed by them, namely, eight Farm Credit associations ("Farm Credit") (but not non-Farm Credit agencies). Before investing in Brisk, Bozic and Watts wanted to confirm that AIPs' service-fee payments to Brisk for its software under this new business model would not constitute agent compensation as defined by RMA because, otherwise, the AIPs would not be interested.

4.  Bozic and Watts proactively contacted RMA and disclosed the details of their proposed business model, including that AIPs would provide Brisk's software only to Farm Credit, and that Farm Credit would advance funds to Brisk, which Brisk would later refund with AIP payments to it. RMA confirmed that the AIP payments to Brisk would not constitute agent compensation, consistent with MGR-10-011 and MGR-10-011.1, and were otherwise compliant with the SRA and RMA's regulations.

5.  In reliance on RMA's confirmation of its prior determination, Brisk, through affiliates, hired over 50 staff members and spent nearly $20 million to develop the software and

otherwise build and operate the company. It entered into major contracts with Farm Credit and four AIPs. It undertook a two-year process to obtain SOC 2 certification, an independent cybersecurity and data-handling compliance standard. In February 2025, its software went live.

6. Brisk's competitors—specifically, AIPs who chose not to partner with Brisk, and non-Farm Credit agents who could not use the new Brisk software—increasingly began to mount political pressure on RMA, looking for any excuse to remove Brisk from the marketplace.

7. Bowing to this industry pressure, on February 20, 2026, RMA issued a bulletin (MGR-26-002) targeting and effectively destroying Brisk's business. MGR-26-002 reaffirmed the existing "policy administration software" carveout to the agent compensation cap but stated such software *will* constitute agent compensation where (i) an agent funds the software developer; (ii) an agent can control the software developer's work; or (iii) an AIP provides the software to less than 100% of its agents. RMA thus created three new conditions *just* specific enough to largely preserve the carveout but simultaneously to prevent Brisk from being able to continue its current business model under the carveout. And even worse, the three conditions are *precisely* the scenarios RMA previously represented to Brisk did *not* involve agent compensation.

8. Following the commencement of this lawsuit, on May 11, 2026, RMA issued a new bulletin, MGR-26-002.1, to replace and supersede MGR-26-002. MGR-26-002.1 contains the same three conditions announced in MGR-26-002.

9. Brisk brings this action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, to have MGR-26-002.1 declared unlawful and set aside because (i) it is arbitrary and capricious in violation of § 706(2)(A); (ii) RMA lacks statutory authority to regulate the subject conduct in violation of § 706(2)(C); and (iii) RMA failed to engage in the requisite notice-and-comment procedure commensurate with rulemaking in violation of § 706(2)(D).

## PARTIES

10.     Brisk is a Delaware limited liability company with its principal place of business located at 4331 Hillcrest Road, Billings, MT 59101.

11.     Defendant FCIC is a government corporation of the United States Department of Agriculture that has overall authority for the FCIP.

12.     Defendant RMA is an agency of the United States Department of Agriculture that manages the FCIP on the FCIC's behalf.

13.     Defendant Patricia Swanson is the Manager of FCIC and Administrator of RMA. She is sued in her official capacity only as the signatory of RMA's Manager's Bulletins.

14.     All defendants are headquartered at 1400 Independence Avenue SW, Washington, DC 20250.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over this action under (i) 7 U.S.C. § 1506(d), because the Court has exclusive original jurisdiction of all suits brought against FCIC (and, by extension, RMA); and (ii) 28 U.S.C. § 1331, because this case arises under the laws of the United States, including but not limited to the Federal Crop Insurance Act, 7 U.S.C. § 1501 *et seq.* and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

16.     Venue is proper in this Court under (i) 7 U.S.C. § 1506(d), which provides that FCIC (and, by extension, RMA) may be sued in this Court; and (ii) 28 U.S.C. § 1391(e)(1), because all the defendants reside, and a substantial part of the events giving rise to this action occurred, in this District.

## FACTUAL BACKGROUND

### A.    The Federal Crop Insurance Program

17.    FCIC, through its operating arm, RMA, administers the FCIP, a public-private partnership.

18.    FCIC has the authority under the Federal Crop Insurance Act, but its authority is carried out by RMA. For the purposes herein, FCIC and RMA are used interchangeably.

19.    Under the FCIP, AIPs sell crop and livestock insurance to agricultural producers, such as farmers and ranchers.

20.    FCIC subsidizes the insurance premiums and provides reinsurance and A&O subsidies to the AIPs.

21.    An AIP's participation in the FCIP is governed by the SRA that each AIP is required to enter into each reinsurance year.

22.    The AIPs use licensed insurance agents to sell and service policies on AIPs' behalf.

23.    For the agents' services, AIPs pay agent compensation in accordance with the SRA.

24.    Such agent compensation is generally based on a percentage of the premium earned by the crop and livestock insurance policies sold and serviced by the agent.

25.    Under 7 U.S.C. § 1507(c), agents control the policies and may move them to any AIP willing to accept the business, so compensation and service by AIPs is key to agent retention.

