## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRISK INSURANCE SERVICES LLC,<br><br>                  Plaintiff,<br><br>   v.<br><br>FEDERAL CROP INSURANCE<br>CORPORATION *et al.*,<br><br>                Defendants. | Civil Action No.: 1:26-cv-00842 |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 7(h)(2) of the Local Civil Rules, and the Court's Minute Order dated May 19, 2026, plaintiff Brisk Insurance Services LLC moves for summary judgment in its favor and against defendants Federal Crop Insurance Corporation ("FCIC"); Risk Management Agency ("RMA"); and Patricia Swanson, in her official capacity as Manager of FCIC and Administrator of RMA. The Court should grant this motion and set aside Manager's Bulletin MGR-26-002.1 ("MGR-26-002.1") because, *inter alia*, (i) RMA lacked legal authority to issue MGR-26-002.1; (ii) RMA issued MGR-26-002.1 without providing for the requisite notice and comment; and (iii) MGR-26-002.1 is arbitrary and capricious because, *inter alia*, it violates the change-in-position doctrine and it is neither reasonable nor reasonably explained. The motion is supported by the accompanying Memorandum of Law, which is incorporated herein by reference.

Respectfully submitted,

By:    /s/ Charles A. Zdebski

Charles A. Zdebski (#451075)
Chad E. Kurtz (#1016934)
COZEN O'CONNOR
2001 M Street NW, Suite 500
Washington, DC 20036
Tel: (202) 280-6528
czdebski@cozen.com
ckurtz@cozen.com

*Attorneys for Plaintiff,*
*Brisk Insurance Services LLC*

Dated: May 29, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BRISK INSURANCE SERVICES LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>FEDERAL CROP INSURANCE<br>CORPORATION *et al.*,<br><br>  Defendants. | Civil Action No.: 1:26-cv-00842 |

**<u>PLAINTIFF'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

Charles A. Zdebski (#451075)
Chad E. Kurtz (#1016934)
COZEN O'CONNOR
2001 M Street NW, Suite 500
Washington, DC 20036
Tel: (202) 280-6528
czdebski@cozen.com
ckurtz@cozen.com

*Attorneys for Plaintiff,*
*Brisk Insurance Services LLC*

Dated: May 29, 2026

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

I.      FACTUAL BACKGROUND............................................................................................... 1

        A.      Contextual background. ........................................................................................... 1

        B.      ███████████████████████████████████████
                ███████████████████████████. ...................................................... 4

        C.      ████████████████████████████████████████
                ██████████████████████. ............................................................... 5

        D.      ████████████████████████████████████. ........... 8

        E.      ███████, ██████████████████████████████
                ██████████████████████████████████████
                ████████████████ ............................................................................ 9

        F.      ███████████████████████. ..................................................... 12

        G.      RMA issued Manager's Bulletin MGR-25-009................................................... 12

        H.      RMA issued Manager's Bulletin MGR-26-002, leading to this lawsuit. ............. 14

        I.      RMA issued Manager's Bulletin MGR-26-002.1.................................................. 15

II.     ARGUMENT......................................................................................................................... 17

        A.      Legal standard on a summary judgment motion challenging agency action ........ 17

        B.      Brisk has standing to challenge MGR-26-002.1.................................................... 17

        C.      The Court should set aside MGR-26-002.1 as unlawful under § 706(2)............... 20

                1.      The Court should set aside MGR-26-002.1 under § 706(2)(C)
                        because RMA lacked regulatory authority to issue it. .............................. 20

                2.      The Court should set aside MGR-26-002.1 under § 706(2)(D)
                        because RMA failed to undertake notice-and-comment
                        rulemaking. ................................................................................................ 22

                        a.      The "interpretive rule" exception to notice-and-comment
                                rulemaking under § 553(b)(4)(A) is not applicable here. ............. 23

                        b.      The "contract" exception to notice-and-comment
                                rulemaking under § 553(a)(2) is not applicable here. ................... 27

                3.      The Court should set aside MGR-26-002.1 under § 706(2)(A)
                        because it is arbitrary and capricious. ....................................................... 28

                        a.      MGR-26-002.1 is arbitrary and capricious because it fails
                                to comply with the change-in-position doctrine by ignoring
                                Brisk's serious reliance interests.................................................. 28

                        b.      MGR-26-002.1 is arbitrary and capricious because it is
                                neither reasonable nor reasonably explained. .............................. 30

1. MGR-26-002.1 does not support the ostensible general rationales allegedly underlying it. .................................... 31

2. The three conditions are neither reasonable nor reasonably explained. ......................................................... 33

    a. The "financing" condition is neither reasonable nor reasonably explained. ............................................. 33

    b. The "influencing" condition is neither reasonable nor reasonably explained. ..................................... 36

    c. The "exclusivity" condition is neither reasonable nor reasonably explained. ..................................... 39

3. The "Schemes or Devices" guidance is neither reasonable nor reasonably explained. ............................... 41

4. It is not reasonable for MGR-26-002.1 to distinguish between third-party software and in-house software. ....... 42

5. MGR-26-002.1 is internally inconsistent with respect to the counting of compensation. ..................................... 43

III.    CONCLUSION ................................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Mining Congress v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993)............................................................................................24

*Amgen, Inc. v. Smith*,
    357 F.3d 103 (D.C. Cir. 2004)...............................................................................................18

*Amneal Pharms. LLC v. F.D.A.*,
    285 F. Supp. 3d 328 (D.D.C. 2018).......................................................................................30

*ANR Pipeline Co. v. Fed. Energy Regul. Comm'n*,
    71 F.3d 897 (D.C. Cir. 1995).................................................................................................29

*Arkema Inc. v. E.P.A.*,
    618 F.3d 1 (D.C. Cir. 2010).......................................................................................36, 37, 39

*Bangor Hydro-Electric Co. v. FERC*,
    78 F.3d 659 ......................................................................................................................34, 35

*Bennett v. Spear*,
    520 U.S. 154 (1997)...............................................................................................................19

*Block v. Meese*,
    793 F.2d 1303 (D.C. Cir. 1986).............................................................................................19

*Burt Lake Band of Ottawa & Chippewa Indians v. Bernhardt*,
    613 F. Supp. 3d 371 (D.D.C. 2020).......................................................................................33

*Cap. Area Immigrants' Rts. Coal. v. Trump*,
    471 F. Supp. 3d 25 (D.D.C. 2020).........................................................................................23

*Cath. Health Initiatives v. Sebelius*,
    617 F.3d 490 (D.C. Cir. 2010)...............................................................................................24

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)...............................................................................................................20

*City of Billings v. TSA*,
    153 F.4th 46 (D.C. Cir. 2025)..........................................................................................22, 23

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987)...............................................................................................................18

iii

*Coalition for Humane Immigrant Rights v. Noem*,
    805 F. Supp. 3d 48 (D.D.C. 2025) ..................................................................................30

*CSL Plasma Inc. v. U.S. Cust. & Border Prot.*,
    628 F. Supp. 3d 253 (D.D.C. 2022) ....................................................................23, 24, 29, 30

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    146 F.4th 1144 (D.C. Cir. 2025) ....................................................................................30

*Devon Energy Corp. v. Kempthorne*,
    551 F.3d 1030 (D.C. Cir. 2008) ....................................................................................24

*DHS v. Regents of Univ. of Cal.*,
    591 U.S. 1 (2020)............................................................................................................29

*Duke City Lumber Co. v. Butz*,
    382 F. Supp. 362 (D.D.C. 1974) ....................................................................................17

*Earthworks v. U.S. Dep't of Interior*,
    496 F. Supp. 3d 472 (D.D.C. 2020) ..............................................................................20

*Ethyl Corp. v. EPA*,
    306 F.3d 1144 (D.C. Cir. 2002) ....................................................................................18

*FDA v. Wages & White Lion Inv., LLC*,
    604 U.S. 542 (2025)........................................................................................................28

*Friends of Animals v. Pendley*,
    523 F. Supp. 3d 39 (D.D.C. 2021) ................................................................................23

*Goldstein v. SEC*,
    451 F.3d 873 (D.C. Cir. 2006) ......................................................................................34

*Gomez v. Trump*,
    485 F. Supp. 3d 145 (D.D.C. 2020) ..............................................................................23

*Guardian Federal Savings & Loan Association v. Federal Savings & Loan
    Insurance Corporation*,
    589 F.2d 658 (D.C. Cir. 1978) ................................................................................27, 28

*HMO Louisiana, Inc. v. Dep't of Health & Hum. Servs.*,
    793 F. Supp. 3d 150 (D.D.C. 2025) ..............................................................................17

*Humana of S.C., Inc. v. Califano*,
    590 F.2d 1070 (D.C. Cir. 1978) ....................................................................................27

*IGas Holdings, Inc. v. EPA*,
    146 F.4th 1126 (D.C. Cir. 2025) ..................................................................................30

iv

*Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*,
   887 F. Supp. 2d 259 (D.D.C. 2012) ........................................................................17

*Judulang v. Holder*,
   565 U.S. 42 (2011) ...................................................................................................33

*Kingdom v. Trump*,
   No. 25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) .............................33

