# EXHIBIT "C"

## April 3, 2026 Letter from Brisk to RMA

April 3, 2026

Administrator Patricia Swanson
Risk Management Agency
U.S. Department of Agriculture
1400 Independence Avenue, SW
Washington, DC 20250

**Re: Request for Clarification in a New Bulletin to Supplement or Replace MGR-26-002, Agent Compensation and Third-Party Software Payments**

Dear Administrator Swanson:

Brisk Insurance Services LLC ("Brisk") respectfully submits this letter in connection with the RMA's evaluation of a new manager's bulletin to supplement or replace MGR-26-002. As reflected in the RMA's Status Report filed March 30, 2026 in *Brisk Insurance Services LLC v. Federal Crop Insurance Corporation et al*., Civil Action No. 26-0842 (SLS) (D.D.C.), the RMA has indicated it expects to decide on issuing such a new bulletin by April 8, 2026, and projects that issuance to the public would take 30 to 60 days.

Brisk founders have dedicated their careers to developing tools that help farmers make better risk management decisions. We have consistently engaged with RMA to ensure that our business model fully complies with all SRA provisions, policy and procedures, and we remain committed to proactive compliance. In that spirit, we offer the following observations for a new bulletin to provide stability for all AIPs and their associated third-party vendors.

MGR-26-002 establishes that payments by an AIP to a service provider for policy administration software and support services will be deemed a benefit of value, and thus considered agent compensation under the SRA, if any of three conditions listed in the bulletin apply. The bulletin does not, however, clearly define the operative terms within those conditions with sufficient precision to allow AIPs and service providers to predict with confidence which arrangements are compliant (i.e. not deemed as agent compensation) and which are not. Because MGR-26-002 is binding, and because violations may result in sanctions under section III(a)(4)(E) of the SRA, we believe a new bulletin should establish clear, objectively assessable regulatory standards for each of the three conditions.

We address each condition below, identify the specific ambiguities that require clarification, and offer concrete suggestions drawn from existing RMA precedent and standard industry practices.

1

**1. Funding by Agencies That Receive the Benefit of the Software or Services**

*"The service provider is funded in whole or in part by an agency or group of agencies that receives the benefit of the software and services."* (MGR-26-002, Condition 1)

The term "funded" is not defined in MGR-26-002, the SRA, or prior guidance. As currently drafted, it is unclear whether this condition is triggered by equity ownership, loans, fee-for-service revenue relationships, or some combination of these. This ambiguity creates compliance uncertainty for AIPs, service providers, and agencies alike.

The regulatory concern most consistent with the SRA's structure is that a service provider receiving AIP payments for software exempt from compensation limits under paragraph 2(g) of MGR-10-011.1 could use those AIP-funded revenues to subsidize, i.e. provide at below-market prices, services to agencies for activities that fall outside the 2(g) exemption. In that scenario, the AIP would effectively be paying for services to agencies through the service provider as an intermediary, which could constitute indirect compensation.

If that is the regulatory concern, well-established cost-allocation and audit frameworks exist to address precisely this type of cross-subsidization risk. As summarized in Appendix A to this letter, numerous federal agencies and other regulatory bodies have adopted audit-based mechanisms to prevent regulated funds from subsidizing unregulated or non-exempt activities, and none of them resort to blanket prohibitions on the structural relationships between the regulated entity and its service providers.

Without further clarification, the "funding" condition, if applied broadly, would also appear to reach loan and loan-like arrangements that RMA has previously reviewed and approved. Under MGR-10-011.1, paragraph 2(b), loans made on commercially reasonable terms, at a rate of interest, of a duration, and with repayment terms typical of commercial loans, do not constitute compensation. In December 2022, RMA reviewed a specific proposal in which Farm Credit Associations would pre-pay service fees to Brisk, effectively a loan, with Brisk repaying those amounts (with interest at the U.S. Prime Rate) once AIPs established service contracts. In a letter dated December 22, 2022, David L. Miller, Director of RMA's Reinsurance Services Division, concluded that "*as of this date, RMA has not detected any violations of the SRA with regards to the FCA's financing and Brisk repayment in the proposal revision.*"

**Suggested Clarifications:**

(a) **Equity and equity-like interests.** Consistent with MGR-10-011.1, paragraph 1(n), if a service provider is "owned in whole or in part" by an agency or group of agencies that benefits from the software, the service provider should be deemed "funded" by those agencies. For these purposes, "ownership" should encompass equity investments, convertible notes, and similar instruments common in technology start-ups.