### B.    RMA implemented a cap on agent compensation to ensure AIPs remained solvent.

26.    The premium an AIP may charge a producer for FCIC-reinsured products is established by RMA, meaning AIPs cannot compete with one another on price.

27.    Unable to compete on price, AIPs compete on service, historically paying increasingly exorbitant commissions to agents in an effort to have those agents direct more business to them. AIPs relied on underwriting gains to service its policies and pay claims.

28.    In 2002, American Growers Insurance Company, one of the then-largest AIPs, became insolvent after paying out excessive agent compensation, and was ordered into liquidation.

29.    Specifically, American Growers paid out more in agent compensation than it received in A&O subsidies, and it was projected to have an underwriting loss, such that it lacked sufficient funds to service its policies and pay claims.

30.    To ensure that, in underwriting-loss years, AIPs have adequate funds to service policies and pay claims, RMA and AIPs renegotiated the SRA effective for the 2011 and succeeding reinsurance years to, among other things, impose an annual, per-state cap on "[c]ompensation to persons involved in the direct sale and service of any eligible crop insurance contract under [the SRA]," *i.e.*, insurance agents. (SRA, § III(a)(4)).

31.    The cap is as follows: "[I]n any State in which [an AIP] is doing business, the [AIP], its MGA, or any affiliate shall not pay total compensation in excess of 80 percent of the total amount of A&O subsidy and CAT LAE … for such State." (*Id.*, § III(a)(4)(B)).

32.    The SRA defines "compensation" as, "for any reinsurance year, commissions, salary, profit sharing, and other forms of payment including, but not limited to, transfer or other types of bonuses, consulting fees, loans, advance payments, deferred payments, cooperative advertising, and any monetary or non-monetary benefits of value, except for those benefits required by law, in accordance with FCIC procedures." (*Id.*, § I).

33.    The SRA states that, if an AIP pays agent compensation in excess of the cap, "[the AIP] will be subject to any sanction described in [the SRA] or applicable regulations." (*Id.*, § III(a)(4)(E)).

34.    The SRA further states that "[a]ny scheme or device to circumvent the [agent compensation cap] will be considered a violation of this [SRA]." (*Id.*).

**C.    RMA determined that AIPs' provision of insurance policy administration software to agents does not constitute agent compensation.**

35.    RMA may release "bulletins" that, according to its website, "provide program-related information to [AIPs] to administer the terms of the policy to the insured producers, to inform and/or request information from the public."

36.    One such type of bulletin is a "Manager's Bulletin," a "[n]umbered bulletin[] issued by RMA's Administrator's office which may change procedures."

37.    Per the SRA, Manager's Bulletins are binding on AIPs. (SRA, §§ I, III(a)(4)).

38.    On September 13, 2010, RMA issued Manager's Bulletin MGR-10-011, entitled "Guidance Regarding SRA Section III(a)(4)—Agent Compensation" ("MGR-10-011"), to address questions raised regarding what constitutes agent compensation.

39.    In MGR-10-011, RMA identified items it believed to constitute or not constitute agent compensation.

40.    Items constituting agent compensation included but were not limited to commissions, salary, profit sharing, bonuses, and consulting fees. (MGR-10-011, ¶ 1(a)-(e)).

41.    MGR-10-011 stated that an AIP paying a service provider for policy administration software does *not* constitute compensation because such software is "necessary to operate the [AIP] business": "The following items do not constitute compensation[:] … An AIP's payment to

7

a third party for license fees for software, office equipment (including, but not limited to, computers), and other items necessary to operate the business." (¶ 2(h)).

42.    MGR-10-011 reiterated that "RMA's purpose in limiting agent compensation" is "in particular, preserving the solvency of AIPs." (¶ 14).

43.    On October 29, 2010, RMA issued Manager's Bulletin MGR-10-011.1, also entitled "Guidance Regarding SRA Section III(a)(4)—Agent Compensation" ("MGR-10-011.1").

44.    MGR-10-011.1 states that it provides "necessary modifications" to MGR-10-011 to address numerous issues raised by AIPs after its release.

45.    MGR-10-011.1 revised the "software" carveout as follows: "Computer software, including licensing fees, provided by an AIP to an agent, agency, or affiliate for providing eligible crop insurance contract premium quotes to producers or performing the processing tasks identified in paragraph 11, except that payments for such software paid to an agent, agency, or affiliate who sells or services eligible crop insurance contracts written by the AIP will be deemed to be compensation." (¶ 2(g)).

46.    The referenced "processing tasks identified in paragraph 11" are as follows:

(a)    "Processing" includes, but is not limited to, the performance of all of the following tasks:

(i)    Beginning in the 2012 and continuing in subsequent reinsurance years, scanning, faxing, mailing, or otherwise providing original eligible crop insurance contract documents or legible copies of such documents to the AIP;

(ii)    The entry of electronic data at the eligible crop insurance contract level (including data necessary to comply with FCIC procedures); and

(iii)    The transmission of eligible crop insurance contract data to the AIP in a format that is compatible with the AIP's system for transmitting data to RMA.