*Le v. USCIS*,
   2025 WL 1743942 (D.D.C. June 24, 2025) ..............................................................23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) .................................................................................................19

*Marin Audobon Soc'y v. Fed. Aviation Admin.*,
   121 F.4th 902 (D.C. Cir. 2024) ...............................................................................20

*Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*,
   752 F. Supp. 3d 13 (D.D.C. 2024) ...........................................................................19

*MediNatura, Inc. v. F.D.A.*,
   998 F.3d 931 (D.C. Cir. 2021) .................................................................................31

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014) ...............................................................................23

*NAACP v. U.S. Dep't of Educ.*,
   779 F. Supp. 3d 53 (D.D.C. 2025) ...........................................................................23

*Nat'l Ass'n of Broadcasters v. Fed. Commc'ns Comm'n*,
   39 F.4th 817 (D.C. Cir. 2022) .................................................................................20

*Nat'l Res. Def. Council v. Wheeler*,
   955 F.3d 68 (D.C. Cir. 2020) ..............................................................................23, 24

*Petro Star Inc. v. Fed. Energy Regul. Comm'n*,
   166 F.4th 161 (D.C. Cir. 2026) ...............................................................................30

*Petry v. Block*,
   737 F.2d 1193 (D.C. Cir. 1984) ...............................................................................22

*Planned Parenthood Fed. of Am., Inc. v. Heckler*,
   712 F.2d 650 (D.C. Cir. 1983) .................................................................................20

*Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*,
   No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) ....................................31

*Rempfer v. Sharfstein*,
    583 F.3d 860 (D.C. Cir. 2009) ...................................................................................17

*Richards v. INS*,
    554 F.2d 1173 (D.C. Cir. 1977) .................................................................................17

*San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Inspection Serv.*,
    257 F. Supp. 2d 133 (D.D.C. 2003) ...........................................................................18

*Sentara-Hampton Gen. Hosp. v. Sullivan*,
    980 F.2d 749 (D.C. Cir. 1992) ...................................................................................24

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) .....................................................................................25

*Teva Pharms. USA, Inc. v. U.S. Food & Drug Admin.*,
    514 F. Supp. 3d 66 (D.D.C. 2020) .............................................................................19

*The Altman Grp., Inc. v. FCIC et al.*,
    No. 25-2193, Dkt. 22 ..................................................................................................22

*Vanda Pharm., Inc. v. FDA*,
    436 F. Supp. 3d 256 (2020) ........................................................................................23

*West Virginia v. Env't Prot. Agency*,
    597 U.S. 697 (2022).....................................................................................................21

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................................19

*Widakuswara v. Lake*,
    779 F. Supp. 3d 10 (D.D.C. 2025). .............................................................................31

*World Shipping Council v. Fed. Maritime Comm'n*,
    152 F.4th 215 (D.C. Cir. 2025)...................................................................................31

**Statutes**

5 U.S.C. § 553(a)(2)........................................................................................22, 27, 28

5 U.S.C. § 553(b) .......................................................................................................22

5 U.S.C. § 553(b)(4)(A)..........................................................................................22, 23

5 U.S.C. § 553(b)(A).....................................................................................................27

5 U.S.C. § 702...............................................................................................................17

5 U.S.C. § 706(2)...........................................................................................................20

5 U.S.C. § 706(2)(A).............................................................................................................1, 28

5 U.S.C. § 706(2)(C).............................................................................................................1, 20

5 U.S.C. § 706(2)(D).............................................................................................................1, 22

7 U.S.C. § 1501 *et seq.*............................................................................................................21

7 U.S.C. § 1502.........................................................................................................................25

7 U.S.C. § 1506(o).....................................................................................................................21

7 U.S.C. § 1508...........................................................................................................................21

7 U.S.C. § 1508(k).....................................................................................................................21

7 U.S.C. § 1508(k)(1) ..........................................................................................................3, 8, 21

7 U.S.C. § 1508(k)(2) ...........................................................................................................2, 21

**Other Authorities**

7 C.F.R. § 400.15(a)..................................................................................................................21

Fed. R. Civ. P. 56(c) .................................................................................................................17

U.S. Const. Art. III....................................................................................................................19

Plaintiff Brisk Insurance Services LLC ("Brisk") moves for summary judgment to have Manager's Bulletin MGR-26-002.1, issued by defendant Risk Management Agency ("RMA"), declared unlawful and set aside under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* because (i) RMA lacks statutory authority to regulate the subject conduct in violation of § 706(2)(C); (ii) RMA failed to engage in the requisite notice-and-comment procedure commensurate with rulemaking in violation of § 706(2)(D); and (iii) the bulletin is arbitrary and capricious in violation of § 706(2)(A).

## I.    FACTUAL BACKGROUND

### A.    Contextual background.

Congress established the federal crop insurance program ("FCIP") in 1938, "after private insurance companies were unable to establish a financially viable crop insurance business." (GOV000545).  The Federal Crop Insurance Act of 1980 (P.L. 96-365) was enacted to protect farmers from financial losses caused by events such as droughts, floods, hurricanes, and other natural disasters as well as losses resulting from a drop in crop prices. (GOV000545).  Congress created the Federal Crop Insurance Corporation ("FCIC") within the United States Department of Agriculture ("USDA") to administer the FCIP.  (GOV000545).

FCIC initially offered crop insurance under the FCIP directly to farmers.  (*Id.*)  "However, in 1980, Congress enacted legislation that expanded the program and, for the first time, directed that crop insurance—to the maximum extent possible—be offered through private insurance companies, which would sell, service, and share in the risk of federal crop insurance policies." (GOV000545-46). In 1996, Congress created an independent office, eventually called the Risk Management Agency ("RMA"), to supervise FCIC operations and to administer and oversee the FCIP.  (GOV000546).

1

"RMA establishes the terms and conditions to be used by private insurance companies selling and servicing crop insurance policies to farmers through a contract made with the companies called the SRA [the Standard Reinsurance Agreement]." (GOV000546; *see also* 7 U.S.C. § 1508(k)(2) ("The reinsurance shall be provided on such terms and conditions as the Board may determine to be consistent with subsections (b) and (c) and sound reinsurance principles."). "The SRA is a cooperative financial assistance agreement between RMA, through FCIC, and the private crop insurance companies to deliver federal crop insurance under the authority of the Federal Crop Insurance Act [("FCIA")]." (GOV000546 (footnote omitted)).

Companies retain insurance agents for the sale and service of these crop insurance policies. (*Id.*) "An agent, a person licensed by the state in which the agent does business to sell crop insurance, is employed by or contracts with a company to sell and service eligible crop insurance policies." (*Id.*; *see also* GOV000488 (defining "agent" in the SRA)). "While most companies pay their agents a commission to sell and service crop insurance policies, some companies pay agents a salary." (GOV000546).

"Under the SRA, FCIC reinsures or subsidizes a portion of the losses and pays the insurance companies an administrative fee or expense reimbursement—a preestablished percentage of premiums—to reimburse the companies for the administrative and operating ["A&O"] expenses of selling and servicing crop insurance policies, including the expenses associated with adjusting claims." (GOV000546-47 (footnote omitted)). As a reinsuring agreement, the SRA provides "insurance for insurance companies" (GOV000547), "to limit liability on specific risks, increase the volume of insurance policies that may be written, and help companies stabilize their business in the face of wide market swings in the insurance industry." (GOV000547). The SRA serves as the means by which "RMA shares the risks associated with

crop insurance policies with companies that sell federal crop insurance." (*Id*.; *see also* 7 U.S.C. § 1508(k)(1) (requiring that FCIC, "to the maximum extent practicable, provide reinsurance to insurers")).

The premium an approved insurance provider ("AIP") may charge a producer for FCIC-reinsured products is established by RMA, meaning AIPs cannot compete with one another on price. (GOV000546). In 2002, American Growers Insurance Company, one of the then-largest AIPs, became insolvent due to "the cumulative effect of company decisions that reduced the company's surplus, making it vulnerable to collapse when widespread drought in 2002 erased anticipated profits." (GOV000537). One such decision was to pay out excessive agent commissions. (GOV000543; GOV000571). In response to a draft Report issued by the General Accounting Office in 2004 as to the American Growers insolvency, RMA committed to change the SRA to "formalize a system of enhanced insurance company disclosures and accountabilities consistent with the Agency's current authority and will help RMA to more efficiently and effectively deal with insolvencies and clarify the roles and responsibilities of the companies and RMA in the event of another catastrophic failure." (GOV000583).

Starting with the 2011 reinsurance year, RMA amended the SRA to impose an annual, per-state cap on "[c]ompensation to persons involved in the direct sale and service of any eligible crop insurance contract under [the SRA]," i.e., insurance agents. (GOV000512; *see also* GOV000901 ("Agent compensation limitations were first implemented for the 2011 reinsurance year")). The cap is as follows: "[I]n any State in which [an AIP] is doing business, the [AIP], its MGA, or any affiliate shall not pay total compensation in excess of 80 percent of the total amount of A&O subsidy and CAT LAE … for such State." (GOV000512) The SRA defines "compensation" as, "for any reinsurance year, commissions, salary, profit sharing, and other forms of payment

3

including, but not limited to, transfer or other types of bonuses, consulting fees, loans, advance payments, deferred payments, cooperative advertising, and any monetary or non-monetary benefits of value, except for those benefits required by law, in accordance with FCIC procedures." (GOV000489). If an AIP pays agent compensation in excess of the cap, it can be sanctioned. (GOV000513).