(b) **Loans and loan-like prepaid service fees.** MGR-10-011.1 establishes two safe harbors for loans: paragraph 2(a) exempts loans made on or before June 30, 2010, and paragraph 2(b) exempts loans made on commercially reasonable terms as determined by FCIC. The new bulletin should confirm that loans and loan-like prepaid service fees from agencies to service providers do not constitute "funding" under Condition (1), provided they carry commercially reasonable interest and repayment terms. Specifically, a loan or prepaid fee arrangement should be deemed commercially reasonable if: (i) the repayment period does not exceed seven years; and (ii) the interest rate does not exceed the U.S. Prime Rate as published by the Wall Street Journal. These parameters are consistent with the standard Brisk proposed to RMA in December 2022, which RMA reviewed and found not to violate the SRA.

**Reliance on Prior RMA Review:**

To the extent the new bulletin would treat loans from agencies to service providers as "funding," we believe the bulletin should articulate the basis for any departure from the position reflected in the December 2022 review. That review letter specifically addressed whether loans from Farm Credit Associations to Brisk, made on commercially reasonable terms consistent with paragraph 2(b), constituted a violation of the SRA, and concluded they did not. If RMA had considered these loans to be agent compensation, the December 2022 review should have stated so and notified Brisk and relevant parties to report them accordingly. Instead, the review was clear that such loans were not a scheme or device to circumvent SRA rules. Brisk and its partners structured their arrangements in reliance on that determination. If RMA's position has changed, a new bulletin should articulate the basis for that change, consistent with the obligation to provide a reasoned explanation when departing from prior policy and to account for the serious reliance interests of affected parties. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). At a minimum, the new bulletin should exempt pre-existing arrangements (entered into before February 20, 2026) from any new restrictions (as paragraph 2(a) did), or provide a reasonable transition period for restructuring them to meet new requirements.

(c) **Fee-for-service revenue.** Where a service provider receives revenue from both AIPs and agencies (for example, when an AIP pays for a core software platform and individual agencies separately pay for optional customizations or add-on features), the receipt of agency fees should not, standing alone, render the provider "funded" by those agencies. Concern with cross-subsidization, if that is RMA's concern, is not unique to crop insurance. Appendix A details numerous cases where other Federal agencies have addressed similar issues. In those cases, without exception, the regulation provides standards that providers must follow, but they do not outright prohibit commercial activity. Consistent with that approach, to guard against cross-subsidization, we suggest that the bulletin require an annual audit by an independent accountancy firm to validate

3

that AIP-funded software revenues are not being used to underwrite below-market pricing of agency-facing services that fall outside the 2(g) exemption.

## 2. Authority of Agencies to Control the Service Provider's Work

*"An agency or group of agencies receiving the benefit of the software and services has authority to control the service provider's work."* (MGR-26-002, Condition 2)

This condition does not delineate the boundary between ordinary user feedback, which every software provider solicits from its customers, and the type of "control" that would trigger the provision. Every AIP utilizes agent advisory committees, user surveys, and beta-testing programs to inform product development. Third-party service providers do the same. Without a clear regulatory standard, routine and beneficial interactions between agencies and service providers could inadvertently trigger the condition.

The apparent purpose of this condition is to prevent a scenario in which a subset of agencies effectively directs the service provider's development priorities, timelines, and feature design, such that the software becomes a bespoke product built to those agencies' specifications using AIP funds. This is materially different from soliciting feedback or convening advisory panels open to all users.