(¶ 11(a)(1)-(3)).

47.    In August 2011, RMA reiterated that the policy administration software referenced in ¶ 2(g) of MGR-10-011.1 does not constitute compensation because it is a "necessary" "tool[]" for agents to service AIPs' insurance policies.

48.    Specifically, on August 25, 2011, and as revised on August 7, 2017, RMA issued a memorandum entitled "Agent Compensation – Schemes or Devices," which it posted on the FAQ section of its website ("FAQ Memorandum").

49.    In explaining why AIPs providing free map books to agents does not constitute compensation, the FAQ Memorandum used policy administration software as a comparison point:

> An AIP wishes to provide its agents free map books with Common Land Units (CLUs) for completing Acreage Reports. This would not be considered compensation because such map books are tools, similar to the software that is not considered compensation under [¶ 2(g)], necessary for the agent to perform the tasks to service eligible crop insurance contracts.

**D.    Bozic and Watts considered developing a single software platform that could be used for servicing multiple AIPs' policies.**

50.    Each AIP has its own software/portal through which an insurance agent can service the AIP's policies, including but not limited to obtaining insurance quotes, completing policy applications, completing various insurance forms, and reporting planted acreage and harvested crop production.

51.    Each such software/portal is unique and requires specialized training.

52.    There also are third-party service providers that provide similar software to insurance agencies, such as Bozic and Watts.

53.    Bozic develops quoting and analytical software and training materials/instructions for agencies selling federal livestock insurance.

54.     Watts provides similar services for agencies selling federal crop insurance.

55.     Bozic and Watts discovered that their common clients, *i.e.*, agencies selling both livestock insurance and crop insurance, were interested in a single software and training program that would address both livestock insurance and crop insurance.

56.     Specifically, Farm Credit expressed an interest in such a single software and training program.

57.     Farm Credit is a group of major financial institutions across the country providing credit to agricultural producers, all of which institutions are licensed as insurance agencies selling FCIP policies. They are collectively among the largest livestock insurance and crop insurance agencies in the country.

58.     Farm Credit is unique among livestock insurance and crop insurance agents because it is regulated by a separate federal agency, the Farm Credit Administration, under The Farm Credit Act of 1971. This separate regulatory umbrella is designed to safeguard all aspects of these organizations' financial activities.

59.     One such regulation is that Farm Credit, unlike other agents, must make a reasonable and good-faith effort to offer livestock insurance and crop insurance through at least two AIPs, *see* 12 C.F.R. § 618.8040(b)(4)(v), whereas most agents offer such insurance only through a single AIP.

60.     Because of this regulatory requirement, Farm Credit agents have to learn how to navigate and use at least two distinct AIP software programs/portals. Functionally, because of their size and diverse producer needs, Farm Credit agencies deal with many more than two AIPs to best serve their policyholders.

61.    Under these circumstances, it is far easier and more cost-efficient for Farm Credit to train its agents on how to use just one software and training program.

62.    With Farm Credit expressing an interest in a single software and training program, Bozic and Watts contemplated forming a new entity to achieve that objective (which later became Brisk).

63.    Specifically, Brisk contemplated that it would contract with AIPs, who would pay Brisk a service fee for development and access to Brisk's software and training programs, and AIPs would provide this software and training programs to their Farm Credit agents.

**E.    In reliance on ¶ 2(g) and RMA's confirmation that payments made by AIPs to Brisk under Brisk's proposed business model would not constitute agent compensation under ¶ 2(g), Brisk moved forward with its operations.**

64.    Before Bozic and Watts invested substantial funds and time into the Brisk business venture, they wanted to ensure it complied with the SRA and any applicable RMA regulations.

65.    Specifically, they wanted to ensure that the service fees AIPs would pay to Brisk would not constitute agent compensation. Bozic and Watts knew that, if the fees were viewed by AIPs as constituting agent compensation, the AIPs would not be interested in participating because paying the fees could push the AIPs over the agent compensation cap, requiring them to reduce commissions paid to agents, potentially losing their business.

66.    Bozic and Watts began by consulting with their respective legal consultants.

67.    Bozic's consultant, Kimberley Arrigo of Arrigo Risk Consulting PLLC, is a retired attorney who worked at the USDA's Office of General Counsel for several decades and was assigned to RMA.

68.    Watts' consultant, Kenneth D. Ackerman, an attorney at the law firm of Olsson Frank Weeda Terman Matz PC, was an RMA Administrator from 1993 to 2001.

11

69. In separate written legal opinions provided to Bozic and Watts in early August 2022, Arrigo and Ackerman both opined that the fees AIPs would pay to Brisk under Brisk's proposed business venture would *not* constitute agent compensation under the SRA because of the "software" exception set forth in ¶ 2(g) of MGR-10-011.1.

70. On August 9, 2022, Bozic and Watts contacted RMA, sending an email, along with an attached memorandum, advising RMA of the contemplated business venture in which Brisk would contract with AIPs, and seeking formal guidance before proceeding.