The RMA's stated purpose for the cap on agency compensation is preventing AIP insolvency. (GOV000596 ("RMA's purpose in limiting agent compensation" is "in particular, preserving the solvency of AIPs[.]"); GOV000611 (same); GOV000901 ("the SRA includes a cap on agent compensation" "[t]o ensure AIPs have enough funds to service policies and adjust losses"); GOV000901 (RMA stating it "added [the cap] as a result of an [AIP] which failed after paying out more agent compensation than it received in [A&O expenses] during a high loss year"); GOV001781 ("███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████"); GOV001769).

**B.**    ████████████████████████████████████████
████████████████████████████████████.

On September 13, 2010, RMA issued Manager's Bulletin MGR-10-011, entitled "Guidance Regarding SRA Section III(a)(4)—Agent Compensation" ("MGR-10-011"), to address questions about agent compensation. (GOV000591-96). Sections 1 and 2 of MGR-10-011 list items that "constitute" and "do not constitute" agent compensation, respectively. (GOV000591-93). Although MGR-10-011 does not explicitly state so, the items listed as not compensation are items that meet the definition of "Compensation " in the SRA but that, for certain policy reasons, RMA decided to not count as agent compensation. Paragraph 2(h) of MGR-10-011 states that "[a]n

4

AIP's payment to a third party for license fees for software … and other items necessary to operate the business" do not constitute agent compensation. (GOV000593).

On October 29, 2010, RMA issued Manager's Bulletin MGR-10-011.1 ("MGR-10-011.1") to provide "necessary modifications" to MGR-10-011 to address numerous issues raised by AIPs about it. (GOV000604-11). Section 1(l) of MGR-10-011.1 states that "a[n] AIP's cost to benefit an agent, agency, or affiliate for … computer software (except as provided in paragraph 2)" is agent compensation. (GOV000605). Paragraph 2(g) of MGR-10-011.1 ("¶ 2(g)") states that, subject to one exception, the licensing fees paid by an AIP for policy quoting and processing software are *not* agent compensation:

> Computer software, including licensing fees, provided by an AIP to an agent, agency, or affiliate for providing eligible crop insurance contract premium quotes to producers or performing the processing tasks identified in paragraph 11, except that payments for such software paid to an agent, agency, or affiliate who sells or services eligible crop insurance contracts written by the AIP will be deemed to be compensation.

(GOV000606). In a FAQ memorandum issued in August 2011 and revised in August 2017, RMA reiterated that quoting and processing software is not deemed agent compensation because it is a "tool[]" "necessary for the agent to perform the tasks to service eligible crop insurance contracts." (GOV000613; GOV000452; GOV000612; GOV000621).

**C.** ███████████████████████████████████████████████
████████████████████████████████████████ .

Although MGR-10-011.1 allows AIPs to provide policy administration software to agents without such software counting as agent compensation, █████████████████████████
████████████████████████████████████████████████████
██████████████████████ (GOV000009; GOV000018). ████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

5

██████████████████████████████████████████████████

████████ (GOV000017-18; GOV000025). ████████████████████

████████████████████████████ (GOV000882), as is permitted by ¶ 2(g).

████████████████████████████████████████████

████████████████████████████████████████ (GOV000017;

GOV000025). ████████████████████████████████████

██████████████████████████████████████████████

███████████████████ (GOV000025; GOV000121-28; GOV000655).

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████ (GOV000129-30; GOV000655).

██████████████████████████████████████████████████

██ ██ ██ ██ █ █ ██ ██ █ ██ ██ ███ ██ ██ ██ ██

██████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████████████████

(GOV000130). █████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████ (GOV000002).

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ (GOV000634; GOV000656). ████████████

████████████████████████████████████████████████████████

████████████████████████ (*See* GOV001791 ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ ”); GOV001780 ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ ); *see also* GOV000009 ████████████

████████████████████████████████████████████████████████

████████████ GOV000661 ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ GOV000137-38; GOV000641). ████████████

████████████████████████████████████████████████████████

████████████████████████████████████ (GOV000137-38;  GOV000641). ████

████████████████████████████████████████████████████████

████████████ ████████████████████████████████████████



(GOV000644; *see also* GOV000166 (

**D.**

(GOV00018).

. (GOV00452;

GOV000893; *see also* GOV001781 (

8

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████.

(GOV000664; *see also* GOV000452 ████████████████████

█████████████████████████████████████████

████████████████████████████ ████████████████

█████████████████████████████████████████

████" (GOV000664). ███████████████████████

███████████████" (GOV000893).

    **E.**    ████████, ███████████████████████
████████████████████████████████████████
████████████

████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████ ████ █ ██ ████ (GOV000054-55; GOV000187-94; GOV000462;

GOV001792; *see also* GOV000452 ███████████████████████

████████████████████.[1] ██████████████████████████

████████████████████ (GOV000187-94; GOV001797). ████████████

█████████████████████████████████████████

---

[1] █████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
██████████████



(GOV000090-91).

(GOV000462). ██████████████████████████████████████ :

(GOV001792; GOV001797 (footnote omitted)).

████████████████████████████████ (Ex. A, Declaration of

Anthony Jesina, ¶ 2).[2] ████████████████████████████████

████████████████████████████████ (GOV000187-

94). ████████████████████████████████

---

[2] Simultaneously with the filing of this summary judgment motion, Brisk filed a motion to supplement the administrative record and to admit extra-record evidence. (Dkt. 39). For in the event the Court grants the motion to supplement, Brisk is attaching to this motion the three exhibits that are the subject of that motion to supplement.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

(GOV000189; GOV000191; GOV000194).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████ (GOV000054). ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████ (GOV000059). ███████████████████████████████████████

███████████████████████████████████████████████ (GOV000058).

███████████████████████████████████████████████████████████

████████████████████████████████ . (Ex. B, Declaration of Marin Bozic ("Bozic Decl."),

¶ 9). █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████ (*Id.*). ████████████████████████████████████████████

██████████████████████████████████ . (*Id.*). ██████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████ . (*See, e.g.,* GOV000033 ██████████████████████

███████████████████████████████████████████████████████████ ;

11

GOV000061 (█████████████████████████████████████████

██████████████████████████████).

    **F.**    ████████████████████████████████████.

████████████████████████████████████████████████

███████████████████████ (GOV000064). ██████████████████

████████████████████████████████. (GOV000220-23).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ (GOV000074; GOV000481). ████████████████████

████████████████████████████████████████████████

████████████████████████████████████ (GOV000075). ████████

████████████████████████████ (*Id.*).

    **G.**    **RMA issued Manager's Bulletin MGR-25-009.**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ (GOV000895-96).

On November 20, 2025, RMA issued Manager's Bulletin MGR-25-009, entitled "Agent Compensation - Third Party Software Payments" ("MGR-25-009"), which requested that AIPs provide RMA, within 10 business days, certain specified "documentation for third party computer software and licensing fees paid for and provided by an AIP to an agent … for the 2026 reinsurance year." (GOV000901-02). ████████████████████████████████████████

12

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████ (GOV000086). █████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████ (*Id.*). █████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

(GOV000088).

　　　██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████ GOV001794). ████████

███████████████████████████████████████████████████████████

████████████████████████████████████ (GOV000129-30). ██████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ (GOV000175). ██████████████

███████████████████████████████████████████████████████████

███████████████████ (GOV000035).

13

**H.     RMA issued Manager's Bulletin MGR-26-002, leading to this lawsuit.**

On February 20, 2026, RMA issued Manager's Bulletin MGR-26-002, also entitled "Agent

Compensation - Third Party Software Payments" ("MGR-26-002"). (GOV001769-71). MGR-26-

002 stated that, if one or more of three conditions applies, AIP payments to third-party service

providers for policy administration software would now be considered agent compensation:

> [A]n AIP may enter into an agreement with an independent service provider to deliver general policy administration software and support services on behalf of the AIP to all of the AIP's agencies, and payments made by the AIP to the service provider under those circumstances will, as a general matter, not be considered compensation under the SRA. However, payments made by an AIP to a service provider for policy administration software and support services will be deemed a benefit of value and considered compensation under the SRA if any of the following conditions apply: (1) The service provider is funded in whole or in part by an agency or group of agencies that receives the benefit of the software and services; (2) An agency or group of agencies receiving the benefit of the software and services has authority to control the service provider's work; or (3) The software and support services are provided to a select agency or group of agencies rather than being available to the AIP's entire agency force.

(GOV001770). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮GOV001772).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮. (GOV001780-82). ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (GOV001780). ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ (GOV001782).

14

Following the issuance of MGR-26-002, on March 10, 2026, Brisk commenced this action against RMA, seeking to set aside the bulletin as unlawful under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.* After the hearing on Brisk's emergency motion for a stay, on March 27, 2026, RMA filed a status report stating in part: "[T]he Department is evaluating preparing a new manager's bulletin to supplement MGR-26-002." (Dkt. 13).