**Suggested Clarifications:**

Some potential clarifications the new bulletin could specify regarding "authority to control" could be that control exists when any of the following circumstances apply:

(a) **Contractual control.** An agency or group of agencies has a written agreement with the service provider (such as a statement of work, development agreement, or similar instrument) that dictates specific software features, development timelines, or delivery milestones for software licensed to AIPs.

(b) **Customization arrangements.** An agency or group of agencies has authority or contractual control that prevents the service provider from serving other agencies on comparable terms. For example, if one agency commissions the service provider to develop customized add-on software for its agents, that arrangement should not constitute "control" so long as the service provider remains free to enter into similar arrangements to develop customized add-on software for any other agency. "Authority to control" exists only when an agency can prohibit the service provider from contracting with other agencies on comparable terms.

(c) **Exclusive advisory access.** Agency personnel have access to the service provider's product-development process (through an advisory council, steering committee, or equivalent body) on terms that are not offered to other appointed agents on equitable conditions.

Internal Use

(d) **Governance overlap.** Agency personnel serve as an officer, director, or board member of the service provider.

Conversely, the bulletin should confirm what does not constitute "authority to control", such as: voluntary participation in user advisory groups open to all appointed agents; submission of feature requests through standard channels available to all users; and participation in beta-testing programs offered on equitable terms.

### 3. Availability of Software and Services to the AIP's Entire Agency Force

*"The software and support services are provided to a select agency or group of agencies rather than being available to the AIP's entire agency force."* (MGR-26-002, Condition 3)

This condition raises practical questions about what it means for software to be "available" to an AIP's entire agency force. Today, AIPs routinely differentiate software access based on agent roles: "keying agents" who enter data into the system of record have access to different features than agents who simply submit applications. We do not believe RMA intends to require AIPs to grant uniform access to every software feature across all agents, regardless of role. However, as currently drafted, this is the likely consequence.

Modern software platforms that provide decision-support and analytics tools operate on producer-level data. Such data contains sensitive personally identifiable information and may only be shared with a service provider through clearly expressed consent of both the AIP and the agency. Without these permissions and the underlying data, the tools are not "available" in any meaningful sense. A standard that equates "availability" with a requirement that every appointed agent be automatically provisioned access, regardless of consent or data-sharing agreements, would be impractical and could raise data-privacy concerns.

**Suggested Clarifications:**

(a) **Opt-in "availability" standard.** The software and supporting services should be deemed "available to the AIP's entire agency force" if all appointed agents are given the opportunity to opt in to the platform, subject to execution of reasonable non-disclosure agreements and provision of the data access necessary for the software to function. An AIP or service provider should not be found non-compliant with Condition (3) merely because some agents have elected not to participate.

(b) **Service fees for policies placed with non-funding AIPs.** The bulletin should clarify that a third-party service provider may assess service fees to agencies that have opted in to the platform for quoting or servicing policies that are placed with AIPs other than those funding the software. The SRA compensation limits apply to the relationship between an AIP and the agents selling that AIP's policies. When an opted-in agency uses the platform to quote a policy with a different AIP that has no contractual relationship with

5

Internal Use

the service provider, the service provider's fee for that transaction is an ordinary commercial charge, not a benefit of value subject to compensation limits.

(c) **Livestock insurance software.** Software that is relevant exclusively to livestock insurance programs, which are not regulated under the SRA, should be explicitly excluded from Condition (3). The SRA's compensation provisions govern the relationship between AIPs and agents selling policies reinsured under the SRA; livestock insurance programs operate under separate statutory authority and are not subject to SRA compensation limits. Software that serves only those programs falls outside the SRA's regulatory scope, and the new bulletin should confirm this boundary.

### 4. Scope of "Support Services" and Related Exemptions

MGR-26-002 references "software and support services" but does not clearly define the scope of "support services." Without a definition, this term could be read to encompass virtually any service a provider offers in connection with software, from technical help-desk support and system maintenance to training. We suggest the new bulletin define "support services" as services that are directly necessary for the operation, maintenance, or effective use of the software platform, including technical support, system configuration, data integration, user onboarding, and software updates. Services that are independently valuable apart from the software should be treated separately. Specifically, training on crop insurance products has historically been excluded from compensation under paragraph 2(d) of MGR-10-011.1. The new bulletin should confirm that this exclusion remains in effect and is not affected by the new conditions in MGR-26-002.