71. Bozic and Watts attached the two legal opinions to the email, advising RMA that Arrigo and Ackerman "have both, independently, reached the same conclusion that AIP payments to [Brisk] to provide training and analytical/integration software do not constitute indirect agent compensation."

72. The email concluded, "Before we proceed, we want to inform you of our intentions and respectfully request formal guidance from your department so we have legal certainty before we invest in the business."

73. The memorandum laid out a detailed description of the proposed business venture, including that the business would provide software services only to Farm Credit agents.

74. The "Request" set forth in the memorandum was Brisk explicitly asking RMA if Brisk's proposed business model—AIPs making payments to Brisk for software services to be provided only to Farm Credit agents—would constitute agent compensation:

> Based on the information above we would like your legal advisory opinion on the compatibility of the proposed business model with the SRA rules on agent compensation limits. Does anything in the above proposal constitute an indirect form of agent compensation? Is this proposed structure in any way in conflict with the current regulatory guidance?

75.     RMA responded to Brisk's request in a letter dated September 7, 2022. In this response, RMA made clear that such payments to Brisk would *not* constitute agent compensation: "[RMA] has reviewed the information provided regarding your proposal to establish Brisk … as [a] service provider[] to [Farm Credit]. As of this date, RMA has not detected any violations of the [SRA] in the structure or operation you are proposing to establish."

76.     RMA also verbally told Brisk that AIP payments to Brisk would not constitute agent compensation.

77.     Over the next few months, as Brisk worked with Farm Credit to refine the framework of the business model, a few minor non-substantive changes, and one substantive change, to the business model arose.

78.     Because Brisk at all times wanted to be fully transparent with RMA, Brisk disclosed those changes to RMA.

79.     On December 5, 2022, Brisk sent an email to RMA—along with another memorandum and legal opinion from Arrigo—advising that Farm Credit was going to initially fund Brisk so Brisk could start developing its software before receiving AIP service fees.

80.     Brisk asked RMA whether, once Brisk later contracted with the AIPs and the AIPs started paying for the software, Brisk could use those AIP payments to refund Farm Credit the amounts it paid, plus interest at the U.S. Prime Rate, without running afoul of the SRA.

81.     Arrigo's second legal opinion opined that the AIPs, through Brisk, refunding Farm Credit would not constitute agent compensation.

82.     On December 22, 2022, RMA sent a letter to Brisk confirming that Farm Credit funding Brisk, and Brisk later repaying Farm Credit with AIP funds, would not violate the SRA:

> [RMA] has reviewed the information provided regarding your proposal revision to have [Farm Credit] pre-pay fees for new services that would be created

by Brisk, including the universal quoting front-end and the new agent software training platform. Brisk would then consider repaying [Farm Credit] the prepaid fees, possibly with interest once the approved insurance providers (AIPs) establish service contracts and make payments to Brisk. Basically, [Farm Credit] will be financing the Brisk start-up costs with the expectation of repayment.

Brisk understands that paying interest rates that exceed market rates would be a form of indirect rebating and is considering using the U.S. Prime Rate[.] …

Brisk has requested RMA's review of the proposal revision to determine whether the repayment of funds provided by [Farm Credit] is compliant with the Standard Reinsurance Agreement (SRA). As of this date, RMA has not detected any violations of the SRA with regards to [Farm Credit's] financing and Brisk repayment in the proposal revision.

83.    With now both the September 7, 2022 and December 22, 2022 letters from RMA finding Brisk's business model compliant with the SRA, including by confirming that AIP payments to Brisk would not constitute agent compensation consistent with RMA's prior determination in MGR-10-011 and MGR-10-011.1, Bozic and Watts proceeded with the Brisk venture.

84.    After months of extensive negotiations, on September 15, 2023, Brisk executed a Master Software Development and Related Services Agreement ("MSA") with Farm Credit.

85.    Under the MSA, and as Brisk had disclosed to RMA, Farm Credit would prepay service fees to Brisk, which, if certain circumstances were met, Brisk would repay to Farm Credit with funds provided by AIPs to Brisk pursuant to Brisk's anticipated future contracts with the AIPs.

**E.    After obtaining a further RMA letter, Brisk signed contracts with four AIPs.**

86.    Having negotiated and executed the MSA with Farm Credit, Brisk then turned to the negotiations with AIPs.

87.    As Brisk considered the structure of the service fees AIPs would pay to it, Brisk again approached RMA to ensure the proposed structure would be SRA-compliant.

88.    On October 4, 2023, RMA and Brisk had a meeting to discuss the fee structure.

89.    The next day, Brisk sent a letter to RMA identifying the proposed fee structure and asking RMA to confirm that the fee structure was SRA-compliant.

90.    On November 7, 2023, Brisk had a meeting with RMA leadership and one AIP (American Agricultural Insurance Company).

91.    On November 28, 2023, RMA sent a letter to Brisk that responded to Brisk's October 4, 2023 letter, in which RMA confirmed that it had "not detected any violations of the [SRA] with the services Brisk will provide under contract with an AIP," including as to the proposed fee structure.