In connection with the forthcoming new bulletin, on April 3, 2026, Brisk's consultant emailed to Secretary Swanson an eight-page, single-spaced letter from Brisk that, *inter alia*, requested clarifications of MGR-26-002, and he requested a meeting between RMA and Brisk. (Ex. C). RMA did not respond to the letter or otherwise contact or meet with Brisk. Although RMA previously represented that the letter and cover email, and "further correspondence" between the parties relating to Brisk's outreach, "are likely to become part of any new administrative record for a new manager's bulletin" (Dkt. 18 at 3), the administrative record for the new bulletin (MGR-26-002.1, described below) does not include that Brisk letter or cover email.

## I.     RMA issued Manager's Bulletin MGR-26-002.1.

On May 11, 2026, RMA issued Manager's Bulletin MGR-26-002.1, entitled "Agent Compensation - Third Party Software Payments" ("MGR-26-002.1"), which "replaces MGR-26-002." (GOV001784). MGR-26-002.1 contains the same three "conditions" as MGR-26-002 ("financing," "influencing," and "exclusivity")—albeit worded differently—under which AIP payments to third-party software providers for quoting and process software, as described in ¶ 2(g), will be deemed agent compensation, with the conditions set forth in MGR-26-002.1 "supersed[ing] the prior action language in MGR 26-002." (GOV001785-88). MGR-26-002.1 also provides "[a]dditional [g]uidance" regarding schemes or devices:

> Consistent with prior guidance: Any arrangement used to channel additional value to agents, directly or indirectly, is a scheme or device unless counted as agent compensation. Attempts to use software structures to convey indirect benefits (e.g.,

15

unique features, financed development, preferential licensing) constitute schemes unless reported as compensation. AIPs should evaluate whether software arrangements create indirect benefit pathways and report associated payments accordingly.

(GOV001788). MGR-26-002.1 is in effect "[b]eginning with the 2027 Reinsurance Year," *i.e.*, July 1, 2026. (GOV001785). Unlike MGR-26-002, which states that, if any of the three conditions are met, software payments "will" be deemed agent compensation, MGR-26-002.1 states that such payments "may" be considered agent compensation, without identifying any standard or factors pertinent to that determination. (GOV001770; GOV001785). MGR-26-002.1 makes no mention of Brisk.

Although MGR-26-002.1, unlike its predecessor, references ¶ 2(g), it does not explicitly amend ¶ 2(g). Rather, it "applies longstanding RMA guidance and principles" and "clarifies" how software payments should be treated. (GOV001784). ██████████████



██████ █ █████ ██ █████ █ ████ █████ ████ ██████ ███████ (GOV001781).

███████████████████████████████████████████

████████████████████████████████ (GOV001789-1805). ██

██████ ████ █████ █████ ████ ███████ ██ ██ ███ ████ (GOV001795-99). ███ ████████████████████████████

███████████████████████████████

███ ██████ ███ █ █████ █ ███████ (GOV001793; GOV001795; GOV001800). █████████████████████████. (GOV001791-1800).

The only documents included in the administrative record for MGR-26-002.1 that were not included in that for MGR-26-002 are (i) MGR-26-002.1 itself; and ████████████████

16

## II.    ARGUMENT

### A.    Legal standard on a summary judgment motion challenging agency action

"When ruling on a summary judgment motion in a case involving final review of an agency action under the APA, the standards of Federal Rule of Civil Procedure 56(c) do not apply because of the limited role of the court in reviewing the administrative record." *Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*, 887 F. Supp. 2d 259, 265–66 (D.D.C. 2012). Rather, summary judgment in the context of an APA challenge "serves as a mechanism for deciding, as a matter of law, whether the administrative record supports the agency action and whether the agency action is consistent with the APA standard of review." *Id.* at 266 (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)); *HMO Louisiana, Inc. v. Dep't of Health & Hum. Servs.*, 793 F. Supp. 3d 150, 154 (D.D.C. 2025) ("At summary judgment, the Court must determine whether the challenged agency action complies with the APA and is supported by the administrative record."); *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (emphasizing that, on summary judgment motions for APA claims, "the district judge sits as an appellate tribunal" because "[t]he entire case on review is a question of law" and only presents "arguments about the legal conclusions to be drawn about the agency action"). Review is limited to the administrative record and the party challenging an agency's action bears the burden of proof. *See HMO Louisiana, Inc.*, 793 F. Supp. 3d 150, 154 (D.D.C. 2025) (citations omitted).

### B.    Brisk has standing to challenge MGR-26-002.1.

Under the APA, a plaintiff may seek judicial review of agency action where it is "adversely affected or aggrieved by agency action[.]" 5 U.S.C. § 702. Courts apply a "liberal position regarding a party's standing to challenge administrative action." *Duke City Lumber Co. v. Butz*, 382 F. Supp. 362, 368–69 (D.D.C. 1974). To establish standing, a plaintiff must show (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable

17

to the challenged agency action; and (3) that the injury is likely to be redressed by a favorable judicial decision. *See San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Inspection Serv.*, 257 F. Supp. 2d 133, 137 (D.D.C. 2003). The APA also requires that a plaintiff's interests fall within the "zone of interests" arguably protected by the statute under which the agency acted. *Id.* at 138. The zone-of-interests standard is "not meant to be especially demanding," and only excludes "parties whose interests are not consistent with the purposes of the statute in question[.]" *Amgen, Inc. v. Smith*, 357 F.3d 103, 108–09 (D.C. Cir. 2004) (first quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)); and then quoting *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002)). Brisk has standing because RMA specifically designed and intended MGR-26-002 to impact Brisk. MGR-26-002 has accomplished its purpose, and vacating the bulletin will redress the harm to Brisk.



. *See* (GOV000063–65; GOV000067; GOV000074–75; GOV000082–88; GOV000113–118; GOV001772; GOV001780–81).

That harm is fairly traceable to MGR-26-002 and RMA's actions. Indeed, RMA's conduct—as reflected by the record—is essentially an admission that they believe there is a causal link between MGR-26-002 and the impact on Brisk's business. That was their goal and they cannot now plausibly argue that they believe there was no connection between the issuance of MGR-26-

18

002 and three AIPs dropping Brisk from their plans of operations. When a third party's actions are part of a causal chain, all a plaintiff need show is that the agency action had a "determinative . . . effect" on that third party. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Because Article III "requires no more than *de facto* causality," *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986), and because "[p]roximate causation is not a requirement" for standing, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014), agency action need not be the only step— or even "the very last step"—in the causal chain, *Bennett*, 520 U.S. at 169. "[W]hen plaintiffs meet 'their burden of showing that third parties will likely react in predictable ways' to the defendant's conduct, . . . courts will countenance 'a domino-effect theory of causation[.]'" *Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 752 F. Supp. 3d 13, 29 (D.D.C. 2024) (citation omitted) ("Thirty years of D.C. Circuit caselaw illustrate how standing may rest 'on the predictable effect of Government action on the decisions of third parties.'").

Because the concrete and actual harm caused to Brisk is fairly traceable to MGR-26-002, it is redressable by the relief sought here. Vacating the bulletin will remove the AIPs, their plans of operations and Brisk from MGR-26-002's regime, thereby allowing the AIPs to put Brisk back in their plans. "'Causation and redressability typically 'overlap as two sides of a causation coin.' For 'if a government action causes an injury, enjoining the action usually will redress that injury.'" *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 25 (D.D.C. 2020) (internal citation omitted).

Finally, Brisk falls within the zone of interests because it is a "service provider" as referenced in MGR-26-002. (And, of course, the reason for MGR-26-002's existence). "In the APA context, 'the zone-of-interests test is not 'especially demanding,''" *Teva Pharms. USA, Inc. v. U.S. Food & Drug Admin.*, 514 F. Supp. 3d 66, 92 (D.D.C. 2020) (citations omitted), because

"it exists against a backdrop of 'Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'"" *Earthworks v. U.S. Dep't of Interior*, 496 F. Supp. 3d 472, 488 (D.D.C. 2020) (citation omitted). "A suit will thus fail the zone-of-interests test 'only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"" *Id.* (citation omitted). Brisk satisfies this very lenient test because, *inter alia*, FCIC endeavors to regulate Brisk under the SRA. Brisk is a "service provider," and thus, in turn, an AIP "affiliate," under the SRA. (GOV000487; GOV000494 (defining "service provider" as "any … entity … who … develops, operates or maintains the [IT] systems or prepares or transmits data," and defining AIP "affiliate" to include, among others, a "service provider")). The SRA addresses what an affiliate may and may not do and, thus, regulates it. (GOV000496; GOV000499; GOV000512-14; GOV000516).

### C. The Court should set aside MGR-26-002.1 as unlawful under § 706(2).

#### 1. The Court should set aside MGR-26-002.1 under § 706(2)(C) because RMA lacked regulatory authority to issue it.

"Federal agencies … are creatures of statute and as such 'literally ha[ve] no power to act' except to the extent Congress authorized them." *Marin Audobon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 911-12 (D.C. Cir. 2024); *see also Nat'l Ass'n of Broadcasters v. Fed. Commc'ns Comm'n*, 39 F.4th 817, 819 (D.C. Cir. 2022) ("An agency must identify statutory authority for any action it takes."). "[R]egulations can be sustained only if this 'reviewing court [is] reasonably able to conclude that the grant of authority contemplates the regulations issued.'" *Planned Parenthood Fed. of Am., Inc. v. Heckler*, 712 F.2d 650, 655 (D.C. Cir. 1983) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 308 (1979)). "Agencies have only those powers given to them by Congress, and

20

'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'" *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022).