### 5. Proposed Forward-Looking Compliance Framework

Brisk believes the most effective regulatory standards are those that clearly define rules capable of objective assessment. We respectfully suggest the new bulletin establish a forward-looking compliance framework that includes:

**Periodic reviews.** Regular reviews of third-party service provider arrangements, including software capabilities, agency relationships, and fee structures. Brisk has continuously offered such transparency to RMA and intends to continue doing so.

**Annual certification.** An annual certification process under which AIPs and their service providers attest to compliance with the conditions set forth in the new bulletin, supported by documentation available to RMA upon request, similar to the current Non-Disclosure Affiliate Annual Certification.

**Independent audit.** Where a service provider provides services to both AIPs and agencies (core functionality developed with the AIP revenues and agency-specific customizations or add-ons paid for by the agencies receiving the customized service), an annual independent

6

audit to confirm that AIP-funded software revenues are not being used to cross-subsidize, i.e. provide at below-market price, customized services commissioned by agencies. As documented in Appendix A, cost-allocation and independent-audit requirements are the standard regulatory tool employed across the federal government to prevent exactly this type of cross-subsidization, from FERC's regulation of electric utilities to CMS's cost reporting requirements for Medicare providers.

**6. Transition Period for Existing AIP Software Contracts**

MGR-26-002 and any new bulletin will necessarily require AIPs and their service providers to evaluate, and in many cases renegotiate, existing contractual arrangements governing software and support services. These contracts were negotiated and executed in reliance on the regulatory framework as it existed at the time, including the no-objection letters issued by RMA between 2022 and 2025. Requiring immediate compliance with new conditions would force parties to operate in breach of existing agreements or to abandon contractual rights for which they bargained in good faith.

Federal agencies have recognized this exact problem when adopting rules that alter the permissible terms of existing contracts. In its 2022 order prohibiting certain revenue-sharing agreements between broadband providers and multi-tenant environment owners, the FCC adopted a 180-day delayed compliance date for existing contracts, agreeing with commenters that a transition period was necessary to "allow time for providers to conduct the extensive contract renegotiations that would be required if existing graduated revenue sharing provisions are rendered void by the Commission's decision." *Improving Competitive Broadband Access to Multiple Tenant Environments*, 87 Fed. Reg. 17,174, 17,187 (Mar. 28, 2022) (FCC 22-12, ¶ 77). The FCC calibrated the transition period to balance the time needed for contract restructuring against the urgency of the policy change, a framework that applies with equal force here.

Given this precedent, we encourage RMA to consider a provision in the new bulletin which provides the same for AIP software contracts in existence as of the date MGR-26-002 was issued: that compliance with any new or clarified conditions shall not be required until the start of crop year 2028, i.e. July 1, 2027. This timeline would give AIPs and service providers a reasonable period following the expected issuance of the new bulletin to review existing arrangements against the clarified standards, negotiate amendments where necessary, and implement any required operational changes, including modifications to cost-allocation methodologies, audit procedures, and software-access configurations.

**Conclusion**

We believe that Brisk and RMA share a common objective: ensuring that U.S. farmers and ranchers have access to the best possible tools for making sound risk management decisions. The public-private partnership is designed to encourage innovation and competition among AIPs, and

7

Internal Use

third-party software providers play an increasingly important role in that ecosystem. Clear regulatory standards in the new bulletin will enable all participants to invest and operate with confidence.

We welcome the opportunity to discuss these suggestions with the Agency at its convenience, and we remain prepared to provide any additional information that may be helpful as the Department prepares the new bulletin.