92.    With that additional RMA letter, over the next year-plus from January 2024 through January 2025, Brisk executed a multi-year Services Agreement with each of four AIPs ("AIP Agreements"): (i) American Agricultural Insurance Company ("AmericanAg"); (ii) Great American Insurance Company ("Great American"); (iii) Rural Community Insurance Company ("RCIC"); and (iv) QBE Americas, Inc. ("NAU") (together, the "Four AIPs").

93.    Under the AIP Agreements, each AIP agreed to pay Brisk service fees to license Brisk's software and for related services, which the AIPs would provide to their respective Farm Credit agents.

94.    The Four AIPs each independently sought, and obtained, RMA confirmation that their proposed business arrangement with Brisk did not run afoul of the SRA, including that the payments to Brisk did not constitute agent compensation.

95.    For example, on February 13, 2025, RMA sent a letter response to NAU stating that, with respect to the proposed agreement between Brisk and NAU, "[a]s of this date, RMA has not detected any violations of the [SRA] in the structure or operation proposed."

96. On information and belief, the Four AIPs each also independently conducted their own internal compliance and due diligence checks with their own inside and outside counsel.

**F.    Brisk expended substantial funds and time in developing its software and otherwise building and operating the company.**

97. Meanwhile, after RMA provided its third and final letter to Brisk in November 2023, and in reliance on those three letters, the "software" carveout in ¶ 2(g) of MGR-10-011.1, the FAQ Memorandum, and Brisk's consultants' legal opinions, Brisk started expending substantial funds and, through Bozic and Watts, started hiring numerous staff members to develop the software program and otherwise serve Brisk.

98. Since January 2024, Brisk has spent over $21 million developing the software and otherwise building and operating the company.

99. Also starting in January 2024, Brisk, through service contracts with affiliated companies, hired over 50 staff members to serve Brisk.

100. Specifically, Brisk signed service contracts with Bozic and Watts, and Bozic in turn signed a service contract with Bozic Europe d.o.o., for Watts, Bozic, and Bozic Europe to hire employees to work on the Brisk venture.

101. Watts, Bozic, and Bozic Europe have together hired over 50 full-time employees to work on the Brisk venture.

102. Since January 2024, those 50+ employees have spent over 150,000 hours working on the Brisk venture, including but not limited to software development, agent training, and management.

103. Brisk also undertook a two-year process to obtain SOC 2 certification—an independent cybersecurity and data-handling compliance standard—so Brisk could (i) securely handle the Personally Identifiable Information of agricultural producers as contemplated by RMA's

own guidance to Brisk, and (ii) establish enterprise-grade IT infrastructure including two real-time redundant data centers in geographically separate locations to ensure continuous availability of the platform to AIPs and their agents.

104.    After over a year of development, in early February 2025, Brisk finalized and released the first version (1.0) of its proprietary software, Brisk WorkSpace ("BWS").

105.    BWS is a web-based software tool compatible with certain AIP systems that enables insurance agents to quote premiums for and service livestock insurance and crop insurance policies issued by those AIPs.

106.    BWS improves upon existing AIP systems by (i) offering advanced analytics that help agents have informed discussions with producers regarding the optimal insurance coverage choices; and (ii) allowing agents to be more efficient, by using the same system for servicing policies placed with multiple AIPs.

107.    Brisk planned to release the next set of BWS modules in Spring or Summer of 2026, and has invested heavily in the development and creation of these modules. The successor modules are currently in the development pipeline.

G.    **Reacting to industry concerns, RMA started looking for ways that Brisk's business model might not be SRA-compliant.**

108.    Since Brisk implemented its business model, AIPs who chose not to partner with Brisk, and livestock insurance and crop insurance agents other than Farm Credit, have put immense pressure on RMA to find a way to remove Brisk from the marketplace—not because Brisk is harmful to producers (they benefit from the software) but because Brisk, through its innovative software, makes those other AIPs and agents less competitive.

109.    On May 29, 2025, RMA sent an email to Brisk stating, "[USDA] Administrator Swanson would like to set up a time to meet with [Brisk] to discuss some concerns that have been raised by the industry regarding [Brisk]."

110.    On June 4, 2025, RMA and Brisk held a meeting to discuss those industry concerns, namely a flurry of social media posts regarding a relationship between Farm Credit agencies and only a subset of AIPs, but also complaints directly from AIPs and agents.

111.    At no point during (or after) that meeting did RMA inform Brisk that it was in violation of the SRA.

112.    On July 28, 2025, RMA and Brisk had another meeting, at which RMA advised that it was still reviewing the issue.

113.    On August 26, 2025, RMA told Brisk it was reviewing whether AIP payments to Brisk were subject to a certain 5% cap.

114.    For context, per MGR-10-011.1, AIP payments to agents for the "cost of processing" are not deemed compensation up to and including 5% of the A&O subsidy and "CAT LAE."