The enabling legislation granting powers to FCIC is the Federal Crop Insurance Act ("FCIA"), 7 U.S.C. § 1501 e*t seq.* Under the FCIA, for instance, FCIC may "issue such regulations as are necessary to carry out this subchapter." 7 U.S.C. § 1506(o). Pertinent to this action, § 1508(k) of the FCIA addresses the manner in which FCIC must, "to the maximum extent practicable," provide reinsurance to AIPs. *Id.*, § 1508(k)(1). For implementing this mandate, "[t]he reinsurance shall be provided on such terms and conditions as the Board may determine to be consistent with subsections (b) and (c) and sound reinsurance principles." *Id.*, § 1508(k)(2). Neither § 1508(k) nor any other part of § 1508 or the FCIA authorizes FCIC to regulate a relationship between an agent and a third-party software provider, including the amount an agent may pay to, or the amount of control an agent may exercise over, a software provider to develop software that facilitates the agent's sale or service of eligible crop insurance contracts ("ECICs"). Further, the agent's role relates only to ECICs issued by the AIPs the agent is authorized to represent, not the reinsurance contract which an AIP may enter into with FCIC. (*See* GOV000488 (defining "agent"); 7 C.F.R. § 400.15(a) (the application for an ECIC by any person who wishes to participate in the program "must be submitted to FCIC or the reinsured company through the crop insurance agent[.]")). As to RMA's non-exclusivity provision, the FCIA simply does not authorize RMA to dictate to which agents AIPs must provide services.

It is telling that RMA did not issue a bulletin stating, for example, that an AIP must make its software available to its full agency force—full stop. RMA knows it lacks the authority to make such a decree. Unable to regulate such conduct, RMA seeks to indirectly do so by stating that, if an AIP does not make its software available to its full agency force, RMA will deem the AIP's

21

payment for that software—otherwise exempt from compensation under ¶ 2(g)—to be compensation. RMA tries to shoehorn into the "agent compensation" context—an area RMA contends it has authority to regulate[3]—a bulletin that, as explained above, does not serve the purpose underlying the cap on agent compensation. The Court should not permit RMA to use the threat of arbitrarily labeling a benefit or indirect benefit as "agent compensation" as a means of compelling conduct that it lacks authority under the FCIA to regulate.

### 2. The Court should set aside MGR-26-002.1 under § 706(2)(D) because RMA failed to undertake notice-and-comment rulemaking.

The APA "generally assumes that an agency's exercise of rulemaking must abide by [the notice-and comment] procedures [set forth in 5 U.S.C. § 553(b)] unless certain exceptions apply." *City of Billings v. TSA*, 153 F.4th 46, 51 (D.C. Cir. 2025). "As an elementary principle, it is clear that exceptions to section 553 notice-and-comment procedures are to be 'narrowly construed and only reluctantly countenanced.'" *Petry v. Block*, 737 F.2d 1193, 1200 (D.C. Cir. 1984). "[A] central object of requiring that the public be afforded notice and an opportunity to comment is to assure that the agency fully understands the potential impact of a proposed rule before finalizing it." *Billings*, 153 F.4th at 53. "Public notice and comment, that is, might alter an agency's initial assumptions about whether (and how) a proposed rule affects the public at large." *Id.*

Brisk expects RMA to argue that MGR-26-002.1 was exempt from notice and comment on the bases that (i) the bulletin is allegedly an interpretive rule under § 553(b)(4)(A); and (ii) the bulletin involved a "contract" as used in § 553(a)(2). As shown, neither exception applies here.

---

[3] Notably, the FCIA does not authorize FCIC to impose a cap on agent compensation. In a recent filing in another case pending before the Court, FCIC stated: "The FCIA sets out a structure for FCIC's program administration, but it does not give FCIC or RMA rulemaking or enforcement authority as to agent compensation." *The Altman Grp., Inc. v. FCIC et al.*, No. 25-2193, Dkt. 22, at 2.

22

**a.    The "interpretive rule" exception to notice-and-comment rulemaking under § 553(b)(4)(A) is not applicable here.**

The APA "requires substantive rules"—known also as legislative rules—"to be promulgated through notice-and-comment rulemaking." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 44 (D.D.C. 2020). Courts determine whether a rule "is a legislative rule (which generally must go through notice-and-comment procedures) or an interpretive rule (which need not)." *Billings*, 153 F.4th at 51. The primary inquiry is "whether the new rule effects a substantive regulatory change to the statutory or regulatory regime." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014).

The hallmark of a legislative rule is that "[i]t commands, it requires, it orders, it dictates." *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 53 (D.D.C. 2021) (quoting *Vanda Pharm., Inc. v. FDA*, 436 F. Supp. 3d 256, 270 (2020)). A legislative rule speaks with the "force of law," *see NAACP v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53, 62 (D.D.C. 2025), and "adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *CSL Plasma Inc. v. U.S. Cust. & Border Prot.*, 628 F. Supp. 3d 253, 261–62 (D.D.C. 2022) (quoting *Mendoza*, 754 F.3d at 1021); *see also Gomez v. Trump*, 485 F. Supp. 3d 145, 195 (D.D.C. 2020) ("[A] rule is legislative, not interpretive, 'when it change[s] the law.'"). Legislative rules produce an "independent legal effect," rather than put "the public on notice of *pre-existing* legal obligations or rights," as interpretive rules do. *See Nat'l Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020). An effective date "bespeaks a legislative rule." *Billings*, 153 F.4th at 52.

Interpretive rules "clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or 'merely track[]' preexisting requirements and explain something the statute or regulation already required." *Mendoza*, 754 F.3d at 1021; *see also Le v. USCIS*, 2025 WL

23

1743942, at *11 (D.D.C. June 24, 2025) ("A legislative rule *amends* the previous regulation; an interpretive rule merely *interprets* it."). An interpretive rule "'derive[s] a proposition from an existing document,' such as a statute, regulation, or judicial decision, 'whose meaning compels or logically justifies the proposition.'" *Nat'l Res. Def. Council*, 955 F.3d at 83. "The substance of the derived proposition must flow fairly from the substance of the existing document." *Cath. Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010). The interpretive rule exception "was designed to provide agencies with a degree of flexibility where substantive rights are not at stake," and, as such, "[a]n agency may not, under the interpretive rule exception, constructively rewrite [a] regulation or effect a totally different result." *Sentara-Hampton Gen. Hosp. v. Sullivan*, 980 F.2d 749, 759 (D.C. Cir. 1992) (internal quotation marks omitted); *see also Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1036 (D.C. Cir. 2008) (an agency may not "evade" notice and comment "by amending a rule under the guise of reinterpreting it").

> To help streamline the analysis, the D.C. Circuit has provided this guidance:

> Accordingly, insofar as our cases can be reconciled at all, we think it almost exclusively on the basis of whether the purported interpretive rule has "legal effect", which in turn is best ascertained by asking (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action … , (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule. If the answer to any of these questions is affirmative, we have a legislative, not an interpretive rule.

*Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). This analysis "is inherently a fact-driven inquiry, in which courts consider the impact of the new agency action on the duties or burdens of the regulated parties." *CSL Plasma*, 628 F. Supp. 3d at 262.

Beginning with the D.C. Circuit's factors, absent MGR-26-002.1, there is no "adequate legislative basis for enforcement action." Under ¶ 2(g) of MGR-10-011.1, AIP payments to third-

24

party software providers for quoting and processing software do not constitute agent compensation, subject to one exception not applicable here. ███████████

████████████████████████████ (GOV001795; GOV001799). ███████████

████████████████████████████████████████████

████████████████████████ (GOV001780 (emphasis added)). Absent MGR-26-002.1, the three conditions in that bulletin do not turn software payments under ¶ 2(g) into compensation. RMA may argue that software payments in the presence of any of the three conditions have always allegedly been a "scheme or device," but that is easily rebutted by the fact that RMA deems a "scheme or device" inapplicable to payments "excluded from compensation in [MGR-10-011.1]," such as software payments under ¶ 2(g). (GOV000598; GOV000613; GOV000901; GOV001770; GOV001785).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ " (GOV001800 (██████████████

████████████████████████████████████████████

████████████████████████████

MGR-26-002.1 amends—not interprets—a prior legislative rule. As an initial matter, ¶ 2(g) of MGR-10-011.1 is a legislative rule; it did not interpret the word "Compensation" in the SRA (*i.e.*, determine whether "quoting and processing software" payments meet that definition) but rather created a new rule, based on an arbitrary policy choice, to not count such payments as compensation despite that they meet the definition of "Compensation." *See Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (finding a rule is not an interpretive rule because "[i]t

25

does not purport to construe any language in a relevant statute or regulation; it does not interpret anything"). Further, MGR-26-002.1 plainly amends ¶ 2(g). It takes a rule that had just one exception and added three new exceptions to it. With these new exceptions, RMA has "effect[ed] a substantive regulatory change," ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ (GOV001782).