Respectfully submitted,

**Connor Scharfe**, President and Chief Executive Officer
**Alex Offerdahl**, Co-Founder
**Marin Bozic, Ph.D.**, Chairman of the Board
Brisk Insurance Services LLC

8

Internal Use

## Appendix A

## Cross-Subsidization Frameworks in Federal and State Regulation

Condition (1) of MGR-26-002 addresses scenarios where a service provider is "funded in whole or in part" by agencies that receive the benefit of the software. As discussed in the body of this letter, we understand the underlying concern to be that a service provider receiving AIP payments for software exempt under paragraph 2(g) of MGR-10-011.1 could use those revenues to offer services to agencies for activities that fall outside the exemption, at below-cost or below-market prices. The AIP would then effectively be paying for non-exempt services to agencies through the service provider as an intermediary.

This type of cross-subsidization concern is not unique to crop insurance. Across the federal government, regulators routinely confront the question of whether funds from one regulated or subsidized activity are being used to underwrite a separate activity at below-market rates. In every case we have identified, the regulatory response is to impose cost-allocation standards, pricing requirements, and independent audit obligations. No federal agency we are aware of addresses the problem by banning the structural or funding relationship between the entities involved.

The following survey describes how ten federal or state regulatory frameworks address cross-subsidization risk, with particular attention to how each framework handles the "funding" question that is central to Condition (1) of MGR-26-002.

### 1. Federal Energy Regulatory Commission (FERC), 18 CFR Part 35

FERC regulates transactions between electric utilities and their affiliates to prevent regulated ratepayers from subsidizing unregulated operations. Under 18 C.F.R. Part 35 and the Commission's affiliate-transaction rules, utilities must use a cost-allocation methodology based on fully distributed costs when purchasing from affiliates and must price sales to affiliates at the higher of cost or market. The central concern is that regulated revenue could flow to unregulated affiliates at below-market transfer prices. FERC addresses this through transparent cost allocation, independent audits, and Codes of Conduct.

**Regulatory mechanism:** Cost-allocation standards, Codes of Conduct, independent audits.

**Relevance to Condition (1):** Utilities are permitted to transact with affiliates that they "fund" through shared ownership structures. The safeguard is pricing discipline and audit, not a ban on the funding relationship.

### 2. Federal Communications Commission (FCC), 47 CFR Part 64

The FCC's cost-allocation rules under 47 C.F.R. Part 64 govern how incumbent local exchange carriers allocate costs between regulated telephone services and nonregulated activities such as broadband and information services. Carriers must maintain a Cost Allocation Manual (CAM) that details how shared costs, including personnel, facilities, and technology platforms, are distributed between regulated and nonregulated lines of business. The rules require that nonregulated activities bear their fair share of joint and common costs, and carriers submit annual cost studies to the FCC for review.

**Regulatory mechanism:** Cost Allocation Manuals, joint-cost allocation rules, annual reporting.

9

**Relevance to Condition (1):** Carriers operate regulated and nonregulated services on shared infrastructure. The FCC does not prohibit this; it requires that regulated revenue not subsidize the nonregulated side, verified through cost studies.

### 3. U.S. Postal Service / Postal Regulatory Commission (PRC), 39 U.S.C. § 3633

The Postal Accountability and Enhancement Act, 39 U.S.C. § 3633, requires that each competitive postal product cover its attributable costs and that competitive products collectively make an appropriate contribution to institutional costs. The PRC has established regulations requiring the Postal Service to maintain cost-attribution methodologies that ensure market-dominant mail products are not cross-subsidizing competitive products. The framework relies on periodic cost studies and financial reporting, not restrictions on the Postal Service's ability to offer competitive products alongside its regulated services.

**Regulatory mechanism:** Attributable-cost tests, institutional cost contributions, periodic cost studies.

**Relevance to Condition (1):** The Postal Service's regulated revenue base "funds" its operations across both market-dominant and competitive segments. The PRC prevents cross-subsidization through cost attribution, not by prohibiting participation in competitive markets.