115.    RMA was considering whether that 5% cap applicable to AIP payments to agents also was applicable to AIP payments to service providers, such as Brisk.

116.    Brisk responded that the 5% cap applies only to AIP payments to agents, and provided another memorandum from Arrigo reaching that same conclusion.

117.    RMA never responded to Brisk, never said that Brisk's interpretation of the 5% cap was incorrect, and never again raised the issue of the 5% cap allegedly applying to Brisk.

118.    RMA also raised the issue of whether Brisk's business model raised a certain conflict of interest under § 508(h) of the Federal Crop Insurance Act. But after Brisk provided

RMA with certain information responsive to the question, RMA ultimately let that potential issue go, too.

119. On November 20, 2025, RMA issued Manager's Bulletin MGR-25-009, entitled "Agent Compensation - Third Party Software Payments" ("MGR-25-009").

120. MGR-25-009 requested that AIPs provide RMA, within 10 business days, with certain specified "documentation for third party computer software and licensing fees paid for and provided by an AIP to an agent … for the 2026 reinsurance year [i.e., July 1, 2025 to June 30, 2026]."

121. The requested documents in no way implicated the aforementioned 5% cap or § 508(h) issues, such that RMA apparently no longer had any alleged concerns about those issues.

122. Notably, Brisk had already long ago proactively provided to RMA all the documents requested by MGR-25-009.

123. MGR-25-009 reiterated that the purpose of the cap on agent compensation was to ensure AIP solvency: "Agent compensation limitations were first implemented for the 2011 reinsurance year. These limitations were added as a result of an [AIP] which failed after paying out more agent compensation than it received in [A&O] during a high loss year. To ensure AIPs have enough funds to service policies and pay claims, the SRA includes a cap on agent compensation[.]"

124. AIPs, including the Four AIPs, provided RMA with the documents requested by MGR-25-009.

125. At a December 16, 2025 meeting between RMA and Brisk, RMA made no indication that it believed Brisk to not be SRA-compliant.

19

**H.      RMA issued MGR-26-002 and then MGR-26-002.1, which arbitrarily and capriciously deem all AIP payments to Brisk to constitute agent compensation, a complete reversal of prior RMA policy and RMA's multiple assurances to Brisk and the Four AIPs.**

126.     Following its purported review of the documents provided in response to MGR-25-009, without any notice to Brisk, and without any documented record as the basis for its decision, on February 20, 2026, RMA issued Manager's Bulletin MGR-26-002, entitled "Agent Compensation - Third Party Software Payments" ("MGR-26-002"), which deems all payments made by AIPs to it to be agent compensation.

127.     Although the subject matter of MGR-26-002 is "policy administration software" and its title refers to "[s]oftware [p]ayments," MGR-26-002 astonishingly never mentioned ¶ 2(g) of MGR-10-011.1, which states that policy administration software does *not* constitute agent compensation.

128.     Without even referencing ¶ 2(g), MGR-26-002 purported to revise it by stating that, from this point forward, policy administration software would constitute agent compensation if one or more of three conditions applies:

> [P]ayments made by an AIP to a service provider for policy administration software and support services will be deemed a benefit of value and considered compensation under the SRA if any of the following conditions apply: (1) The service provider is funded in whole or in part by an agency or group of agencies that receives the benefit of the software and services; (2) An agency or group of agencies receiving the benefit of the software and services has authority to control the service provider's work; or (3) The software and support services are provided to a select agency or group of agencies rather than being available to the AIP's entire agency force.

129.     Following the commencement of this action, on May 11, 2026, RMA issued Manager's Bulletin MGR-26-002.1, entitled "Agent Compensation - Third Party Software Payments" ("MGR-26-002.1"), which "replaces MGR-26-002."

130.    MGR-26-002.1 contains the same three scenarios (identified in MGR-26-002.1 as "conditions"), albeit worded slightly differently:

AIP payments to a service provider that is funded by agents who receive the benefit may be counted as agent compensation when evaluating for SRA compliance.

…

AIP payments to a software service provider controlled, influenced, or directed by agents may be counted as agent compensation when evaluating SRA compliance.

…

If software is not available to all agents contracted with the AIP, AIP payments for that software may be counted as agent compensation when evaluating SRA compliance.

131.    MGR-26-002.1 states: "These conditions supersede the prior action language in MGR 26-002."

132.    MGR-26-002.1 has a "Disposal Date" of "Effective until superseded or rescinded," and states that the three conditions apply "[b]eginning with the 2027 Reinsurance Year," *i.e.*, July 1, 2026.

133.    Although MGR-26-002.1 is targeted at Brisk, the bulletin astoundingly makes no mention of Brisk or how—as RMA is well aware—Brisk relied on ¶ 2(g) of MGR-10-011.1 and RMA's multiple assurances to Brisk that its proposed business model did not involve any agent compensation and was otherwise SRA-compliant.

134.    Indeed, RMA previously told Brisk that it "has not detected any violations of the SRA" with respect to "[Farm Credit's] financing [of Brisk]," the business structure of Brisk "as [a] service provider[] to [exclusively] [Farm Credit]," or Brisk contracting with Farm Credit (through which Farm Credit might have contractual control over some aspects of the software).