That MGR-26-002.1 has an effective date—"[b]eginning with the 2027 Reinsurance Year" on July 1, 2026 (GOV001785)—underscores that the bulletin is a legislative rule, not an interpretive one. If the bulletin merely interpreted an existing rule already in effect, there would be no need to set an effective date. Finally, MGR-26-002.1 is binding on AIPs. It states: "AIPs should evaluate whether software arrangements create indirect benefit pathways and report associated payments accordingly." (GOV001788). MGR-26-002 unequivocally stated that, if any of the three conditions exists, the software payments "will" count as compensation. (GOV001770). But MGR-26-002.1, perhaps in an effort to avoid the perception of being binding, was revised to say the payments "may" count as compensation (GOV001785), but as worded, the bulletin remains binding (and confusing). It states that payments "may be counted [by RMA] as agent compensation," but it also states that RMA may deem the payments a scheme or device "unless counted as agent compensation," presumably by the AIPs. (GOV001787; GOV001788 (directing AIPs to "report" payments)). The bulletin thus appears to instruct AIPs to report the payments as agent compensation—a binding requirement—but then ostensibly gives RMA the discretion to effectively overrule the AIP designations and *not* count the payments as compensation.

### b. The "contract" exception to notice-and-comment rulemaking under § 553(a)(2) is not applicable here.

A rule is exempt from notice and comment "to the extent that there is involved … a matter relating to … public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). To trigger this exemption, one of those "enumerated categories" must be "'clearly and directly' involved in the regulatory effort at issue." *Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1082 (D.C. Cir. 1978) (citing the legislative history for § 553(a)(2)). For the reasons explained below, MGR-26-002.1 does not "clearly and directly" involve a "contract."

The SRA is not a "contract" within the meaning of § 553(a)(2). Although the APA does not define the term "contract," other legal authority inform its meaning. In *Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corporation*, the appellant, a federally chartered savings and loan association, challenged regulations issued by an agency, the Federal Savings and Loan Insurance Corporation ("FSLIC"). 589 F.2d 658, 661 (D.C. Cir. 1978). Under the National Housing Act of 1934 ("NHA"), the appellant, like all federally chartered savings and loan associations, had been required to enter into a mandatory agreement with FSLIC to have its accounts insured by FSLIC. *Id.* at 661& n.2, 664. The D.C. Circuit Court of Appeals held that the regulations were exempt from notice and comment under § 553(b)(A). *Id.* at 662. In dicta, though, the court expressed doubt over whether a "mandatory" contract—as opposed to a "bargained-for, voluntary" one—is a "contract" under § 553(a)(2):

> … FSLIC argues first that the agreement between the agency and [appellant], which forms the foundation of the insurer/insured relationship, is a "contract" within this exception, and then that the exception of subsection 553(a) (2) extends not only to rules establishing the initial terms and conditions of the agreement, but also to all subsequent rules affecting the insured institutions. We are doubtful whether the term "contract," as it is used in subsection 553(a)(2), reaches beyond the ordinary meaning of a bargained-for, voluntary agreement. To extend the exception to an agreement that is mandatory as this one is (NHA section 403), would open the door to substantive regulation without public participation.

27

*Id.* at 664. Here, for any AIP wishing to participate in the FCIP, it is mandatory for the AIP to sign the SRA that is issued each year by RMA. (GOV000488). No participating AIP may negotiate the SRA; they can either sign the one published each year by RMA, or not.

Even if the SRA were a "contract," MGR-26-002.1 does not "clearly and directly" involve the SRA because it does not govern the formation, terms, or performance of any contractual obligation between RMA and AIPs. The tenuous connection between MGR-26-002.1 and the SRA is that the SRA contains a definition of "Compensation"; MGR-10-011.1—a bulletin, not a contract—states that, despite meeting the definition of "Compensation," certain items will not constitute compensation for policy reasons; and MGR-26-002.1 limits the circumstances under which quoting and processing software will not be deemed agent compensation under MGR-10-011.1. This is not a "clear and direct" involvement required under § 553(a)(2).

### 3. The Court should set aside MGR-26-002.1 under § 706(2)(A) because it is arbitrary and capricious.

MGR-26-002.1 is arbitrary and capricious because (i) it violates the change-in-position doctrine because it ignores Brisk's serious reliance interests; and (ii) it is neither reasoned nor reasonably explained because, *inter alia*, it does not serve the policy underlying ¶ 2(g), it cites irrelevant and flawed rationales, it is vague, it is internally inconsistent, it fails to consider relevant data, it fails to consider reasonable alternatives, and it is impermissibly retroactive.

### a. MGR-26-002.1 is arbitrary and capricious because it fails to comply with the change-in-position doctrine by ignoring Brisk's serious reliance interests.

Under the change-in-position doctrine, "'[a]gencies are free to change their existing policies so long as they provide a reasoned explanation for the change,' 'display awareness that [they are] changing position,' and consider 'serious reliance interests.'" *FDA v. Wages & White Lion Inv., LLC*, 604 U.S. 542, 568 (2025) (citations omitted). The doctrine applies not just to

28

formal policy but also "prior practice and precedent, even if there had been no previous formal policy." *CSL Plasma*, 628 F. Supp. 3d at 259; *ANR Pipeline Co. v. Fed. Energy Regul. Comm'n*, 71 F.3d 897, 901 (D.C. Cir. 1995) (referring to "established precedent").

An agency must "'be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account,''" and "'[i]t would be arbitrary and capricious to ignore such matters.'" *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citations omitted). "When serious reliance interests are at play, the agency must 'determine whether they were significant, and weigh any such interests against competing policy concerns.'" *CSL*, 628 F. Supp. 3d at 259. An agency thus must "address why the policy shift outweighs the alleged reliance interests and 'explain[ ] its 'good reasons' for concluding those interests were insufficient to hold off' the policy shift." *Id.* at 261.



(GOV001795, GOV001797),

(GOV001791; *see also* GOV000002, GOV000009, GOV000634, GOV000656, GOV000661, GOV001780).

(GOV000225-426, GOV000455).

(GOV000064, GOV000074).



." (GOV001772, GOV001782).

, which alone renders

the bulletin arbitrary and capricious.

" *See CSL*, 628 F. Supp. 3d at 259.

.

      **b.**      **MGR-26-002.1 is arbitrary and capricious because it is neither reasonable nor reasonably explained.**

"The arbitrary and capricious standard requires that an agency decision 'be reasonable and reasonably explained.'" *Petro Star Inc. v. Fed. Energy Regul. Comm'n*, 166 F.4th 161, 167 (D.C. Cir. 2026); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1163 (D.C. Cir. 2025) (decision must be "sensible"); *Amneal Pharms. LLC v. F.D.A.*, 285 F. Supp. 3d 328, 346 (D.D.C. 2018) (decision "must be logical and rational," and "coheren[t]"); *IGas Holdings, Inc. v. EPA*, 146 F.4th 1126, 1142 (D.C. Cir. 2025) (decision must be "reasoned"). "'[U]nacknowledged and unexplained inconsistency,' including of the agency's legal conclusions, 'is the hallmark of arbitrary and capricious decision-making.'" *Coalition for Humane Immigrant Rights v. Noem*, 805 F. Supp. 3d 48, 98 (D.D.C. 2025). "'[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *IGas*, 146 F.4th at 1142. "'[W]here the agency has failed to

provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.'" *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 33 (D.D.C. 2025).

"'[O]f course, it would be arbitrary and capricious for the agency's decision making to be 'internally inconsistent[.]'"" *World Shipping Council v. Fed. Maritime Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025). "Vague agency action that invites unreasoned, discriminatory enforcement is arbitrary and capricious." *Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 25-2453, 2025 WL 2840318, at *23 (D.D.C. Oct. 7, 2025). "When taking action, an agency must consider alternatives 'within the ambit of the existing standard.' … An agency must consider only ''significant and viable' and 'obvious' alternatives.'" *MediNatura, Inc. v. F.D.A.*, 998 F.3d 931, 943-44 (D.C. Cir. 2021) (quotation omitted).

### 1. MGR-26-002.1 does not support the ostensible general rationales allegedly underlying it.

MGR-26-002.1 states that one of its purposes is to "ensure consistent, equitable application of compensation rules." (GOV001784). Brisk does not understand this rationale because ¶ 2(g) already was consistently, equitably applied to all AIPs, service providers, and agents.

31

(GOV001798; GOV001784 ("As technology and business models evolve, third-party software systems increasingly provide functions beyond policy quoting and processing. While quoting and processing tools may be excluded from compensation under MGR-10-011.1(2)(g), many modern software platforms also provide additional benefits for agency management, accounting, policy lifecycle management, or other features, which may directly or indirectly benefit agents, and therefore may fall within the SRA definition of compensation.")).

RMA's reliance on that rationale is curious, though, because the scope of MGR-26-002.1 is limited to quoting and processing software: "AIP payments to software or service providers for providing premium quotes to producers or performing the processing tasks as described in MGR-10-011.1 2(g) may be counted as agent compensation when any of the following conditions are met when evaluating for SRA compliance." (GOV001785). None of the three conditions have anything to do with quoting and processing software versus non-quoting, non-processing software.