### 4. Centers for Medicare & Medicaid Services (CMS), 42 CFR § 413.24

CMS cost-reporting rules under 42 C.F.R. § 413.24 require hospitals and other providers that participate in Medicare to maintain adequate cost data and to allocate costs between Medicare and non-Medicare services using approved statistical methodologies. The regulations mandate that costs be adequately documented and that the allocation basis be consistent and verifiable. Providers are subject to audit by fiscal intermediaries and the Office of Inspector General to ensure that Medicare funds are not cross-subsidizing non-covered services.

**Regulatory mechanism:** Cost reports, approved allocation methodologies, fiscal intermediary audits.

**Relevance to Condition (1):** Hospitals receive substantial Medicare funding while also serving non-Medicare patients. CMS does not prohibit this dual-revenue structure; it requires cost allocation and audit to prevent cross-subsidization.

### 5. Federal Reserve, Regulation W (12 C.F.R. § 223)

Regulation W implements Sections 23A and 23B of the Federal Reserve Act, which govern transactions between a bank and its affiliates. The regulation limits the volume of covered transactions to 10% of capital per affiliate and 20% aggregate and imposes arms-length pricing requirements. Regulation W does not prohibit affiliate transactions; it structures them with quantitative limits, collateral requirements, and pricing standards to prevent the federal safety net, including deposit insurance, from subsidizing non-bank affiliates.

**Regulatory mechanism:** Quantitative transaction limits, arms-length pricing, collateral requirements.

Internal Use

**Relevance to Condition (1):** Banks are permitted to "fund" affiliates through covered transactions, subject to caps and pricing rules. The regulatory tool is transaction structuring, not a blanket prohibition on the funding relationship.

### 6. Office of the Comptroller of the Currency (OCC), 12 C.F.R. § 5.34

The OCC's operating subsidiary rules under 12 C.F.R. § 5.34 permit national banks to conduct activities through subsidiaries but require that transactions between the bank and its subsidiary comply with Sections 23A and 23B of the Federal Reserve Act. The framework employs structural safeguards, including separate accounting, independent management, and arms-length pricing to ensure that insured deposits do not subsidize subsidiary operations.

**Regulatory mechanism:** Sections 23A/23B compliance, separate accounting, arms-length pricing.

**Relevance to Condition (1):** Banks are permitted to fund and operate subsidiaries. The OCC prevents cross-subsidization through pricing and transparency requirements, not by banning the parent-subsidiary funding relationship.

### 7. State Public Utility Commissions (PUCs)

State utility regulators have developed extensive cross-subsidization frameworks for companies that operate in both regulated and competitive markets. These include Michigan's affiliated-transaction standards, Virginia's Code of Conduct for competitive energy affiliates, California's Affiliate Transaction Rules under CPUC Decision 06-12-029, and the NARUC Cost Allocation Guidelines. All follow a common pattern: they require fully distributed cost allocation, restrict below-market pricing to affiliates, mandate separate books and records, and impose audit obligations, while permitting the regulated utility to transact with affiliates.

**Regulatory mechanism:** Fully distributed cost allocation, affiliate Codes of Conduct, separate books and records, audit requirements.

**Relevance to Condition (1):** Regulated utilities are permitted to fund and transact with competitive affiliates. The concern about regulated revenues subsidizing competitive activities is addressed through cost allocation, not through prohibitions on the relationship.

### 8. Cost Accounting Standards Board (CAS), 48 C.F.R. § 9904

The CAS Board, established under 41 U.S.C. § 1501, promulgates cost accounting standards that apply to negotiated federal contracts and subcontracts. CAS 401 through CAS 420 require contractors to maintain consistent cost-allocation practices, ensure that costs are allocated to the proper cost objectives, and prevent the shifting of costs between government contracts and commercial work. The framework is entirely cost-allocation and audit-based; the government does not prohibit contractors from having commercial customers or affiliated entities.

**Regulatory mechanism:** Uniform cost-accounting standards, consistency in allocation, CAS administration by the CFAO, supported by audit.

11

Internal Use

**Relevance to Condition (1):** Federal contractors receive government funding while also serving commercial customers. The CAS framework prevents government funds from subsidizing commercial activities through cost accounting, not by banning dual revenue streams.