21

135.    With the three conditions set forth in MGR-26-002.1, RMA has now found agent compensation present in the *precise* scenarios it previously told Brisk did *not* involve agent compensation

136.    MGR-26-002.1 identifies no valid reasoning, rationale, justification, or other basis for why, when one or more of the three conditions exist, policy administration software—otherwise always deemed non-compensation under ¶ 2(g)—should now arbitrarily be considered compensation, nor does it provide a rationale for why this reversal in position is necessary to ensure AIP solvency given that the use of such software is still necessary to service the crop and livestock insurance policies.

137.    That is, although policy administration software does not constitute agent compensation because it is a "tool[] … necessary for the agent to perform the tasks to service eligible crop insurance contracts" and thus "necessary to operate the [AIP] business," RMA does not explain why policy administration software, as such a "necessary" "tool," should *ever* be considered compensation, whether in the three specified scenarios or otherwise.

138.    As for the "financing" condition, in ¶ 2(b) of MGR-10-011.1, loans on commercial terms from AIPs to agents do not constitute compensation. RMA does not explain in MGR-26-002.1 why *any* financing, whether on commercially reasonable terms or otherwise, would make AIP payments to a software provider no longer exempt from agent compensation limits. The concerns regarding loans from AIPs to agents and from agents to software providers are symmetric. If AIPs provide loans to agents at below market rate, then the savings in interest payments is a form of agent compensation. Likewise, if an agent provides a loan to a software provider at above market rates, then the difference in interest rate is the extra compensation that agent receives indirectly from AIPs, via software provider.

22

139.    As for the "influence" condition, that an agent using software has a say in how the software is configured—to, *inter alia*, suit the agent's needs and/or streamline the policy administration process—has no logical connection to whether software would materially reduce the financial stability of the AIP that licenses the software from the third-party provider.

140.    Further, for software platforms to help agents do their work well, software developer needs to understand agent needs, and hurdles they face in using the existing software platforms provided by AIPs. In the process of building a software platform, in a typical agile software development approach, agents will be consulted regularly, they may be asked to review mock-ups, functional specification documents, serve as beta-testers, and agent feedback would be the cornerstone of development. The "influence" condition would appear to allow AIPs to license from third-party software providers only software almost guaranteed to fail to be adopted by agents because it would not genuinely understand agent workflows. No such restrictions on agent influence exists for AIP in-house software, as AIPs regularly appoint select agents to advisory councils, or grant advance access to select agents to test new software features before general release.

141.    As for the "non-exclusivity" condition, it makes no sense that whether policy administration software constitutes agent compensation depends on whether an AIP provides it to 100% of its agent workforce.

142.    Using a fictitious example to illustrate that point, under MGR-26-002.1, if an AIP provides software to 99 of its 100 agents, the $1 million it pays to the service provider is deemed agent compensation. But if the AIP suddenly makes the software available to the 100th agent, then the $1 million is instantly reduced to $0 in agent compensation.

143.    The arbitrary nature of the "non-exclusivity" condition is further evidenced by two inconsistencies in its interpretation. First, of all the various types of non-compensation specified under ¶ 2 of MGR-10-011.1, policy administration software is now the *only* item that, if provided by an AIP to less than 100% of its agents, is deemed compensation. Thus, if an AIP provides, for example, continuing education training, certain entertainment, or promotional items of nominal value, to less than 100% of its agents, those items still remain as non-compensation. There is no rational basis for distinguishing between policy administration software and all other items of non-compensation on this basis.

144.    Second, under MGR-26-002.1, if an AIP offers its own proprietary software—as opposed to software licensed from a service provider—to less than 100% of its agents, that AIP-owned software does not count as compensation. AIPs routinely differentiate among their own agents in the provision of software access: some agents are granted direct-entry privileges to key policy information into the AIPs' own systems, while other agents must submit paper or electronic policy forms to the AIPs, which then keys the information internally. These two groups of agents receive materially different levels of software access and functionality from the same AIP, yet RMA has never suggested that providing direct-entry access to some agents but not others constitutes agent compensation. There is no rational basis for distinguishing between software developed in-house at AIPs and software provided by a third-party service provider when deciding whether to count the software as agent compensation because, in both instances, AIPs are expending funds on software development.

145.    The lack of any rational connection between the three conditions and the AIP financial stability that motivates the cap on agent compensation underscores what is really going on here: MGR-26-002.1 is not about the agent compensation cap or the cap's purpose of ensuring

AIPs have adequate funds to service policies and pay claims. It is about RMA—reacting to industry pressure—misusing the cap as a means to achieve an objective wholly unrelated to the cap, affecting the competitive balance within the AIP industry.

146.    MGR-26-002.1 also contains multiple internal inconsistencies. For example, as it pertains to the "influence" condition, the bulletin states that, on the one hand, what matters is whether agents have "authority" to influence, control, or guide the software provider's work (authority to influence), but, on the other hand, what matters is whether the work or software provider was "controlled, influenced, or directed" (actual influence).