██████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████. Specifically, RMA relied ██████████████████████████████████:

████████████████████████████
██ ████ ███ █████ ██ ███ ███ ██ █████ ████
████████████████████████████████
████████████████████████████████
██████████████████████████████
████████████████████

(GOV001797 (footnote omitted); GOV001792 ("████████████████████

██████████████████████████████████

████████████████████; GOV000462 ████████████████████

32



. (GOV000054, GOV000059, GOV000189; GOV000191; GOV000194). Nonetheless, in issuing MGR-26-002.1, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.

       **2.      The three conditions are neither reasonable nor reasonably explained.**

For the reasons explained below, all three conditions in MGR-26-002.1—the "financing" condition, "influencing" condition, and "exclusivity" condition—are arbitrary and capricious.

       **a.      The "financing" condition is neither reasonable nor reasonably explained.**

An agency's decision is arbitrary and capricious when it is "unmoored from the purposes and concerns" of the underlying statutory scheme. *Judulang v. Holder*, 565 U.S. 42, 64 (2011). The decision thus should be connected to the goals and objectives of the relevant laws. *See id.* at 58 (criticizing the agency's rule because it had "no connection to the goals" or "rational operation" of the relevant laws); *see also Burt Lake Band of Ottawa & Chippewa Indians v. Bernhardt*, 613 F. Supp. 3d 371, 384-85 (D.D.C. 2020) (vacating agency decision that "will frustrate, and not advance, the stated goal" and thus was "not rationally connected to the reasons proffered by the agency"); *Kingdom v. Trump*, No. 25-cv-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025) (stating "the APA does require an agency to take actions that are rationally and demonstrably related to its stated goals" and granting preliminary injunctive relief where the "rationale at face

33

value, it has little, if anything, to do with the agency's decision"); *Goldstein v. SEC*, 451 F.3d 873, 883-84 (D.C. Cir. 2006) (vacating a rule as "arbitrary" where the "rule bears no rational relationship to achieving [the relevant law's] goal"); *Bangor Hydro-Electric Co. v. FERC*, 78 F.3d 659, 663-64 & 663 n.3 (D.C. Cir. 1996) (applying arbitrary-and-capricious standard and vacating the agency's decision because it was not "reasonably related to its goal").

The purpose of ¶ 2(g) is to exclude from agent compensation the cost of quoting and policy software because such software is a "tool" "necessary to operate the [AIP] business" and, more specifically, "necessary for the agent to perform the tasks to service eligible crop insurance contracts." (GOV000593; GOV000612; GOV001793 ("██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████). The "financing" condition does not serve, and is irrelevant to, that purpose. Whether an agent finances a software provider—or, more broadly, how the software provider obtains funding in general—is wholly irrelevant to whether the provider's software is a necessary, administrative tool. Nor does the "financing" condition serve the objective underlying the cap on agent compensation—protecting AIP solvency—because an agent paying funds to a service provider (or anyone), in and of itself, does not reduce or otherwise affect AIP funds.

RMA's rationale for the "financing" condition is not reasonable. MGR-26-002.1 states— without explanation—that, if agents finance a service provider, "payments by AIPs [to the provider] for that software confer a benefit of value to those agents." (GOV001785). ██████████ ████████████████████████████████████████ ████████████████████████████████████r. ██████████ ████████████████████████████████████████

34

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████ *(See* GOV000606, MGR-10-011.1, ¶ 2(b) (excepting from agent compensation loans "with repayment terms typical of commercial loans")). Simply put, the act of an agent financing a service provider does not alone provide any benefit of value to the agent.

Contrary to RMA's assertion, an agent financing a service provider does not "mirror" schemes or devices previously identified by RMA. An agent financing a provider does not somehow constitute an AIP "channel[ing] payments to agents" under ¶ 12(f) of MGR-10-011.1. (GOV001785). An agent financing a provider does not somehow constitute an AIP "provid[ing] services to producers [*i.e.*, farmers, etc.] … normally performed by an agent" under ¶ 12(g) of MGR-10-011.1. (*Id.*). An agent financing a provider does not somehow render the agent and provider "affiliates" under IS-11-006 (*id.*), which RMA improperly assumes. (*See* GOV001787

████████████████████████████████████████████████████

████████████████████████████████████████ ); GOV001796 (██████

████████████████████████████████████████ )). ██████

████████████████████████████████████ █████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ (GOV001796). ████████████████████████████████

████████████████████████████████████████████████████

█████████████████ . (*See* GOV001777 ████████████████████████ ")).

RMA does not appear to have considered reasonable alternatives for the "financing" condition. ███████████████████████████████████████

██████████████████████████████████████. (*See* GOV000083 ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████) (emphasis in original omitted)). ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████

The "financing" condition is impermissibly retroactive because Farm Credit already financed Brisk's software. "If a new rule is 'substantively inconsistent' with a prior agency practice and attaches new legal consequences to events completed before its enactment, it operates retroactively." *Arkema Inc. v. E.P.A.*, 618 F.3d 1, 7 (D.C. Cir. 2010). █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████ (*See* GOV000606, MGR-10-011.1, ¶ 2(a), (b) (excepting from agent compensation loans made on commercial reasonable terms and "[l]oans made on or before June 30, 2010," regardless of the loan terms)).

> **b.    The "influencing" condition is neither reasonable nor reasonably explained.**

The "influencing" condition does not serve, and is irrelevant to, the objective underlying ¶ 2(g). Whether an agent has any influence over a software provider's software is wholly irrelevant to whether the software is "necessary for the agent to perform the tasks to service eligible crop insurance contracts" because the software remains necessary regardless of any agent input. Nor

does the "influencing" condition serve the objective underlying the cap on agent compensation—protecting AIP solvency—because an agent providing input on software features does not reduce or otherwise affect AIP funds.

RMA's justifications for the "influencing" condition are unreasonable. The bulletin states, "When agents have the authority to guide software development as described above, it is no longer software provided by an AIP but is now software that can be adapted to match the benefits desired by the agent[.]" (GOV001787). Brisk does not understand this assertion because AIP software remains "provided by an AIP" to an agent even if the software is designed in part to address the agent's preferences and concerns. "Software provided by an AIP" and "software that can be adapted to match the benefits desired by the agent" are not mutually exclusive or contradictory.

RMA's contention that software "shaped to agent preferences" provides "value to the agents" (GOV001786), thereby allegedly warranting a finding of compensation, is a red herring. All quoting and processing software—regardless of the extent to which agents play a role in developing the software features—provides a benefit of value to agents. Under RMA's policy decision in ¶ 2(g), though, despite the software being a benefit of value, RMA decided to not deem it agent compensation. That an agent, for example, instructs a provider to configure one feature a certain way should not suddenly, arbitrarily change the software from non-compensation to compensation.

MGR-26-002.1 states that agents having authority to influence software "transfers responsibilities that belong to AIPs under the SRA[.]" (GOV001786). RMA, without citing a specific SRA provision, states, "Under the SRA, an AIP, not the agent, has the responsibility to control the systems and processes used to sell and service eligible crop insurance contracts." (*Id.*). On the contrary, the SRA states that an AIP "and all of its affiliates"—including service

37

providers—"shall develop, implement, and maintain information controls and systems … ." (GOV000487; GOV000516). The provision RMA cites—section IV(h)(1)—states only that an AIP has ultimate responsibility for its actions and actions taken on its behalf: "The Company is solely responsible for the conduct and performance of its personnel and affiliates with respect to the obligations imposed by this Agreement and FCIC procedures." (GOV000524; GOV001786).

The bulletin's description of the "influencing" condition is internally inconsistent. On the one hand, it characterizes the condition as whether agents have "authority" to influence, but on the other hand, it states the condition is triggered if actual influence occurs. (GOV001786 (referring to an agent's "direct or indirect authority"); GOV001787 (referring to a provider "controlled, influenced, or directed by agents")). The bulletin also discusses influencing both the "[s]ervice [p]rovider's [w]ork" and the "service provider" itself, with the distinction, if any, unclear. (GOV001786 ("Authority to Control or Influence the Service Provider's Work"); GOV001787 ("AIP payments to a software service provider controlled, influenced, or directed by agents may be counted as agent compensation when evaluating SRA compliance.")).

MGR-26-002.1 is vague with respect to the "influencing" condition. It inconsistently uses the words "influence," "control," "guide," and "direct." Most concerning is the very broad word "influence," the scope and meaning of which is unclear. Assuming "direct authority" to influence refers to a contract, it is unclear what "indirect authority" to influence means. Finally, it is unclear whether an agent influencing a software provider must be affiliated with the provider because, when describing "AIP payments to a software service provider controlled, influenced, or directed by agents, RMA states it "may consider any payments to such entities affiliated with the agents to be a scheme or device[.]" (GOV001787). The vague nature of the rule deprives Brisk and others of knowing what circumstances will trigger the "influencing" condition.

38

██████████████████████████████████████████████

████████████████████████████████ *See Arkema Inc. v. E.P.A.*, 618 F.3d 1, 7 (D.C.