### 9. OMB Uniform Guidance, 2 C.F.R. Part 200

The Office of Management and Budget's Uniform Guidance (2 C.F.R. Part 200) establishes cost principles for all federal awards, including grants and cooperative agreements. Subpart E (Cost Principles) requires that recipients allocate costs to federal awards using methodologies that are consistent, auditable, and reflective of the benefits received. The Single Audit Act further requires recipients expending more than $1,000,000 in federal awards to undergo an annual independent audit. The framework applies to universities, nonprofits, and state and local governments, all of which routinely serve multiple funding sources, without restricting their ability to do so.

**Regulatory mechanism:** Uniform cost principles, benefits-received allocation, Single Audit Act.

**Relevance to Condition (1):** Grant recipients receive federal funding while also generating revenue from other sources. OMB prevents cross-subsidization through cost principles and audit, not by prohibiting recipients from having multiple revenue streams.

### 10. Federal Aviation Administration (FAA), 49 U.S.C. §§ 47107, 47133

Federal statutes require that airport revenue generated from federally funded airports be used exclusively for airport purposes. The FAA enforces these revenue-use requirements through audits, cost-center accounting, and reporting obligations under the Airport Improvement Program. Airport sponsors must demonstrate that revenue from aeronautical and non-aeronautical sources is not being diverted to non-airport purposes. The framework uses cost-center accounting and audit to ensure compliance.

**Regulatory mechanism:** Revenue-use restrictions, cost-center accounting, AIP compliance audits.

**Relevance to Condition (1):** Airports receive federal funding while generating revenue from diverse commercial activities. The FAA prevents diversion of funds through accounting and audit requirements, not by restricting airports' commercial relationships.

### Summary: Cross-Subsidization Regulatory Approaches

The following table summarizes the primary regulatory tool used by each framework:

| Regulatory Body | Framework | Primary Tool | Bans Funding Relationship? |
|---|---|---|---|
| FERC | 18 C.F.R. Part 35 | Cost allocation + audit | No |
| FCC | 47 C.F.R. Part 64 | Cost Allocation Manual | No |
| USPS / PRC | 39 U.S.C. § 3633 | Attributable-cost test | No |
| CMS | 42 C.F.R. § 413.24 | Cost reports + audit | No |
| Federal Reserve | Reg W / 12 CFR 223 | Transaction limits + pricing | No |

Internal Use

| Regulatory Body | Framework | Primary Tool | Bans Funding Relationship? |
|---|---|---|---|
| OCC | 12 C.F.R. § 5.39 | Separate accounting + pricing | No |
| State PUCs | Various | Cost allocation + Codes of Conduct | No |
| CAS Board | 48 C.F.R. § 9904 | Uniform cost standards + CAS administration and audit review | No |
| OMB | 2 C.F.R. Part 200 | Cost principles + Single Audit | No |
| FAA | 49 U.S.C. §§ 47107/47133 | Cost-center accounting + audit | No |
| USDA/RMA | MGR-26-002 | Three conditions (undefined terms) | Unclear |

**Implications for the new Bulletin**

As the table illustrates, every regulatory framework surveyed addresses cross-subsidization risk through cost-allocation standards, audit requirements, and transparency obligations. None prohibits the underlying funding relationship, whether it is a utility transacting with an affiliate, a hospital serving both Medicare and non-Medicare patients, or a federal contractor with commercial customers. The consistent approach is to ensure that costs are properly attributed and independently verified, so that funds from one activity are not used to subsidize another at below-market rates.

Condition (1) of MGR-26-002, as currently drafted, risks departing from this well-established regulatory consensus. By using the undefined term "funded" without reference to cost-allocation or audit standards, the bulletin could be read to prohibit funding relationships that every other federal agency permits, so long as adequate cost-allocation and audit safeguards are in place. The new bulletin presents an opportunity to align RMA's approach with the proven, audit-based frameworks used throughout the federal government, and to define "funding" by reference to whether AIP-paid revenues are being used to cross-subsidize below-market services to agencies outside the 2(g) exemption.

13

Internal Use