147.    By way of another example, MGR-26-002.1 cites, as a basis for its implementation, evolving technology and business models that enable software systems to "increasingly provide functions beyond policy quoting and processing," but then limits the scope of MGR-26-002.1 to only policy quoting and processing, rendering the ostensible basis for its implementation as meaningless. Further, software platforms that "provide additional benefits for agency management," as referenced in MGR-26-002.1, were to be treated as agency compensation even under MGR-10-011.1, and in 2022, RMA provided guidance to Brisk to not extend software to encompass such features.

148.    MGR-26-002.1 is vague and therefore fails to provide adequate notice to Brisk and others about compliance because, *inter alia*, the meaning and scope of the word "influence" and the phrase "indirect authority" are unclear.

149.    MGR-26-002.1 allows for selective enforcement by RMA because it states that, if any of the three conditions are met, the AIP payments for software "may"—not "will"—be counted as agent compensation, without any guidance as to how that discretion will be exercised or why it

is necessary to exercise discretion in that circumstance. Notably, MGR-26-002 stated that, if any of the three conditions were met, such payments "will" be considered compensation.

### COUNT I – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 701 *et seq.*)

150.    Brisk incorporates by reference all preceding paragraphs.

151.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, entitles any person "adversely affected or aggrieved by agency action" to judicial review.

152.    MGR-26-002.1 constitutes final agency action because it marks the consummation of RMA's decision-making process and determines legal rights.

153.    Brisk is aggrieved by MGR-26-002.1 because, *inter alia*, the bulletin has caused or will cause the Four AIPs to stop doing business with Brisk, causing substantial financial loss to Brisk.

154.    MGR-26-002.1 violates § 706(2) of the APA because, *inter alia*, (i) it is "arbitrary" and "capricious" under § 706(2)(A); (ii) it is "in excess of statutory … authority" under § 706(2)(C); and (iii) it is "without observance of procedure required by law" under § 706(2)(D).

155.    For the reasons explained above, MGR-26-002.1 is arbitrary and capricious because, *inter alia*, (i) it fails to comply with the change-in-position doctrine; (ii) it is irrational and illogical; (iii) it contains internal inconsistencies; (iv) it is vague; and (v) it allows for selective and arbitrary enforcement by affording RMA regulatory discretion without any standards or parameters.

156.    In adopting MGR-26-002.1, RMA acted in excess of its statutory authority.

157.    The enabling legislation granting powers to FCIC is the Federal Crop Insurance Act ("FCIA"), 7 U.S.C. § 1501 e*t seq.*

158.    Agencies have only those powers granted to them by Congress.

159.    The FCIA does not authorize FCIC to regulate a relationship between an agent and a third-party software provider, including the amount an agent may pay to, or the amount of influence an agent may exercise over, a software provider. Nor does the FCIA authorize RMA to dictate the agents to whom AIPs must provide tools for the sale or service of policies.

160.    MGR-26-002.1 was implemented "without observance of procedure required by law" because RMA did not provide any opportunity for notice and comment.

161.    Under 5 U.S.C. § 553(b), notice and comment is required for rulemaking unless a rule satisfies one of the exceptions set forth in § 553(b)(A)-(B).

162.    No exception in § 553(b)(A)-(B) applies here.

163.    By way of example, MGR-26-002.1 is not an "interpretative rule[]" under § 553(b)(A) because, *inter alia*, (i) the cap on agent compensation contained in the SRA is a legislative rule that was unlawfully implemented without the requisite notice and comment, such that alleged interpretations of it do not qualify under the "interpretative rule" exception; (ii) MGR-26-002.1 does not interpret a statute or regulation; and (iii) MGR-26-002.1 does not actually interpret any SRA term.

164.    As a direct result of MGR-26-002.1, Brisk has been and will further be damaged because, of the Four AIPs with which Brisk had a contract, three have dropped Brisk from their current plan of operations and one has purported to terminate its contract with Brisk.

WHEREFORE, Brisk respectfully requests that the Court (i) declare that MGR-26-002.1 is unlawful; (ii) set aside MGR-26-002.1; and (iii) award Brisk its legal fees, expenses, and costs, and such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Charles A. Zdebski
Charles A. Zdebski (#451075)
Chad E. Kurtz (#1016934)
COZEN O'CONNOR
2001 M Street NW, Suite 500
Washington, DC 20036
Tel.: (202) 280-6528
czdebski@cozen.com
*Attorneys for Plaintiff,*
*Brisk Insurance Services LLC*

Dated: May 21, 2026

## **<u>VERIFICATION</u>**

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 21, 2026.

Brisk Insurance Services LLC

By: _____

Name: Connor Scharfe
Title: President and CEO

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of May, 2026, I caused Plaintiff's Amended Verified Complaint to be served via ECF on all counsel of record.


<u>/s/ Charles A. Zdebski</u>
Charles A. Zdebski

30