Cir. 2010). ██████████████████████████████████████

███████████████████████████████████████ As it could have done

with the "financing" condition, RMA could have grandfathered in all third-party software

previously influenced by agents, but it declined to do so, ██████████████████████

████████████████████████████████████

In adopting the "influencing" condition, RMA failed to consider all relevant data. ████

█████████████████████████████████—and the administrative record does not show

that RMA even considered—the importance of user input and feedback for the development and

maintenance of policy quoting and processing software. (*See* Ex. B, Bozic Decl., ¶ 6). This

condition effectively ceases the ability for a software service provider to adequately meet the needs

of its customers (the agents), and thus in turn for the agents to use software that best suits the

farmers and other producers that the FCIP is designed to protect.

        c.      **The "exclusivity" condition is neither reasonable nor reasonably explained.**

Like the other conditions, the "exclusivity" condition—requiring an AIP to make third-

party software available to its entire agency force—is irrelevant to whether the software is a

necessary tool for "perform[ing] the tasks to service eligible crop insurance contracts." Whether

all, or something less than all, of an AIP's agency force has access to a service provider's quoting

and processing software is irrelevant to whether the software is a necessary tool for agents to quote

policies and process pertinent information. Nor does the "exclusivity" condition serve the

"protecting AIP solvency" objective because more agents having access to software does not

somehow lower AIP costs. And, on the contrary, the "exclusivity" condition *undermines* the

solvency goal because it provides that, if all agents have access to software, the funds an AIP would pay for the software (potentially millions of dollars) do not count towards the cap on agent compensation, thereby cutting into the very AIP funds the cap is designed to protect.

RMA's rationale for the "exclusivity" condition is unreasonable. ████████████████ ████████████████████████████████████ (GOV001788; GOV001799

████████████████████████████████████████

██████████████████ The benefits to agents is not the appropriate consideration because software and all other items exempted from compensation under ¶ 2 of MGR-10.011.1 provide benefits to agents; the appropriate consideration is whether the software, exclusive or not, is a necessary tool. Also, exclusivity is not a "benefit of value" within the meaning of the "Compensation" definition in the SRA. (*See* GOV000489). "Compensation" is defined not just as "benefits" but "benefits *of value*," and there is no way to objectively value "exclusivity" to calculate the amount that would count towards agent compensation. If RMA is saying that the value of exclusivity is simply the full cost of the software, then that is just another way of saying the benefit of value is the software itself, which is exempted under ¶ 2(g).

██████████████████████████████████████

██████████████████████████████████████

(GOV001799 ("████████████████████████████████████

████████████████████████████.")); *id.* ("D████████████████

██████████ The "exclusivity" condition, though, does not solve or otherwise address that cited concern.████████████████████████████████████

████████████████████████████████, ██████████████████████

████████████████████████████████ Further,



RMA failed to examine all relevant data by not considering why an AIP having multiple software

systems is beneficial. (*See* Ex. B, Bozic Decl., ¶¶ 3-5).

> **3.      The "Schemes or Devices" guidance is neither reasonable nor reasonably explained.**

At the very end of MGR-26-002.1 after the three conditions are discussed, there is a small

but extremely consequential passage, even more consequential than the three conditions:

**Additional Guidance:**

**Schemes or Devices**

Consistent with prior guidance: Any arrangement used to channel additional value
to agents, directly or indirectly, is a scheme or device unless counted as agent
compensation. Attempts to use software structures to convey indirect benefits (e.g.,
unique features, financed development, preferential licensing) constitute schemes
unless reported as compensation. AIPs should evaluate whether software
arrangements create indirect benefit pathways and report associated payments
accordingly. …

(GOV001788). This new rule—which was not in MGR-26-022—is, respectfully, a disaster for

regulated parties. It is entirely unclear what it means, what it encompasses, and whether and to

what extent it duplicates and/or overlaps with any of the three conditions. These are some of the

many questions raised by the rule's vague nature:

1.  Does the term "[a]rrangement" refer to only software arrangements (the focus
    of the bulletin) or all arrangements?

2.  For the term "additional value," "additional" to what?

3.  What is the connection, if any, between the terms "value" and "benefits" as
    used in the rule, and as compared against the term "benefit of value" as used in
    the SRA's definition of "Compensation?"

4.  What does the term "software structures" mean, and to what extent, if at all,
    does it overlap with the term "software arrangements?"

5.  Does the phrase "[a]ttempts to use software structures to convey indirect
    benefits" include but is not limited to the three conditions, such that the three
    conditions are only three of many, with the rest being unspecified?

41

6. What is the difference, if any, between "value" conveyed "indirectly" in the first sentence and "indirect benefits" in the second sentence?

7. Do unsuccessful "[a]ttempts" to convey indirect benefits to an agent—as opposed to actually conveying indirect benefits—really require an AIP to report as compensation the benefits that were not actually conveyed?

8. What are "indirect benefit pathways?"

9. Does "financed development" simply refer to the "financing" condition, and if not, what is the difference?

10. If third-party software does not trigger any of the three conditions but includes "unique features"—which is undefined—does the AIP need to report the software as compensation?

11. Are the phrases "counted as compensation" and "reported as compensation" synonymous?

Although the rule is prefaced with the phrase "Consistent with prior guidance," RMA does not specify that alleged prior guidance and it is not clear that it actually exists. The rule fails to provide adequate notice of what precisely will count as compensation and thus is arbitrary and capricious.

    **4.    It is not reasonable for MGR-26-002.1 to distinguish between third-party software and in-house software.**

As RMA acknowledges, "Some AIPs use third party software, while others develop their own in-house software." (GOV001787). The scope of MGR-26-002.1 is limited only to "third party software" provided by "software or service providers." (GOV001784-85). To the extent the reasons underlying the three conditions are legitimate, RMA offers no reason, and there is no rational reason, for restricting the bulletin in this manner. Under MGR-26-002.1, if an agency finances an AIP's in-house software, influences and control's the AIP's development of that software, and is the sole agent allowed to use the software, the AIP's software costs would *not* count towards agent compensation despite triggering all three conditions. This loophole raises questions about the extent to which MGR-26-002.1 is truly policy-driven versus just targeting

Brisk, especially where there is no indication in the administrative record that any service provider other than Brisk is affected by the bulletin.

### 5. MGR-26-002.1 is internally inconsistent with respect to the counting of compensation.

MGR-26-002.1 is contradictory with respect to who decides whether, in situations where one or more of the three conditions are triggered, software payments should count as agent compensation. On one hand, the bulletin states that software payments "may be counted as agent compensation when any of the following conditions are met when evaluating for SRA compliance." (GOV001785). Because it is RMA who evaluates for SRA compliance, the "may be counted" appears to mean "may be counted by RMA." On the other hand, the "Schemes or Devices" section states that AIPs should "report … payments." (GOV001788). The bulletin also states that RMA may consider software payments to be a scheme or device "unless counted as agent compensation,"  which suggests RMA may find a scheme or device if an AIP does not count software payments as compensation. (*Id.*). Finally, although omitted from MGR-26-002.1, MGR-26-002 stated: "AIPs are directed to review all arrangements with their service providers to ensure they are paying and reporting agent compensation in accordance with the SRA, the FAQs for Agent Compensation, Schemes or Devices on RMA's website, and this bulletin in advance of the start of the 2027 RY." (GOV001770).

This internal inconsistency—and the resulting lack of notice—render MGR-26-002.1 arbitrary and capricious.

43

44

## III.    CONCLUSION

For the above reasons, Brisk respectfully asks the Court to grant Brisk's motion and set aside MGR-26-002.1.

Respectfully submitted,

By:    /s/ Charles A. Zdebski
Charles A. Zdebski (#451075)
Chad E. Kurtz (#1016934)
COZEN O'CONNOR
2001 M Street NW, Suite 500
Washington, DC 20036
Tel: (202) 280-6528
czdebski@cozen.com
ckurtz@cozen.com

*Attorneys for Plaintiff,*
Dated: May 29, 2026                          *Brisk Insurance Services LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRISK INSURANCE SERVICES LLC,

                Plaintiff,

    v.

FEDERAL CROP INSURANCE
CORPORATION *et al.*,

                Defendants.

Civil Action No.: 1:26-cv-00842

### [PROPOSED] ORDER

AND NOW, this _____ day of _____, 2026, upon consideration of plaintiff Brisk Insurance Services LLC's Motion for Summary Judgment, and the brief in opposition thereto filed by defendants Federal Crop Insurance Corporation ("FCIC"); Risk Management Agency ("RMA"), an agency of the United States Department of Agriculture; and Patricia Swanson, in her official capacity as Manager of FCIC and Administrator of RMA, and any hearing and/or oral argument on the motion, it is hereby **ORDERED** that the Motion is **GRANTED**. The bulletin entitled "MGR-26-002.1: Agent Compensation – Third Party Software Payments" issued by RMA on May 11, 2026 is hereby **SET ASIDE**.

BY THE COURT:

_____
The Honorable Sparkle L. Sooknanan

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of May 2026, I caused Plaintiff's Motion for Summary Judgment, along with the accompanying Memorandum of Law, proposed Order, and exhibits, to be served via ECF on all counsel of record.

                                       /s/ Charles A. Zdebski
                                       Charles A. Zdebski